UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN K. GRELLE | * |
| 8525 Egret Meadow Lane | * |
| West Palm Beach, Florida  33412 | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | * |
| NATIONAL UNION FIRE INSURANCE | *  Case No.:_____ |
| COMPANY OF PITTSBURGH, PA. | * |
| 175 Water Street | * |
| New York, New York 10038 | * |
| | * |
| Defendant. | * |
| _____ | * |

## COMPLAINT

John Grelle ("Grelle"), by undersigned counsel, files this Complaint against National

Union Insurance Company of Pittsburg, Pa. ("National Union"), and in support thereof, states as

follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Grelle is a citizen of the State of Florida.

2.      Defendant National Union is a corporation domiciled in Pennsylvania with its

principal place of business in New York, and does business in the District of Columbia.  At all

times relevant hereto, National Union transacted business in Washington, D.C., and in fact wrote

the policies in question to Ullico, Inc., which has a principal place of business in Washington,

D.C.

3.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the

amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and the

action is between citizens of different states.  Also, previously filed, related cases involving these

parties and arising from the same operative facts have been transferred to this Court. [1]

4.       Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §§2201 and 2202 because this action seeks a declaratory judgment determining the rights of Grelle and the liability of National Union.  The Court has jurisdiction over the ancillary common law bad faith and breach of contract claims because they arise out of the same set of operative facts as the substantive federal law claims.

5.       Venue is proper in this judicial district, where the contract at issue was negotiated and where a substantial part of the events or omissions giving rise to the claim occurred.

## UNDERLYING FACTS

6.       ULLICO, Inc. ("Ullico") is a corporation formed under the laws of the State of Maryland and having its principal place of business in the District of Columbia.  Ullico sponsored certain pension benefit plans.

7.       Ullico employed Grelle who was Ullico's Senior Vice President and Chief Financial Officer and its Vice President and Chief Legal Officer from January 2, 1996 until February 25, 2003.

8.       An actual controversy has arisen between Grelle and National Union.  The controversy arises from National Union's wrongful refusal--despite proper notice and requests for coverage--to provide full indemnity and a full defense to Grelle under applicable polices of insurance for certain litigation claims brought against him by Ullico, Inc. as described below.

### The Carabillo Litigation and Counterclaims

### Carabillo I

9.       Ullico employed Joseph Carabillo ("Carabillo") (a lawyer) as its Vice President

---

[1] Carabillo I is one of a series of related cases that have been consolidated and stayed.  The other related cases include 1:04CV00776, 1:03-cv-01556, and 1:06CV00080.

and Chief Legal Officer from March 2, 1987 until June of 2003.

10.     On July 18, 2003, Carabillo filed Civil Action No. 1:03CV01556 in the United States District Court for the District of Columbia, challenging the actions of Ullico's Acting President and alleging that Ullico, following a change of control and acting through new management, breached a contract with him, wrongfully terminated him, and deprived him of his statutory rights under the Employee Retirement Income Security Act.

11.     Ullico, along with four other parties joining it, asserted a counterclaim against Carabillo and Grelle on October 17, 2003 (amended November 3, 2003), alleging that:

> a.  Grelle had engaged in "self-interested transactions" with Ullico with respect to 1998 and 1999 Stock Offer Programs and Ullico's Actual 2000 Stock Repurchase Program.  More specifically, the Counterclaim plaintiffs accuse Grelle of breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, and unjust enrichment (Count III);
>
> b.  Due to the alleged actions of Grelle, including (*inter alia*) allegedly implementing Amendments to Ullico's Qualified Pension Plan and Trust, and actions allegedly taken for Ullico's Benefits Committee, (said committee functions are allegedly fiduciary functions geared to administer welfare and benefits plans for Ullico, and its subsidiaries and affiliates) Grelle purportedly breached a fiduciary duty of care to the Ullico Plans and is allegedly disqualified from receiving benefits under the Ullico Plans (Count VI);
>
> c.  By allegedly receiving a distribution from a Deferred Compensation Plan, Grelle violated a Fiduciary Duty to Ullico (Count IX); and,
>
> d.  Due to the alleged issuance of loans by Ullico to a Nephew of Ullico's former President, Robert Georgine, Grelle allegedly breached a fiduciary duty of care to Ullico (Count XIII).

Ullico's Counterclaim from Carabillo I is attached as **Ex. 1**.

12.     The Counterclaim alleges that Grelle engaged in alleged Wrongful Acts during the period of 1998-2001, but several of the Counterclaimants' averments go back to 1997 and before.

13.     On November 18, 2003, Grelle filed an Answer to Counterclaim denying the allegations that Ullico made against him in Carabillo I, and it is attached as **Ex. 2**.

### Carabillo II

14.     On May 13, 2004, Carabillo filed Civil Action 1:04CV00776 (RJL)  in the United States District Court for the District of Columbia, challenging the actions of ULLICO Inc. Pension Plan and Trust (the "Qualified Plan") and others seeking benefits under the terms of  the Qualified Plan.

15.     On July 26, 2004, Ullico, Inc., and the Qualified Plan filed an Answer and Counterclaims against Carabillo, Grelle and others alleging that the Counterclaim Defendants breached fiduciary duties to the Qualified Plan and other plans sponsored by Ullico. **Ex. 3.**

16.   Grelle is also a party Defendant to Ullico Inc.,  v. Robert Georgine, *et al,* 04-00036, in the Superior Court for the District of Columbia (hereinafter "the Superior Court Litigation"), which was filed on January 16, 2004, and stayed shortly thereafter.  The allegations against Grelle from the Superior Court Litigation substantially identical to those that Ullico asserts in Carabillo I.

### The National Union Insurance Policies

### The Directors and Officers Insurance Policies

17.     National Union issued Ullico a "Directors, Officers and Private Company Liability Insurance Policy," (the "Directors and Officers Policy") Policy No. 495-36-84 (policy period July October 30, 2002 to October 30, 2003, with Run-off Endorsement (Endorsement #14) applicable July 19, 2003 to July 19, 2009.  The Directors and Officers Policy is attached as **Ex. 4.**

18.     Upon information and belief, National Union also issued Ullico a "Directors,

Officers and Private Company Liability Insurance Policy", (the "Directors and Officers Policy"), Policy No. 299-96-17, with a policy period of July 19, 2002-July 19, 2003, (the "2003 Directors and Officer's Policy). The 2003 Directors and Officer's Policy has a limit of liability of $10,000,000 and retention of $750,000.00.

19.     The Directors and Officers Policy's coverage extends:

to every director, officer, and employee of the company arising from a claim made against such insured during the policy period or the discovery period and reported to the insurer pursuant to the terms of the policy for any actual or alleged wrongful act in their respective capacities and as directors, officers or employees of the company. . .

**Ex. 4**. at "Insurance Agreements," p. 1.

18.     Under the Directors and Officer Policy, the term "Insured" includes any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company, but only in their capacities as such,  or when serving in the capacity as director, officer or trustee or governor of an outside entity, if such service is as the specific written request of Ullico.  Insured also includes any employee of Ullico.  *Id.*  at §2 (Definitions).

19.     The policy allows an Insured to tender his defense and requires the insurer to advance defense costs for covered claims.  The Directors and Officers policy states that "Defense Costs" means "reasonable and necessary attorneys fees, costs, and expenses…resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds."  *Id.* at ¶2 (e) ("Definitions").

19.     Under the Directors and Officers Policy, a "Claim" includes (but is not limited to) a "written demand for monetary or non-monetary relief," and "a civil proceeding commenced by filing a Complaint or similar proceeding."

**Employee Benefit Plan Fiduciary Liability**
**Insurance Policies 548-03-72, 874-44-03 and 495-38-35**

**The 2003 Policy - Policy Number 548-03-72**

20.      National Union issued Ullico an "Employee Benefit Fiduciary Liability Policy" with a policy period of October 30, 2003 to October 30, 2004 (the "2003 Policy"), *i.e.,* Policy Number 495-38-35.    The 2003 Policy has a stated limit of liability of $5,000,000.  The 2003 Policy is attached as **Ex. 5**.

21.      The 2003 Policy requires the Insurer to pay the Loss of each and every Insured arising from a Claim against an Insured for any actual or alleged Wrongful Act.  *Id.*  § 1 (a) (Insuring Agreements).  Under the Policy, "Loss" includes damages judgments, settlements and Defenses Costs."  *Id.* at §3 ("Definitions").

22.      Under the 2003 Policy, an "Insured" is any past, present, or future natural person director, officer, partner, governor, general partner, management committee member, member of the board of managers, or employee of the sponsor organization or if applicable, a Plan…" in his or her capacity as a fiduciary, administrator or trustee of a plan.  *Id.* at §3 ("Definitions").

23.      The 2003 Policy includes the duty to defend any Claim against an Insured alleging a Wrongful Act, even if the claim is groundless, false or fraudulent.  *Id.* at §2 (a) ("Defense Agreement").

24.      The 2003 Policy defines the term "Wrongful Act" to include  *inter alia*, a violation of any of the responsibilities, obligations, or duties imposed upon fiduciaries by the employee benefit law with respect to a plan, any matter claimed against an insured arising out of his service as a fiduciary or  any matter claimed against him or arising out of his or her service as a fiduciary or administrator of any multiemployer plan.  *Id.* at §3 ("Definitions").

25.      Under the 2003 Policy, National Union is required to advance Defense Costs to

the Insured prior to the final disposition of a Claim, and required to defend any Claim against the Insured arising from a Wrongful Act, even if the Claim against the Insured is groundless, false, or fraudulent.  *Id.* at § 2 (c) ("Defense Agreement").  "Defense Costs" include reasonable and necessary fees costs and expenses consented to in writing by the insurer resulting from the investigation, adjustment, defense and appeal of a claim against an insured.  *Id.* at §3 ("Definitions").

26.　　The 2003 Policy's definition of  "Claim" includes civil proceedings for monetary, non-monetary, or injunctive relief, which are commenced by the service of a complaint or similar pleading. *Id.* at §3 ("Definitions").

## The 2002 Policy  - Policy Number 495-38-35

27.　　National Union issued Ullico an Employee Benefit Fiduciary Liability Policy with a policy period of October 30, 2002 to October 30, 2003 (the "2002 Policy"), *i.e.,* Policy Number 495-38-35.  The 2002 Policy has a stated limit of liability of $5,000,000.  The 2002 Policy is attached as **Ex. 6**.

28.　　Under the 2002 Policy, an "Insured" is any past, present, or future natural person director, officer, partner, governor, general partner, management committee member, member of the board of managers, or employee of the sponsor organization or if applicable, a Plan in his or her capacity as a fiduciary, administrator or trustee of a Plan.

29.　　The 2002 Policy requires the Insurer to pay the Loss of each and every Insured arising from a Claim against an Insured for any actual or alleged Wrongful Act by an Insured. *Id.*  § 1 (a) (Insuring Agreements).  Under the Policy, "Loss" includes damages judgments, settlements and defense costs."  *Id.* at §3 ("Definitions").

30.　　The 2002 Policy defines the term "Wrongful Act" to include  *inter alia*, a

violation of any of the responsibilities, obligations, or duties imposed upon fiduciaries by the employee benefit law with respect to a plan, and any matter claimed against an Insured arising out of his service as a Fiduciary or Plan Administrator by reason of his or her status as a fiduciary. *Id.* at §3 (a) ("Definitions").

31.    Under the 2002 Policy, National Union is required to advance Defense Costs to the Insured prior to the final disposition of a Claim, and required to defend any Claim against the Insured arising from a Wrongful Act, even if the Claim against the Insured is groundless, false, or fraudulent. *Id.* at § 2 (c) ("Defense Agreement").  "Defense Costs" include reasonable and necessary fees costs and expenses consented to in writing by the insurer resulting from the investigation, adjustment, defense and appeal of a claim against an insured. *Id.* at §3 (c) ("Definitions").

32.    The 2002 Policy's definition of  "Claim" includes civil proceedings for monetary, non-monetary, or injunctive relief, which are commenced by the service of a complaint or similar pleading. *Id.* at §3 (a) ("Definitions").

33.    Under the 2002 Policy, an insured is any past, present, or future natural person director, officer, partner, or employee of the sponsor organization of a plan in his capacity as a fiduciary, administrator or trustee of a plan. *Id.* at §3 ("Definitions").

**The 2001 Policy  - Policy Number 874-44-03**

34.    National Union issued Ullico an Employee Benefit Fiduciary Liability (Insurance Policy No. 87-44-03) with a policy period of October 30, 2001 to October 30, 2002 (the "2001 Policy"), and a $5,000,000 limit of liability.  **Ex. 7**.

35.    The 2001 Policy requires the Insurer to pay the Loss of each and every Insured arising from a Claim against an Insured for any actual or alleged Wrongful Act by an Insured.

*Id.* § 1 (a) (Insuring Agreements).  Under the Policy, "Loss" includes damages judgments, settlements and Defense Costs.  *Id.* at §3 ("Definitions").

36.    The 2001 Policy includes the duty to defend any claim against an insured alleging a Wrongful Act, even if the claim is groundless, false or fraudulent. *Id.* at §2 (a) ("Defense Agreement").

37.    The 2001 Policy defines the term "Wrongful Act" to include  *inter alia*, a violation of any of the responsibilities, obligations, or duties imposed upon fiduciaries by the employee benefit law with respect to a plan, and any matter claimed against an insured arising out of his service as a Fiduciary or Plan Administrator by reason of his or her status as a fiduciary. *Id.* at §3 (a) ("Definitions").

38.    Under the 2001 Policy, National Union is required to advance Defense Costs to the Insured prior to the final disposition of a Claim, and required to defend any Claim against the Insured arising from a Wrongful Act, even if the Claim against the Insured is groundless, false, or fraudulent. *Id.* at § 2 (c) ("Defense Agreement").

39.    The 2001 Policy defines "Claim" to include a civil proceeding for monetary, non-monetary, or injunctive relief, which is commenced by the service of a complaint or similar proceeding.  *Id.* at §3 (c) ("Definitions").

40.    Under the 2001 Policy, an "Insured" is "any past, present, or future natural person director, officer, partner, or employee of the Sponsor organization or if applicable,  a Plan…" in his or her capacity as a Fiduciary, Administrator or trustee of a Plan. *Id.* at §3 ("Definitions").

41.    Together the 2001 Policy, 2002 Policy and 2003 Policies are referred to as the "Fiduciary Policies."

42.    Grelle is an "insured" under each of the National Union insurance policies

described *supra*.

## The Demands for Coverage

43.    On April 13, 2004, Grelle, through his counsel, issued a letter to National Union that tendered Ullico's Counterclaim in Carabillo I to National Union for defense and indemnity, and a copy of which is attached as **Ex. 8**.

44.    On April 30, 2004, National Union, (through its administrator AIG Technical Services, Inc.)  responded to Grelle's request for coverage and denied any coverage under the Directors and Officers Policy, and a copy of that denial letter is attached as **Ex. 9**.

45.    National Union wrongfully denied coverage to Grelle for Carabillo I under the Directors and Officers Policy and under the 2003 Directors and Officers Policy.  National Union's stated reason for denying coverage under these Directors and Officers Policies was that the "insured versus insured" exclusion stated in provision  4 (i) of the policy excluded the claim from coverage.

46.     National Union's denial of coverage under the Directors and Officers Policy and under the 2003 Directors and Officers Policy was wrongful because several of the Counterclaim-Plaintiffs who have made claims against Grelle in Carabillo I are not "Insureds" as defined by the Directors and Officers Policy.   For this reason and others, National Union wrongfully denied coverage to Grelle under Directors and Officers Policy.

47.    On August 18, 2004, Grelle, through his counsel, issued a letter to National Union that tendered Ullico's Counterclaim in Carabillo II to National Union for defense and  indemnity under *all* applicable policies, including specifically, the 2003 Fiduciary Policy.   The August 18, 2004 letter is attached as **Ex. 10**.

48.    By letter dated October 29, 2004, National Union, by and through its counsel

responded to Grelle's demand for coverage under the Fiduciary Policies and denied him coverage for any of the Counts against him in Ullico's Carabillo I Counterclaim. The October 29, 2004 letter is attached as **Ex. 11.**

49.    While the October 29, 2004 letter is lengthy, the gravamen of National Union's denial of any coverage for the Counterclaims under the 2003 Fiduciary Policy was its contention that the events of the Carabillo I Counterclaim "arose out of" or were "related to" subpoenas that the United States Department of Labor ("DOL") issued to Ullico, Inc. (the "DOL Investigation") and thus were precluded by Endorsement 12, which addressed the DOL Investigation and excluded coverage. National Union's October 29, 2004 letter provided no coverage analysis with respect to the 2002 Fiduciary Policy and thus, effectively and wrongfully denied Grelle coverage thereunder. National Union also contended that two of the counts from the Carabillo I Counterclaim that Grelle faced (Counts III and XIII) did not fall within the 2001 Policy's definition of "Wrongful Act."

50.    By letter dated November 29, 2004, National Union, by and through its counsel responded to Grelle's demand for coverage under the Fiduciary Policies and granted him coverage under a reservation of rights for the Counts against him in Ullico's Carabillo II Counterclaim under the 2001 Fiduciary Policy only. The November 29, 2004 letter is attached as **Ex. 12**.

51.    Because the November 29, 2004 letter completely failed (despite Grelle's request) to address coverage under the Directors and Officers Policies, National Union effectively denied Grelle any coverage under the Directors and Officers Policies for the Counterclaim against him in Carabillo II.

52.    By letter dated December 14, 2004 (attached as **Ex. 13**), National Union, by and

through its counsel, revised National Union's response to Grelle's demand for coverage under the Fiduciary Policies and granted him coverage under a reservation of rights for Counts VI and IX. National Union continued to deny coverage to Grelle for Counts III and XIII in Ullico's Carabillo I Counterclaim under the 2001 Fiduciary Policy for the reasons stated in National Union's October 29, 2004 letter. *See* **Ex. 11**.

53.    National Union wrongfully denied coverage to Grelle under the 2002 Fiduciary Policy and/or the 2003 Fiduciary Policy because some of the claims that Ullico asserts in its Carabillo I and Carabillo II Counterclaims and the Superior Court Litigation do not arise out of or relate to the DOL Investigation.

54.    National Union wrongfully denied coverage to Grelle under the Fiduciary Policies for Counts III and XIII from the Carabillo I Counterclaim because those Counts involving responsibilities imposed upon fiduciaries by Employee Benefit Law with Respect to a Plan and claims made against an Insured (Grelle) with respect to a Plan, and thus qualify as Wrongful Acts or alleged Wrongful Acts under the Policy that entitle Grelle to coverage.

55.    Alternatively, if (as National Union claims) the matters alleged in Counts III and XIII of Carabillo I do not qualify as Wrongful Acts under the Fiduciary Policies, then Grelle is entitled to indemnity and a defense for those Counts under the Directors and Officers Policies.

56.    Because the Counterclaim in Carabillo I is substantively identical to Ullico's Complaint in the Superior Court Litigation, National Union must provide indemnity and a full defense to Grelle in the Superior Court Litigation for the same reasons that warrant indemnity and a full defense in the Carabillo Litigation

57.    Grelle may qualify as an Insured under other applicable National Union Policies copies of which he has requested but has not received.

58.    Grelle may be entitled to a defense and indemnity from or National Union under other applicable National Union policies, copies of which he has requested but has not received.

59.    Grelle properly reported the claims and litigation that Ullico has brought against him to National Union, and in fact National Union has acknowledged notice of the claims by responding to Grelle and making coverage determinations for him under some of the applicable policies.

60.    Grelle has satisfied all conditions precedent to coverage under the various National Union policies discussed herein.

61.    Nonetheless, without reasonable justification, Defendants have refused to provide the full coverage, indemnity and a defense to Grelle that he is entitled to receive under the Directors and Officers Policies, or the various Fiduciary Policies, and thus is in breach of its obligations under the aforesaid Policies.  Said denials of coverage were arbitrary, capricious and vexatious.

62.    As a result of aforesaid breach, Grelle has suffered damages including sums expended in his defense of Ullico's claims against him, and costs of pursuing full coverage from National Union as he is entitled.  Furthermore, as the Carabillo I and II cases progress, Grelle will face additional defense costs as well as potential liability should he receive an adverse judgment or settlement from the litigation.

63.    Upon information and belief, the amount of coverage under the 2001 Fiduciary Policy is substantially depleted and may be exhausted.

<u>**COUNT I-  BREACH OF CONTRACT**</u>

64.    Grelle incorporates all of the allegations of all preceding paragraphs herein.

65.    National Union has breached its obligations to Grelle under the Directors and

13

Officers Policies and the Fiduciary Policies, by refusing refusing to provide Grelle with full coverage, indemnity and/or a full defense in the Carabillo Litigation and the Superior Court Litigation. National Union's refusal to provide Grelle with full coverage and a full defense is not justified by the terms of the applicable policies.

66.     As a direct consequence of aforesaid breach, Grelle has suffered damages including costs, expenses, and attorney's fees expended in his defense of Ullico's claims against him, and costs of pursuing full coverage from National Union as he is entitled. Furthermore, as the Carabillo I and II and Superior Court cases proceed, Grelle will face additional defense costs as well as potential liability should he receive an adverse judgment or settlement from the aforementioned litigation.

67.     National Union is liable to Grelle for damages, together with the costs and expenses that he has incurred in prosecuting this action, including but not limited to reasonable attorney's fees, and pre-judgment and post-judgment interest.

WHEREFORE, Grelle demands judgment in his favor against National Union:

a)      Finding that National Union has breached its obligations to Grelle to provide him indemnity and a defense under the applicable policies;

b)      Requiring National Union to pay the costs of Grelle's defense of Ullico's claims, the Carabillo I and II Counterclaims and the Superior Court Litigation, and provide him full coverage and indemnity for those claims;

c)       For money damages in an amount to be determined, but not less than $500,000, together with pre-judgment and post-judgment interest;

d)      For costs of suit;

d)      For attorney's fees; and,

e)    For such other relief as the Court may deem just and proper.

## COUNT II-DECLARATORY JUDGMENT

68.    Grelle incorporates all of the allegations of all preceding paragraphs herein.

69.    Grelle has sought coverage, indemnity and a defense from National Union with respect to the claims of Carabillo I and II, and the Superior Court Litigation.

70.    National Union has denied coverage for the Carabillo and Superior Court Litigation under the Fiduciary Policies and the Directors and Officers Policies either in part or entirely, and have reserved their rights with respect to the terms, conditions, endorsements, and exclusions that National Union contends currently preclude, or in the future may preclude coverage to Grelle.

71.    An actual and justiciable controversy exists between the parties with respect to their rights and duties under the Fiduciary Policies and the Directors and Officers Policies.

WHEREFORE, Grelle prays that this Court enter a Declaratory Judgment,

a)    Construing the provisions of the Fiduciary Policies and the Directors and Officers Policies and determining the respective rights and liabilities of the Plaintiff and Defendant thereunder, and under the circumstances of the Carabillo I and Carabillo II litigation and the Superior Court Litigation;

b)    Directing Defendant to assume the defense of Plaintiff for all Counts asserted against Plaintiff in the Carabillo Litigation and Superior Court Litigation under the Directors and Officers Policies and /or the Fiduciary Policies;

c)    Directing Defendant to pay all judgments, attorneys fees, and costs that may be rendered against Plaintiff in the Carabillo Litigation, and Superior Court Litigation;

d)    Directing Defendant to pay all money that Plaintiff has expended and has  become

obligated to pay as costs, expenses and attorneys fees that Plaintiff incurred in the prosecution of the Carabillo Litigation and Superior Court Litigation up through the day of entry of a final order following the exhaustion of all appeals; and,

e)      For such other relief as the Court may deem just and proper.

## COUNT III-BAD FAITH

72.      National Union's denial of full coverage and a defense to Grelle under the Fiduciary Policies and the Directors and Officers, through its agents, is in gross derogation of an insurer's obligation to make a good faith evaluation of its duty to defend based on the allegations in the Counterclaims from Carabillo I and II, and the Complaint in the Superior Court Litigation, and whether such allegations are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy.

73.      As a direct result of National Union's bad faith action and denials of coverage to Grelle, Grelle has been wrongfully deprived of a full defense and indemnification, and as a result, has suffered annoyance, aggravation, and inconvenience.

74.      National Union's failure and refusal to honor its obligations to Grelle constitutes extreme and outrageous behavior.

75.      With its facially deficient coverage evaluation as to the Directors and Officers Policy, National Union has intentionally or recklessly caused Grelle severe emotional distress.

WHEREFORE, Grelle demands judgment in his favor against National Union for:

a.      An order that National Union reimburse him for costs previously expended in defense of the litigation brought by ULLICO, et al.;

b.      Damages for aggravation and inconvenience in the amount of $500,000;

e.      Punitive damages;

f.      Pre- and post-judgment interest; and

16

g.     Any such other relief as this Court deems appropriate under these facts.


                                        Respectfully submitted,


<u>4/26/2007</u>                        _____/s/_____
Date                                    Timothy C. Lynch, Unified Bar No. 461651
                                        tlynch@offitkurman.com
                                        (301) 575-0336
                                        Offit Kurman, P.A.
                                        8171 Maple Lawn Boulevard, Suite 200
                                        Maple Lawn, Maryland 20759


                                        _____/s/_____
                                        Eric J. Pelletier, Unified Bar No. 454794
                                        epelletier@offitkurman.com
                                        (301) 575-0339
                                        Offit Kurman, P.A.
                                        8171 Maple Lawn Boulevard, Suite 200
                                        Maple Lawn, Maryland 20759

                                        *Attorneys for John Grelle*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH A. CARABILLO,<br><br>        Plaintiff,<br><br>    v.<br><br>ULLICO INC.,<br><br>        Defendant.<br><br>_____<br><br>ULLICO INC., THE UNION<br>LABOR LIFE INSURANCE<br>COMPANY, THE ULLICO INC.<br>NON-QUALIFIED DEFERRED<br>COMPENSATION PLAN,<br>THE UNION LABOR LIFE<br>AUXILIARY RETIREMENT<br>BENEFITS PLAN, and MARK<br>SINGLETON, in his capacity as<br>a Plan Administrator,<br><br>        Counterclaim Plaintiffs,<br><br>    v.<br><br>JOSEPH A CARABILLO, ROBERT<br>A. GEORGINE, JOHN K. GRELLE,<br>JAMES W. LUCE; ANN J.<br>O'BRIEN, TRUSTEE,<br>ROBERT A. AND MARY RITA<br>GEORGINE TRUST; and PACIFIC<br>LIFE INSURANCE COMPANY,<br><br>        Counterclaim Defendants.<br>_____ | CASE NUMBER:  1:03CV01556(RLJ)<br><br>DECK TYPE: Labor/ERISA (non-employment) |

## AMENDED ANSWER AND COUNTERCLAIM

Defendant and counterclaim plaintiffs file this Amended Answer and Counterclaim pursuant to Fed. R. Civ. R. 15.

## ANSWER

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff has failed to exhaust his administrative remedies with respect to Claim I.

### THIRD DEFENSE

Plaintiff's common law claims set forth in Claims II and III are preempted under ERISA.

### FOURTH DEFENSE

Plaintiff has engaged in material breaches of his duty and obligations owed to ULLICO Inc. ("ULLICO"), and is therefore precluded and otherwise barred from obtaining the relief sought.

### FIFTH DEFENSE

Plaintiff failed to satisfy the conditions to receive, and has not otherwise qualified to receive, the benefits claimed.

### SIXTH DEFENSE

Responding to the specific allegations of the Complaint, defendant ULLICO Inc.:

1.     Affirmatively alleges that the allegations of paragraph 1 are legal conclusions to which no response is necessary, but to the extent that there are any allegations of wrongdoing, improper conduct or causation in any respect such allegations are denied.

2.     Admits the allegations of paragraph 2.

2

3.    Admits the venue is proper in this district; and denies the remaining allegations of paragraph 3.

4.    Admits that plaintiff was employed by defendant in the District of Columbia at or around the time of the events giving rise to the Complaint; and does not have knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 4.

5.    Admits the allegations of paragraph 5.

6.    Admits plaintiff was employed by defendant and that he worked for ULLICO in the District of Columbia; and denies the remaining allegations of paragraph 6.

7.    Does not have knowledge or information sufficient to form a belief as to the age of plaintiff; and admits the remaining allegations of paragraph 7.

8.    Admits that ULLICO's Board of Directors approved the June 1, 2003 Early Retirement Program on or about April 16, 2003, and that plaintiff received a letter concerning his participation in this Early Retirement Program; and denies the remaining allegations of paragraph 8.

9.    Admits that plaintiff was informed of ULLICO's June 1, 2003 Early Retirement Program; and that plaintiff timely responded to it; and denies the remaining allegations of paragraph 9.

10.    Admits the allegations of paragraph 10.

11.    Admits that by letter dated May 7, 2003, plaintiff received an acknowledgement; and denies the remaining allegations of paragraph 11.

12.    Admits that plaintiff ceased to function as defendant's chief legal officer beginning in March 2003; and denies the remaining allegations of paragraph 12.

13.    Admits plaintiff cleaned out his desk and office; that there occurred certain correspondence with ULLICO employees concerning the June 1, 2003, Early Retirement Program and benefits under that program; that he had wound up all his ULLICO duties and responsibilities and ceased in all respects to function as an employee; and does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13.

14.    Admits that by letter marked Friday, May 30, 2003, the Acting President of ULLICO terminated plaintiff's employment for cause and removed him as an officer of ULLICO and from any positions he may hold with any related or affiliated entities because, among other reasons, management had lost confidence in him; and denies the remaining allegations of paragraph 14.

15.    Denies the allegations of paragraph 15.

**As to Claim I – ERISA Violation:**

16.    Denies the allegations of paragraph 16.

17.    Denies all allegations of direct and proximate result; and admits that plaintiff is being denied retirement benefits under the June 1, 2003 Early Retirement Program; that he is not receiving pension payments, health insurance coverage and life insurance coverage under the June 1, 2003 Early Retirement Program; and denies the remaining allegations of paragraph 17.

**As to Claim II – Breach of Contract:**

18.    Denies the allegations of paragraph 18.

19.    Denies the allegations of paragraph 19.

20.    Denies the allegations of paragraph 20.

4

## As to Claim III — Wrongful Termination:

21.    Denies the allegations of paragraph 21.

22.    Denies the allegations of paragraph 22.

23.    Denies the allegations of paragraph 23.

### SEVENTH DEFENSE

Plaintiff is not entitled to the relief sought.

### COUNTERCLAIM
(Breach of Fiduciary Duty, Breach of Contract,
Declaratory Judgment)

1.    This counterclaim seeks compensatory and equitable relief in connection with millions of dollars in windfall profits and other benefits that plaintiff and counterclaim defendant Joseph Carabillo ("Carabillo") and certain other corporate insiders joined as counterclaim defendants reaped through self-dealing primarily during the period 1998-2001, all at the expense of, and in violation of their fiduciary and contractual duties to, ULLICO and its shareholders.

### Jurisdiction and Venue

2.    This Court has jurisdiction pursuant to Fed. R. Civ. P 13, 19 and 20, 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1332 (diversity of citizenship), 29 U.S.C. § 1132(a)(3) (ERISA), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 2201 (Declaratory Judgment) and also under the doctrines of pendent and ancillary jurisdiction. The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and 29 U.S.C. § 1132(e)(2). This Court has personal jurisdiction over the counterclaim defendants pursuant to Fed. R. Civ. P. 4(e) and (k) and 13, and D.C. Code §13-423.

## Parties

3.     Counterclaim Plaintiff ULLICO Inc. is a corporation formed under the laws of the state of Maryland, with its principal place of business in the District of Columbia ("ULLICO"). ULLICO was created in 1987 as a holding company in order to raise capital for its various subsidiaries that provide insurance, pension, health and management and lending services to unions, union members and their families, and benefit funds. Its subsidiaries include counterclaim plaintiff The Union Labor Life Insurance Company, formed in 1925, to provide life insurance to union members in high-risk jobs. ULLICO's Board of Directors has historically consisted primarily of present or former officers of unions affiliated with the AFL-CIO and their affiliated Taft-Hartley funds, who are major ULLICO shareholders. It also serves as a Plan Administrator for the Union Labor Life Auxiliary Retirement Benefits Plan, or its successor.

4.     Counterclaim Plaintiff The Union Labor Life Insurance Company ("Union Labor Life") is a Maryland corporation with its principle place of business in the District of Columbia, and created The Union Labor Life Auxiliary Retirement Benefits Plan.

5.     Counterclaim Plaintiff ULLICO Inc. Non-Qualified Deferred Compensation Plan is an employee benefits plan, purportedly established by ULLICO, effective as of August 1, 1998.

6.     Counterclaim Plaintiff Union Labor Life Auxiliary Retirement Benefits Plan is an employee benefits plan, established by Union Labor Life Insurance Company effective as of January 1, 1983.

7.     Counterclaim Plaintiff Mark Singleton if the Chief Financial Officer of ULLICO Inc., serves as a Plan Administrator for the Qualified Pension Plan and Trust and Deferred

6

Compensation Plan, and joins as a counterclaim plaintiff solely in his capacity as a Plan Administrator.

8.    Counterclaim Defendant Robert Georgine ("Georgine") is a citizen of the State of Maryland and served as Chairman of the Board of Directors of ULLICO and its Executive Committee. He was employed by ULLICO as its Chairman beginning on December 5, 1990, and as President and Chief Executive Officer beginning on May 6, 1997, until May 8, 2003, when he ceased to serve as Chairman and CEO and resigned as President under the imminent threat of dismissal for cause.

9.    Counterclaim Defendant Joseph Carabillo ("Carabillo") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as the Company's Chief Legal Officer from March 2, 1987 until he was terminated for cause on May 30, 2003.

10.    Counterclaim Defendant John K. Grelle ("Grelle") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as a Senior Vice President and Chief Financial Officer of the Company from January 2, 1996, until his resignation on February 25, 2003.

11.    Counterclaim Defendant James W. Luce ("Luce") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as an Executive Vice President of the Company from February 14, 1983, until his retirement, effective June 1, 2003. For the purposes of the counterclaim, counterclaim defendants Georgine, Carabillo, Grelle and Luce are collectively referred to as the "counterclaim defendant officers."

12.    Counterclaim Defendant Ann J. O'Brien, Trustee is named as a counterclaim defendant solely in her capacity as Trustee of the Robert A. and Mary Rita Georgine Life Insurance Trust and solely for the purposes of adjudicating the rights of ULLICO and

7

counterclaim defendant Robert A. Georgine under the Split Dollar Life Insurance Agreement and related insurance policy.

13.    Counterclaim Defendant Pacific Life Insurance Company is the issuer of Pacific Estate Preserver, Policy No. 1A23725140, which is owned by the Robert A. and Mary Rita Georgine Trust and issued in connection with the Split Dollar Life Insurance Agreement between ULLICO Inc. and the Robert A. and Mary Rita Georgine Life Insurance Trust entered into as part of defendant Robert A. Georgine's Employment Agreement, effective October 1, 1999.

**Facts**
**(General Allegations As To All Counts)**

14.    During the relevant period, ULLICO was a privately held corporation with three classes of stock that consist of (i) voting Capital Stock; (ii) Class A voting stock; and (iii) Class B non-voting stock. By June 1998, ULLICO had issued and outstanding approximately 256,000 shares of Capital Stock, 6.7 million shares of Class A stock, and 753,000 shares of Class B stock.

**ULLICO Invests in Global Crossing**

15.    In February 1997, the Board approved as part of a private equity investment program an investment of $7.6 million in a new non-public company called Nautilus LLC, the predecessor of Global Crossing.

16.    In August 1998, Global Crossing became a publicly traded company with its initial public offering, at which time ULLICO's share of Global Crossing was worth more than 30 times its initial investment; over the life of that investment, ULLICO realized a gross profit of approximately $486 million on its original investment.

17.    Throughout 1998 and 1999, Global Crossing's value continued to rise dramatically so that by the end of 1999, ULLICO's unrealized and after tax realized gains on its Global Crossing investment was more than $1 billion or 85% of ULLICO's total stockholders'

8

equity. Because of the skyrocketing value of Global Crossing stock, the book value of
ULLICO's stock increased nearly 600% between December 31, 1997 and December 31, 1999.

### ULLICO Adopts a Formal Repurchase Program in 1997

18.     Before 1997, ULLICO paid high annual cash and stock dividends, typically in the
range of an annual 8% cash and 10% stock dividend. However, in the spring of 1997 the Board
decided to use a share redemption program to replace dividends as the principal means to
distribute to shareholders a return on their investment and also to provide liquidity for ULLICO's
larger shareholders.

19.     In May 1997, in order to implement its decision to transition away from dividends
to shareholder distributions through stock redemptions, the ULLICO Board approved a formal
stock repurchase program, under which ULLICO would repurchase shares of ULLICO Class A
and B stock that had been acquired through what had been known as the preferred certificate
program (the "1997 Repurchase Program"). The 1997 Repurchase Program envisioned that
ULLICO would be allowed to repurchase $180 million in Class A and B stock over 11 years,
with $30 million of stock being repurchased in 1997 and $15 million in each of the following 10
years. Consistent with the business purpose for the 1997 Repurchase Program, ULLICO
decreased its dividend from 8% in 1996 to 2% in 1997 and 1998 and eliminated dividends
completely in 1999.

20.     Consistent with its business objective to replace dividends with other types of
distributions, the Board envisioned that to the extent more shares were tendered than could be
repurchased with the funds allocated for any particular repurchase program, the share
redemptions would be prorated based on the total number of shares tendered, thereby ensuring
the proportionate and equitable distribution of ULLICO's funds among shareholders. The only

9

exception authorized by the Board would be among holders of 10 or fewer shares who tendered shares, all of which would be repurchased without proration. However, prior to the actual commencement of the 1997 Repurchase Program, the proration threshold was raised from 10 to 10,000 shares. This change in threshold was never approved by the Board or the Executive Committee.

### ULLICO Adopts a New Share Price Valuation System in Connection With the 1997 Repurchase Program

21.    Historically, the price of ULLICO's stock had been set at $25 per share. In order to facilitate the 1997 Repurchase Program, the Board decided that beginning in May 1997, it would abandon its method of valuing its stock at $25 per share, and would set the price per share annually under a "book value" method based on ULLICO's prior year-end audited book value per share. Under this method, the stock price was determined by taking the "Total Shareholder Equity," as reflected on the Company's audited December 31 balance sheet, and dividing it by the total number of outstanding shares of Capital, Class A and B stock. The initial price set in May 1997, based on the book value of the stock as of December 1, 1996, was $27.06 per share.

22.    Based on the pricing formula adopted in connection with the 1997 Repurchase Program, ULLICO adopted the following prices per share for the period 1997 – 2003:

     a.    May, 1997 - May, 1998: $27.06

     b.    May, 1998 - May, 1999: $28.70

     c.    May, 1999 - May, 2000: $53.94

     d.    May, 2000 - May, 2001: $146.04

     e.    May, 2001 - May, 2002: $74.87

     f.    May, 2002 - May, 2003: $46.58

## Corporate Insiders Utilize the New Price Formula
## to Reap Personal Benefits from the Run Up of ULLICO Stock

23.    With the clear prospects for the dramatic rise in ULLICO stock as a result of the Global Crossing investment, a series of programs were put into place that allowed the senior officers and directors of ULLICO to unjustly enrich themselves by exploiting for purposes never intended ULLICO's method of determining share value in connection with the 1997 Repurchase Program. These programs were either to the exclusion of ULLICO's other shareholders or structured to benefit counterclaim defendant officers and other insiders disproportionately in relationship to other larger shareholders and were proposed and implemented either through *ultra vires* or other improper actions, including without limitation, material misrepresentations and omissions in certain legally required disclosures.

24.    Beginning in 1998, the management of ULLICO, acting principally through Georgine and Carabillo, designed, sponsored, endorsed, and implemented a series of programs and transactions to divert to the senior officers and directors of the company corporate profits and other distributions generated by the Global Crossing investment. These programs included:

(1)    the 1998 and 1999 Stock Offer Programs, available only to senior officers and directors;

(2)    the 1998, 1999, 2000, and 2001 Formal Repurchase Programs, which had the effect of exempting officers and directors from any proration and which, in fact, allowed certain officers and directors, including the counterclaim defendant officers, to receive disproportionate distributions of ULLICO funds;

(3)    an improperly authorized program of "discretionary" repurchases in 2000 and 2001, under which Georgine and Carabillo caused ULLICO to

11

repurchase nearly $15 million of ULLICO stock from corporate insiders, including all of the counterclaim defendant officers;

(4)    a non-qualified "Top Hat" Deferred Compensation Plan, under which certain corporate officers could "defer" portions of their compensation, including incentive payments, into "deemed investments" of ULLICO stock that was "deemed" purchased and sold using the price formula adopted for the 1997 Repurchase Program;

(5)    special Global Crossing "incentive payments" to the most senior officers, under which more than $4.75 million was paid to counterclaim defendant officers as bonuses;

(6)    expanded retirement benefits for the senior most corporate officers under an Auxiliary Retirement Benefits Plan, accomplished through a purported amendment of the Qualified Pension Plan and Trust, adopted by the counterclaim defendant officers without Board or Executive Committee approval; and

(7)    a Stock Purchase and Credit Agreement for Georgine, never approved by the Board or Executive Committee, under which Georgine received without cost 40,000 shares of ULLICO stock, with special "put" provisions obligating ULLICO to repurchase those shares at Georgine's request.

A key feature to many of these programs was the use of the price formula, adopted by the Board in May 1997 for the purpose of distributing to shareholders a return on their investment in

replacement of dividend distribution, to improperly direct millions of dollars to corporate insiders.

## The 1998 and 1999 Stock Offer Programs to Corporate Insiders

25. On February 11, 1998, the Board's Executive Committee, headed by Georgine and with Carabillo's endorsement, appointed purportedly pursuant to Article VI, Section 1 of the By-Laws, a Compensation Committee to ". . . act on all matters concerning compensation and the establishment and administration of all programs and agreements relating to compensation, whether current or deferred," provided, however, that "[n]o member of the Committee shall participate in the determination of any matter affecting his own compensation."

26. On July 27, 1998, purportedly pursuant to the Executive Committee's February 11, 1998 resolution, and motivated by the remarkable performance of ULLICO's Global Crossing investment, the Compensation Committee, at the request and with the approval of Georgine and Carabillo, authorized the offer of up to 2,000 shares of Class A stock to each director and officer of ULLICO and directed Georgine to implement the program "at the earliest opportunity" (the "1998 Stock Offer Program").

27. On February 13, 1999, the Executive Committee again appointed a Compensation Committee to act on all matters concerning the compensation of officers and employees (omitting any mention of directors); and on May 13, 1999, the Compensation Committee authorized defendant Georgine to offer up to 4,000 shares of ULLICO stock to senior officers and directors at "book value" of $53.94 per share based on the Company's 1998 year-end financials, (the "1999 Stock Offer Program"). The offers were to occur at "some time during the course of the year 1999 at the Chairman's [Georgine's] discretion."

28.     On December 17, 1999, despite warning from outside counsel that there were "issues involved in any sale" of ULLICO stock to officers and directors, Georgine with Carabillo's approval offered each senior officer and director the right to purchase up to 4,000 shares of Class A stock at $53.94 per share.

29.     In connection with the 1999 Stock Offer Program, Georgine and Carabillo, without any Board or Compensation Committee approval, caused ULLICO to enter into certain stock buy-back agreements with lenders to whom ULLICO stock had been pledged as security in order to provide credit support for loans to counterclaim defendants Georgine, Carabillo and Grelle for the purchase of ULLICO stock.

30.     Because the members of the Compensation Committee were eligible to participate in the 1998 and 1999 Stock Offer Programs, the actions of the Compensation Committee violated the February 11, 1998 and February 13, 1999 Executive Committee resolutions that expressly prohibited the Compensation Committee from participating in matters directly affecting their own compensation. In addition, the Compensation Committee exceeded the delegation of authority pursuant to the February 13, 1999, Executive Committee resolution when it included directors as eligible participants under the 1999 Stock Offer Program.

31.     In addition to its aforesaid *ultra vires* actions , the Compensation Committee also exceeded the scope of permissible activity with respect to the 1998 and 1999 Stock Offer Programs under Article VI, Section 2 of ULLICO's by-laws. Under that provision of the by-laws, the Executive Committee, which established the Compensation Committee, did not have the authority to authorize the issuance of stock and therefore could not have delegated any such authority to the Compensation Committee. Moreover, prior Board resolutions and other provisions of ULLICO's by-laws allowed only those directors and officers that had been granted

14

the right of purchase to buy ULLICO stock; and none of the directors or officers that were eligible to participate in the 1998 and 1999 Stock Offer Programs had been so designated.

32.    Following the actions of the Compensation Committee with respect to the 1998 and 1999 Stock Offer Programs as aforesaid, Georgine and Carabillo offered to each director and senior officer of ULLICO the opportunity to buy 2,000 shares of ULLICO stock in July 1998 and an additional 2,000 shares in October 1998 at a price of $28.70, and an additional 4,000 shares in December 1999 at a price of $53.94. These prices were based on the book value price for the shares as of December 31 preceding the actual dates of purchase.

33.    All of the counterclaim defendant officers purchased stock pursuant to the 1998 and 1999 Stock Offer Program. The counterclaim defendant officers were able to purchase ULLICO stock with knowledge that the purchase price was substantially below the book value that would likely be determined as of December 31, 1998 and 1999 and adopted by the Board the following May as the price for ULLICO stock.

34.    The 1998 and 1999 Stock Purchase Programs approved by the Compensation Committee resulted in self-interested transactions between ULLICO and its officers and directors in violation of Maryland law and the fiduciary duties of those directors who participated in the Compensation Committee decision. Specifically, the Programs were used for the purposes of providing corporate insiders with an opportunity not available to other shareholders generally to buy stock and realize large quick profits with little or no risk by using a pricing formula that had been adopted by the Board to replace dividend distributions to shareholders and to provide a return on shareholders' investment.

35.    The actions of the Compensation Committee in approving the 1998 and 1999 stock offers were not reported to ULLICO's Board of Directors or Executive Committee, were

not approved by either the Board or its Executive Committee, and to the extent that the Compensation Committee was deemed to have been delegated such authority, that delegation constituted a violation of Section 2-411 of the Maryland Code and otherwise violated the standards for fiduciary duties under Section 2-405.1.

### The 1998, 1999, 2000 and 2001 Repurchase Programs

36.     On May 4, 1998, the Executive Committee, headed by Georgine and with the approval of Carabillo, authorized a $15 million repurchase program for Class A and B stock at $28.70 a share – the book value as of December 31, 1997. On June 30, 1998, Georgine, with Carabillo's endorsement, sent a letter to company shareholders announcing the program; and on November 9, 1998, Georgine, again with Carabillo's approval, formally offered to repurchase stock under the program. As in 1997, the 1998 repurchase program included a provision exempting holders of 10,000 or fewer shares from the program's proration provisions.

37.     On May 17, 1999, the Executive Committee – again headed by Georgine and with the approval of Carabillo – authorized a $15 million repurchase of ULLICO stock at the "book value" price of $53.94 per share. On November 16, 1999, Georgine formally offered to repurchase $15 million of Class A and B stock at $53.94 a share. The repurchase offer closed on December 17, 1999, the same day Georgine offered stock to senior officers and directors under the 1999 stock offering. Like the 1997 and 1998 repurchase programs, the 1999 repurchase program again exempted from proration holders of fewer than 10,000 shares who tendered such shares. The repurchase offer was oversubscribed, and resulted in shareholders of more than 10,000 shares being allowed to redeem only 91.93% of shares tendered. Despite the doubling of Company stock price in a single year, no officer or director sold stock acquired pursuant to the 1998 stock offer in the 1999 Repurchase Program.

16

38.     As of December 31, 1999, Global Crossing stock had risen to approximately $50 per share ($100 per share before adjustments for stock splits). However, by May, 2000, Global Crossing stock had fallen to nearly half its December 31, 1999 price levels and accordingly the actual book value of ULLICO was falling precipitously.

39.     Despite the quickly declining value of ULLICO's Global Crossing investment, on May 10, 2000, the Executive Committee of the Board led by Georgine, and with the approval of Carabillo, once again set the price of ULLICO stock based on its book value as of the preceding December 31, and thereby approved a record high ULLICO stock price of $146.04 per share, a price nearly three times the price of $53.94 adopted by the Board the previous May.

40.     In light of the declining value of ULLICO's Global Crossing investment and its predictable effect on the value of ULLICO stock, the Executive Committee recognized that the stock price of $146.04 represented a premium over its actual value and on May 10, 2000, approved an "extraordinary" repurchase program in order to distribute equitably to all shareholders some of the returns on the Global Crossing investment (the "extraordinary" repurchase plan).

41.     Under the "extraordinary" repurchase plan, ULLICO would repurchase up to 20% of ULLICO's outstanding stock, including Capital Stock, from all shareholders. The program had an aggregate value of approximately $240 million and ULLICO planned to sell $360 million of its shares of Global Crossing by the end of 2000 in order to obtain the necessary cash to implement the program.

42.     The "extraordinary" repurchase plan was subject to a number of conditions, including that the market price of Global Crossing stock, then trading at about $33 per share, had to be not less than $43 per share, a price within approximately 15% of Global Crossing's stock

17

price on December 31, 1999. In the event that the program was oversubscribed, which was anticipated, all shareholders, including officers and directors, would be treated equally by having the same percentage of their stock holdings redeemed, except that tenders of shares by shareholders holding 100 shares or less would be accepted in total, without proration.

43.    On May 11, 2000, the Board approved this "extraordinary" repurchase plan with the conditions established by the Executive Committee after receiving from Credit Suisse First Boston an opinion that the program was favorable to stockholders and has been balanced in a manner so that it will not jeopardize ULLICO's "well-being."

44.    By the end of August 2000, the market value of ULLICO's Global Crossing investment had lost over $475 million since December 31, 1999. By November, 2000, the stock price of Global Crossing had failed to reach the $43 level; and on November 3, 2000, with Global Crossing stock trading at only $23 5/8 per share, the Board abandoned the "extraordinary" repurchase program. In its place, the Board approved a $30 million repurchase program at $146.04 per share, limited to holders of Class A and Class B shares (the "Actual 2000 Repurchase Program"). This Program together with Georgine's unprecedented use of "discretionary" repurchases, discussed infra, provided grossly disproportionate redemptions to senior officers and directors.

45.    The Actual 2000 Repurchase Program had a number of features that worked to counterclaim defendant officers' benefit. In order to implement the program, all shareholders holding more than 2% of outstanding Class A and Class B Stock had to tender 100% of their holdings. Given the high premium reflected in the purchase price of $146.04 and the 2% rule, it was likely that over $800 million of stock would be tendered in an offering capped at $30 million, and that as a result, severe proration would occur. Nevertheless, with Georgine and

18

Carabillo's approval, an exemption from proration was adopted for shareholders owning 10,000 shares or less. Moreover, Georgine, at his "discretion", further benefited such insiders by agreeing to repurchase ULLICO shares (at $146.04 per share), outside the formal repurchase program, from May to October 2000, even though none of the counterclaim defendant officers ever disclosed the details of those discretionary repurchases to the Board.

46.    On November 21, 2000, Georgine, with Carabillo's approval, sent a letter to ULLICO's shareholders announcing the Actual 2000 Repurchase Program. In his letter, Georgine misrepresented that all shareholders would "share ratably in the offering" and failed to disclose that shareholders holding fewer than 10,000 shares could avoid proration or that such shareholders could sell their shares outside the program at Georgine's "discretion" at the price of $146.04. On the contrary, Georgine stated that the company "continues to reserve its right, pursuant to the bylaws, to repurchase shares outside the Repurchase Program at $25 per share."

47.    On December 14, 2000, ULLICO, through Georgine and with Carabillo's approval, formally offered to repurchase $30 million of Class A and Class B Stock, but not Capital Stock. In the legally required tender offer documents that accompanied the offer, the exemption from proration for holders of less than 10,000 shares was disclosed, although there was no disclosure that Georgine intended or might repurchase shares from holders of 10,000 or less shares outside the formal program at $146.04, that all ULLICO senior officers and directors except Georgine held less than 10,000 shares, and that several senior officers and directors, including Georgine, had already redeemed shares at $146.04 through various "discretionary" repurchases in 2000 before the tender offer commenced. To the contrary, the tender offer documents represented that "[t]he Company has not been advised that any of its directors and executive officers presently intend to tender any Shares personally owned by them pursuant to

the Offer" and that shares of the company "represented[ed] an excellent long-term investment opportunity."

48. As one would have expected, the Actual 2000 Repurchase Program was wildly oversubscribed and, as a result, under the Program's proration rules ULLICO could only repurchase 2.2% of the stock tendered by each shareholder owning more than 10,000 shares. In contrast, the senior officers and directors who tendered shares had all of their shares repurchased without proration at $146.04. As a result, those senior officers and directors who tendered shares received more under the $30 million Actual 2000 Repurchase Program than they would have received under the abandoned $240 million "extraordinary" repurchase plan, which did not provide for any significant proration.

49. The Actual 2000 Repurchase Program was adopted in violation of the fiduciary duties and obligations owed to the Board and ULLICO by the senior executives who sponsored and presented those proposals to the Board, specifically counterclaim defendants Georgine and Carabillo. As in the 1998 and 1999 Stock Offer Programs, it used the same price formula to provide a return on investments to shareholders in lieu of dividends to provide windfall profits and disproportionate corporate distribution to shareholders who were corporate insiders. It resulted in substantial self-interested transactions disproportionately benefiting the counterclaim defendant officers.

### Georgine's "Discretionary" Repurchases in 2000-2001

50. There had existed for some time an informal "discretionary" repurchase program, whereby ULLICO stock was eligible for repurchase at the discretion of the Board Chairman. Historically, this "discretionary" program had been used to address unusual situations such as shareholder emergencies or hardship, or to redeem shares upon the death of a shareholder.

Though in existence for many years, this discretionary program was not formally presented to the Board for approval until November 2000.

51.    Following the Board's adoption of the $240 million "extraordinary" repurchase plan in May 2000 (which would have exempted from proration only holders of 100 or less shares) but before the satisfaction of those conditions imposed on that program, such as a rise in Global Crossing stock to $43 per share, and in advance of any authorization to go forward with any replacement repurchase program, Georgine undertook a series of unprecedented "discretionary" repurchases of ULLICO stock, where, at his sole discretion, the company repurchased shares from certain officers and directors at a price Georgine determined to be appropriate.

52.    Between May 2000 and November 2000, when the Actual 2000 Repurchase Program was authorized, Georgine, pursuant to this "discretionary" program, caused ULLICO to repurchase nearly 30,000 shares of company stock from senior officers and directors at $146.04 per share, including the repurchase of his own shares. None of these purchases were ever disclosed to the full Board or to the shareholders in the tender offer documents that accompanied the later Actual 2000 Repurchase Program. In addition, Georgine knew, or should have known, at the time these discretionary repurchases were made, that Global Crossing stock had not reached the price level on which the Board conditioned the "extraordinary" repurchase of ULLICO stock at $146.04 per share.

53.    Following the expiration of the Actual 2000 Repurchase Program on January 16, 2001, and before the May 2001 Board meeting at which a substantially lower ULLICO share price was adopted, Georgine, with Carabillo's approval, continued to exercise his "discretion"

21

and caused ULLICO to repurchase an additional 31,212 shares of ULLICO stock at $146.04 per share, including shares of Capital Stock, from corporate insiders.

54.    The existence of these discretionary repurchases was not advertised to ULLICO shareholders, nor was it ever adequately disclosed to the full Board. At the November 3, 2000, Board meeting, an attempt was made to authorize these discretionary repurchases by passing resolutions permitting Georgine to approve stock repurchases outside the formal programs and ratifying "any and all actions taken by the Chairman or other appropriate officers of the Corporation falling within the scope of any of the preceding resolutions . . . taken at any time." However, details concerning the specific discretionary purchases purportedly ratified were never disclosed to the Board in connection with the ratification.

### Total Stock Repurchased at $146.04 Per Share

55.    From 2000-2001, pursuant to the 2000 Actual Repurchase Program and Georgine's "discretionary" repurchases, the Company repurchased 305,636 shares of Class A and Capital Stock at the rate of $146.04 per share, resulting in a total cost to the Company of approximately $44.6 million, $30 million pursuant to the Actual 2000 Repurchase Program and $14.6 million in Georgine's "discretionary" purchases. Of the $14.6 million in discretionary repurchases made by Georgine, 62.6% were from senior officers and directors, with an aggregate value of $9.2 million. None of the individual repurchases were disclosed to or approved by the full Board, the Executive Committee or ULLICO shareholders.

56.    During the period 2000-2001, twenty directors and senior officers holding only 1.3% of ULLICO stock redeemed 93,923 shares of Class A and Capital shares at $146.04 per share and received $13.7 million, or 31% of the total funds distributed by the Company, for stock repurchases while the share price was set at $146.04. Approximately $9.6 million of the $13.7

million distributed to senior officers and directors was used to repurchase shares originally purchased under the 1998 and 1999 Stock Offer programs. The directors and officers participating in these purchases collectively realized pre-tax profits of at least $10.7 million.

### The 2001 Stock Repurchase Program

57.    On May 7, 2001 the Executive Committee, headed by Georgine and with Carabillo's endorsement, approved a $15 million repurchase of ULLICO stock at the book value price of $74.87.

58.    The 2001 repurchase program again provided that, if the offer were oversubscribed, shareholders holding and tendering over 10,000 shares would be prorated, while those possessing less than 10,000 shares would not be prorated provided they tendered all their shares.

59.    The 2001 offer was again highly oversubscribed, and resulted in a proration rate of 2.657% for holders of more than 10,000 shares.

60.    At least five shareholders holding fewer than 10,000 shares participated in the 2001 repurchase program and were not prorated, including Luce, who was allowed to redeem 1,100 of his 1,500 remaining Class A shares under the program without proration, despite the requirement that shareholders holding less than 10,000 shares needed to tender all their stock to avoid proration.

61.    In addition to the programs as aforesaid, Georgine and Carabillo, with the knowledge and acquiescence of Luce and Grelle, the senior most officers in the company who controlled the operational and daily activities of the company, formulated, proposed and implemented certain deferred compensation programs or amendments to existing deferred

compensation or pension plans in order to obtain windfall profits in addition to those obtained through the 1998 Stock Offer Program and the 2000-2001 repurchase programs, all in violation of fiduciary duties owed to ULLICO. These included a "Top Hat" Deferred Compensation Plan and amendments to ULLICO's qualified Pension Plan that had the effect of increasing benefits under ULLICO's non-qualified Auxiliary Retirement Benefits Plan.

### The Non-Qualified Deferred Compensation Plan

62.    On July 27, 1998, the Compensation Committee approved the Non-Qualified Deferred Compensation Plan effective August 1, 1998 ("the Deferred Compensation Plan").

63.    Under the Deferred Compensation Plan, the counterclaim defendant officers were allowed to defer up to 25% of their base salary and up to 100% of their bonuses (thereby avoiding any current income tax on the deferred amounts), including incentive awards under the Global Incentive Program, and to make "deemed investments" of those amounts into one or more investment alternatives. Amounts deferred under the Deferred Compensation Plan were not actually invested in the investment alternatives, which served only as a measure of return to the plan participants. One of the investment alternatives available to the participants was ULLICO stock, as valued each year.

64.    Georgine, Carabillo, Luce and Grelle deferred significant portions of their income pursuant to this plan into a "deemed" investment in ULLICO stock. Specifically, Georgine elected, as of the effective date of the plan, to "invest" all his deferred income in ULLICO stock through "deemed" purchases of company stock at $28.70 per share. In December 1999, shortly before the date used to calculate the ULLICO stock price for the next year (which would be $146.04 per share) Carabillo, Grelle and Luce, as Georgine had since the beginning of the plan, elected to move all of their "deemed investments" into ULLICO stock. As a result, Carabillo,

24

Grelle and Luce were "deemed" to have purchased ULLICO stock at $53.94 per share. Thereafter, between January and May 2000, when the price of ULLICO stock was set at $146.04 based on the book value as of December 31, 1999, certain of the counterclaim defendant officers continued to "purchase" shares through the Deferred Compensation Plan at the price of $53.94 per share.

65.    Shortly after the ULLICO share price was set at $146.04 in May 2000, based on the audited book value as of December 31, 2000, Carabillo, Grelle, and Luce, shifted their "deemed investments" out of ULLICO stock and into other "deemed investments" alternatives. As a result, Carabillo, Grelle, and Luce were able to nearly triple their "investment" in less than six months and realize gains during a period when the real value of ULLICO stock fell dramatically and actual shareholders could not sell.

66.    In late 2001 or early 2002, Carabillo withdrew through a "hardship" distribution all his "deemed investments" and deferred income from the Deferred Compensation Plan, totaling approximately $606,000.

67.    On March 28, 2003, Grelle withdrew all amounts from his deferred compensation account. This withdrawal was approved and authorized by Carabillo, and occurred the same day Carabillo went on "administrative leave" in advance of his termination "for cause."

### Auxiliary Retirement Benefits Plan

68.    By Resolution on May 5, 1997, the Executive Committee of the Board of ULLICO Inc. authorized the creation of a Benefits Committee consisting of the senior officers of ULLICO Inc., including counterclaim defendant officers (the "May 5, 1997 Executive Committee Resolution"). Under the May 5, 1997, Executive Committee Resolution, the Benefits Committee was " . . . authorized, directed and empowered to act as fiduciaries to all plans

25

created or to be created for the benefit and welfare of the corporation's employees and any employees of each of its subsidiaries and affiliates in which the corporation or its subsidiaries owns 80% or more of the outstanding stock and was to have full authority for the administration of all such plans and also delegated authority for the administration of all such plans." The Benefits Committee was not authorized to amend the terms of the plans themselves.

69.    On or about October 20, 1999, counterclaim defendant officers, who constituted four of the five members of the Benefits Committee, purported to amend the definition of "Sponsoring Employee ULLICO Group Compensation" as set forth in the ULLICO Inc. Qualified Pension Plan and Trust, as amended and restated, to include "regularly established annual incentive compensation with no maximum, effective January 1, 2000" (the "Amendment").

70.    As a result of the Amendment, counterclaim defendant officers' benefits payable under the Auxiliary Retirement Benefits Plan would increase significantly.

71.    The Benefits Committee did not have the authority to amend the terms of the ULLICO Inc. Qualified Pension Plan and Trust.

### Georgine's Employment Agreement and Related Agreements

72.    On September 22, 1999, the Board approved and authorized a five year Employment Agreement with Georgine and delegated to the Compensation Committee the authority to negotiate the terms and conditions of the contract.

73.    In December 1999, the Compensation Committee and Georgine entered into a five year Employment Agreement with an effective date of October 1, 1999. That Agreement included a provision providing for a Split Dollar Life Insurance Agreement, which was entered

into on February 9, 2000, between ULLICO and the Robert A. and Mary Rita Georgine Life Insurance Trust, Ann J. O'Brien, Trustee.

74.    In addition to Georgine's Employment Agreement, on December 17, and again on December 27, 1999, the Compensation Committee, without authorization, approved a 40,000-share "bonus" to Georgine; and Georgine and each member of the Compensation Committee executed a Stock Purchase and Credit Agreement, whereby Georgine was allowed to purchase 40,000 shares of Class A stock at $53.94 per share, with a loan from the company of $2,157,600. According to the terms of the Agreement, the loan was to be forgiven at a rate of 20% per year for five years, so long as Georgine continued to serve as Chairman, President, and CEO.

75.    Pursuant to the Stock Purchase and Credit Agreement, Georgine received 40,000 shares on or about February 1, 2000, although the Stock Purchase and Credit Agreement was not fully executed by all parties until May 10, 2000. The Stock Purchase and Credit Agreement also contained a "put" option, allowing Georgine to, with 30 days written notice, require the Company to repurchase any portion of the 40,000 shares that no longer represented collateral for the loan made under the Agreement, at a "purchase price per share equal to the Fair Market Value." Pursuant to this agreement, on February 14, 2001, Georgine sold 8,000 shares released from collateral at $146.04 per share.

76.    In addition to the 8,000 shares that Georgine sold back to ULLICO on February 14, 2001, under the "put" option of the Stock Purchase and Credit Agreement, Georgine sold back to ULLICO, pursuant to his own discretionary authority, 12,868 shares of ULLICO stock at $146.04 per share, 4,000 of which were repurchased by ULLICO on July 20, 2000, and the balance also on February 14, 2001.

27

77.    In the fall of 2000 in order to address the obvious conflict of interest associated with Georgine's sales of his stock back to ULLICO through the exercise of "discretion" in his favor, Carabillo presented to the Compensation Committee an Addendum to Georgine's Employment Agreement allowing Georgine to "put" to ULLICO his shares obtained other than through the Stock Purchase and Credit Agreement; and the Compensation Committee approved the Addendum. The Stock Purchase and Credit Agreement was never brought before the Executive Committee or full Board.

78.    The existence and terms of the Stock Purchase and Credit Agreement were never expressly disclosed to or approved by the entire Board of Directors or Executive Committee; and the Compensation Committee lacked the authority to issue stock and was not otherwise authorized to enter into agreements with Georgine in addition to the Employment Agreement.

79.    In early 2002, press reports began to appear concerning self-dealing by ULLICO corporate insiders, and in April, 2002, former Illinois Governor James Thompson was appointed by the Board as Special Counsel to investigate the events surrounding ULLICO's 1998 and 1999 stock purchase offers to directors and several officers, its stock repurchase program, and the Global Crossing investment. After seven months of investigations, with over 40 interviews and the review of thousands of pages of documents, Governor Thompson issued, on November 26, 2002, the "Report of the Special Counsel on ULLICO Stock Purchase Offer and Repurchase Programs and Global Crossing Investment" (the "Thompson Report"). One of that Report's findings was that "a forceful argument exists that certain senior officers of the Company, principally Georgine and Carabillo, violated their duties of loyalty and care to the company." The Thompson Report further found that Georgine and Carabillo were "instrumental in creating

28

and implementing the stock offer and repurchase programs and . . . benefited from ULLICO stock transactions."

80.    In the aftermath of the Thompson Report, ULLICO became the subject of multiple, ongoing, state and federal investigations, including those conducted by the Department of Labor, the United States Securities and Exchange Commission, a District of Columbia Grand Jury, the Maryland Insurance Administration, and the United States Congress.

81.    Following the issuance of the Thompson Report, a number of the Board's members decided not to stand for reelection, and at their annual meeting on May 8, 2003, ULLICO's shareholders elected and installed a new Board of Directors that, for the first time since the 2000 Actual Repurchase Program, had a majority of directors who did not participate in any of the transactions that were the subject of the Thompson Report.

82.    Georgine resigned on May 8, 2003, shortly before the new Board was installed, recognizing that the new Board would otherwise terminate him "for cause." At the end of March 2003, Carabillo "stepped aside" as Chief Legal Officer, and on May 30, 2003, was terminated for cause. Grelle resigned on February 25, 2003; and Luce retired effective June 1, 2003.

83.    In May 2003, the new Board appointed former federal judge Abner Mikva as chairman of a special Regulatory and Litigation Oversight Subcommittee to review the recommendations of the Thompson Report and recommend whether claims should be asserted as a result of the events that took place during 1998-2001. After deliberation, Mr. Mikva and his Committee recommended to the Board that legal action be instituted, and pursuant to that recommendation the Board authorized such legal action.

## Count I – Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment
### (Against Georgine and Carabillo)

84.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 83.

85.    At all material times herein, Georgine, in his capacity as a ULLICO director, was under statutory and other fiduciary obligations to ULLICO, including, without limitation, those obligations set forth in Md. Code, Section 2-405.1(a) to perform his duties as a member of the Board (i) in good faith; (ii) in a manner he reasonably believed to be in the best interests of the company; and (iii) with the care that an ordinarily prudent person in a like position would use under similar circumstances.

86.    At all material times herein, Georgine, in his capacity as an officer, was under a fiduciary duty and other legal obligations to ULLICO, including, without limitation, a duty of care, loyalty and obedience, the obligation to ensure legal compliance with all applicable legal requirements pertaining to ULLICO's operations, and the obligation to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

87.    At all material times herein, Carabillo, in his capacity as Chief Legal Officer, was under a fiduciary duty and other legal obligations to ULLICO, including, without limitation a duty of care, loyalty and obedience, the obligation to ensure legal compliance with all applicable legal requirements pertaining to ULLICO's operations, and the obligation to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

30

88.    Georgine and Carabillo created, designed, sponsored, presided over and implemented the 1998 and 1999 Stock Offer Programs, the Actual 2000 Repurchase Program, the 2001 Repurchase Program, the 2000 and 2001 discretionary repurchases, the Amendment to the Pension Plan and Trust, and the Non Qualified Deferred Compensation Plan. They also personally profited from all of those programs except in the case of Georgine, the Actual 2000 Repurchase Program and the 2001 Repurchase Program, and in the case of Carabillo, the 2001 discretionary repurchases, all in violation of their duties and obligations to ULLICO.

89.    As a result of the programs as aforesaid, self-interested transactions took place between ULLICO and Georgine and Carabillo and certain other senior officers and directors, through which they improperly benefited or profited in money, property or services.

90.    During the period 1998-2001 and despite their duties and obligations as aforesaid, Georgine and Carabillo preferred their own interests and those of other insiders over those of ULLICO through:

        a.    obtaining profits for themselves from improper and self-interested transactions and permitting other senior officers and directors to do the same.

        b.    improperly profiting or otherwise benefiting from "deemed investments" in ULLICO stock under the Non-Qualified Deferred Compensation Plan.

        c.    improperly increasing their benefits under the Auxiliary Retirement Benefits Plan.

        d.    failing to report as required and otherwise withholding and concealing from the Board certain information material to stock transactions and corporate operations, including, without limitation, information pertaining

to their own self-dealing and that of the other counterclaim defendants; and

e.  failing to disclose to the Board and ULLICO shareholders the fact, substance, import and reasons for the stock offer and repurchase program through which they profited.

91.  As a result of their acts and omissions, including, without limitation, those in connection with the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program and the discretionary repurchase programs in 2000 and 2001, Georgine and Carabillo breached their duties and obligations to ULLICO and also aided and abetted each other in connection with those breaches of duty.

92.  As a direct and proximate cause of Georgine's and Carabillo's breaches of duty and aiding and abetting as aforesaid, Georgine and Carabillo:

a.  profited personally on ULLICO stock transactions in the amount of approximately $2.6 million and approximately $720,000 respectively;

b.  permitted other insiders to obtain profits improperly on ULLICO stock transactions in the approximate amount of $10.4 million;

c.  caused ULLICO to become the subject of ongoing state, federal and congressional investigations, including grand jury proceedings and proceedings before various regulatory agencies, and to spend and continue to spend large sums of money in response to and defense of those state, federal and congressional investigations;

  d.  created potential obligations to other ULLICO employees under the ULLICO Qualified Pension Plan and Trust and Auxiliary Retirement Benefits Plan; and

  e.  otherwise caused ULLICO to engage in a waste of corporate assets.

93.  As a direct and proximate cause of Georgine's and Carabillo's breaches of duties and aiding and abetting as aforesaid, Georgine and Carabillo, as well as other senior officers and directors, have been unjustly enriched.

94.  As a direct and proximate cause of Georgine's and Carabillo's breaches of duties and aiding and abetting as aforesaid, ULLICO has been damaged.

95.  As a direct and proximate cause of their breaches of duty and aiding and abetting as aforesaid, Georgine and Carabillo are jointly and severally liable and obligated to ULLICO with respect to the following amounts:

  a.  their own profits of approximately $3.3 million from stock transactions with ULLICO;

  b.  profits that were unfairly, improperly, and disproportionately distributed to other directors and officers, in the total amount of approximately $10.4 million;

  c.  the costs and expenses incurred (including attorney's fees) in connection with past, ongoing and any future investigations of ULLICO transactions over which these defendants presided and resulting litigation (including, but not limited to, this action);

  d.  all compensation and benefits including bonuses and Global Crossing Incentive bonuses received between 1998 and 2001, the period during

33

which they engaged in willful breaches of fiduciary and other duties owed
to ULLICO, in the approximate amount of $6.1 million;

e.  those amounts distributed or to be distributed to themselves or others
under the Non-Qualified Deferred Compensation Plan as a result of the
"deemed investment" in ULLICO stock;

f.  those increased amounts ULLICO will be required to pay to others under
the Auxiliary Retirement Benefit Plan as a result of the Amendment to the
Qualified Pension Plan and Trust, in an amount to be determined; and

g.  such other amounts, to be determined, that adequately compensate
ULLICO for damages and injuries it has sustained, including, without
limitation, damage to its credit and financial rating and reputation.

## COUNT II – Professional Negligence
### (Against Carabillo)

96.  ULLICO incorporates herein by reference and makes a part hereof the allegations
of paragraphs 1 through 95.

97.  At all material times, Carabillo was a lawyer licensed in the District of Columbia
and as such was under a duty to ULLICO to provide legal advice in accordance with the
prevailing standards of professional care applicable to lawyers employed as in-house chief legal
counsel.

98.  Despite his obligations as aforesaid, Carabillo engaged in a course of conduct that
caused ULLICO to engage in improper and unauthorized stock transactions and other
transactions and activities, including, without limitation, those that violated ULLICO's Articles
of Incorporation and bylaws.

99. As a result of his conduct as aforesaid, Carabillo breached the applicable standard of professional care and his duties and obligations owed to ULLICO, all to the detriment and damage of ULLICO.

100. As a direct and proximate result of Carabillo's breaches of duty as aforesaid, ULLICO has been damaged in an amount to be determined at trial, but in an amount no less than $20,000,000.

## COUNT III-Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment (Against Grelle)

101. ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 100.

102. As a result of his position as a senior executive officer and Chief Financial Officer of ULLICO, Grelle was under fiduciary duties of care, loyalty and obedience, and other legal obligations to ULLICO, including, without limitation, a duty not to permit or cause corporate waste, or to benefit or profit from self interested transactions with ULLICO, and was further obligated to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

103. As a result of the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program and the discretionary repurchase programs in 2000, Grelle improperly participated and profited in self-interested, unfair stock transactions with ULLICO, which unjustly enriched him and resulted in a waste of corporate assets.

104. As a direct and proximate cause of his acts and omissions in connection with the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program and the

35

discretionary repurchase program in 2000, Grelle breached his duties and obligations to ULLICO or aided and abetted such breaches by others or otherwise improperly benefited and profited from tainted, unfair and improper stock transactions.

105.    As a direct and proximate cause of his breach of duties and obligations to ULLICO and aiding and abetting such breaches as aforesaid, ULLICO has been damaged and injured.

106.    As a result of the events and his conduct as aforesaid, Grelle is obligated, *inter alia*, to disgorge and return to the ULLICO any and all profits and benefits he obtained in connection with, or as a result of the 1998 and 1999 Stock Offer Program, the Actual 2000 Repurchase Program and the 2000 discretionary repurchases and also any other amounts of damage or injury to counterclaim plaintiffs that are shown to be a direct and proximate cause of any breaches of duty on the part of Grelle.

## Count IV – Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment
### (Against Luce)

107.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 106.

108.    As a result of his position as a senior executive officer of ULLICO, Luce was under fiduciary duties of care, loyalty and obedience, and other legal obligations to ULLICO, including, without limitation, a duty not to permit or cause corporate waste, or benefit and profit from self interested transactions with ULLICO, and was further obligated to report to the Board of Directors all pertinent information concerning company transactions and any personal interest he may have in those transactions.

36

109.    As a result of the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program, the 2001 Repurchase Program and the discretionary repurchase programs in 2000, Luce improperly participated in and profited from self-interested, unfair stock transactions with ULLICO that unjustly enriched him and resulted in a waste of corporate assets.

110.    As a direct and proximate cause of his acts and omissions in connection with the 1998 and 1999 Stock Offer Programs, the Actual 2000 Stock Repurchase Program, the 2001 Repurchase Program and the discretionary repurchase program in 2000, Luce breached his duties and obligations to ULLICO or aided and abetted such breaches by others or otherwise improperly benefited and profited from tainted, unfair and improper stock transactions.

111.    As a direct and proximate cause of his breach of duties and obligations to ULLICO and aiding and abetting such breaches as aforesaid, ULLICO has been damaged and injured.

112.    As a result of the events and his conduct as aforesaid, Luce is obligated, *inter alia*, to disgorge and return to the ULLICO any and all profits and benefits be obtained in connection with or as a result of the 1998 and 1999 Stock Offer Programs, the Actual 2000 Repurchase Program, and the 2000 discretionary repurchases and also any other amounts of damage or injury to counterclaim plaintiffs that are shown to be a direct and proximate cause of any breaches of duty on the part of Luce.

## COUNT V – Breach of Employment Agreement
### (Against Georgine, O'Brien and Pacific Life Insurance Co.)

113.    ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 112.

114.    Under the Employment Agreement, Georgine's duties included those specified in ULLICO's by-laws and "such other duties as are reasonable and customary for a chairman of the board, president and chief executive officer."

115.    ULLICO's by-laws impose upon Georgine the obligation to make "regular reports to the Board of Directors and the Executive Committee on Company operations and conformance thereof to all legal requirements."

116.    As a result of the events and his acts and omissions as aforesaid, Georgine failed to discharge his express and implied duties and obligations under or arising out of the Employment Agreement and his employment relationship with ULLICO, and as a result failed, *inter alia*, to adequately advise the Board and to prevent ULLICO from engaging in actions that failed to comply with all applicable legal requirements, all in breach of his express and implied contractual duties under the Employment Agreement.

117.    As a result of Georgine's acts and omissions as aforesaid, Georgine materially and substantially breached his contract of employment with ULLICO.

118.    As a result of his substantial and material breaches of his contract of employment as aforesaid, ULLICO had been damaged.

119.    As a result of his substantial and material breaches of his contract of employment as aforesaid, ULLICO is entitled to cancel and rescind the Employment Agreement and all related contracts, including his Split Dollar Life Insurance Agreement, his Stock Purchase and Credit Agreement, and his Agreement dated August 20, 1994, providing certain supplemental excess retirement plan benefits, and be discharged of all duties and obligations thereunder, and also to receive a disgorgement of those benefits paid to and received by Georgine under those agreements or as part of his employment relationship during the period 1998-2001.

38

120.     In addition to a disgorgement of the benefits he has received under his Employment Agreement, and all related agreements, benefits, bonuses and incentive plans, ULLICO is entitled to a declaration that the Employment Agreement, the Stock Purchase and Credit Agreement, the Split Dollar Life Insurance Agreement, and related life insurance policy, and the agreement providing supplemental retirement benefits are cancelled and of no further effect, that all stock held by Georgine pursuant to those agreements are cancelled and of no further validity or effect, that counterclaim plaintiffs have no duties or obligations to Georgine under those agreements and Georgine has no rights or entitlement under those agreements and that all funds being held related to those agreements are to be returned to ULLICO with no further right, title, interest, or claim to them by Georgine.

## COUNT VI – Declaratory Judgment: Auxiliary Retirement Benefits Plan
### (Against Georgine, Carabillo, Grelle and Luce)

121.     ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 120.

122.     In drafting, adopting and implementing the Amendment to the Qualified Pension Plan and Trust, under which benefits would increase under the Auxiliary Retirement Benefits Plan, the counterclaim defendant officers, acting as members of the Benefits Committee, engaged in a settlor function that was reserved for the Board of Directors and therefore beyond the scope of authority that was delegated to the Benefits Committee.

123.     Section 402(b)(3) of ERISA, 29 U.S.C. § 1102(b)(3) requires every ERISA covered plan to set forth procedures to amend a plan and to identify the persons or entities with authority to amend the plan.

39

124.    Under Section 11.1 of the ULLICO Inc. Qualified Pension Plan and Trust, the Board of ULLICO Inc. retains the right to amend that Plan; and under Article 9 of the Auxiliary Retirement Benefits Plan, The Union Labor Life Insurance Company retains the right to amend the Auxiliary Retirement Benefits Plan.

125.    As a result of their conduct as aforesaid, counterclaim defendant officers acted *ultra vires* and otherwise breached their fiduciary duties to ULLICO, including their duty of loyalty and care, since, *inter alia*, each of the members of the Benefits Committee would benefit personally from the Amendment and therefore acted with and in furtherance of an interest in conflict with their positions as fiduciaries.

126.    As a result of counterclaim defendant officers' conduct as aforesaid, the Amendment is invalid with respect to any claim for benefits payable as a result of the Amendment to the members of the Benefits Committee that adopted it.

127.    Despite their conduct and the invalidity of the Amendment as to any claim for benefits by the counterclaim defendant officers as aforesaid, counterclaim defendant officers have claimed or are expected to claim that they are entitled to retirement benefits under the Auxiliary Retirement Benefits Plan that are calculated with reference to the Amendment.

128.    There is an actual, justiciable controversy between the parties, ripe for adjudication.

129.    As a result of the conduct of the counterclaim defendant officers, the invalidity of the Amendment and the claims or expected claims of the counterclaim defendant officers as aforesaid, ULLICO is entitled to a declaration that counterclaim defendant officers are not entitled to receive any benefits payable pursuant to the Auxiliary Retirement Benefits Plan as a result of the Amendment, and further that they are obligated and responsible for indemnifying

ULLICO for any amount it is or will be obligated to pay under the Qualified Pension Plan and Trust and the Auxiliary Retirement Benefits Plan as a result of the Amendment.

## Count VII – Declaratory Judgment: The Deferred Compensation Plan
### (Against Georgine and Luce)

130.   ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 129.

131.   The 1998 Non-Qualified Deferred Compensation Plan was enacted without Board approval and was otherwise administered in violation of fiduciary duties owed to ULLICO by the Benefits Committee on which the counterclaim defendant officers served.

132.   The counterclaim defendant officers exploited the ULLICO share valuation system, adopted in connection with the 1997 Repurchase Program, in a manner and for a purpose never intended, such that their manipulation of their Deferred Compensation accounts in and out of "deemed investments" in ULLICO stock allowed them to generate "profits" that under the circumstances constituted a breach of their fiduciary duties and waste of corporate assets.

133.   The impact of ULLICO's investment in Global Crossing stock on the book value of ULLICO stock resulted in large short-term changes in the value of ULLICO stock that had never been anticipated by the Board, or the Compensation Committee when it established the Deferred Compensation Plan and the "deemed investment" features of that program, or the price valuation system enacted in 1997 for a purpose unrelated to the Deferred Compensation Plan.

134.   Counterclaim defendant officers, as a fiduciaries of ULLICO and the Deferred Compensation Plan, were under a duty to report or disclose to the Compensation Committee, the Executive Committee, and the Board of Directors the unintended and unexpected impact that the stock valuation system had on the benefits available under the Deferred Compensation Plan.

41

Specifically, they were under an obligation to disclose that the Deferred Compensation Plan, as structured, allowed for the manipulation of investment options under the Deferred Compensation Plan to generate enormous windfall profits for the participants in the Plan through the "purchase" and "sale" of ULLICO stock in a manner that allowed participants to realize "profits" in a way that actual shareholders could not.

135.    The counterclaim defendant officers, as the senior most executives of the company, and as a fiduciaries of the Deferred Compensation Plan (in their capacity as members of the Benefits Committee) were under a fiduciary obligation to disclose to the Board any personal benefits that they would or could obtain as a result of the dramatic and unexpected rise in ULLICO share value as a result of ULLICO's investment in Global Crossing stock.

136.    Counterclaim defendant officers' failure to disclose and obtain approvals regarding the unintended benefits that they would or did obtain under the Deferred Compensation Plan was, under the circumstances, a breach of their fiduciary duties to ULLICO and the Deferred Compensation Plan, including a breach of their duties of disclosure, loyalty, and care, and duty to avoid corporate waste on the part of ULLICO.

137.    As implemented, the benefits under the Deferred Compensation Plan with respect to the "deemed investments" in ULLICO stock resulted in the accrual of benefits that, if paid, would constitute unjust enrichment, a waste of corporate assets, and a breach of fiduciary duty owed to ULLICO and the shareholders.

138.    As a result of their conduct aforesaid, Georgine and Luce have improperly and unjustly enriched themselves through benefits under an improperly enacted and administered deferred compensation plan and are otherwise barred from obtaining any benefits thereunder based on "deemed investments" in ULLICO stock.

42

139.    As a result of their conduct aforesaid, ULLICO does not intend to disburse profits or benefits to Georgine and Luce from the Deferred Compensation Plan resulting from their "deemed" investments in ULLICO Stock.

140.    There is an actual, justiciable controversy, ripe for adjudication.

141.    ULLICO is entitled to a declaration that Georgine and Luce are not entitled to a distribution of profits or benefits under the Deferred Compensation Plan based on "deemed investments" in ULLICO stock, as they claim.

### COUNT VIII - Breach of Fiduciary Duty and Return of Profits: Deferred Compensation Plan
### (Against Georgine and Carabillo)

142.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 141.

143.    As a result of the events and conduct as aforesaid, Carabillo is obligated to disgorge, return to ULLICO and forfeit the amounts he received through a "hardship" distribution he received in late 2001 and early 2002 by virtue of his "deemed investments" in ULLICO stock under the Deferred Compensation Plan.

144.    In addition to Carabillo's disgorgement as aforesaid, Georgine and Carabillo, because of their conduct as aforesaid, are obligated to disgorge or otherwise forfeit to ULLICO those amounts of compensation deferred under the deferred compensation plan through which they attempted to obtain improper benefits in breach of their fiduciary duties to ULLICO.

145.    As a result of their conduct aforesaid, Georgine and Carabillo are jointly and severally liable for those amounts they are obligated to disgorge to ULLICO.

## COUNT IX – Breach of Fiduciary Duty and
## Return of Profits: Deferred Compensation Plan
### (Against Georgine, Carabillo and Grelle)

146.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 145.

147.    In March 2003, Grelle requested and with Carabillo's approval, received a distribution from the Deferred Compensation Plan in the amount if $732,326.99.

148.    As a result of the events and conduct aforesaid, Grelle is obligated to disgorge, return to ULLICO, and forfeit the amount of distributions he received under the Deferred Compensation Plan on March 28, 2003, by virtue of his "deemed investments" in ULLICO stock under the Deferred Compensation Plan.

149.    As a result of their conduct aforesaid, Georgine and Carabillo are jointly and severally liable with Grelle for the amounts disbursed to Grelle.

## COUNT X –Declaratory Judgment: SERP
### (Against Georgine)

150.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 149.

151.    ULLICO and Georgine entered into an Agreement dated August 30, 1994, under which Georgine would receive under certain circumstances supplemental retirement benefits (the "SERP").

152.    Pursuant to the SERP, ULLICO entered into a trust agreement dated November 5, 1994 with First Union National Bank of Virginia (the "Rabbi Trust") and pursuant to that agreement, have made deposits over time into the Rabbi Trust, which has a current value in excess of $6 million.

44

153.    As a result of the events and his conduct aforesaid, Georgine willfully engaged in a course of conduct that was demonstrably and materially injurious to ULLICO, monetarily or otherwise. This course of conduct by Georgine was not in good faith and was without a reasonable belief that it was in the best interests of ULLICO.

154.    As a result of all of the events and his conduct as aforesaid, Georgine would have been terminated for cause, through an appropriate resolution of the Board, but for his resignation on May 8, 2003 in the face of certain dismissal for cause that precluded and frustrated that process.

155.    As a result of his conduct as aforesaid, Georgine is not entitled to or has otherwise forfeited any right or entitlement to any benefits under the SERP.

156.    As a result of his conduct as aforesaid, ULLICO is entitled to a declaration that Georgine has no rights or entitlement to any benefits under his SERP or related Rabbi Trust.

157.    There is an actual and justiciable controversy, ripe for adjudication concerning Georgine's rights under his SERP.

## COUNT XI – Declaratory Judgment: Split Dollar Life Insurance Agreement
### (Against Georgine, O'Brien, and Pacific Life Insurance Co.)

158.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 157.

159.    As part of the Employment Agreement, ULLICO and the Robert A. and Mary Rita Georgine Life Insurance Trust entered into a Split Dollar Life Insurance Agreement dated February 9, 2000, pursuant to which Pacific Life Insurance Company issued a certain Pacific Estate Preserver, Policy No. 1A23725140.

160.    As a result of his material breach of his Employment Agreement, his breach of fiduciary and other duties owed to ULLICO and ULLICO's cancellation and rescission of that Agreement as aforesaid, Georgine has no right or entitlement to any benefits under the Split Dollar Life Insurance Agreement or related insurance policy.

161.    As a result of his conduct as aforesaid, ULLICO is entitled to a declaration that Georgine has forfeited and is not otherwise entitled to any benefits under his Split Dollar Life Agreement or related insurance policy, and that ULLICO is entitled to receive any surrender or cash value under that insurance policy.

162.    There is an actual and justiciable controversy, ripe for adjudication concerning ULLICO and Georgine's rights under his Split Dollar Life Insurance Agreement and the related insurance policy.

### COUNT XII – Declaratory Judgment: Stock Purchase and Credit Agreement
### (Against Georgine)

163.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 162.

164.    In February of 2000, Georgine and ULLICO executed a Stock Purchase and Credit Agreement, which purported to transfer 40,000 shares of ULLICO Class A stock to Georgine. In consideration for this transfer, and pursuant to the Stock Purchase and Credit Agreement, Georgine borrowed $2,157,600 from ULLICO, which was to be forgiven at a rate of 20% per year, for the next five years, so long as Georgine continued to serve as Chairman, CEO, and President. The Stock Purchase and Credit Agreement was conceived as a way to provide a "bonus" to Georgine.

165.    As a result of his breach of fiduciary and other duties owed to ULLICO, Georgine has no right or entitlement to any benefits under the Stock Purchase and Credit Agreement.

166.    As a result of his conduct as aforesaid, ULLICO is entitled to a declaration that Georgine has forfeited and is not otherwise entitled to any benefits under the Stock Purchase and Credit Agreement, that all remaining shares issued and outstanding under the Agreement are rescinded and cancelled, and that ULLICO has no further obligation towards Georgine pursuant to the Stock Purchase and Credit Agreement. Alternatively, ULLICO is entitled to recover the outstanding amount of the loan extended to Georgine under the Stock Purchase and Credit Agreement and also the amount previously forgiven.

167.    There is an actual and justiciable controversy, ripe for adjudication concerning Georgine's rights under the Stock Purchase and Credit Agreement.

## COUNT XIII – Breach of Fiduciary Duty: P&I Loans
### (Against Georgine and Grelle)

168.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 167.

169.    On or about February 28, 2001, May 31, 2001, and October 31, 2001, Georgine, with Grelle's knowledge and consent, approved, and caused ULLICO to make, a series of loans in the total amount of $380,000 to Planners and Insurers, Inc., d/b/a Union Specialists ( "P&I ), an insurance brokerage and sales agency located in Omaha, Nebraska.

170.    At the times the loans were made, P&I was owned or controlled by Patrick J. Mertz, a nephew of Georgine; and the loans were not supported by appropriate due diligence, loan agreements, personal guarantees or other indicia of arms-length transactions. Since the

47

loans were made, P&I has defaulted on the loans, without any repayment of principal, and legal counsel for P&I has advised ULLICO that P&I has been dissolved.

171.   As a result of Georgine's and Grelle's conduct aforesaid in connection with the P&I loans, Georgine and Grelle breached their duties and obligations to ULLICO.

172.   As a direct and proximate cause of their breach of duty aforesaid, ULLICO has been damaged and injured.

WHEREFORE, Plaintiff ULLICO Inc. demands the following relief:

1.   As to Count I, judgment against counterclaim defendants Robert Georgine and Joseph A. Carabillo jointly and severally in an amount to be determined at trial, but in any event no less than Twenty Million Dollars ($20,000,000).

2.   As to Count II, judgment against counterclaim defendant Joseph A. Carabillo in an amount to be determined at trial, but in any event no less than Twenty Million Dollars ($20,000,000).

3.   As to Count III, judgment against counterclaim defendant John K. Grelle in an amount to be determined at trial, but in any event no less than $837,760.

4.   As to Count IV, judgment against counterclaim defendant James W. Luce in an amount to be determined at trial, but in any event no less than $789,299.

5.   As to Count V, judgment against counterclaim defendant Robert A. Georgine in an amount to be determined at trial but in any event no less than $6,114,226; and a judicial declaration that ULLICO is under no further obligation to counterclaim defendant officer Georgine as a result of the Employment Agreement, or related agreements, including the Split Dollar Life Insurance Policy, the Stock Purchase and Credit Agreement, or the SERP.

48

6.     As to Count VI, a judicial declaration that counterclaim defendants Robert A. Georgine, Joseph A. Carabillo, James W. Luce, and John K. Grelle are not entitled to receive any benefits under the Auxiliary Retirement Benefits Plan based on the Amendment to the ULLICO Qualified Pension Plan and Trust, adopted by the Benefits Committee on October 20, 1999, and shall indemnify ULLICO Inc. and The Union Labor Life Insurance Company with respect to any financial obligation incurred as a result of the Amendment.

7.     As to Count VII, a judicial declaration that counterclaim defendants Robert A. Georgine and James W. Luce are not entitled to receive any distributions or benefits under the Non-Qualified Deferred Compensation Plan based on earnings realized through the "deemed investments" in ULLICO stock.

8.     As to Count VIII, judgment as to counterclaim defendants Robert A. Georgine and Joseph A. Carabillo jointly and severally in an amount to be determined at trial but in any event no less than $1,906,000.

9.     As to Count IX, judgment against Georgine, Carabillo and Grelle jointly and severally in an amount to be determined at trial, but in any event no less than $732,326.99.

10.     As to Count X, a judicial declaration that ULLICO has no further financial or other obligation, and counterclaim defendant Robert A. Georgine has no rights, entitlements or benefits, under the SERP.

11.     As to Count XI, a judicial declaration that counterclaim defendant Robert A. Georgine, or anyone claiming through him, has no right, title or interest under the Split Dollar Life Insurance Agreement and related life insurance policy, that such Agreement and related policy are cancelled and that any surrender value, cash value or funds that he accumulated

thereunder be returned to ULLICO with no further right, title or interest on the part of counterclaim defendant Robert A. Georgine or anyone that claims an interest through him.

12.    As to Count XII, a judicial declaration that counterclaim defendant Georgine has forfeited and is not otherwise entitled to any benefits under the Stock Purchase and Credit Agreement, that all remaining shares issued and outstanding under the Agreement are rescinded and cancelled, and that ULLICO has no further obligation towards Georgine pursuant to the Stock Purchase and Credit Agreement. Alternatively, ULLICO is entitled to a judgment in the amount of $2,157,600.

13.    As to Count XIII, judgment against counterclaim defendants Robert A. Georgine and John K. Grelle jointly and severally in an amount to be determined at trial, but in any event no less than $380,000 plus accumulated interest due and owing on the outstanding promissory notes from P&I.

14.    Such other and equitable relief as the Court may deem appropriate, including set-offs, recoupments, and constructive trusts in favor of counterclaim plaintiffs, and prejudgment interest and the costs of this Action, including reasonable attorneys' fees.

MILLER & CHEVALIER CHARTERED

By    _____/s/_____
        James A. Bensfield (DC Bar #189-084)
        Anthony J. Trenga (DC Bar #218255)
        Mark J. Rochon (DC Bar #376042)
        Matthew T. Reinhard (DC Bar # 474941)
        655 Fifteenth Street, N.W., Suite 900
        Washington, DC  20005-5701
        Tel. (202) 626-5800
        Fax. (202) 628-0858
        atrenga@milchev.com

Attorneys for Defendant/Counterclaim
Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

JOSEPH A. CARABILLO,                               )
                                                   )
      Plaintiff,                             )
                                                   )
v.                                                 )        Case No.:      1:03CV01556(RJL)
                                                   )        Judge:         Richard J. Leon
ULLICO INC.,                                       )        Deck Type:     Labor/ERISA
                                                   )
      Defendant.                             )
                                                   )
_____            )
                                                   )
ULLICO INC., et al.,                               )
                                                   )
      Counterclaim Plaintiffs,               )
                                                   )
v.                                                 )
                                                   )
JOSEPH A. CARABILLO, et al.                        )
                                                   )
      Counterclaim Defendants.               )
                                                   )
_____            )
                                                   )
JOHN K. GRELLE,                                    )
                                                   )
      Counterclaim/                          )
      Cross-claim Plaintiff,                 )
                                                   )
v.                                                 )
                                                   )
ULLICO INC., ROBERT A. GEORGINE,   )
THE UNION LABOR LIFE AUXILIARY     )
RETIREMENTBENEFITS PLAN, and       )
MARK SINGLETON in his capacity as  )
Plan Administrator,                                )
                                                   )
      Counterclaim/                          )
      Cross-claim Defendants.                )
_____            )

## COUNTERCLAIM DEFENDANT/COUNTERCLAIM AND CROSS-CLAIM PLAINTIFF JOHN K. GRELLE'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND CROSS-CLAIM TO COUNTERCLAIM PLAINTIFFS ULLICO INC. ET AL.'S AMENDED ANSWER AND COUNTERCLAIM

Counterclaim Defendant/Counterclaim and Cross-claim Plaintiff JOHN K.

GRELLE, by and through undersigned counsel, hereby answers Defendant/Counterclaim

Plaintiffs/Third Party Plaintiffs ULLICO INC., THE UNION LABOR LIFE

INSURANCE COMPANY, THE ULLICO INC. NON-QUALIFIED DEFERRED

COMPENSATION PLAN, THE UNION LABOR LIFE AUXILIARY RETIREMENT

BENEFITS PLAN, and MARK SINGLETON'S (collectively, "ULLICO") Amended

Answer and Counterclaim,[1] and by way of setting forth his affirmative defenses,

counterclaims, and cross-claim, hereby states and alleges as follows:

## ANSWER TO COUNTERCLAIM
(Breach of Fiduciary Duty, Breach of Contract,
Declaratory Judgment)

1.      To the extent ULLICO alleges its counterclaim seeks compensatory and

equitable relief, Mr. Grelle admits this allegation in paragraph 1 of the counterclaim.  Mr.

Grelle denies the remaining allegations in paragraph 1.

### Jurisdiction and Venue

2.      The allegations contained in paragraph 2 of the counterclaim are legal

conclusions to which no response is required.  To the extent any further response is

required, Mr. Grelle denies the allegations in paragraph 2.

### Parties

3.      To the extent ULLICO alleges ULLICO Inc. is a Maryland corporation

with its principal place of business in the District of Columbia, Mr. Grelle admits this

---

[1] Counterclaim Plaintiffs ULLICO et al. include Mr. Grelle as a "Counterclaim Defendant" in the amended
Answer and Counterclaim, even though he was not an original party to this lawsuit. The only plaintiff in
this action is Joseph Carabillo. Thus, the only counterclaim defendant in ULLICO's amended answer is
Mr. Carabillo, while all other named parties brought into this action by ULLICO, including Mr. Grelle, are
third party defendants. *See* Fed. R. Civ. P. 13, 14. For convenience of the Court, Mr. Grelle will be
consistent with ULLICO's description of the third party complaint as a counterclaim.

2

allegation in paragraph 3 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 3. To the extent not admitted, the allegations contained in paragraph 3 are denied.

4.    To the extent ULLICO alleges The Union Labor Life Insurance Company is a Maryland corporation with its principal place of business in the District of Columbia, Mr. Grelle admits this allegation in paragraph 4 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 4 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 4 are denied.

5.    To the extent ULLICO alleges the ULLICO Inc. Non-Qualified Deferred Compensation Plan is an employee benefits plan, Mr. Grelle admits this allegation in paragraph 5 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 5 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 5 are denied.

6.    To the extent ULLICO alleges the Union Labor Life Auxiliary Retirement Benefits Plan is an employee benefits plan, Mr. Grelle admits this allegation in paragraph 5 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 6 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 6 are denied.

7.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 7 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 7 are denied.

8.    To the extent ULLICO alleges Robert Georgine was employed by ULLICO as its President and Chief Executive Officer, Mr. Grelle admits this allegation in paragraph 8 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 8. To the extent not admitted, the allegations contained in paragraph 8 are denied.

9.    To the extent ULLICO alleges Joseph Carabillo was employed by ULLICO as its Chief Legal Officer, Mr. Grelle admits this allegation in paragraph 9 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 9. To the extent not admitted, the allegations contained in paragraph 9 are denied.

10.    To the extent ULLICO alleges Mr. Grelle is a citizen of the Commonwealth of Virginia and was employed by ULLICO as a Senior Vice President and Chief Financial Officer of the company starting January 2, 1996, Mr. Grelle admits these allegations in paragraph 10 of the counterclaim. To the extent ULLICO alleges Mr. Grelle resigned on February 25, 2003, Mr. Grelle denies this allegation in paragraph 10.

11.    To the extent ULLICO alleges James Luce was employed by ULLICO as an Executive Vice President, Mr. Grelle admits this allegation in paragraph 11 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 11. To the extent not admitted, the allegations contained in paragraph 11 are denied.

4

12.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 12 of the counterclaim.  To the extent not admitted, the allegations contained in paragraph 12 are denied.

13.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 13 of the counterclaim.  To the extent not admitted, the allegations contained in paragraph 13 are denied.

### Facts
### (General Allegations As To All Counts)

14.    To the extent ULLICO alleges that during the relevant period ULLICO was a privately held company, Mr. Grelle admits this allegation in paragraph 14 of the counterclaim.  Based upon information and belief, Mr. Grelle admits that ULLICO Inc. had three classes of stock, consisting of voting Capital Stock, voting Class A Stock, and non-voting Class B Stock.  Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 14.  To the extent not admitted, the allegations contained in paragraph 14 are denied.

### ULLICO Invests in Global Crossing

15.    Based upon information and belief, Mr. Grelle admits the allegations in paragraph 15 of the counterclaim.

16.    Based upon information and belief, Mr. Grelle admits the allegations in paragraph 16 of the counterclaim.

17.    Based upon information and belief, Mr. Grelle admits that there were rises in Global Crossing stock value.  Mr. Grelle, however, is without sufficient information or belief to either admit or deny the specific allegations contained in paragraph 17 of the

5

counterclaim. To the extent not admitted, the allegations contained in paragraph 17 are denied.

### ULLICO Adopts a Formal Repurchase Program in 1997

18.     To the extent ULLICO alleges that, in the spring of 1997 the Board decided to use a share redemption program, Mr. Grelle admits this allegation in paragraph 18 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 18. To the extent not admitted, the allegations contained in paragraph 18 are denied.

19.     To the extent ULLICO alleges the Board approved a formal stock repurchase program in May 1997, Mr. Grelle admits this allegation in paragraph 19 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 19. To the extent not admitted, the allegations contained in paragraph 19 are denied.

20.     Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 20 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 20 are denied.

### ULLICO Adopts a New Share Price Value System in Connection With the 1997 Repurchase Program

21.     To the extent ULLICO alleges that, beginning in May 1997, the Board would set the price per share annually under a "book value" method based on ULLICO's prior year-end audited book value per share, Mr. Grelle admits this allegation in paragraph 21 of the counterclaim. Furthermore, to the extent ULLICO alleges the initial price set in May 1997 was $27.06 per share, Mr. Grelle admits this allegation in paragraph 21. Mr. Grelle is without sufficient information or belief to either admit or

deny the remaining allegations contained in paragraph 21. To the extent not admitted, the

allegations contained in paragraph 21 are denied.

22.    To the extent ULLICO alleges it adopted the following prices per share for

the period 1997 – 2003: May 1997 – May 1998: $27.06; May 1998 – May 1999: $28.70;

May 1999 – May 2000: $53.94; May 2000 – May 2001: $146.04; May 2001 – May 2002:

$74.87; and May 2002 – May 2003: $46.58, Mr. Grelle admits these allegations in

paragraph 22 of the counterclaim. Mr. Grelle is without sufficient information or belief

to either admit or deny the remaining allegations contained in paragraph 22. To the

extent not admitted, the allegations contained in paragraph 22 are denied.

### Corporate Insiders Utilize the New Price Formula
### to Reap Personal Benefits from the Run Up of ULLICO Stock

23.    Mr. Grelle denies the allegations in paragraph 23 of the counterclaim.

24.    Mr. Grelle denies the allegations in paragraph 24 of the counterclaim.

### The 1998 and 1999 Stock Offer Programs to Corporate Insiders

25.    Mr. Grelle is without sufficient information or belief to either admit or

deny the allegations contained in paragraph 25 of the counterclaim. To the extent not

admitted, the allegations contained in paragraph 25 are denied.

26.    Mr. Grelle is without sufficient information or belief to either admit or

deny the allegations contained in paragraph 26 of the counterclaim. To the extent not

admitted, the allegations contained in paragraph 26 are denied.

27.    Mr. Grelle is without sufficient information or belief to either admit or

deny the allegations contained in paragraph 27 of the counterclaim. To the extent not

admitted, the allegations contained in paragraph 27 are denied.

28.    To the extent ULLICO alleges Mr. Georgine offered Mr. Grelle the right to purchase up to 4,000 shares of stock at $53.94 per share, Mr. Grelle admits this allegation in paragraph 28 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 28. To the extent not admitted, the allegations contained in paragraph 28 are denied.

29.    Mr. Grelle denies the allegations in paragraph 29 of the counterclaim.

30.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 30 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 30 are denied.

31.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 31 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 31 are denied.

32.    To the extent ULLICO alleges Mr. Georgine offered Mr. Grelle the opportunity to buy 2,000 shares of ULLICO stock in July 1998 and 2,000 shares in October 1998 at a price of $28.70 per share, and an additional 4,000 shares in December 1999 at a price of $53.94 per share, Mr. Grelle admits these allegations in paragraph 32 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 32. To the extent not admitted, the allegations contained in paragraph 32 are denied.

33.    To the extent ULLICO alleges Mr. Grelle purchased stock pursuant to the 1998 and 1999 Stock Offer Programs, Mr. Grelle admits this allegation. Furthermore, to the extent the allegations in paragraph 33 of the counterclaim apply to other officers, Mr.

8

Grelle is without sufficient information or belief to either admit or deny these allegations contained in paragraph 33. To the extent not admitted, the allegations contained in paragraph 33 are denied.

34.    The allegations contained in paragraph 34 of the counterclaim are legal conclusions to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations in paragraph 34.

35.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 35 of the counterclaim. Furthermore, to the extent ULLICO alleges violations of Maryland law, the allegations in paragraph 35 contain legal conclusions to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations in paragraph 35.

<u>The 1998, 1999, 2000 and 2001 Repurchase Programs</u>

36.    To the extent ULLICO alleges Mr. Grelle received an offer to repurchase stock under the 1998 repurchase program, and that the 1998 program included a provision exempting holders of 10,000 or fewer shares from the program's proration provisions, Mr. Grelle admits these allegation in paragraph 36 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 36. To the extent not admitted, the allegations contained in paragraph 36 are denied.

37.    To the extent ULLICO alleges Mr. Grelle received an offer to repurchase stock under the 1999 repurchase program at $53.94 per share, that the repurchase offer closed on December 17, 1999, and that the 1999 program included a provision exempting holders of 10,000 or fewer shares from the program's proration provisions, Mr. Grelle

9

admits these allegations in paragraph 37 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 37. To the extent not admitted, the allegations contained in paragraph 37 are denied.

38.    Based upon information and belief, Mr. Grelle admits that there were changes in Global Crossing stock value. Mr. Grelle, however, is without sufficient information or belief to either admit or deny the specific allegations contained in paragraph 38 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 38 are denied.

39.    To the extent ULLICO alleges that the company adopted a ULLICO stock price of $146.04 per share, Mr. Grelle admits this allegation in paragraph 39 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 39. To the extent not admitted, the allegations contained in paragraph 39 are denied.

40.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 40 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 40 are denied.

41.    Based on information and belief, Mr. Grelle admits the program had an aggregate value of approximately $240 million. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 41 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 41 are denied.

42.    Based on information and belief, Mr. Grelle admits the repurchase plan was subject to the condition that Global Crossing stock could not be trading less than $43 per share. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 42 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 42 of the counterclaim are denied.

43.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 43 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 43 of the counterclaim are denied.

44.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 44 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 44 are denied.

45.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 45 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 45 are denied.

46.    To the extent ULLICO alleges Mr. Grelle received a letter from Mr. Georgine announcing the Actual 2000 Repurchase Program, Mr. Grelle admits this allegation in paragraph 46 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 46. To the extent not admitted, the allegations contained in paragraph 46 are denied.

47.    To the extent ULLICO alleges that, on December 14, 2000, Mr. Georgine formally offered to repurchase $30 million of stock, and that the exemption from proration for holders of less than 10,000 shares was disclosed in the repurchase

11

documents, Mr. Grelle admits these allegations in paragraph 47 of the counterclaim. To the extent ULLICO alleges statements in the tender offer documents, no response is required because the language of the documents speaks for itself. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 47. To the extent not admitted, the allegations contained in paragraph 47 are denied.

48. Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 48 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 48 are denied.

49. The allegations contained in paragraph 49 of the counterclaim are legal conclusions to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 49.

### Georgine's "Discretionary" Repurchases in 2000-2001

50. Based upon information and belief, Mr. Grelle admits that, for some time, the Chief Executive Officer had the discretion to repurchase ULLICO Inc. stock. Mr. Grelle, however, is without sufficient information or belief to either admit or deny the specific allegations contained in paragraph 50 of the counterclaim, particularly whether there was either an informal "discretionary" repurchase program. To the extent not admitted, the allegations contained in paragraph 50 are denied.

51. Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 51 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 51 are denied.

12

52.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 52 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 52 are denied.

53.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 53 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 53 are denied.

54.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 54 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 54 are denied.

### Total Stock Repurchased at $146.04 Per Share

55.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 55 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 55 are denied.

56.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 56 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 56 are denied.

### The 2001 Stock Repurchase Program

57.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 57 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 57 are denied.

58.    Mr. Grelle admits the allegations in paragraph 58 of the counterclaim.

59.    Mr. Grelle is without sufficient information or belief to either admit or

deny the allegations contained in paragraph 59 of the counterclaim.  To the extent not

admitted, the allegations contained in paragraph 59 are denied.

60.    Mr. Grelle is without sufficient information or belief to either admit or

deny the allegations contained in paragraph 60 of the counterclaim.  To the extent not

admitted, the allegations contained in paragraph 60 are denied.

61.    Mr. Grelle denies the allegations in paragraph 61 of the counterclaim.

### The Non-Qualified Deferred Compensation Plan

62.    Based upon information and belief, Mr. Grelle admits the allegations in

paragraph 62 of the counterclaim.

63.    To the extent ULLICO alleges that, under the Deferred Compensation

Plan, Mr. Grelle was allowed to defer up to 25% of his base salary and up to 100% of his

bonuses, including incentive awards under the Global Incentive Program, and to make

deemed investments of those amounts into one or more investment alternatives, Mr.

Grelle admits these allegations in paragraph 63 of the counterclaim.  Furthermore, to the

extent ULLICO alleges that one of the investment alternatives available to Mr. Grelle

under the Deferred Compensation Plan was ULLICO stock as valued each year, Mr.

Grelle admits this allegation in paragraph 63 of the counterclaim.  Mr. Grelle is without

sufficient information or belief to either admit or deny the remaining allegations

contained in paragraph 63.  To the extent not admitted, the allegations contained in

paragraph 63 are denied.

64.    To the extent ULLICO alleges that, in December 1999, Mr. Grelle elected

to move all of his deferred compensation to the deemed investment of ULLICO stock,

14

Mr. Grelle admits this allegation in paragraph 64 of the counterclaim. Furthermore, to the extent ULLICO alleges Mr. Grelle was deemed to have purchased ULLICO stock at $53.94 per share, Mr. Grelle admits this allegation in paragraph 64. Furthermore, to the extent the allegations in paragraph 64 apply to other officers, Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 64. To the extent not admitted, the allegations contained in paragraph 64 are denied.

65.    To the extent ULLICO alleges that Mr. Grelle elected to move his deferred compensation from the deemed investment of ULLICO stock into other deemed investment alternatives, Mr. Grelle admits this allegation in paragraph 65 of the counterclaim. Furthermore, to the extent the allegations in paragraph 65 apply to other officers, Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 65. To the extent not admitted, the allegations contained in paragraph 65 are denied.

66.    Based on information and belief, Mr. Grelle admits that Mr. Carabillo withdrew through a "hardship" distribution from the Deferred Compensation Plan. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 66 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 66 are denied.

67.    To the extent ULLICO alleges Mr. Grelle withdrew all amounts from his deferred compensation account, Mr. Grelle admits this allegation in paragraph 67 of the counterclaim. Furthermore, to the extent the allegations in paragraph 67 apply to another officer, Mr. Grelle is without sufficient information or belief to either admit or deny the

15

allegations contained in paragraph 67. To the extent not admitted, the allegations contained in paragraph 67 are denied.

## Auxiliary Retirement Benefits Plan

68.    Based upon information and belief, Mr. Grelle admits the Executive Committee of the Board of ULLICO Inc. authorized the creation of a Benefits Committee consisting of the senior officers of ULLICO Inc. Furthermore, to the extent ULLICO alleges statements in the May 5, 1997 Executive Committee Resolution, no response is required because the language of the resolution speaks for itself. To the extent ULLICO alleges the Benefits Committee was not authorized to amend the terms of the plans themselves, Mr. Grelle denies this allegation in paragraph 68.

69.    Mr. Grelle denies the allegation in paragraph 69 of the counterclaim that the officers "purported" to amend the definition of "Sponsoring Employee ULLICO Group Compensation." To the extent ULLICO alleges the officers did amend the definition, Mr. Grelle admits this allegation in paragraph 69. To the extent ULLICO alleges what the amendment stated, no response is required because the language of the amendment speaks for itself.

70.    Mr. Grelle denies the allegations in paragraph 70 of the counterclaim.

71.    Mr. Grelle denies the allegations in paragraph 71 of the counterclaim.

## Georgine's Employment Agreement and Related Agreements

72.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 72 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 72 are denied.

73.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 73 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 73 are denied.

74.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 74 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 74 are denied.

75.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 75 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 75 are denied.

76.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 76 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 76 are denied.

77.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 77 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 77 are denied.

78.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 78 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 78 are denied.

79.    To the extent ULLICO alleges former Illinois Governor James Thompson was appointed by the Board as Special Counsel to investigate the events surrounding ULLICO's 1998 and 1999 stock purchase offers to directors and several officers, its stock repurchase program, and the Global Crossing investment, Mr. Grelle admits this allegation in paragraph 79 of the counterclaim. To the extent ULLICO alleges that, in

17

early 2002, press reports began to appear concerning self-dealing by ULLICO corporate insiders, and to the extent ULLICO alleges that, after seven months of investigations, with over 40 interviews and the review of thousands of pages of documents, Governor Thompson issued the "Thompson Report," Mr. Grelle is without sufficient information or belief to either admit or deny these allegations contained in paragraph 79 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 79 are denied. Furthermore, to the extent ULLICO alleges the findings of the Thompson Report, no response is required because the language of the Report speaks for itself.

80.    Based upon information and belief, Mr. Grelle admits the allegations in paragraph 80 of the counterclaim.

81.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 81 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 81 are denied.

82.    To the extent ULLICO alleges Mr. Grelle resigned on February 25, 2003, Mr. Grelle denies this allegation in paragraph 82 of the counterclaim. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 82 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 82 are denied.

83.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 83 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 83 are denied.

**Count I – Breach of Fiduciary Duty; Aiding and Abetting
Breaches of Fiduciary Duty and Unjust Enrichment
(Against Georgine and Carabillo)**

84.     In response to the allegations contained in paragraph 84 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-83 in this answer.

85.     No response is necessary to the allegations in paragraph 85 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 85.

86.     No response is necessary to the allegations in paragraph 86 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 86.

87.     No response is necessary to the allegations in paragraph 87 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 87.

88.     No response is necessary to the allegations in paragraph 88 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 88.

89.     No response is necessary to the allegations in paragraph 89 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 89.

90.     No response is necessary to the allegations in paragraph 90 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 90.

91.    No response is necessary to the allegations in paragraph 91 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 91.

92.    No response is necessary to the allegations in paragraph 92 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 92.

93.    No response is necessary to the allegations in paragraph 93 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 93.

94.    No response is necessary to the allegations in paragraph 94 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 94.

95.    No response is necessary to the allegations in paragraph 95 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 95.

## Count II – Professional Negligence
### (Against Carabillo)

96.    In response to the allegations contained in paragraph 96 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-95 in this answer.

97.    No response is necessary to the allegations in paragraph 97 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 97.

98.    No response is necessary to the allegations in paragraph 98 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 98.

99.    No response is necessary to the allegations in paragraph 99 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 99.

100.    No response is necessary to the allegations in paragraph 100 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 100.

### Count III – Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment (Against Grelle)

101.    In response to the allegations contained in paragraph 101 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-100 in this answer.

102.    The allegations contained in paragraph 102 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 102.

103.    Mr. Grelle denies the allegations in paragraph 103 of the counterclaim.

104.    The allegations contained in paragraph 104 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 104.

105.    The allegations contained in paragraph 105 of the counterclaim call for a legal conclusion, to which no response is required.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 105.

106.    The allegations contained in paragraph 106 of the counterclaim call for a legal conclusion, to which no response is required.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 106.

### Count IV – Breach of Fiduciary Duty; Aiding and Abetting; Breaches of Fiduciary Duty and Unjust Enrichment
### (Against Luce)

107.    In response to the allegations contained in paragraph 107 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-106 in this answer.

108.    No response is necessary to the allegations in paragraph 108 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 108.

109.    No response is necessary to the allegations in paragraph 109 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 109.

110.    No response is necessary to the allegations in paragraph 110 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 110.

111.    No response is necessary to the allegations in paragraph 111 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 111.

112.    No response is necessary to the allegations in paragraph 112 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 112.

## Count V – Breach of Employment Agreement
### (Against Georgine, O'Brien and Pacific Life Insurance Co.)

113.    In response to the allegations contained in paragraph 113 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-112 in this answer.

114.    No response is necessary to the allegations in paragraph 114 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 114.

115.    No response is necessary to the allegations in paragraph 115 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 115.

116.    No response is necessary to the allegations in paragraph 116 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 116.

117.    No response is necessary to the allegations in paragraph 117 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 117.

118.    No response is necessary to the allegations in paragraph 118 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 118.

119.    No response is necessary to the allegations in paragraph 119 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 119.

120.    No response is necessary to the allegations in paragraph 120 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 120.

### Count VI – Declaratory Judgment: Auxiliary Retirement Benefits Plan
### (Against Georgine, Carabillo, Grelle, and Luce)

121.    In response to the allegations contained in paragraph 121 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-120 in this answer.

122.    The allegations contained in paragraph 122 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 122.

123.    The allegations contained in paragraph 123 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 123.

124.    The allegations contained in paragraph 124 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 124.

125.    The allegations contained in paragraph 125 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 125.

126.    The allegations contained in paragraph 126 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 126.

127.    To the extent ULLICO alleges Mr. Grelle is expected to claim that he is entitled to retirement benefits under the Auxiliary Retirement Benefits Plan that are calculated with reference to the Amendment, Mr. Grelle admits this allegation in paragraph 127 of the counterclaim. To the extent ULLICO alleges the invalidity of the Amendment as to any claim for benefits by Mr. Grelle, Mr. Grelle denies this allegation in paragraph 127. Furthermore, to the extent the allegations in paragraph 127 apply to other officers, Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 127. To the extent not admitted, the allegations contained in paragraph 127 are denied.

128.    The allegations contained in paragraph 128 of the counterclaim call for a legal conclusion, to which no response is required.

129.    The allegations contained in paragraph 129 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 129.

### Count VII – Declaratory Judgment: The Deferred Compensation Plan
### (Against Georgine and Luce)

130.    In response to the allegations contained in paragraph 130 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-129 in this answer.

131.    No response is necessary to the allegations in paragraph 131 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 131.

132.    No response is necessary to the allegations in paragraph 132 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 132.

133.    No response is necessary to the allegations in paragraph 133 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 133.

134.    No response is necessary to the allegations in paragraph 134 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 134.

135.    No response is necessary to the allegations in paragraph 135 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 135.

136.    No response is necessary to the allegations in paragraph 136 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 136.

137.    No response is necessary to the allegations in paragraph 137 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 137.

138.    No response is necessary to the allegations in paragraph 138 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 138.

139.    No response is necessary to the allegations in paragraph 139 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 139.

140.    No response is necessary to the allegations in paragraph 140 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 140.

141.    No response is necessary to the allegations in paragraph 141 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 141.

## Count VIII – Breach of Fiduciary Duty and
## Return of Profits: Deferred Compensation Plan
### (Against Georgine and Carabillo)

142.    In response to the allegations contained in paragraph 142 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-141 in this answer.

143.    No response is necessary to the allegations in paragraph 143 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 143.

144.    No response is necessary to the allegations in paragraph 144 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 144.

145.    No response is necessary to the allegations in paragraph 145 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 145.

**Count IX – Breach of Fiduciary Duty and
Return of Profits: Deferred Compensation Plan
(Against Georgine, Carabillo, and Grelle)**

146.    In response to the allegations contained in paragraph 146 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-145 in this answer.

147.    Mr. Grelle admits the allegations in paragraph 147 of the counterclaim.

148.    Mr. Grelle denies the allegations in paragraph 148 of the counterclaim.

149.    Mr. Grelle denies the allegations in paragraph 149 of the counterclaim.

**Count X – Declaratory Judgment: SERP
(Against Georgine)**

150.    In response to the allegations contained in paragraph 150 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-149 in this answer.

151.    No response is necessary to the allegations in paragraph 151 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 151.

152.    No response is necessary to the allegations in paragraph 152 of the counterclaim because this claim is not against Mr. Grelle.  To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 152.

153.    No response is necessary to the allegations in paragraph 153 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 153.

154.    No response is necessary to the allegations in paragraph 154 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 154.

155.    No response is necessary to the allegations in paragraph 155 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 155.

156.    No response is necessary to the allegations in paragraph 156 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 156.

157.    No response is necessary to the allegations in paragraph 157 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 157.

### Count XI – Declaratory Judgment: Split Dollar Life Insurance Agreement
### (Against Georgine, O'Brien, and Pacific Life Insurance Co.)

158.    In response to the allegations contained in paragraph 158 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-157 in this answer.

159.    No response is necessary to the allegations in paragraph 159 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 159.

160.    No response is necessary to the allegations in paragraph 160 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 160.

161.    No response is necessary to the allegations in paragraph 161 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 161.

162.    No response is necessary to the allegations in paragraph 162 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 162.

### Count XII – Declaratory Judgment: Stock Purchase and Credit Agreement
### (Against Georgine)

163.    In response to the allegations contained in paragraph 163 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-162 in this answer.

164.    No response is necessary to the allegations in paragraph 164 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 164.

165.    No response is necessary to the allegations in paragraph 165 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 165.

166.    No response is necessary to the allegations in paragraph 166 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 166.

167.    No response is necessary to the allegations in paragraph 167 of the counterclaim because this claim is not against Mr. Grelle. To the extent any further response is required, Mr. Grelle denies the allegations contained in paragraph 167.

### Count XIII – Breach of Fiduciary Duty: P&I Loans
### (Against Georgine and Grelle)

168.    In response to the allegations contained in paragraph 168 of the counterclaim, Mr. Grelle incorporates by reference the responses to paragraphs 1-167 in this answer.

169.    To the extent ULLICO alleges Mr. Grelle had knowledge of loans made to Planners and Insurers, Inc., d/b/a Union Specialists ("P&I"), Mr. Grelle admits this allegation in paragraph 169 of the counterclaim. To the extent ULLICO alleges Mr. Grelle consented to the loans, Mr. Grelle admits that he conducted due diligence for the loans and that the loans were no different than previously made loans of a similar nature, but denies this allegation to the extent it implies any impropriety. Mr. Grelle is without sufficient information or belief to either admit or deny the remaining allegations contained in paragraph 169 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 169 are denied.

170.    Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 170 of the counterclaim. To the extent not admitted, the allegations contained in paragraph 170 are denied.

171.    The allegations contained in paragraph 171 of the counterclaim call for a legal conclusion, to which no response is required. To the extent any further response is required, Mr. Grelle is without sufficient information or belief to either admit or deny the

allegations contained in paragraph 171 as those allegation apply to Mr. Georgine. To the extent the allegations in paragraph 171 apply to Mr. Grelle, he denies the allegations.

172.    To the extent the allegations in paragraph 172 of the counterclaim apply to Mr. Georgine, Mr. Grelle is without sufficient information or belief to either admit or deny the allegations contained in paragraph 172. To the extent not admitted, the allegations contained in paragraph 172 are denied. Furthermore, to the extent the allegations in paragraph 172 apply to Mr. Grelle, he denies the allegations.

WHEREFORE, Mr. Grelle denies that Counterclaim Plaintiffs are entitled to any of the relief requested in ULLICO's prayer for relief. Unless specifically and expressly admitted herein, each and every allegation set forth in the Counterclaim is denied.

## AFFIRMATIVE DEFENSES

For his Affirmative Defenses, Mr. Grelle, by and through undersigned counsel, states as follows:

### First Affirmative Defense

ULLICO's counterclaim fails to state a claim against Mr. Grelle upon which relief can be granted.

### Second Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred by waiver, estoppel, and unclean hands.

### Third Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred by applicable statutes of limitations and laches.

### Fourth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred by failure to exhaust applicable administrative remedies.

### Fifth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred from insufficiency and/or defect of service of process.

### Sixth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred for failure to name all necessary parties.

### Seventh Affirmative Defense

ULLICO has failed to mitigate damages.

### Eighth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are an abuse of judicial process.

### Ninth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred, or any award of damages must be offset, under the doctrines of contributory/comparative negligence.

### Tenth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred, or any award of damages must be offset, under the doctrine of equitable indemnity.

### Eleventh Affirmative Defense

ULLICO's counterclaims against Mr.Grelle are subject to an offset pursuant to applicable state and federal laws.

### Twelfth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred by the business judgment rule.

### Thirteenth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred because he acted in the utmost good faith, exercised reasonable care and skill in the performance of his duties, and relied on the advise of counsel.

### Fourteenth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred due to ratification of the stock transactions by the Board of Directors.

### Fifteenth Affirmative Defense

ULLICO's counterclaim against Mr. Grelle for aiding and abetting is barred because there exists no underlying tortious activity.

### Sixteenth Affirmative Defense

ULLICO's counterclaim against Mr. Grelle for unjust enrichment is barred for lack of inequity.

### Seventeenth Affirmative Defense

ULLICO's counterclaim against Mr. Grelle in Count IX is barred, or any award of damages must be offset, to the extent ULLICO seeks a return of deferred compensation separate from the profits earned from the deemed investments.

### Eighteenth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred for presumption of assent by directors pursuant to Md. Code Ann. Corps. & Ass'ns § 2-410.

### Ninteenth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred because he performed his

duties in compliance with Md. Code Ann. Corps. & Ass'ns § 2-414.

### Twentieth Affirmative Defense

ULLICO's counterclaims against Mr. Grelle are barred under applicable state and federal

common law and statutes.

WHEREFORE, Mr. Grelle requests that Counterclaim Plaintiffs' Counterclaims

against his are dismissed with prejudice, and that Mr. Grelle be granted judgment against

Counterclaim Plaintiffs for costs and attorneys' fees, and any other relief this Court

deems appropriate.

### COUNTERCLAIMS AND CROSS-CLAIM

Mr. Grelle, by and through undersigned counsel, hereby alleges the following in

support of his counterclaims and cross-claim:

### Jurisdiction and Parties

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 2201 (declaratory

judgment), and 29 U.S.C. § 1132(a)(1)(B) (Employment Retirement Income Security Act

("ERISA")).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (c).

2.      Counterclaim and Cross-claim Plaintiff John K. Grelle is a citizen of

Virginia and was employed by ULLICO Inc. as Senior Vice President and Chief

Financial Officer.

3.      Counterclaim Defendant ULLICO Inc. is a Maryland corporation with its

principal place of business in the District of Columbia.

4.    Counterclaim Defendant The Union Labor Life Insurance Company is a
Maryland corporation with its principal place of business in the District of Columbia.

5.    Counterclaim Plaintiff ULLICO Inc. Non-Qualified Deferred
Compensation Plan ("Deferred Compensation Plan") is an employee benefits plan
established by ULLICO Inc.

6.    Counterclaim Defendant Union Labor Life Auxiliary Retirement Benefits
Plan ("Auxiliary Retirement Plan") is an employee benefits plan.

7.    Based on information and belief, Counterclaim Defendant Mark Singleton
serves as a Plan Administrator for the ULLICO Inc. Qualified Pension Plan and Trust and
Deferred Compensation Plan.  Counterclaim Defendants ULLICO Inc., Union Labor Life
Insurance Company, ULLICO Inc. Non-Qualified Deferred Compensation Plan, Union
Labor Life Auxiliary Retirement Plan, and Mark Singleton are hereinafter collectively
referred to as "ULLICO."

8.    Cross-claim Defendant Robert Georgine is a citizen of Maryland and was
Chairman of the Board of Directors, President and Chief Executive Officer of ULLICO
Inc.

### Counterclaim I – Abuse of Judicial Process
**(Against ULLICO Inc., Union Labor Life Ins. Co., ULLICO Inc.
Non-Qualified Deferred Compensation Plan, Union Labor Life Auxiliary
Retirement Plan, and Mark Singleton (collectively, "ULLICO"))**

9.    Mr. Grelle hereby incorporates by reference the allegations contained in
paragraphs 1-9 as though fully set forth in this Counterclaim.

10.    In April 2002, ULLICO Inc.'s Board of Directors appointed former
Illinois Governor James Thompson to investigate the events surrounding ULLICO's

stock purchase offers and its stock repurchase programs that occurred from 1997 through 2001.

11. Based on information and belief, in November 2002, Governor Thompson submitted to the Board of Directors the "Report of the Special Counsel[,] ULLICO Inc. Stock Purchase Offer and Repurchase Programs and Global Crossing Investment" (the "Thompson Report").

12. The Thompson Report stated that a "compelling argument" exists that ULLICO's directors, particularly those who benefited from "self-interested transactions," and principal officers Mr. Georgine and Joseph Carabillo, the Chief Legal Officer, may have breached their fiduciary duties under Maryland law. The Thompson Report did not name Mr. Grelle as a principal officer who may have breached his fiduciary duties under Maryland law.

13. The Thompson Report stated that Mr. Georgine and Mr. Carabillo were the corporate officers "heavily involved" in the formulation and implementation of the 1998 and 1999 stock offers, and the formal stock repurchase program and the "discretionary" stock repurchase program for the relevant period. The Thompson Report stated nothing about Mr. Grelle being heavily involved in such programs.

14. The Thompson Report found that the opportunity under the Deferred Compensation Plan to generate large returns based on the short-lived increase in the book value of ULLICO Inc. stock was the result of either a design flaw in the Plan or the purposeful decision by the Compensation Committee to permit the ULLICO Inc.'s senior officers to earn substantial additional compensation under the Plan. Mr. Grelle neither partook in the design of the Plan nor was a member of the Compensation Committee.

15.    As part of its remedial recommendations, the Thompson Report recommended that certain directors and officers return to ULLICO Inc. profits from sales of the stock purchased in 1998 and 1999. The Thompson report did not recommend that Mr. Grelle return his profits. Instead, the Thompson Report recommended that a determination be made whether a return of profits is appropriate in connection with the stock profits received by Mr. Grelle. As part of that determination, the Thompson Report stated that a special committee should determine the reasonableness of the profits received by senior officers other than Mr. Georgine and Mr. Carabillo in the form of stock sales. The Thompson report acknowledged that Mr. Grelle did not appear to be significantly involved in the creation or promotion of the 1998 and 1999 stock offer programs, the 2000 stock repurchase program or the "discretionary" stock repurchase program. Nor, as the Report mentioned, did it appear that Mr. Grelle was directly responsible for recommending or approving any of these programs.

16.    After the Thompson Report was provided to ULLICO Inc., the Board of Directors authorized the creation of a select committee, chaired by the late Professor John T. Dunlop and Daniel H. Mintz (the "Dunlop Committee"), to review the Thompson Report and make final recommendations to the Board of Directors. None of the members of the Dunlop Committee participated in the stock transactions reviewed in the Thompson Report.

17.    The Dunlop Committee's work focused on issues of law pertaining to the stock purchase and repurchase programs and whether any illegality had occurred. The Dunlop Committee enlisted the help and received the advice of several experts, including the framer and foremost expert on Maryland Corporate law, Professor James J. Hanks, Jr.

18.     Based on Mr. Hanks' opinions, other expert reports, and the Committee's own deliberations, the Dunlop Committee issued its report (the "Dunlop Report") concluding that there was no violation of Maryland corporate law by the directors or officers of ULLICO Inc. The Dunlop Report concluded that the sales and repurchase of shares to officers and directors were transacted in accordance with provisions and procedures developed by competent legal and accounting professionals, did not materially violate corporate by-laws or previous Board actions, and was consistent with the culture and traditional decision making procedures of ULLICO Inc. The Dunlop Report also found no evidence that corporate management deliberately withheld information pertinent to Board decisions, and found no evidence of any accounting irregularities or material misstatements of fact.

19.     The majority of the Dunlop Committee concluded that the Thompson Report uncovered no illegality on the part of board members and officers, and concluded there was no legal basis to call for the disgorgement by any director or officer of the proceeds of their investment in the company.

20.     The Dunlop Report noted that other reasons for disgorgement were suggested either in the Thompson Report or in the Dunlop Committee's discussions, such as media induced perceptions of wrong-doing and a cultural aversion among some trade unionists to the notion of anyone personally profiting from the operations of a trade union owned company. According to the Dunlop Report, in the view of the Dunlop Committee majority, it was profoundly unfair and immoral to punish or make scapegoats of individuals innocent of any wrongdoing for reasons of pragmatism or expediency.

21.    According to the Dunlop Report, two minority members of the Dunlop
Committee, which included Director Terence O'Sullivan (who is now ULLICO Inc.'s
Chairman), dissented from the majority on the grounds that only full adoption of the
Thompson Report's remedial actions would put the issues facing ULLICO Inc. behind
the company, whether the transactions in question were illegal or not.

22.    In addition to the Dunlop Report, and after the submission of the
Thompson Report to ULLICO Inc.'s Board of Directors, a report analyzing the
compensation for directors and senior officers of ULLICO Inc. was prepared by Robert
B. Jones of Aon Consulting (the "Jones Report"). The Jones Report concluded that
compensation for Mr. Grelle was reasonable and competitive with executive
compensation for similarly-situated companies.

23.    Several other reports prepared by experts, which were prepared after the
Thompson Report but before the filing of ULLICO's counterclaims against Mr. Grelle,
have concluded there was no violation of federal or state laws by Mr. Grelle.

24.    ULLICO's counterclaim against Mr. Grelle is a perversion of the judicial
process to achieve some other end which the process was not intended to accomplish,
including, but not limited to, placating to a media induced perception of wrong-doing,
appeasing a cultural aversion among some trade unionists to the notion of anyone
personally profiting from the operations of a trade union owned company, and coercing
Mr. Grelle to return profits and compensation to which he is legally entitled.

25.    Because of ULLICO's perversion of the judicial process, Mr. Grelle has
incurred and continues to incur substantial monetary costs, including but not limited to,
costs in defending this lawsuit.

**Counterclaim II – Declaratory Judgment re: Auxiliary Retirement Plan**
**(Against ULLICO Inc., Union Labor Life Ins. Co., Union Labor Life Auxiliary**
**Retirement Plan, and Mark Singleton)**

26.    Mr. Grelle hereby incorporates by reference the allegations contained in
paragraphs 1-25 as though fully set forth in this Counterclaim.

27.    Pursuant to ERISA, 29 U.S.C. § 1001 *et seq.*, Mr. Grelle was a participant
and beneficiary of the Auxiliary Retirement Plan.

28.    Based on information and belief, the Auxiliary Retirement Plan was
established on or about January 1, 1983 to provide benefits to employees and
beneficiaries of employees whose benefits under The Union Labor Life Insurance
Company/ULLICO Inc. qualified retirement plan might be reduced because of limitations
contained in Section 415 of the Internal Revenue Code.

29.    Based on information and belief, effective on or about January 1, 1989,
the Auxiliary Retirement Plan was amended to provide that recipients of benefits under
the ULLICO Inc. Qualified Pension Plan and Trust ("Qualified Plan") whose benefits
were reduced because of the application of Section 401(a)(17) of the Internal Revenue
Code were automatically Auxiliary Retirement Plan participants, and that benefits
payable by the Auxiliary Retirement Plan included any benefit that would have been
payable under the Qualified Plan had the Qualified Plan not been subject to the
limitations of Section 401(a)(17).

30.    Based on information and belief, as a result of the amendment to the
Auxiliary Retirement Plan effective on or about January 1, 1989, the Auxiliary
Retirement Plan was no longer maintained for the sole purpose of providing benefits in
excess of the limitations imposed by Section 415 of the Internal Revenue Code.

Therefore, the Auxiliary Retirement Plan was no longer exempt from ERISA coverage as an unfunded excessive benefit plan.

31.     Based on information and belief, the Auxiliary Retirement Plan currently in effect is a "top hat" plan subject to enforcement provisions of ERISA, but exempt from ERISA's substantive provisions, including vesting, funding and fiduciary requirements. Furthermore, and based on information and belief, the current plan provides for payment of benefits that would otherwise be payable under the Qualified Plan available to all ULLICO Inc. employees that cannot be paid as a result of limitations set forth in the Internal Revenue Code. Consequently, the definition of compensation and the calculations of benefits under the Auxiliary Retirement Plan are made by reference to the terms of the Qualified Plan.

32.     On or about May 5, 1997, the Executive Committee of ULLICO Inc.'s Board of Directors created the Benefits Committee of ULLICO Inc. The Executive Committee delegated to the Benefits Committee the authority to effect changes in the Qualified Plan, and deemed the acts and deeds of the Benefits Committee to be conclusively presumed the acts and deeds of the Corporation.

33.     Prior to January 1, 2000, the Qualified Plan's definition of "Sponsoring Employer ULLICO Group Compensation" did not include incentive compensation paid to a "Sponsoring Employer ULLICO Group Employee" by the Sponsor Employer ULLICO Group for personal services rendered during the Qualified Plan year.

34.     On or about October 20, 1999, the Benefits Committee resolved to amend the definition of "Sponsoring Employer ULLICO Group Compensation" in the Qualified

Plan to include "regularly established annual incentive compensation with no maximum, effective January 1, 2000."

35.    For each Qualified Plan year after January 1, 2000, Mr. Grelle received incentive compensation for services to ULLICO Inc. and is therefore entitled to receive benefits under the Auxiliary Retirement Plan for such incentive compensation.

36.    Based on information and belief, ULLICO Inc., The Union Labor Life Insurance Co., the Auxiliary Retirement Plan, and Mr. Singleton have denied, or have decided to deny in the future, benefits due under the Auxiliary Retirement Plan for senior officers, including Mr. Grelle.

37.    There is an actual, ripe, and justiceable controversy.

38.    As a result of the intent to deny benefits due to Mr. Grelle, he is entitled to a declaration that he is entitled to receive benefits payable pursuant to the Auxiliary Retirement Plan.

### Cross-claim I – Equitable Indemnity
### (Against Mr. Georgine)

39.    Mr. Grelle hereby incorporates by reference the allegations contained in paragraphs 1-38 as though fully set forth in this Counterclaim.

40.    Based on information and belief, Mr. Georgine was the principal senior officer responsible for the formulation and implementation of the stock offers, the repurchase program, and the "discretionary" stock repurchases during the relevant period that are the subject of the counterclaims brought by ULLICO against Mr. Grelle.

41.    Mr. Grelle began his employment as Senior Vice President and Chief Financial Officer at ULLICO Inc. in January 1996.

42.    From the beginning of his employment at ULLICO, Mr. Grelle advised
Mr. Georgine of the "cash crunch" facing ULLICO Inc., and that investments were being
made without regard to available cash and future liquidity of investments.

43.    In early 1997, Mr. Grelle expressed his concern to Mr. Georgine regarding
many of the Property and Causualty product lines ULLICO Inc. had entered into in the
early 1990s, and Mr. Grelle recommended that ULLICO Inc. discontinue most, if not all
of them. Mr. Grelle's recommendation was rejected by Mr. Georgine.

44.    Also during 1997 and 1998, ULLICO Inc. was considering Small Group
Insurance and Group Reinsurance product lines. While senior officers including Mr.
Grelle expressed concern as to the risks involved in these product lines, Mr. Georgine
told these officers to mind their own business.

45.    As of April 2003, cumulative losses for the Property and Casualty, Small
Group Insurance, and Group Reinsurance product lines reached more than $180 million.

46.    In both 1997 and 1998, during the time when the Global Crossing
investment provided short-term gains for ULLICO Inc., Mr. Grelle recommended two
separate proposals for cost cutting and reorganization measures. In both years, after
presentation of both proposals, Mr. Georgine rejected Mr. Grelle's recommendations.

47.    Since mid-2000, ULLICO Inc. had the right to sell all of its shares in
Global Crossing.

48.    On or around January 1, 2001, Global Crossing shares were selling at
more than $20 per share, but the value of the stock had experienced by that time a steady
decline. Although the senior investment officer had advised Mr. Georgine that the
proceeds from Global Crossing were going to be put into reserves and should not be sold,

44

Mr. Georgine never consulted Mr. Grelle about the senior investment officer's advice. Furthermore, despite Mr. Grelle's pleas to Mr. Georgine that ULLICO Inc. sell all of its Global Crossing Shares, Mr. Georgine never authorized any sales even though Global Crossing's share value continued to decline throughout 2001.

49.    On or about October 15, 2001, Mr. Grelle had notified Mr. Georgine that, taking into account ULLICO Inc.'s inability to realize all the cash expected from the Global Crossing investment, ULLICO Inc.'s future cash needs as projected needed Board action to alleviate the situation. Mr. Georgine failed to take timely action as recommended by Mr. Grelle.

50.    During the first half of 2002, Mr. Georgine implemented a "dual reporting structure" for the head of Ullico Insurance Group, severely compromising Mr. Grelle's authority and ability to manage the Property and Casualty product lines.

51.    Mr. Georgine allowed contracts to be signed on behalf of ULLICO Inc. by employees that greatly exceeded the authorized limit for the individual signing the contract, in complete disregard for corporate authority.

52.    In 2002, Mr. Georgine allowed for misrepresentations to be made to third parties, including ULLICO Inc.'s rating agency, A.M. Best. Among the misrepresentations made were that $1 billion had been committed for a ULLICO Inc. account, and that a $50 million bank loan had been secured through the First State Bank of Iowa. When Mr. Grelle had conducted due diligence regarding these misrepresentations and confronted Mr. Georgine about them, Mr. Georgine chastised Mr. Grelle.

53.     On or about November 22, 2002, after enduring numerous instances when Mr. Georgine either ignored or criticized Mr. Grelle's recommendations to improve the Company, Mr. Grelle sent a letter to Mr. Georgine announcing his decision to relinquish his position as Senior Vice President and Chief Financial Officer.

54.     After Mr. Georgine received the November 22, 2002 letter, he asked Mr. Grelle to remain at ULLICO Inc., to which Mr. Grelle agreed because of his belief that Mr. Georgine would allow him to perform his job effectively.

55.     On or about February 6, 2003, Mr. Grelle drafted, on behalf of Mr. Georgine and prepared for Mr. Georgine's signature, a letter to Mr. Gary Stephani of PricewaterhouseCoopers, who was conducting a "going concern" audit of ULLICO Inc. at that time. In the February 6, 2003 letter, Mr. Grelle provided a detailed plan of how ULLICO Inc. would streamline expenses and develop new ways of increasing revenue. Mr. Georgine, however, never signed or sent the letter.

56.     In February 2003, during an executive session of the ULLICO Inc. board members, Mr. Georgine recommended the retention of one or two consultants at the cost of $1.5 million to create a plan to streamline expenses and develop new avenues of revenue. Mr. Georgine made this recommendation without discussing the proposal with any senior officers, including Mr. Grelle, and despite the shortage of cash available to ULLICO Inc.

57.     On or about February 25, 2003, Mr. Grelle sent a letter to Mr. Georgine, stating he could no longer work with Mr. Georgine's undermining his authority and that he had been constructively discharged from his position.

46

58.    ULLICO has brought counterclaims against Mr. Grelle for breach of fiduciary duty to the Company in Counts III, IX, and XIII. In its counterclaim, ULLICO has prayed for the following relief against Mr. Grelle: As to Count III, judgment against Mr. Grelle in an amount to be determined at trial, but no less than $837,760; as to Count IX, judgment against Mr. Georgine, Mr. Carabillo, and Mr. Grelle jointly and severally in an amount to be determined at trial, but no less than $732,326.99; and as to Count XIII, judgment against Mr. Georgine and Mr. Grelle jointly and severally in an amount determined at trial, but no less than $380,000.

59.    ULLICO has brought counterclaims against Mr. Georgine for breaches of fiduciary duty.

60.    Should Mr. Grelle be found liable for any amount as alleged in Counts III, IX and/or XIII, and should Mr. Grelle be ordered to pay any monetary damages in an amount determined at trial, the Court should order Mr. Georgine to pay the entire amount of said monetary damages under the doctrine of equitable indemnity, based on the relationship of the parties, and Mr. Georgine's failure to uphold his duty to ULLICO despite Mr. Grelle's advice.

61.    Mr. Georgine would be unjustly enriched at the expense of Mr. Grelle if Mr. Grelle must pay said monetary damages, given Mr. Georgine's breach of duties to ULLICO.

62.    Mr. Grelle's conduct was not blameworthy, or as blameworthy as Mr. Georgine's conduct, in serving as an officer for ULLICO.

WHEREFORE, Mr. Grelle prays for and demands the following relief:

1.    With respect to Counterclaim I, judgment against ULLICO Inc., Union
Labor Life Insurance Company, ULLICO Inc. Non-Qualified Deferred Compensation
Plan, Union Labor Life Auxiliary Retirement Plan, and Mark Singleton, jointly and
severally in an amount to be determined by proof; and

2.    With respect to Counterclaim II, a declaratory judgment against ULLICO
Inc., Union Labor Life Insurance Company, Union Labor Life Auxiliary Retirement Plan,
and Mark Singleton, the Mr. Grelle is entitled to full benefits under the Auxiliary
Retirement Plan, including any benefits accrued on or after January 1, 2000; and

3.    With respect to Cross-claim I, judgment against Robert Georgine in an
amount to be determined by proof, but not less than any amount of damages Mr. Grelle is
ordered to pay for liability based on the allegations set forth in Counts III, IX, and/or XIII
of ULLICO's counterclaim; and

4.    With respect to all Counterclaims and Cross-claim, costs incurred,
including attorneys' fees, for this action; and

5.    With respect to all Counterclaims and Cross-claim, any other relief this

Court deems appropriate.


DATED this 18th day of November, 2003.


                                Respectfully submitted,

                                KRUPIN O'BRIEN LLC


                    By:    _____
                                Jay P. Krupin (D.C. Bar No. 253252)
                                Alison N. Davis (D.C. Bar No. 429700)
                                1156 Fifteenth Street, N.W., Suite 200
                                Washington, D.C. 20005
                                (202) 530-0700
                                (202) 530-0703 Facsimile
                                Counsel for Defendants


49

**CERTIFICATE OF SERVICE**

I certify that on November 18, 2003 I caused a copy of the foregoing

Counterclaim Defendant/Counterclaim and Cross-Claim Plaintiff John K. Grelle's

Answer, Affirmative Defenses, Counterclaims and Cross-Claims to Counterclaim

Plaintiffs ULLICO Inc., et al.'s Amended Answer and Counterclaim to be served

electronically via Electronic Case Filing and by hard copy via U.S. Mail, upon the

following parties:

> Anthony Trenga, Esq.,
> Miller & Chevalier, Chartered
> 655 Fifteenth Street, NW, Suite 900
> Washington, DC 20005-5701
> Attorney for ULLICO
>
> Robert Scully, Esq.
> Rees Broome & Diaz PC
> 8133 Leesburg Pike, 9th Floor
> Vienna, VA 22182
> Attorney for James W. Luce
>
> Randall Turk, Esq.
> Baker Botts, LLP
> 1299 Pennsylvania Ave., N.W.
> Washington, DC 20004-2400
> Attorney for Robert A. Georgine
>
> Ann J. O'Brien, Trustee
> Robert A. and Mary Rita Georgine Trust
> Arnold & Porter
> Thurman Arnold Building
> 555 Twelfth Street, NW
> Washington, DC
>
> Pacific Life Insurance Company
> 700 Newport Center Drive
> Newport Beach, CA 92660

> _____
> Alison N. Davis

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

JUL 2 6 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| JOSEPH A. CARABILLO, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ULLICO INC. PENSION PLAN | ) |
| AND TRUST, ADMINISTRATOR | ) |
| OF THE ULLICO INC. PENSION | ) |
| PLAN AND TRUST, PLAN | ) |
| ADMINISTRATION COMMITTEE | ) |
| OF THE ULLICO INC. PENSION | ) |
| PLAN AND TRUST, JOHN DOES | ) |
| NOS. 1-20 in their capacities as | ) |
| members or former members of the | ) |
| PLAN ADMINISTRATION | ) |
| COMMITTEE OF THE ULLICO | ) |
| INC. PENSION PLAN AND | ) |
| TRUST, ULLICO INC. | ) |
| EMPLOYEES' LIFE AND HEALTH | ) |
| WELFARE PLAN, | ) |
| ADMINISTRATOR OF THE | ) |
| ULLICO INC. EMPLOYEES' LIFE | ) |
| AND HEALTH WELFARE PLAN, | ) |
| THE UNION LABOR LIFE | ) |
| AUXILIARY RETIREMENT | ) |
| BENEFITS PLAN, and | ) |
| ADMINISTRATOR OF THE | ) |
| UNION LABOR LIFE AUXILIARY | ) |
| RETIREMENT BENEFITS PLAN, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| | ) |
| ULLICO INC.,THE ULLICO INC. | ) |
| NON-QUALIFIED DEFERRED | ) |
| COMPENSATION PLAN, | ) |
| ULLICO INC . | ) |
| EMPLOYEES' LIFE AND HEALTH | ) |
| WELFARE PLAN, THE UNION | ) |
| LABOR LIFE AUXILIARY | ) |

CASE NUMBER:  1:04CV00776(RJL)

DECK TYPE:  Labor/ERISA (non-employment)

RETIREMENT BENEFITS PLAN    )
and MARK SINGLETON,    )
in his capacity as a member of the    )
Employee Benefit Plans    )
Administrative Committee,    )
    )
    Counterclaim Plaintiffs,    )
    )
    v.    )
    )
JOSEPH A. CARABILLO,    )
    )
ROBERT A. GEORGINE    )
301 Valley Brook Drive    )
Silver Spring, MD 20904,    )
    )
 JOHN K. GRELLE,    )
2256 Bridge Hill Lane    )
Oakton, VA 22124    )
    )
and JAMES W. LUCE,    )
10712 Milkwood Drive    )
Great Falls, VA 22066    )
    )
    Counterclaim Defendants.    )
_____    )

## ANSWER AND COUNTERCLAIMS

    In response to the Complaint filed herein, Defendants and counterclaim plaintiffs file this

Answer and Counterclaim.

## ANSWER

### FIRST DEFENSE

    The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

    Plaintiff has failed to exhaust his administrative remedies.

2

## THIRD DEFENSE

Plaintiff has failed to join all necessary parties.

## FOURTH DEFENSE

Plaintiff materially breached his duties and obligations to the ULLICO Inc. Pension Plan and Trust (the "Qualified Plan"), The ULLICO Inc. Employee's Life and Health Welfare Plan (the "Welfare Plan"), The Union Labor Life Auxiliary Retirement Benefits Plan (the "Auxiliary Plan") (collectively "the Plans"), and ULLICO Inc. (which is responsible for funding all benefits under the Welfare and Auxiliary Plans) and therefore has forfeited all or part of any benefits he would otherwise be entitled to receive under the Plans.

## FIFTH DEFENSE

Plaintiff materially breached his duties and obligations to the Plans and ULLICO Inc. and Defendants are therefore entitled to set-off and recoup from any benefits due Plaintiff under the Plans any damages caused to the Plans as a result of Plaintiff's breach of his duties and obligations.

## SIXTH DEFENSE

Plaintiff does not qualify, under the terms of the Plans, for the benefits claimed.

## SEVENTH DEFENSE

Responding to the specific allegations of the Complaint, defendants:

1.    Affirmatively aver that the allegations of paragraph 1 are legal conclusions to which no response is necessary, but to the extent that there are any allegations of wrongdoing, improper conduct or causation such allegations are denied.

3

2.    Admit that this Court has jurisdiction over this dispute, and otherwise affirmatively aver that the allegations of paragraph 2 are legal conclusions to which no response is necessary.

3.    Affirmatively aver that the allegations of paragraph 3 are legal conclusions to which no response is necessary; and deny the allegations of paragraph 3 to the extent it alleges any right to the affirmative relief sought.

4.    Admit that venue is proper in this Court, and otherwise affirmatively aver that the allegations of paragraph 4 are legal conclusions to which no response is necessary.

5.    Admit the allegations of paragraph 5.

6.    Admit the allegations of paragraph 6.

7.    Affirmatively aver that the Qualified Plan is administered by a Plan Administrator, and that the Plan Administrator is the Employee Benefit Plans Administrative Committee ( the "Benefits Committee") appointed by ULLICO Inc., the Plan Sponsor, that members of the Benefits Committee serve as fiduciaries of the Qualified Plan as defined by ERISA §3(21)(A), and deny the remaining allegations of paragraph 7.

8.    Affirmatively aver that the Qualified Plan is administered by a Plan Administrator, and that the Plan Administrator of the Qualified Plan is a Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that members of the Benefits Committee serve as fiduciaries of the Qualified Plan as defined by ERISA §3(21)(A), and deny the remaining allegations of paragraph 8.

9.    Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9.

4

10.    Admit that the Welfare Plan is an employee benefit plan within the meaning of ERISA §3(3), and a welfare benefit plan within the meaning of ERISA §3(1); affirmatively aver that the Welfare Plan maintains insurance policies that, *inter alia*, provide medical and life insurance coverage to Welfare Plan participants, and further aver that all premiums for said policies are paid by and from the general accounts of the Welfare Plan Sponsor, ULLICO Inc. Admit that the Welfare Plan is administered in the District of Columbia; and deny the remaining allegations of paragraph 10.

11.    Affirmatively aver that the Welfare Plan is administered by a Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that the Benefits Committee is an administrator of the Welfare Plan as defined by ERISA § 3(16)(A); and members of the Benefits Committee serve as fiduciaries of the Welfare Plan as defined by ERISA §3(21)(A), and deny the remaining allegations of paragraph 11.

12.    Affirmatively aver that any amounts due under the Auxiliary Plan are paid from the general accounts of the Plan Sponsor, ULLICO Inc; and admit the allegations of paragraph 12.

13.    Affirmatively aver that the Auxiliary Plan is administered by a Benefits Committee appointed by ULLICO Inc., the Plan Sponsor, and that the Benefits Committee is an administrator of the Auxiliary Plan as defined by ERISA §3(16)(A); and deny the remaining allegations of paragraph 13.

14.    Admit that ULLICO Inc. is a corporation formed under Maryland law with its principal place of business in the District of Columbia; that ULLICO Inc. is the Plan Sponsor for the Qualified Plan, Auxiliary Plan and Welfare Plan within the meaning of 29 U.S.C.

§ 1002(16)(b)(i); and affirmatively aver that, as a plan sponsor of the Plans, ULLICO Inc. is a necessary party to these proceedings.

15.    Admit that Plaintiff was employed by ULLICO from March 1987, until May 30, 2003; and that during the term of his employment plaintiff was a participant in the Qualified Plan, Auxiliary Plan, and Welfare Plan; deny that Plaintiff is currently entitled to benefits under those plans; and affirmatively aver that, by virtue of Plaintiff's breach of fiduciary duty to the plans and Plan Sponsor ULLICO Inc., Plaintiff is not entitled to and has otherwise forfeited his rights to any benefits under the plans, and deny the remaining allegations of paragraph 15.

16.    Admit the allegations of paragraph 16, and affirmatively aver that the "June 1, 2003 Early Retirement Program" is also referred to as the "Special Early Retirement Program."

17.    Admit that to be eligible to participate in the Special Early Retirement Program a person, among other things, had to be a participant in the Qualified Plan, either 55 with 15 years of service or 65 with 5 years of service by June 1, 2003, elect retirement by June 1, 2003, and execute an Election and Release Form approved by the Plan Sponsor; affirmatively aver that, in addition to these requirements, to be eligible to participate in the Special Early Retirement Program a person had to actually voluntarily terminate employment and in fact retire on June 1, 2003, and deny the remaining allegations of paragraph 17.

18.    Deny the allegations of paragraph 18.

19.    Admit the allegations of paragraph 19.

20.    Do not have knowledge or information sufficient to form a belief with respect to all participants as to the truth of the allegation that "[t]he Early Retirement Program therefore provided a distinct advantage over the Qualified Plan's regular early retirement benefit"; admit that, under the normal early retirement provisions of the Qualified Plan, participants who retire

6

before age sixty have their benefits calculated by determining the participant's benefit had he retired at the Normal Retirement Age, and then reducing that amount by 0.3% for each month prior to age 65 that benefits commence; and deny the remaining allegations of paragraph 20.

21.    Affirmatively aver that paragraph 21 is a legal conclusion to which no response is required.

22.    Admit the allegations of paragraph 22.

23.    Affirmatively aver that Plaintiff by virtue of his breach of fiduciary duties to defendants and ULLICO Inc. is not, under any circumstances, entitled to benefits under the Auxiliary Plan; and admit the allegations of paragraph 23

24.    Admit that the Early Retirement Program, as defined in the Complaint and hereinafter referring to the June 1, 2003 Special Early Retirement Program, resulted in eligible participants receiving as part of that program those benefits under the Welfare Plan that would have been payable as part of their normal retirement under the Qualified Plan; and deny remaining allegations of paragraph 24.

25.    Admit that ULLICO sent Carabillo a letter dated April 17, 2003; that the letter was addressed from Louis Hejl; that the letter discussed ULLICO Inc.'s Early Retirement Program; that ULLICO sent a letter to Plaintiff on April 21, 2003, which was addressed from Louis Hejl; that the April 21, 2003, letter also enclosed an "Election and Release Form" related to the Early Retirement program; affirmatively aver that the alleged letters and forms speak for themselves, the substance of which are not completely alleged and deny the remaining allegation of paragraph 25.

26.    Admit the allegations of paragraph 26.

27.    Do not have knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation as to when Plaintiff signed and dated the Election and Release form; admit that the executed form was faxed to Lou Hejl on May 7, 2003; that Mr. Hejl informed Plaintiff that he needed to forward the original executed copy of the Election and Release form; that Plaintiff delivered the original form on May 8, 2003, to, and was given a copy of the executed form by, Mr. Hejl; that Mr. Hejl signed and dated the Election and Release form and provided a copy to Plaintiff; and deny the remaining allegations of paragraph 27.

28.    Affirmatively allege that the Election and Release Form speaks for itself, that the contents of the Form is not completely stated and taken out of context; admit that the Form contains the alleged language and deny the remaining allegations of paragraph 28.

29.    Admit the allegations of paragraph 29.

30.    Affirmatively allege that the alleged letter speaks for itself and that its contents are not quoted in its entirety; admit that defendants sent plaintiff a letter dated May 22, 2003, addressed from Jennifer Shea, the Health & Life Benefits Administrator, and Christine Bellotti, the Retirement Benefits Administrator; and that the letter contains the quoted language; and deny the remaining allegations of paragraph 30.

31.    Admit that it appears that $1 was deposited to Plaintiff's checking account at First Union Bank on or about May 27, 2003, and do not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

32.    Affirmatively aver that the alleged letter speaks for itself and that the contents of that letter is not quoted in its entirety or accurately; admit that Edward Grebow executed a letter dated May 30, 2003, informing plaintiff that he was being terminated for cause; and that the letter contains the quoted language; affirmatively aver that this letter was sent via overnight

8

delivery service to Plaintiff at 37437 Quanbeck Lane, Middleburg, Virginia 20117, his address of record and last known address; and deny the remaining allegations of paragraph 32.

33.    Admit that on June 16, 2003 Louis Hejl received an email purporting to be from plaintiff; that the email stated, *inter alia*, that plaintiff had not yet received retirement benefits; and do not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 33.

34.    Admit that the email received by Louis Hejl on June 16, 2003, requested that, under certain circumstances, it be considered "an appeal under the plan"; and deny the remaining allegations of paragraph 34.

35.    Affirmatively aver that the alleged letter speaks for itself and that the contents are not quoted in its entirety; admit that a letter dated August 13, 2003, was sent to plaintiff, that the letter was addressed from Louis Hejl and that the letter contains the quoted language and deny the remaining allegations of paragraph 35.

36.    Affirmatively aver that  the August 13, 2003, letter was sent on or about August 13, 2003, to plaintiff's last known address and that the letter was subsequently provided to UPS on August 29, 2003, for delivery to Plaintiff, after Plaintiff's then current mailing address was learned; and deny the remaining allegations of paragraph 36.

37.    Deny the allegations of paragraph 37.

38.    Affirmatively aver that the provisions of the Qualified Plan, and Section 9.1 thereof, speak for themselves; admit that Article 9.1 states that any determination as to benefits under the Plan is to be made by the Plan Administrator and that Article 9.2 of the Qualified Plan states that the denial of benefits under the Qualified Plan is to be provided to a participant in

writing by the Plan Administrator within a reasonable time; and deny the remaining allegations of paragraph 38.

39.    Admit that Section 9.3 contains the quoted language; and deny the remaining allegations of paragraph 39.

40.    Deny the allegations of paragraph 40.

41.    Deny the allegations of paragraph 41.

42.    Deny the allegations of paragraph 42.

43.    Deny the allegations of paragraph 43.

44.    Deny, as framed, the allegations of paragraph 44.

45.    Deny the allegations of paragraph 45.

46.    Affirmatively aver that the allegations of paragraph 46 are a legal conclusion to which no response is required; but to the extent a response is required, deny the allegations of paragraph 46.

47.    Deny the allegations of paragraph 47.

48.    Deny the allegations of paragraph 48.

49.    Affirmatively aver that the allegations of paragraph 49 are a legal conclusion to which no response is required; admit that the alleged section contains the quoted language and deny the remaining allegations of paragraph 49.

50.    Deny the allegations of paragraph 50.

**As to First Claim for Relief – Benefits Under the Terms of the Qualified Plan:**

51.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-50 in response to the allegations of paragraph 51.

52.    Affirmatively aver that the definition of "retirement" set forth in Section 2.49 does not apply to the Early Retirement Program; and deny the allegations of paragraph 52.

53.    Admit that Plaintiff was terminated "for cause" on May 30, 2003, and affirmatively aver that Plaintiff had been on "administrative leave" since March 28, 2003, and had not been regularly present at defendants' office since that time; and deny the remaining allegations of paragraph 53.

54.    Deny the allegations of paragraph 54.

55.    Deny the allegations of paragraph 55.

56.    Deny the allegations of paragraph 56.

57.    Admit that plaintiff executed an Election and Release Form relating to the Special Early Retirement Program; and deny the remaining allegations of paragraph 57.

**As to Second Claim for Relief – Interest on Retroactive Benefits Under the Terms of the Qualified Plan:**

58.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-57 in response to the allegations of paragraph 58.

59.    Deny the allegations of paragraph 59.

**As to Third Claim for Relief – Benefits from the Welfare Plan:**

60.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-59 in response to the allegations of paragraph 60.

61.    Deny the allegations of paragraph 61.

**As to Fourth Claim for Relief – Refund of all COBRA Payments Made for Continued Coverage Under the Welfare Plan with Interest:**

62.    Defendants incorporate herein and make a part hereof their responses to paragraphs 1-61 in response to the allegations of paragraph 62.

63.     Admit that Plaintiff was denied benefits under the Early Retirement Program, and was not provided with retiree benefits under the Welfare Plan; affirmatively aver that Plaintiff is not eligible to receive benefits under either the Early Retirement Program or the Welfare Plan; and deny the remaining allegation of paragraph 63.

64.     Do not have knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64.

65.     Deny the allegations of paragraph 65.

**As to Fifth Claim for Relief – Benefits under the Terms of the Auxiliary Plan:**

66.     Defendants incorporate herein and make a part hereof their responses to paragraphs 1-65 in response to the allegations of paragraph 66.

67.     Deny the allegations of paragraph 67.

**As to Sixth Claim for Relief – Interest on Retroactive Benefits from the Auxiliary Plan:**

68.     Defendants incorporate herein and make a part hereof their responses to paragraphs 1-67 in response to the allegations of paragraph 68.

69.     Deny the allegations of paragraph 69.

**As to Seventh Claim for Relief – Attorney's Fees and Costs:**

70.     Defendants incorporate herein and make a part hereof their responses to paragraphs 1-69 in response to the allegations of paragraph 70.

71.     Affirmatively aver that the allegations of paragraph 71 are a legal conclusion to which no response is required; but to the extent that there is allegation that plaintiff is entitled to recover legal fees or expenses, deny the allegations of paragraph 71.

**EIGHTH DEFENSE**

Plaintiff is not entitled to the relief sought.

12

## COUNTERCLAIM
(Breach of Fiduciary Duty, Breach of Contract,
Declaratory Judgment)

1.     This counterclaim seeks compensatory and equitable relief in connection with counterclaim defendants Joseph Carabillo ("Carabillo"), Robert A. Georgine ("Georgine"), John K. Grelle ("Grelle") and James A. Luce's ("Luce") breaches of fiduciary duties to Counterclaim Plaintiffs.

### Jurisdiction and Venue

2.     This Court has jurisdiction pursuant to Fed. R. Civ. P 13, 19 and 20, 28 U.S.C. § 1331 (federal questions), 28 U.S.C. § 1332 (diversity of citizenship), 29 U.S.C. § 1132(a)(3) (ERISA), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 2201 (Declaratory Judgment) and also under the doctrines of pendent and ancillary jurisdiction. The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and 29 U.S.C. § 1132(e)(2). This Court has personal jurisdiction over the counterclaim defendants pursuant to Fed. R. Civ. P. 4(e) and (k) and 13, and D.C. Code §13-423.

13

### Parties

3.      Counterclaim Plaintiff ULLICO Inc. ("ULLICO") is a corporation formed under the laws of the state of Maryland, with its principal place of business in the District of Columbia. ULLICO was created in 1987 as a holding company in order to raise capital for its various subsidiaries that provide insurance, pension, health and management and lending services to unions, union members and their families, and benefit funds. Its subsidiaries include counterclaim plaintiff The Union Labor Life Insurance Company, formed in 1925, to provide life insurance to union members in high-risk jobs. ULLICO's Board of Directors has historically consisted primarily of present or former officers of unions affiliated with the AFL-CIO and their affiliated Taft-Hartley funds, who are major ULLICO shareholders.

4.      Counterclaim Plaintiff The ULLICO Inc. Pension Plan and Trust (the "Qualified Plan") is a qualified pension and retirement plan. The Qualified Plan is sponsored by ULLICO.

5.      Counterclaim Plaintiff ULLICO Inc. Employees' Life and Health Welfare Plan (the "Welfare Plan"), is an employee benefit plan and an employee welfare plan. The Welfare Plan is sponsored by ULLICO.

6.      Counterclaim Plaintiff Union Labor Life Auxiliary Retirement Benefits Plan (the "Auxiliary Plan") is an employee benefits plan, sponsored by ULLICO. The Qualified Plan, Welfare Plan and Auxiliary Plan are referred to collectively as "the Plans."

7.      Counterclaim Plaintiff Mark Singleton is the Chief Financial Officer of ULLICO, serves as a member of the Employee Benefit Plans Administrative Committee (the "Benefits Committee"), the Plan Administrator for the Qualified Plan, Welfare Plan, and Auxiliary Plan, and joins as a counterclaim plaintiff solely in his capacity as a Plan Administrator.

14

8.     Counterclaim Defendant Robert Georgine ("Georgine") is a citizen of the State of Maryland and served as Chairman of the Board of Directors of ULLICO and its Executive Committee. He was employed by ULLICO as its Chairman beginning on December 5, 1990, and as President and Chief Executive Officer beginning on May 6, 1997, until May 8, 2003, when he ceased to serve as Chairman and CEO and resigned as President under the imminent threat of dismissal for cause. At all material times herein, Georgine served as a member of the Benefits Committee that served as Plan Administrator of the Qualified Plan, the Welfare Plan and the Auxiliary Plan (hereinafter referred to collectively as "the Plans").

9.     Counterclaim Defendant Joseph Carabillo ("Carabillo") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as the Company's Chief Legal Officer from March 2, 1987 until he was terminated for cause on May 30, 2003. At all material times herein, Carabillo served as a member of the Benefits Committee that served as Plan Administrator for the Plans.

10.     Counterclaim Defendant John K. Grelle ("Grelle") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as a Senior Vice President and Chief Financial Officer of the Company from January 2, 1996, until his resignation on February 25, 2003. At all material times herein, Grelle served as a member of the Benefits Committee that served as Plan Administrator for the Plans.

11.     Counterclaim Defendant James W. Luce ("Luce") is a citizen of the Commonwealth of Virginia and was employed by ULLICO as an Executive Vice President of the Company from February 14, 1983, until his retirement, effective June 1, 2003. At all material times herein, Luce served as a member of the Benefits Committee that served as Plan Administrator for the Plans. For the purposes of the counterclaim, counterclaim defendants

15

Georgine, Carabillo, Grelle and Luce are collectively referred to as the "counterclaim defendants."

## Count I -- Breach of Fiduciary Duty to the Qualified Plan

12.     ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 11.

13.     By Resolution on May 5, 1997, the Executive Committee of the Board of Directors of ULLICO Inc. authorized the creation of a Benefits Committee consisting of the senior officers of ULLICO Inc., including counterclaim defendants (the "May 5, 1997 Resolution").

14.     Under the May 5, 1997 Resolution, the Benefits Committee was "... authorized, directed and empowered to act as fiduciaries to all plans created or to be created for the benefit and welfare of the corporation's employees and any employees of each of its subsidiaries and affiliates in which the corporation or its subsidiaries owns more than 80% or more of the outstanding stock and was to have full authority for the administration of all such plans and also delegated authority for the administration of all such plans."

15.     At all material times herein, counterclaim defendants, as members of the Benefits Committee, served as "fiduciaries" to the Qualified Plan and Welfare Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the Plan Administrator of the Auxiliary Plan.

16.     At all material times herein, counterclaim defendants were under an obligation and duty in performing their duties and responsibilities to the Plans to, *inter alia,* (a) act solely in the interest of the Plans' participants and beneficiaries; (b) act with the care, skill, prudence and

16

diligence under the circumstances then prevailing that a prudent person skilled and expert in the professions of investment management or administration would use; (c) make appropriate disclosures of material information , including without limitation, appropriate disclosures to each other; and (d) act in accordance with the documents and instruments governing the Plans.

17.    On or about October 20, 1999, counterclaim defendants, as members of the Benefits Committee, purported to amend the definition of "Sponsoring Employer ULLICO Group Compensation", as set forth in the ULLICO Inc. Qualified Pension Plan and Trust, as amended and restated, to include "regularly established annual incentive compensation with no maximum, effective January 1, 2000" (the "Amendment").

18.    On or about July 24, 2001, counterclaim defendants, as members of the Benefits Committee, purported to amend the terms of the Qualified Plan by increasing the percentage of a participant's average salary used to determine his normal retirement benefit from 2 to 2 1/2 percent, a 25% increase, applicable to any participant that retires effective on or after January 1, 2002, including counterclaim defendants.

19.    As a result of their conduct as aforesaid, counterclaim defendants engaged in a settlor function without authority and breached their fiduciary duties to the Qualified Plan by purporting to enact the Amendment contrary to the terms of the Qualified Plan and without appropriate disclosures to the Board or Board approval or authorization.

20.    Despite their obligations to the Qualified Plan as aforesaid, counterclaim defendants engaged in a course of conduct that dealt with the Qualified Plan and the Qualified Plan assets for their own benefit, in violation of the terms of the Qualified Plan, and the requirements of ERISA, and otherwise failed to discharge their duties and obligations to the Qualified Plan and its participants, and to each other, and to act to obtain the protections and

17

benefits to which the Qualified Plan was entitled to receive by virtue of the assets that it owned or controlled.

21.    As a direct and proximate result of their conduct as aforesaid, counterclaim defendant acted *ultra vires* and otherwise breached their fiduciary duties to the Qualified Plan, including, without limitation, their duty of care and to act in accordance with the Plan documents, and therefore acted with and in furtherance of personal interests and objectives in conflict with their positions as fiduciaries.

22.    At all material times herein, each counterclaim defendant was a "co-fiduciary" and therefore jointly liable, pursuant to Section 405 of ERISA, 29 U.S.C. § 1105 and otherwise, for all fiduciary breaches to the Qualified Plan committed by the other counterclaim defendants.

23.    As a direct and proximate cause of their breach of fiduciary duty to the Qualified Plan, the Qualified Plan was damaged and counterclaim defendants are not entitled to receive benefits as a result of the invalid Plan amendments they purported to adopt.

24.    Counterclaim defendant officers Luce and Georgine are currently receiving benefits under the Qualified Plan.

25.    Counterclaim defendant Carabillo has claimed certain special early retirement benefits under the Qualified Plan and may seek regular early retirement benefits or regular retirement benefits under the Qualified Plan in the future.

26.    Counterclaim defendant Grelle has not yet elected benefits under the Qualified Plans, but is expected to do so in the future.

27.    As a result of their breaches of fiduciary duty to the Qualified Plan as aforesaid, counterclaim defendant officers have forfeited all or part of their rights to benefits under the Qualified Plan.

28.   As a direct and proximate result of their breaches of duty as aforesaid, the Qualified Plan is entitled to set off and recoup any damage sustained by the Qualified Plan as a result of counterclaim defendants' wrongful conduct.

29.   There is an actual, justiciable controversy between the parties, ripe for adjudication.

30.   Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, the Qualified Plan is entitled to a declaration that the amendments to the Qualified Plan purportedly adopted on about October 20, 1999 and July 24, 2001 are invalid as to counterclaim defendants and that counterclaim defendants are not entitled to receive benefits thereunder, that each counterclaim defendant is jointly and severally liable for all loses sustained by the Qualified Plan and is not entitled to any benefits that they have or may receive as a result of their breaches of duty and obligations to the Qualified Plan and order that each of them indemnify the Qualified Plan for all losses incurred by the Qualified Plan as a result of their violations and disgorge to the Qualified Plan an amount equal to the benefits they received in violation of their fiduciary duties owed to the Qualified Plan.

## COUNT II – Breach of Fiduciary Duty to the Welfare Plan

31.   ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 27.

32.   The Welfare Plan is an "unfunded" plan in that it holds no assets other than the insurance policies that provide benefits to Welfare Plan participants, and, as a result relies upon the plan sponsor, ULLICO Inc., for the payment of all premiums due under the policies held by the Welfare Plan.

33.    As a result of the critical role played by ULLICO Inc. with respect to the Welfare Plan, at all material times herein, counterclaim defendants, in their capacity as fiduciaries to the Welfare Plan, were under an obligation not to damage ULLICO Inc.

34.    Despite their obligations and duties as aforesaid, counterclaim defendants engaged in a course of conduct that damaged ULLICO Inc. and thereby threatened to impair, and, in fact, did impair, ULLICO Inc.'s ability to continue its financial support for the Welfare Plan.

35.    As a result of their conduct aforesaid, counterclaim defendants breached their fiduciary duties to the Welfare Plan, and are therefore not entitled to receive benefits under the Welfare Plan.

36.    There is an actual, justiciable controversy between the parties, ripe for adjudication.

37.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, the Welfare Plan is entitled to a declaration that each counterclaim defendant is not entitled to any benefits otherwise payable under the Welfare Plan.


### COUNT III- Breach of Fiduciary Duty with respect to the Auxiliary Plan

38.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 34.

39.    Counterclaim defendants currently seek, or are expected to seek in the future, benefits under the Auxiliary Plan, including increased benefits as a result of the Amendment.

40.   As a result of their conduct as aforesaid, counterclaim defendants engaged in an unauthorized settlor function, and breached their fiduciary duties to the Qualified Plan in enacting the Amendment.

41.   The Auxiliary Plan is an "unfunded" "top-hat" plan, which holds no assets and is funded entirely out of the general accounts of its plan sponsor, ULLICO Inc.

42.   Because the Auxiliary Plan depends entirely upon ULLICO Inc. for funding, counterclaim defendants had a fiduciary obligation to the Auxiliary Plan not to damage or impair the financial capacity of ULLICO Inc.

43.   Despite their obligations and duties as aforesaid, counterclaim defendants engaged in a course of conduct that damaged ULLICO Inc. and thereby threatened to impair, and, in fact, did impair ULLICO Inc.'s ability to continue its financial support for the Auxiliary Plan.

44.   As a result of their conduct aforesaid, counterclaim defendants breached their fiduciary duties with respect to the Auxiliary Plan, and are therefore not entitled to benefits under the plan.

45.   There is an actual, justiciable controversy between the parties, ripe for adjudication.

46.   The Auxiliary Plan is entitled to a declaration that each counterclaim defendant is not entitled to any benefits otherwise payable under the Welfare Plan.

WHEREFORE, counterclaim plaintiffs demand the following relief:

1.   As to Count I, judgment against counterclaim defendants Carabillo, Georgine, Luce and Grelle in an amount to be determined at trial, and a declaration that the

21

amendments purportedly adopted by the Benefits Committee on or about October 20, 1999 and on July 24, 2001 are invalid and unenforceable as to the counterclaim defendants, that counterclaim defendants Carabillo, Georgine, Luce and Grelle breached their fiduciary duties to the Qualified Plan, that such breaches caused losses and damages to the Qualified Plan, in an amount to be determined at trial, that counterclaim defendants are jointly and severally liable for such amounts that such amounts may be set off against any benefits properly payable under the Qualified Plan.

> 2. As to Count II, a declaration that counterclaim defendants Carabillo, Georgine, Luce and Grelle are not entitled to benefits under the Welfare Plan;

> 3. As to Count III, a declaration that counterclaim defendants Carabillo, Georgine, Luce and Grelle are not entitled to benefits under the Auxiliary Plan;

> 4. Such other and equitable relief as the Court may deem appropriate, including set-offs, recoupments, and constructive trusts in favor of counterclaim plaintiffs, and prejudgment interest and the costs of this Action, including reasonable attorneys' fees pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

July 26, 2004

MILLER & CHEVALIER CHARTERED

By _____
James A. Bensfield (DC Bar #189-084)
Anthony J. Trenga (DC Bar #218255)
Mark J. Rochon (DC Bar #376042)
Brian A. Hill (DC Bar #456086)
Matthew T. Reinhard (DC Bar # 474941)
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
atrenga@milchev.com
Attorneys for Defendants

ALIN Co          ID:2028578355          JHN ?? ?US   16:03 No.002 P.C

POLICY NUMBER:
495-36-84

 *American International Companies* ® RENEWAL OF:
874-44-10

# DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY

## Including Employment Practices and Securities Liability

*PrivateEdge℠*

] AIU Insurance Company
] American Home Assurance Company
] American International Pacific Insurance Company
] American International South Insurance Company
] Birmingham Fire Insurance Company of Penns.

☐ Granite State Insurance Company
☐ Illinois National Insurance Company
☒ National Union Fire Insurance Company of Pitts., Pa®
☐ National Union Fire Insurance Company of Louisiana
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

NOTICE:   EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE:   THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. HOWEVER THE INSUREDS MAY UNDER CERTAIN CONDITIONS TENDER THE DEFENSE OF A CLAIM. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

**ITEM 1.**   NAMED ENTITY:        *ULLICO INC.*

MAILING ADDRESS:        *111 MASSACHUSETTS AVE, N.W.*
*WASHINGTON, DC 20001*

STATE OF INCORPORATION OR STATE OF FORMATION OF THE NAMED ENTITY:
*Maryland*

**ITEM 2.**   SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Entity

**ITEM 3.**   POLICY PERIOD:   From: *October 30, 2002*      To: *October 30, 2003*
(12:01 A.M. standard time at the address stated in Item 1.)

**ITEM 4.**   LIMIT OF LIABILITY:       *$10,000,000*
aggregate for all Loss combined (Including Defense Costs)

*36662*

68461 (8/97)   *COPY*

**ITEM 5.   RETENTION:**

Judgments, Settlements and
Defense Costs (non-indemnifiable Loss)                          None

Employment Practices Claims
Judgments, Settlements and Defense Costs
(Company and Indemnifiable Loss)                               *$750,000*

for Loss arising from Claims
alleging the same Wrongful Act
or Related Wrongful Acts
(waivable under Clause 6 in
certain circumstances)

Security Claims (other than private placements)
Judgments, Settlements and Defense Costs
(Company and Indemnifiable Loss)                              *$750,000*

for Loss arising from Claims
alleging the same Wrongful Act
or Related Wrongful Acts
(waivable under Clause 6 in
certain circumstances)

All Other Claims (including private placements)
Judgments, Settlements and Defense Costs
(Company and Indemnifiable Loss)                             *$750,000*

for Loss arising from Claims
alleging the same Wrongful Act
or Related Wrongful Acts
(waivable under Clause 6 in
certain circumstances)

**ITEM 6.   CONTINUITY DATES:**

A.   Coverages A and B(ii):                     *October 8, 1998*

B.   Coverage B(i):                             *October 8, 1998*

C.   Outside Entity Coverage: Per Outside Entity,
     see endorsement #  *8*

**ITEM 7.   PREMIUM:**   *$246,000*

ADDITIONAL PREMIUM FOR PUNITIVE, EXEMPLARY AND
MULTIPLIED DAMAGES:                     (Included in above)
(No punitive damages coverage provided:  *X* )

*35552*

;B461 (8/97)   **COPY**

ITEM 8.    NAME AND ADDRESS OF INSURER (hereinafter "Insurer"):
           (This policy is issued only by the insurance company indicated below.)

           *National Union Fire Insurance Company of Pittsburgh, Pa.*

           *175 Water Street*

           *New York, NY 10038*

*35552*

68461 (8/87)    *COPY*

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_
**SECRETARY**

_John King_
**PRESIDENT**

_____
**AUTHORIZED REPRESENTATIVE**

_____
**COUNTERSIGNATURE DATE**

_____
**COUNTERSIGNED AT**

*ARC EXCESS & SURPLUS LLC*
*1122 FRANKLIN AVENUE, 3RD FL*
*GARDEN CITY, NY 11530*

*35552*

68461 (8/87)   **COPY**

 **AMERICAN INTERNATIONAL COMPANIES**®

## DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY
### Including Employment Practices and Securities Liability

*PrivateEdge*SM

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 8 of the Declarations, herein called the Insurer, agrees as follows:

### 1. INSURING AGREEMENTS

#### COVERAGE A: INDIVIDUAL INSURED INSURANCE

This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

#### COVERAGE B: PRIVATE COMPANY INSURANCE

This policy shall pay the Loss of the Company arising from a:

    (i)    Claim first made against the Company, or

    (ii)    Claim first made against an Individual Insured,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Individual Insured for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

#### DEFENSE PROVISIONS

The Insurer does not assume any duty to defend, provided, however, the Named Entity may at its sole option tender to the Insurer the defense of a Claim for which coverage is provided by this policy to the Insurer in accordance with Clause 8 of the policy. Regardless of whether the defense is so tendered, the Insurer shall advance Defense Costs (excess of the applicable retention amount) of such Claim prior to its final disposition. Selection of counsel to defend a "Designated Claim" shall be made in accordance with Clause 9 of the policy.

### 2. DEFINITIONS

    (a)    "Affiliate" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

(b)  "Claim" means:

    (1)  a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or

    (2)  a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

        (i)  service of a complaint or similar pleading; or

        (ii)  return of an indictment (in the case of a criminal proceeding); or

        (iii)  receipt or filing of a notice of charges.

    (3)  an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") (or similar state, local or foreign agency) which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the Insured.  However, in no event shall the term "Claim" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

The term "Claim" shall include an Employment Practices Claim and a Securities Claim.

(c)  "Company" means the Named Entity and any Subsidiary thereof.

(d)  "Continuity Date" means the date set forth in:

    (1)  Item 6A of the Declarations with respect to Coverages A and B(II); or

    (2)  Item 6B of the Declarations with respect to Coverage B(I);

    (3)  Item 6C of the Declarations with respect to a Claim made against an individual Insured(s) arising out of such Insured's service as a director, officer, trustee or governor of an Outside Entity.

(e)  "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of officers or Employees of the Company.

(f)  "Employee(s)" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary employee in his or her capacity as such.  An individual who is leased to the Company shall also be an Employee, but only if the Company provides indemnification to such leased individual in the same manner as is provided to the Company's employees.  Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee, but only if the Company provides indemnification to such individual in the same manner as that provided to the Company's employees, and such individual is scheduled by written endorsement attached hereto and the Company pays any additional premium required by the Insurer relating to such individual.

(g)  "Employment Practices Claim" means a Claim alleging an Employment Practices Violation.

(h)  "Employment Practices Violation(s)" means any actual or alleged:

    (1)  wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2)   harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3)   discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(4)   Retaliation (including lockouts);

(5)   employment-related misrepresentation(s) to an Employee or applicant for employment with the Company;

(6)   employment-related libel, slander, humiliation, defamation, invasion of privacy;

(7)   wrongful failure to employ or promote;

(8)   wrongful deprivation of career opportunity, wrongful demotion or negligent employee evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9)   wrongful discipline;

(10)  failure to grant tenure;

(11)  failure to provide or enforce adequate or consistent corporate policies and procedure relating to any Employment Practices Violation;

(12)  violation of an individual's civil rights relating to any of the above,

but only if the Employment Practices Violation relates to an Employee(s), or applicant for employment with the Company or an Outside Entity, whether direct, indirect, intentional or unintentional.

With respect to any customer or client of the Company, whether individually or as a class or group, Employment Practices Violation shall mean only any actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

(I)   "Individual Insured(s)" means:

(1)   any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company, but only in their capacities as such. Coverage will automatically apply to all new directors, officers, management committee members or members of the Board of Managers of the Company after the inception date of this policy;

(2)   any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company serving in the capacity as director, officer, trustee or governor of an Outside Entity, but only if such service is at the specific written request or direction of the Company;

(3)   in the event the Company operates outside the United States, then the terms director, officer, management committee member or member of the Board of Managers shall also mean those titles, positions or capacities in such foreign Company which are equivalent to such positions in an organization incorporated or formed within the United States; and

(4)   any Employee(s) of the Company.

02/27/2004 10:15 FAX 2125091292      FRANK CRYSTAL                                @011

HE McLAUGHLIN Co          ID:  028578355          JAN 5 '05   16:07 No.004 P.08

(j)   "Insured(s)" means:

   (1)   an individual insured; and

   (2)   the Company.

(k)   "Loss" means damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest, and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) taxes; (3) any amount for which the insureds are not financially liable or which are without legal recourse to the insureds; (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an Employment Practices Claim; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

   If an additional premium is stated in Item 7 of the Declarations page, then Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, deliberate fraud, criminal acts or willful violation of any statute, rule or regulation) punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages. If an additional premium is not stated in Item 7 of the Declarations then Loss shall not include punitive, exemplary damages or the multiplied portion of multiple damages.

(l)   "Named Entity" means the organization stated in Item 1 of the Declarations whether a corporation, association, limited liability company or other type of business organization.

(m)   "No Liability" means: (1) a final judgment of no liability obtained prior to trial, in favor of all insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all insureds, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a Claim made against an insured for which a settlement has occurred.

(n)   "Outside Entity" means:

   (1)   a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

   (2)   any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(o)   "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

(p)   "Related Wrongful Acts" shall mean Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, insureds or legal causes of action.

(q)   "Retaliation" means a Wrongful Act of an insured relating to or alleged to be in response to any of the following activities: (1) the disclosure or threat of disclosure by an Employee to a superior or to any governmental agency of any act by an insured which act is alleged to be a violation of any federal, state, local or foreign

02/27/2004 10:16 FAX 2125091292      FRANK CRYSTAL

law, common or statutory, or any rule or regulation promulgated thereunder; (2) the actual or attempted exercise by an Employee of any right that such Employee has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (4) Employee strikes.

(r)  "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by the Securities & Exchange Commission) made against an Insured anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1)  brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the Company, or

(2)  brought by a securities holder of the Company, whether directly, by class action, or derivatively on the behalf of the Company, or otherwise, alleging any Wrongful Act of an Insured.

(s)  "Subsidiary" means:

(1)  any for-profit organization which, on or before the inception of the Policy Period, is more than 50% owned by the Named Entity, either directly, or indirectly through one or more of its Subsidiaries;

(2)  automatically any for-profit organization whose securities are not publicly traded and whose assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy which becomes a Subsidiary during the Policy Period. The Named Entity shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period; or

(3)  an organization which becomes a Subsidiary during the Policy Period (other than a for-profit organization described in paragraph (2) above), but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Entity shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to such new Subsidiary.

An organization becomes a Subsidiary when the Named Entity owns more than a 50% ownership interest in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries. An organization ceases to be a Subsidiary when the Named Entity ceases to own more than a 50% ownership in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against Individual Insureds or a Claim made against any Subsidiary, shall only apply to Claims for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(t) "Wrongful Act" means:

    (1) with respect to Individual   Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or any matter claimed against such Insured solely by reason of their status as directors, officers or Employees of the Company;

    (2) with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company;

    (3) with respect to service on an Outside Entity, any matter claimed against an Individual Insured as defined in definition (l)(2) arising out of his or her serving as a director, officer, trustee or governor of an Outside Entity in such capacity, but only if such service is at the specific written request or direction of the Company.

With respect to an Employment Practices Claim, the term "Wrongful Act" shall include any Employment Practices Violation.

## 3. EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Individual Insureds, and the   legal representatives   of Individual   Insureds in the event of incompetency, insolvency or bankruptcy, who were Individual Insureds at the time the Wrongful Act upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an Individual Insured for all Claims arising solely out of his or her status as the spouse of an Individual Insured, including   a Claim that seeks damages recoverable from marital community property, property jointly held by the Individual Insured and the spouse, or property transferred from the Individual Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an Individual Insured, subject to the policy's terms, conditions and exclusions.

## 4. EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

    (a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

    (b) arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange  Act of 1934 and amendments  thereto or similar provisions of any state statutory law; or (2) payments to an Insured of any remuneration  without the previous  approval of the stockholders  of the Company, which payment  without such previous approval shall be held to have been illegal;

    (c) arising out of, based upon or attributable to the committing in fact of any criminal, fraudulent or dishonest act, or any willful violation of any statute, rule or law;

    [The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c).]

02/27/2004 10:17 FAX 2125091292          FRANK CRYSTAL

(d)    alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)    alleging, arising out of, based upon or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful Act which is the same or Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f)    alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Insured serving in any capacity, other than a director, officer, management committee member, member of the Board of Managers or Employee of the Company, or as a director, officer, trustee or governor of an Outside Entity;

(g)    for any Wrongful Act arising out of an Individual Insured serving in a capacity as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or a director, officer, trustee or governor thereof;

(h)    alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement; provided, however, that with respect to Employment Practice Claims, this exclusion shall not apply to the extent any liability does not arise under such express employment contract or agreement;

(i)    which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured; provided, however, this exclusion shall not apply to:

    (1)    any Claim brought by an Individual Insured where such Claim is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a Claim which is not otherwise excluded by the terms of this policy; or

    (2)    an Employment Practices Claim brought by an Employee of the Company other than an Employee who is or was a director, member of the Board of Managers or management committee member of the Named Entity;

(j)    alleging, arising out of, based upon or attributable to any public offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such public offering;

provided, however, that this exclusion will not apply to:

    (1)    any purchase or sale of securities exempted pursuant to section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the insurer written notice of any public offering exempted pursuant to section 3(b), together with full particulars and as soon as practicable, but not later than 30 days after the effective date of the public offering;

    (2)    to any public offering of securities (other than a public offering described in paragraph (1) above), as well as any purchase or sale of such securities subsequent to such public offering. In the event that within 30 days prior to the effective time of such public offering: (i) the Named Entity shall give the

02/27/2004 10:17 FAX 2125091292    FRANK CRYSTAL    @015

AE McLAUGHLIN Co    ID:        JHN 31 '    NO.    P.12

Insurer written notice of such public offering together with full particulars and underwriting information required thereto and (ii) the Named Entity accepts such terms, conditions and additional premium required by the Insurer for such coverage. Such coverage is also subject to the Named Entity paying when due any such additional premium. In the event the Company gives written notice with full particulars and underwriting information pursuant to (i) above, then the Insurer must offer a quote for coverage under this paragraph;

(k) alleging, arising out of, based upon or attributable to the purchase by the Company of securities of a "publicly traded entity" in a transaction which resulted, or would result, in such entity becoming an Affiliate or Subsidiary of the Company; provided, however, this exclusion shall not apply in the event that within 30 days prior to it becoming an Affiliate or Subsidiary, the Named Entity gives written notice of the transaction to the Insurer together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this policy required by the Insurer relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to the transaction. An entity is a "publicly traded entity" if any securities of such entity have previously been subject to a public offering;

(l) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this exclusion shall not apply to Securities Claims;

(m) for emotional distress, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any Securities Claim or Employment Practices Claim;

(n) for any actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or for any direction or request to test, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however, this exclusion shall not apply to any Claim brought by a securities holder of the Company in its capacity as such or to any Employment Practices Claim;

(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar provisions of any federal, state, local or foreign statutory law or common law; provided, however, that this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(p) alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(q) with respect to Coverage B(i) only:

(1) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

(2) for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

(3)   for the rendering ' or failure to render any service to a customer or client of the insured: provided, however, that this exclusion shall not apply to any:

    (i)   Claim solely alleging Employment Practices Violations;

    (ii)   Securities Claim; or

    (iii)   Claim for the rendering or failure to render any professional service to the extent such professional services errors and omissions  coverage has been added to this policy by written endorsement attached hereto;

(4)   seeking fines or penalties or non-monetary relief against the Company; provided, however, that this exclusion shall not apply to any Securities Claim or Employment Practices Claim.

5.   **LIMIT OF LIABILITY and REINSTATED LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

**Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense Costs are part of Loss and as such are subject to the applicable Limit of Liability for Loss.**

A.   **General Terms**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims first made against the insureds during the Policy Period and the Discovery Period (if applicable): however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period, or the Reinstated Limit as described below (if elected). Further, a Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one applicable aggregate Limit of Liability stated in Item 4 of the Declarations,  or subject to the one aggregate Reinstated Limit if such Reinstated Limit is applicable to such Claim.

B.   **Reinstated Limit of Liability**

In the event of a Claim under this policy, the Named Entity shall have the right to purchase a Reinstated Limit equal to the Limit of Liability stated in Item 4 of the Declarations. The Reinstated Limit shall be subject to the following conditions:

1.   The right to elect the Reinstated Limit commences on the date a Claim is reported to the Insurer and expires on the last day of the Policy Period; provided, that in all events, only one reinstatement is permitted under this policy. The effective date of the reinstatement shall be the date on which the Insurer acknowledges receipt of the written notice of the insured's election to exercise the reinstatement.

2.   If the Policy Period of this policy is more than one year, then the additional premium to elect the Reinstated Limit at any time after one year from the inception date of this policy shall be fixed at 150% of the premium set forth in Item 7 of the Declarations. Regardless of the length of the Policy Period of this policy, the additional premium to elect the Reinstated Limit within one year from the inception date of this policy shall be an amount determined by the Insurer at the time of the election of the Reinstated Limit unless otherwise indicated by written endorsement to this policy.

3.   The Reinstated Limit shall only apply to Claims made against an insured after the effective date of the reinstatement and prior to the end of the Policy

Period or the Discovery Period, if applicable, ("Reinstatement Claims"); provided, however, that the Reinstated Limit shall not apply to Claims which allege a Related Wrongful Act to Claim(s) reported to the Insurer prior to the effective date of the reinstatement.

4.  The Reinstated Limit shall be the maximum liability of the Insurer for all Reinstatement Claims. The Limit of Liability described in Clause 5A as applicable to Claims made against the Insureds prior to the effective date of the reinstatement shall not apply to any Reinstatement Claim.

5.  Upon exercise of the Reinstated Limit, the entire premium set forth in Item 7 of the Declarations shall be deemed fully earned; the insureds shall not be entitled to any return premium as a result of the exercise of the Reinstated Limit nor shall any of the premium paid for the policy be credited toward the additional premium required to exercise the Reinstated Limit.

6.  In no event shall the right to a reinstatement apply if prior to the effective date of the reinstatement, this policy has been cancelled, is otherwise not in effect, or the Discovery Period has been elected.

7.  Other than as stated above, coverage for Reinstatement Claims shall be subject to the same terms, conditions and exclusions of the policy applicable to other Claims under this policy. The Insurer cannot otherwise modify any terms, conditions or exclusions of this policy as a condition of providing the reinstatement.

## 6. RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company or the Insureds and shall remain uninsured, with regard to all Loss under: (1) Coverage A or B(ii) for which the Company has indemnified or is permitted or required to indemnify the Individual Insured(s) ("Indemnifiable Loss"), or (2) Coverage B(i). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or Related Wrongful Act.

Subject to the above paragraph, the Retention amounts stated in Item 5 of the Declarations shall apply. In the event a Claim triggers more than one amount stated in Item 5 of the Declarations, only the highest such amount shall apply, which amount shall apply to all Loss under such Claim.

The Retention amount shall be reduced in the event that an Insured consents to the first "Settlement Opportunity", as defined in Clause 8, by the percentage described in Clause 8, subject to the conditions described in Clause 8.

No Retention shall apply to a Claim which is in the form of a civil action for monetary relief and the insurer shall thereupon reimburse the Defense Costs paid by the insured, in the event of:

(1)  a determination of No Liability of all Insureds; or

(2)  a dismissal or a stipulation to dismiss the civil litigation Claim without prejudice and without the payment of any consideration by any insured;

provided, however, that in the case of (2) above, such reimbursement shall occur ninety (90) days after the date of dismissal or stipulation as long as the Claim is not re-brought (or any other Claim which is subject to the same single retention by virtue of Clause 6 is not brought) within that time, and further subject to an undertaking by the Company in a form acceptable to the Insurer that such reimbursement shall be paid back by the Company to the Insurer in the event the Claim (or any other Claim which is subject to the same single retention by virtue of Clause 6) is brought after such 90 day period and before the expiration of the statute of limitations for such Claim.

HE McLAUGHLIN Lo          1D:7428578555          JHN 01 05

## NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations.

If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on the behalf of any Insured or by the Insurer, whichever comes first.

(a)  The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

    (1)  anytime during the Policy Period or during the Discovery Period (if applicable); or

    (2)  within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging a Related Wrongful Act to the Claim for which such notice has been given shall be considered made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Related Wrongful Act to such circumstances, shall be considered made at the time such notice of such circumstances was given.

8.  **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.

Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of the Claim to the Insurer, which right shall be exercised in writing by the Named Entity on behalf of all Insureds to the Insurer pursuant to the notice provisions of Clause 7 of this policy. This right shall terminate if not exercised within 30 days of the date the Claim is first made against an Insured, pursuant to Clause 7 of the policy. Further, from the date the Claim is first made against the Insureds to the date when the Insurer accepts the tender of the defense of such Claim, the Insureds shall take no action, or fail to take any required action, that prejudices the rights of the Insureds or the Insurer with respect to such Claim. Provided that the Insureds have complied with the foregoing, the Insurer shall be obligated to assume the defense of the Claim, even if such Claim is groundless, false or fraudulent. The assumption of the defense of the Claim shall be effective upon written confirmation sent thereof by the Insurer to the Named Entity. Once the defense has been so tendered, the Insured shall have the right to effectively associate with the Insurer in the defense and the negotiation of any settlement of any Claim, subject to the provisions of this Clause 8. However, the Insurer shall not be obligated to defend such Claim after the

6B482 (8/97)  *COPY*                                11

Limit of Liability has been exhausted, or after an Insured's rejection of a Settlement Opportunity as defined in this Clause 8.

When the Insurer has not assumed the defense of a Claim pursuant to this Clause 8, the Insurer shall advance nevertheless, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 8, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim, and provided further that in all events the Insurer may withhold consent to any settlement, stipulated judgment or Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.

The Insurer shall have the right to effectively associate with the Company in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), and the Insureds consent to such settlement, then the Insured's applicable retention amount shall be retroactively reduced by ten percent (10%) for such Loss. It shall be a condition to such reduction that the Insureds must consent to such settlement within thirty (30) days of the date the Insureds are first made aware of the Settlement Opportunity, or in the case of a Settlement Opportunity which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

However, if a Settlement Opportunity arises and the Insureds do not consent to the settlement within the time prescribed above, the retention amount shall remain the applicable amount set forth in Item 5 of the Declarations even if consent is given to a subsequent Settlement Opportunity.

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 50% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this Insurance that the remaining 60% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5 of the Declarations.

9.   PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED CLAIMS

This clause applies only to an Employment Practices Claim or a Securities Claim (each of the foregoing hereinafter referred to as a "Designated Claim").

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of any Designated Claim against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Designated Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Designated Claim is brought. In the event a Designated Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Designated Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Designated Claim is brought to function as "local counsel" on the Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Designated Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

10. DISCOVERY CLAUSE

Except as indicated below, if the Named Entity shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The Additional Premium Amount for: (1) one year shall be 75% of the "full annual premium"; (2) two years shall be 150% of the "full annual premium"; (3) three years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such

02/27/2004 10:20 FAX 2125091292          FRANK CRYSTAL          ☒021

longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Entity at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent.

This policy may be canceled by or on the behalf of the Insurer only in the event of nonpayment of premium by the Named Entity. In the event of non-payment of premium by the Named Entity, the Insurer may cancel this policy by delivering to the Named Entity or by mailing to the Named Entity, by registered, certified, or other first class mail, at the Named Entity's address as shown in Item 1 of the Declarations, written notice stating when, not less than 30 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender. The Insurer shall have the right to the premium amount for the portion of the Policy Period during which the policy was in effect.

If this policy shall be canceled by the Named Entity, the Insurer shall retain the customary short rate proportion of the premium herein.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12. CHANGE IN CONTROL OF NAMED ENTITY

If during the Policy Period:

    a.    the Named Entity shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    b.    any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the Named Entity, or acquires the voting rights of such an amount of such securities;

    (either of the above events herein referred to as the "Transaction").

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Entity shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Entity shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13. SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Insurer to effectively bring suit in the name of the

02/27/2004 10:20 FAX 2125091292          FRANK CRYSTAL                                    ☑022

THE MCLHUGHLIN CO

Company or the Insureds. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been determined to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or obtained any profit or advantage to which such Insured was not legally entitled.

### 14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance. This policy specifically shall be excess of any other policy pursuant to which any other Insurer has a duty to defend a Claim for which this policy may be obligated to pay Loss.

In the event of a Claim against an Insured arising out of his or her service as a director, officer, trustee or governor of an Outside Entity or an Employment Practices Claim against a leased Employee as described in definition (f) of Clause 2, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or such leasing company and any insurance provided to such Outside Entity or such leasing company.

Further, in the event other insurance is provided to the Outside Entity or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the Insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the Insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part or in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

### 15. NOTICE AND AUTHORITY

It is agreed that the Named Entity shall act on behalf of the Subsidiaries and all Insureds with respect to the giving of notice of a Claim, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a Claim to the Insurer and the exercising or declining of any right to a Discovery Period or Reinstated Limit.

### 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

### 17. DISPUTE RESOLUTION PROCESS

The Insured shall have the option, in its sole discretion, to submit all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, to the alternative dispute resolution process ("ADR") set forth in this clause.

The Insureds may elect the type of ADR discussed below. The Insurer agrees to submit to the ADR process chosen by the Insured. Once elected, the ADR cannot be terminated prior to a determination without the consent of the Insured and the Insurer.

02/27/2004 10:20 FAX 2125091292    FRANK CRYSTAL                                    @023

There shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules. In which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated or formed in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Entity. The Named Entity shall act on behalf of all insureds in deciding to proceed with ADR under this clause.

## 18. ACTION AGAINST INSURER

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insureds' obligation to pay shall have been finally determined either by judgment against the insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the insureds or the Company to determine the insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

## 19. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this Policy, it is agreed that the Insurer has relied upon the statements and representations contained in the application for this policy (including statements and representations contained in the application for this policy (including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete. All such statements and representations shall be deemed to be material to the risk assumed by the Insurer, are the basis of this policy and are to be considered as incorporated into this policy.

With respect to such statements and representations, no knowledge or information possessed by any individual insured, except for those person or persons who executed the application, shall be imputed to any other individual insured. If any person who executed the application knew that such statement or representation was inaccurate or incomplete,

02/27/2004 10:21 FAX 2125091292                  FRANK CRYSTAL

THE McLAUGHLIN CO        ID: 7028578355                  JAN 3' 03   10:18 NO.004 1:21

then this policy will be void as to all insureds other than individual insureds who are "non-employee Directors" of the Company and who did not personally know the statement or representation to be inaccurate or incomplete. (The term "non-employee Director" shall have the meaning described in Securities & Exchange Commission rules or regulations promulgated pursuant to Section 16 of the Securities Exchange Act of 1934).

## 20. WORLDWIDE TERRITORY

This policy shall apply to Claims made against an insured anywhere in the world.

## 21. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

02/27/2004 10:21 FAX 2125091292                FRANK CRYSTAL                                    ☑025

THE MCLHUGHLIN CO          ID: 2020010000          JAN    00    10:10 NO.004 P.22

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

## ALASKA

DAVIS WRIGHT TREMAINE
701 W. Eighth Avenue, Suite 800,
Anchorage, AK 99501-3468
Tel: (907) 257-5300
Contact: David W. Oesting

FOSTER PEPPER & SHEFELMAN
1007 W. Third Ave., Ste. 100,
Anchorage, AK 99501
Tel: (907) 222-7100
Contact: Peter S. Erlichman / Stellman
Keehnel / Tim Filer

## CALIFORNIA

BINGHAM MCCUTCHEN LLP
1900 University Avenue,
East Palo Alto, CA 94303-1212
Tel: (650) 849-4914
Contact: Mary T. Huser

BINGHAM MCCUTCHEN LLP
3 Embarcadero Center,
San Francisco, CA 94111
Tel: (415) 393-2628
Contact: Karen L. Kennard

BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400,
Los Angeles, CA 90071-1560
Tel: (213) 680-6416
Contact: John C. Morrissey

BINGHAM MCCUTCHEN LLP
3 Embarcadero Center,
San Francisco, CA 94111
Tel: (415) 393-2170
Contact: David M. Balabanian

BROBECK, PHLEGER & HARRISON LLP
One Market, Spear St. Tower,
San Francisco, CA 94105
Tel: (415) 442-0900
Contact: Meredith N. Landy / David M.
Furbush

BROBECK, PHLEGER & HARRISON LLP
Two Embarcadero Place, 2200 Geng Road
Palo Alto, CA 94303
Tel: (650) 424-0160
Contact: David M. Furbush / Meredith N.
Landy

BROBECK, PHLEGER & HARRISON LLP
550 South Hope Street,
Los Angeles, CA 90071
Tel: (213) 489-4060
Contact: Howard M. Privette

BROBECK, PHLEGER & HARRISON LLP
12390 El Camino Real,
San Diego, CA 92130
Tel: (858) 720-2500
Contact: Christopher H. McGrath /
William F. Sullivan

CLIFFORD CHANCE ROGERS & WELLS LLP
One Market Steuart Tower, Suite 400,
San Francisco, CA 94105
Tel: (415) 778-4700
Contact: Tower C. Snow / Michael D. Torpey

CLIFFORD CHANCE ROGERS & WELLS LLP
601 South Figueroa Street,
Los Angeles, CA 90017
Tel: (213) 312-9400
Contact: Daniel J. Tyukody

COOLEY GODWARD, LLP
One Maritime Plaza, 20th Floor,
San Francisco, CA 94111
Tel: (415) 693-2073
Contact: Paul A. Renne

COOLEY GODWARD, LLP
One Maritime Plaza, 20th Floor,
San Francisco, CA 94111
Tel: (415) 693-2092
Contact: Benjamin K. Riley

COOLEY GODWARD, LLP
4401 Eastgate Mall,
San Diego, CA 92121-1909
Tel: (858) 550-6050
Contact: William E. Grauer

COOLEY GODWARD, LLP
Five Palo Alto Square,
3000 El Camino Real,
Palo Alto, CA 94306
Tel: (650) 843-5182
Contact: Stephen C. Neal

COOLEY GODWARD, LLP
Five Palo Alto Square,
3000 El Camino Real,
Palo Alto, CA 94306
Tel: (650) 843-5037
Contact: William S. Freeman

Revised (10/02) *COPY*

THE McLAUGHLIN Co          ID:2028578555          JAN  '03   16:13 NO.004 P.29

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**DAVIS WRIGHT TREMAINE**
One Embarcadero Center, Suite 600,
San Francisco, CA 94111-3834
Tel: (415) 276-6500
Contact: Martin Fineman

**GIBSON, DUNN & CRUTCHER LLP**
333 S. Grand Avenue,
Los Angeles, CA 90071-3197
Tel: (213) 229-7543
Contact: Phillip L. Bosl

**GIBSON, DUNN & CRUTCHER LLP**
1530 Page Mill Road,
Palo Alto, CA 94304
Tel: (650) 849-5300
Contact: John C. Dickey

**GIBSON, DUNN & CRUTCHER LLP**
Jamboree Center, 4 Park Plaza,
Irvine, CA 92614-8557
Tel: (949) 451-4108
Contact: Wayne W. Smith

**IRELL & MANELLA LLP**
1800 Ave. of the Stars, Suite 900,
Los Angeles, CA 90067
Tel: (310) 277-1010
Contact: David Schwartz / David Gindler /
David Siegel / James F. Elliot / Jim Adler /
Richard H. Borow

**MORRISON & FOERSTER LLP**
425 Market Street,
San Francisco, CA 94105
Tel: (415) 268-7000
Contact: Melvin R. Goldman / Paul T.
Friedman

**MORRISON & FOERSTER LLP**
555 West 5th Street, Suite 3500,
Los Angeles, CA 90013
Tel: (213) 892-5200
Contact: B. Scott Silverman / Robert S.
Stern

**MUNGER, TOLLES & OLSON**
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9264
Contact: Dennis L. Kinnaird

**MUNGER, TOLLES & OLSON**
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9152
Contact: John W. Spiegel

**MUNGER, TOLLES & OLSON**
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9153
Contact: George M. Garvey

**O'MELVENY & MYERS LLP**
400 South Hope St., 15th Floor,
Los Angeles, CA 90071
Tel: (213) 430-6000
Contact: Robert Vanderet / Seth Aronson

**O'MELVENY & MYERS LLP**
610 Newport Center, 17th Floor,
Newport Beach, CA 92660
Tel: (714) 760-9600
Contact: Brett J. Williamson / Michael G.
Yoder / Phillip Kaplan

**O'MELVENY & MYERS LLP**
275 Battery Street,
San Francisco, CA 94111
Tel: (415) 984-8700
Contact: Daniel Bookin / Richard Warmer

**ORRICK HERRINGTON & SUTCLIFFE LLP**
Old Federal Reserve Bank Building,
400 Sansome Street,
San Francisco, CA 94111
Tel: (415) 773-5469
Contact: John H. Kanberg

**ORRICK HERRINGTON & SUTCLIFFE LLP**
Old Federal Reserve Bank Building,
400 Sansome Street,
San Francisco, CA 94111
Tel: (415) 773-5944
Contact: William F. Alderman

**ORRICK HERRINGTON & SUTCLIFFE LLP**
1020 Marsh Road,
Menlo Park, CA 94025
Tel: (650) 614-7440
Contact: W. Reece Bader

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
555 S. Flower Street, Twenty-Third Floor,
Los Angeles, CA 90071-2371
Tel: (213) 683-6000
Contact: J. Allen Maines

02/27/2004 10:22 FAX 2125091292          FRANK CRYSTAL

THE MCLAUGHLIN CO          FAX:2028510555          JAN  05  10:25 No.004 P.24

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**PILLSBURY WINTHROP LLP**
Pacific Bell Building, 101 W. Broadway,
Suite 1800,
San Diego, CA 92101-8219
Tel: (619) 234-5000
Contact: Richard M. Segal

**PILLSBURY WINTHROP LLP**
2550 Hanover Street,
Palo Alto, CA 94304-1115
Tel: (650) 233-4500
Contact: Walter J. Robinson

**PILLSBURY WINTHROP LLP**
725 South Figueroa Street, Suite 2800,
Los Angeles, CA 90017-5443
Tel: (213) 488-7100
Contact: Kenneth R. Chiate

**PILLSBURY WINTHROP LLP**
50 Fremont Street,
San Francisco, CA 94105-2228
Tel: (415) 983-1000
Contact: Bruce A. Ericson / William D.
Fisher

**SIMPSON THACHER & BARTLETT**
3373 Hillview Avenue,
Palo Alto, CA 94304
Tel: (650) 251-5000
Contact: Charles E. Koob / George M.
Newcombe / James G. Kreissman

**SIMPSON THACHER & BARTLETT**
10 Universal City Plaza, Suite 1850,
Los Angeles, CA 91608
Tel: (818) 755-7000
Contact: Seth A. Ribner

**SULLIVAN & CROMWELL**
1888 Century Park East,
Los Angeles, CA 90067-1725
Tel: (310) 712-6600
Contact: Robert A. Sacks

**WILSON, SONSINI, GOODRICH & ROSATI**
650 Page Mill Road,
Palo Alto, CA 94304-1050
Tel: (650) 493-9300
Contact: Bruce G. Vanyo / Boris Feldman /
Steven M. Schatz

## COLORADO

**COOLEY GODWARD, LLP**
380 Interlocken Crescent, Suite 900,
Broomfield, CO 80021-8023
Tel: (720) 566-4000
Contact: James E. Nesland

## DISTRICT OF COLUMBIA

**ARNOLD & PORTER**
555 Twelfth Street, NW,
Washington, DC 20004-1202
Tel: (202) 942-5872
Contact: Scott B. Schreiber

**CAHILL GORDON & REINDEL**
1990 K Street, N.W., Suite 950,
Washington, DC 20006
Tel: (202) 862-8900
Contact: Donald J. Mulvihill

**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Ave., N.W.,
Washington, DC 20036-5306
Tel: (202) 887-3609
Contact: F. Joseph Warin

**GREENBERG TRAURIG**
800 Connecticut Avenue, N.W., Suite 500,
Washington, DC 20036
Tel: (202) 331-3100
Contact: C. Allen Foster / Eric C. Rowe /
Joe R. Reeder

**PATTON BOGGS LLP**
2550 M Street, N.W.,
Washington, DC 20037
Tel: (202) 457-6000
Contact: Eric A. Kuwana / Lanny J. Davis /
Ronald S. Liebman

**SULLIVAN & CROMWELL**
1701 Pennsylvania Avenue, N.W.,
Washington, DC 20006-5805
Tel: (202) 956-7500
Contact: Daryl A. Libow / Margaret K.
Pfeiffer

**WILLKIE FARR & GALLAGHER**
Three Lafayette Centre,
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1105
Contact: Kevin B. Clark

02/27/2004 10:22 FAX 2125091292    FRANK CRYSTAL    ☑028

THE McLAUGHLIN Co    ID: 028578333    JHN - 03    10:20 NO.004 P.25

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**WILMER, CUTLER & PICKERING**
2445 M Street, N.W.,
Washington, DC 20037
Tel: (202) 663-6000
Contact: Charles A. Davidow / David P. Donovan

### DELAWARE

**BLANK ROME COMISKY & MCCAULEY LLP**
1201 Market Street, 21st Floor,
Wilmington, DE 19801
Tel: (302) 425-6400
Contact: Alan J. Hoffman / Cathy L. Reese / Ian Comisky

**WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP**
One Rodney Square, Suite 300,
920 King Street,
Wilmington, DE 19801-3319
Tel: (302) 777-5860
Contact: David J. Margules

### FLORIDA

**AKERMAN SENTERFITT & EIDSON, P.A.**
Citrus Center, 17th Floor,
255 South Orange Avenue,
Orlando, FL 32801
Tel: (407) 843-7860
Contact: J. Thomas Cardwell

**AKERMAN SENTERFITT & EIDSON, P.A.**
SunTrust International Center, 28th Floor,
Miami, FL 33131
Tel: (305) 374-5600
Contact: Stanley H. Wakshlag

**CARLTON FIELDS**
4000 International Place,
100 S.E. Second Street,
Miami, FL 33131-9101
Tel: (303) 530-0050
Contact: Steven J. Brodie

**CARLTON FIELDS**
One Harbour Place,
Tampa, FL 33602-5780
Tel: (813) 223-7000
Contact: Richard A. Denmon

**GREENBERG TRAURIG**
1221 Brickell Avenue,
Miami, FL 33131
Tel: (305) 579-0500
Contact: Hilarie Bass

**GREENBERG TRAURIG**
777 South Flagler Drive,
West Palm Beach, FL 33401
Tel: (561) 650-7900
Contact: Mark F Bideau

**GREENBERG TRAURIG**
111 North Orange Avenue,
Orlando, FL 32801
Tel: (407) 420-1000
Contact: Tucker H Byrd

**GREENBERG TRAURIG**
101 East College Avenue,
Post Office Drawer 1838
Tallahassee, FL 32302
Tel: (850) 222-6891
Contact: Barry Richard

**HOLLAND & KNIGHT LLP**
315 South Calhoun Street, Suite 600,
P.O. Drawer 810 (Zip 32302),
Tallahassee, FL 32301
Tel: (850) 224-7000
Contact: Robert R. Feagin / Elizabeth Bevington

**HOLLAND & KNIGHT LLP**
625 North Flagler Drive, Suite 700,
West Palm Beach, FL 33401
Tel: (561) 833-2000
Contact: D. Culver (Skip) Smith

**HOLLAND & KNIGHT LLP**
200 South Orange Avenue, Suite 2600,
P.O. Box 1526 (Zip 32802),
Orlando, FL 32801
Tel: (407) 244-1115
Contact: William Wilson

**HOLLAND & KNIGHT LLP**
701 Brickell Avenue – Suite 3000,
P.O. Box 015441 (Zip 33101),
Miami, FL 33131
Tel: (305) 374-8500
Contact: Greg Baldwin / Tracy A. Nichols

**HOLLAND & KNIGHT LLP**
400 North Ashley Drive, Suite 2300,
Tampa, FL 33602
Tel: (813) 227-8500
Contact: Francis Curran / Frederick S. Schrils / G. Calvin Hayes

Revised (10/02) COPY

02/27/2004 10:22 FAX 2125091292          FRANK CRYSTAL          ☑028

THE McLAUGHLIN Co          ID: 2028578555          JAN : 03   10-21 No.004 P.20

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900,
P.O. Box 52687 (Zip 32201),
Jacksonville, FL 32202
Tel: (904) 353-2000
Contact: Fred Lotterhos / George E Schulz
Jr / Michael G. Tanner

MCGUIREWOODS LLP
Bank of America Tower,
50 North Laura Street, Suite 3300,
Jacksonville, FL 32202-3661
Tel: (904) 798-2693
Contact: David M. Wells

STEEL HECTOR & DAVIS LLP
200 South Biscayne Boulevard,
Miami, FL 33131-2398
Tel: (305) 577-2957
Contact: Lewis F. Murphy, P.A. / Wendy
Leavitt

STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard, Suite,
Miami, FL 33131-2385
Tel: (305) 358-9900
Contact: Richard B. Simring / Robert W.
Turken

### GEORGIA

ALSTON & BIRD
One Atlantic Center,
1201 W. Peachtree Street,
Atlanta, GA 30309-3424
Tel: (404) 881-7343
Contact: Peter Q. Bassett

ALSTON & BIRD
One Atlantic Center,
1201 W. Peachtree St.,
Atlanta, GA 30309
Tel: (404) 881-7000
Contact: John Goselin / Mary Gill / Todd
R. David

KING & SPALDING
191 Peachtree Street,
Atlanta, GA 30303-1763
Tel: (404) 572-4600
Contact: M. Robert Thornton / Michael R.
Smith

PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street, N.W., Suite 2400,
Atlanta, GA 30308-2222
Tel: (404) 815-2500
Contact: J. Allen Maines

SMITH, GAMBRELL & RUSSELL, LLP
Suite 3100, Promenade II,
1230 Peachtree Rd., N.E.,
Atlanta, GA 30309-3592
Tel: (404) 815-3730
Contact: John G. Despriet

### ILLINOIS

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street, Suite 1600,
Chicago, IL 60661-3693
Tel: (312) 902-5452
Contact: David H. Kistenbroker

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street, Suite 1600,
Chicago, IL 60661-3693
Tel: (312) 902-5200
Contact: Pamela G. Smith / Leah J.
Domitrovic / Steven L. Bashwiner / Mary
Ellen Hennessy / Bonita L. Stone

KIRKLAND & ELLIS
200 East Randolph Drive,
Chicago, IL 60601
Tel: (312) 861-2000
Contact: Garrett B. Johnson / Robert J.
Kopecky

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7850
Contact: Hille R. Sheppard

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7279
Contact: Eugene A. Schoon

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7734
Contact: Walter C. Carlson

02/27/2004 10:23 FAX 2125091292          FRANK CRYSTAL                               ☒030

THE MCLAUGHLIN CO                     ID-2020510999          JAN 0 00  10:11 NO.004 P.21

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower,
Chicago, IL 60606
Tel: (312) 876-8224
Contact: Christopher Q. King

SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower,
Chicago, IL 60606
Tel: (312) 876-7483
Contact: David L. Schiavone

### LOUISIANA

LOCKE LIDDELL & SAPP LLP
601 Poydras Street, Suite 2400,
New Orleans, LA 70130-6036
Tel: (504) 558-5100
Contact: Brad Foster / John McElhaney /
Morris Harrell / Peter Flynn

### MASSACHUSETTS

HALE & DORR LLP
60 State Street,
Boston, MA 02109
Tel: (617) 526-6000
Contact: James W. Prendergast / Jeffrey
B. Rudman / John F. Batter

HUTCHINS, WHEELER & DITTMAR P.C.
101 Federal Street,
Boston, MA 02110
Tel: (617) 951-6624
Contact: David S. Rosenthal / John
Hughes

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center,
Boston, MA 02111
Tel: (617) 542-6000
Contact: Patrick J. Sharkey / Peter M.
Saparoff

ROPES & GRAY
One International Place,
Boston, MA 02110-2624
Tel: (617) 951-7566
Contact: John D. Donovan

TESTA, HURWITZ & THIBEAULT, LLP
125 High Street,
Boston, MA 02110
Tel: (617) 248-7363
Contact: Jordan D. Hershman

TESTA, HURWITZ & THIBEAULT, LLP
125 High Street,
Boston, MA 02110
Tel: (617) 248-7253
Contact: Brian E. Pastuszenski

### MINNESOTA

DORSEY & WHITNEY LLP
Pillsbury Center South,
220 South Sixth Street,
Minneapolis, MN 55402
Tel: (612) 340-2600
Contact: Brian E. Palmer / Edward J.
Pluimer / J. Jackson / Peter W. Carter /
Roger J. Magnuson

FAEGRE & BENSON LLP
90 South Seventh Street,
Minneapolis, MN 55402-3901
Tel: (612) 336-3000
Contact: Robert L. Schnell / Thomas L.
Kimer

WINTHROP & WEINSTINE, PA
3000 Dain Rauscher Plaza,
60 South Sixth Street,
Minneapolis, MN 55402
Tel: (612) 347-0700
Contact: David P. Pearson / Steven C.
Tourek / Thomas H. Boyd

### NEW YORK

ARNOLD & PORTER
399 Park Avenue,
New York, NY 10022-4690
Tel: (212) 715-1000
Contact: Kent A. Yalowitz / Scott B.
Schreiber

BLANK ROME TENZER GREENBLATT LLP
The Chrysler Building,
405 Lexington Avenue,
New York, NY 10174
Tel: (212) 885-5000
Contact: Robert J. Mittman / Harris N.
Cogan

BROBECK, PHLEGER & HARRISON LLP
1633 Broadway, 47th Floor,
New York, NY 10019
Tel: (212) 581-1600
Contact: Francis S. Chlapowski / Gregory
A. Markel

Revised (10/02) COPY

6 of 10

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

**CADWALADER, WICKERSHAM & TAFT**
100 Malden Lane,
New York, NY 10038
Tel: (212) 504-6000
Contact: Dennis J. Block / Howard R.
Hawkins / Jeffrey Q. Smith / Jonathan M.
Hoff

**CAHILL GORDON & REINDEL**
Eighty Pine Street,
New York, NY 10005
Tel: (212) 701-3000
Contact: Charles A. Gilman / Immanuel
Kohn / Thomas J. Kavaler

**CLIFFORD CHANCE ROGERS & WELLS LLP**
200 Park Avenue,
New York, NY 10166
Tel: (212) 878-8000
Contact: James B. Weidner / James N.
Benedict / John K. Carroll / Mark
Pomerantz / Mark Holland

**CRAVATH, SWAINE & MOORE**
Worldwide Plaza,
825 Eighth Avenue,
New York, NY 10019-7475
Tel: (212) 474-1000
Contact: Evan R. Chesler / Francis P.
Barron / Julie A. North / Keith R. Hummel /
Paul C. Saunders / Peter T. Barbur /
Richard W. Clary / Robert H. Baron /
Ronald S. Rolfe / Rory O. Millson /
Thomas G. Rafferty

**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON**
One New York Plaza,
New York, NY 10004
Tel: (212) 859-8000
Contact: John A. Borek / Sheldon Raab

**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue,
New York, NY 10166-0193
Tel: (212) 351-4000
Contact: David Grais / Wesley G. Howell /
Peter Beshar

**GREENBERG TRAURIG**
MetLife Building 200 Park Avenue,
New York, NY 10166
Tel: (212) 801-9200
Contact: Alan Mansfield / Marshall H.
Fishman

**KATTEN MUCHIN ZAVIS ROSENMAN**
575 Madison Avenue,
New York, NY 10022
Tel: (212) 940-8800
Contact: David Kistenbroker, Robert W.
Gottlieb and Joel W. Sternman,

**KAYE, SCHOLER, FIERMAN, HAYS & HANDLER**
425 Park Avenue,
New York, NY 10022
Tel: (212) 836-8663
Contact: Fredric W. Yerman

**KIRKLAND & ELLIS**
Citicorp Center, 153 East 53rd Street,
New York, NY 10022-4675
Tel: (212) 446-4800
Contact: Frank M. Holozubiec / Yosef J.
Riemer

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
919 Third Avenue,
New York, NY 10022
Tel: (212) 715-9100
Contact: Gary P. Naftalis / Alan Friedman

**MAYER, BROWN ROWE & MAW**
1675 Broadway,
New York, NY 10019
Tel: (212) 506-2500
Contact: Dennis P. Orr / Richard A. Spehr
/ Steven Wolowitz

**MILBANK, TWEED, HADLEY & MCCLOY**
1 Chase Manhattan Plaza,
New York, NY 10005
Tel: (212) 530-5832
Contact: Michael L. Hirschfeld

**MILBANK, TWEED, HADLEY & MCCLOY**
1 Chase Manhattan Plaza,
New York, NY 10005
Tel: (212) 530-5149
Contact: Scott A. Edelman

**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas,
New York, NY 10104
Tel: (212) 468-8000
Contact: Anthony M. Radice / Jack C.
Auspitz

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
399 Park Avenue, Thirty-First Floor,
New York, NY 10022-4697
Tel: (212) 318-6000
Contact: J. Allen Maines

Revised (10/02) **COPY**

7 of 10

THE McLAUGHLIN Co        ID: 928578555        JAN 5 '95   10:22 No.004 P.25

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas,
New York, NY 10019-6064
Tel: (212) 373-3000
Contact: Daniel J. Beller / Martin Flumenbaum / Claudia Hammerman / Brad S. Karp / Mark F. Pomerantz / Daniel J. Kramer / Richard A. Rosen

SCHULTE ROTH & ZABEL LLP
900 Third Avenue,
New York, NY 10022
Tel: (212) 756-2000
Contact: Betty Santangelo / Howard O. Godnick / Irwin J. Sugarman / Michael S. Feldberg / Robert M. Abrahams

SIMPSON THACHER & BARTLETT
425 Lexington Avenue,
New York, NY 10017
Tel: (212) 455-2000
Contact: Bruce D. Angiolillo / George M. Newcombe / Michael J. Chepiga / Paul C. Curnin / Peter Kazanoff / Roy L. Reardon

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane,
New York, NY 10038
Tel: (212) 806-5400
Contact: Laurence Greenwald / Melvin A. Brosterman / Robert Lewin

SULLIVAN & CROMWELL
125 Broad Street,
New York, NY 10004-2498
Tel: (212) 558-4000
Contact: D. Stuart Meiklejohn / Gandolfo V. DiBiasi / John L. Hardiman / John L. Warden / Philip L. Graham, Jr. / Richard H. Klapper

WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd Street, 29th Floor,
New York, NY 10019
Tel: (212) 403-1235
Contact: John F. Savarese

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue,
New York, NY 10153
Tel: (212) 310-8000
Contact: Greg A. Danilow / Irwin H. Warren / Joseph Allerhand

WILLKIE FARR & GALLAGHER
787 Seventh Avenue,
New York, NY 10019-6099
Tel: (212) 728-8000
Contact: David L. Foster / Michael R. Young / Richard L. Posen

WILMER, CUTLER & PICKERING
520 Madison Ave.,
New York, NY 10022
Tel: (212) 230-8800
Contact: Peter Vigeland / Robert B. McCaw

## OHIO

JONES, DAY, REAVIS & POGUE
North Point, 901 Lakeside Avenue,
Cleveland, OH 44114
Tel: (216) 586-3939
Contact: John M. Newman / John W. Edwards

## OREGON

DAVIS WRIGHT TREMAINE
2300 First Interstate Tower,
1300 S.W. Fifth Avenue,
Portland, OR 97201
Tel: (503) 241-2300
Contact: John F. McGrory

FOSTER PEPPER & SHEFELMAN
101 S.W. Main Street, 15th Floor,
Portland, OR 97204-3223
Tel: (503) 221-0607
Contact: Peter S. Ehrlichman / Stellman Keehnel / Tim Filer

LANE POWELL SPEARS LUBERSKY LLP
601 S.W. Second Avenue, Suite 2100,
Portland, OR 97204
Tel: (503) 778-2100
Contact: D. Meredith Wilson / Milo Petranovich / Robert E. Maloney

## PENNSYLVANIA

BLANK ROME COMISKY & MCCAULEY LLP
One Logan Square,
Philadelphia, PA 19103-6998
Tel: (215) 569-5500
Contact: Alan J. Hoffman / Alan M. Lieberman / Alexander D. Bono / Ian Comisky / Laurence S. Shtasel / Matthew J. Siembieda / Richard P. McElroy

THE MCLAUGHLIN CO

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

BUCHANAN INGERSOLL, PC
One Oxford Centre, 20th Floor,
301 Grant Street,
Pittsburgh, PA 15219-8800
Tel: (412) 562-1880
Contact: John R. Leathers

MORGAN, LEWIS & BOCKIUS
1701 Market Street,
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Contact: Marc J. Sonnenfeld / Elizabeth
Hoop Fay / Lisa Klein Wager / The Hon.
Alfred J. (Jim) Lechner / Stuart Sarnoff /
Keith Olin

PEPPER HAMILTON LLP
3000 Two Logan Square, Eighteenth
and Arch Streets,
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Contact: Barbara W. Mather / Jon A.
Baughman / Laurence Z. Shiekman / M.
Duncan Grant / Robert L. Hickok /
Thomas E. Zemaitis

WOLF, BLOCK, SCHORR and SOLIS-
COHEN LLP
1650 Arch Street, 22nd Floor,
Philadelphia, PA 19103-2097
Tel: (215) 977-2058
Contact: Ian A.L. Strogatz / Jay A.
Dubow / Jerome J. Shestack / M.
Norman Goldberger / Mark L. Alderman

## TEXAS

AKIN, GUMP, STRAUSS, HAUER & FELD,
L.L.P.
Pennzoil Place – South Tower, 711
Louisiana Street, Suite 1900,
Houston, TX 77002
Tel: (713) 220-5813
Contact: Gregg C. Laswell

AKIN, GUMP, STRAUSS, HAUER & FELD,
L.L.P.
1700 Pacific Avenue, Suite 4100,
Dallas, TX 75201-4675
Tel: (214) 969-2800
Contact: Edward S. Koppman / Mike
Lowenberg

BROBECK, PHLEGER & HARRISON LLP
4801 Plaza on the Lake,
Austin, TX 78746
Tel: (512) 330-4070
Contact: Paul R. Bessette

FULBRIGHT & JAWORSKI L.L.P
1301 McKinney, Suite 5100,
Houston, TX 77010
Tel: (713) 651-5151
Contact: Frank G. Jones / Richard N.
Carrell / Robert Harrell

FULBRIGHT & JAWORSKI L.L.P
2200 Ross Avenue, Suite 2800,
Dallas, TX 75201
Tel: (214) 855-8000
Contact: Karl G. Dial

JENKENS & GILCHRIST, P.C.
1100 Louisiana, Suite 1800,
Houston, TX 77002
Tel: (713) 951-3300
Contact: John Gilliam

JENKENS & GILCHRIST, P.C.
1445 Ross Avenue Suite 3200,
Dallas, TX 75202
Tel: (214) 855-4308
Contact: John Gilliam

LOCKE LIDDELL & SAPP LLP
100 Congress Avenue, Suite 300,
Austin, TX 78701-4042
Tel: (512) 305-4700
Contact: Brad Foster / John McElhaney /
Morris Harrell / Peter Flynn

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200,
Dallas, TX 75201-6776
Tel: (214) 740-8000
Contact: Brad Foster / John McElhaney /
Morris Harrell / Peter Flynn

LOCKE LIDDELL & SAPP LLP
600 Travis, 3400 Chase Tower,
Houston, TX 77002
Tel: (713) 226-1200
Contact: Brad Foster / John McElhaney /
Morris Harrell / Peter Flynn

02/27/2004 10:24 FAX 2125091292               FRANK CRYSTAL                          ☑004

THE MCLAUGHLIN CO                ID:

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

THOMPSON & KNIGHT, PC
Burnett Plaza, Suite 1600,
801 Cherry Street, Unit #1,
Fort Worth, TX 76102-6881
Tel: (817) 347-1700
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
1200 Smith Street, Suite 3600,
Houston, TX 77002
Tel: (713) 654-8111
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
1700 Pacific Avenue, Suite 3300,
Dallas, TX 75201
Tel: (214) 969-1103
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
98 San Jacinto Boulevard, Suite 1200,
Austin, TX 78701
Tel: (512) 469-6100
Contact: Timothy R. McCormick

WILSON, SONSINI, GOODRICH & ROSATI
8911 Capital of Texas Highway, North
Westech 360, Suite 3350,
Austin, TX 78759-7247
Tel: (512) 338-5499
Contact: Bruce G. Vanyo / Paul Tobias

VIRGINIA

COOLEY GODWARD, LLP
One Freedom Square, Reston Town
Center, 11951 Freedom Drive,
Reston, VA 20190-5601
Tel: (703) 456-8082
Contact: Robert R. Vieth

GREENBERG TRAURIG
1750 Tysons Boulevard 12th Fl.,
McLean, VA 22102
Tel: (703) 749-1300
Contact: Harry M. Glazer / Joseph T.
Casey, Jr.

MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800,
McLean, VA 22102-4215
Tel: (703) 712-5371
Contact: Warren E. Zirkle

MCGUIREWOODS LLP
One James Center, 901 East Cary Street,
Richmond, VA 23219-4030
Tel: (804) 775-1000
Contact: Stephen D. Busch / Anne Marie
Whittemore

WILMER, CUTLER & PICKERING
1600 Tysons Boulevard, 10th Floor,
Tysons Corner, VA 22102
Tel: (703) 251-9700
Contact: David P. Donovan

WILSON, SONSINI, GOODRICH & ROSATI
7927 Jones Branch Drive, Suite 400,
McLean, VA 22102
Tel: (650) 320-4804
Contact: Bruce Vanyo

WASHINGTON

DAVIS WRIGHT TREMAINE
2600 Century Square, 1501 Fourth Avenue,
Seattle, WA 98101-1688
Tel: (206) 622-3150
Contact: Stephen M. Rummage

DAVIS WRIGHT TREMAINE
2600 Century Square, 1501 Fourth Avenue,
Seattle, WA 98101-1688
Tel: (206) 622-3150
Contact: Ladd B. Leavens

FOSTER PEPPER & SHEFELMAN
1111 Third Avenue, Suite 3400,
Seattle, WA 98101-3299
Tel: (206) 447-8998
Contact: Peter S. Ehrlichman / Stellman
Keehnel / Tim Filer

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue, Suite 4100,
Seattle, WA 98101-2338
Tel: (206) 223-7000
Contact: Christopher B. Wells / James B.
Stoetzer / James L. Robart / Larry S.
Gangnes / Rudy A. Englund

PERKINS COIE LLP
1201 Third Avenue, Ste. 4800,
Seattle, WA 98101-3099
Tel: (206) 583-8888
Contact: Barry M. Kaplan / Harry H.
Schneider / Ronald L. Berenstein

THE McLAUGHLIN CO    ID-2025918533

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

### ALABAMA

LLOYD GRAY & WHITEHEAD
Two Perimeter Park South
Suite 100
Birmingham, AL 35423
Tel: (205) 967-8822
Contact: Steven E. Whitehead, Esq.
*Class Action Approved*

LUTHER OLDENBURG & RAINEY
63 S. Royal Street
Mobile, AL
Tel: (334) 433-8088
Contact: Rudene C. Oldenburg, Esq.

### ALASKA

LANE POWELL SPEARS LUBERSKY LLP
420 L Street
Suite 300
Anchorage, AK 99501-1937
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved*

### ARIZONA

GOODWIN RAUP PC
One Columbus Plaza
Suite 1200
Phoenix, AZ 85012-1942
Tel: (602) 650-2000
Contact: Calvin Raup
*Class Action Approved*

CAMPBELL YOST
234 North Central Avenue
Suite 600
Phoenix, AZ 85004
Tel: (602) 322-1600
Contact: Martin P. Clare, Esq.
*Class Action Approved*

### ARKANSAS

HUCKABAY MUNSON ROWLETT &
TILLEY
1900 West Capital Avenue
Suite 1900
Little Rock, AR 72201
Tel: (501) 374-6535
Contact: Bruce Munson, Esq.
*Class Action Approved*

### CALIFORNIA

EPSTEIN BECKER & GREEN PC
Two Embarcadero Center
Suite 1650
San Francisco, CA 94111
Tel: (415) 398-3500
Contact: Ron Souza, Esq
*Class Action Approved*

IRELL & MANELLA
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4275
Tel: (310) 277-1010
Contact: James F. Elliot, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER &
KRUPMAN
1888 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel: (310) 203-0200
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved-All Locations*

1215 K Street, Suite 1800
Sacramento, CA 95814
Tel: (916) 341-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

199 Freemont Street, 10th Floor
San Francisco, CA 94105
Tel: (415) 394-9400
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

KUTAK ROCK
117 E. Colorado Avenue
Suite 210
Pasadena, CA 91105
Tel: (626) 432-1830
Contact: Gregory Hurley, Esq.

LEWIS D'AMATO BRISBOIS & BISGAARD
LLP
221 N. Figueroa Street, Suite 1200
Los Angeles, CA 90012
Tel: (213) 500-1800
Contact: Robert F. Lewis, Esq. &
          Gary S. Rattet, Esq.

Revised (5/01)

1

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

One Sansome Street, Suite 1900
San Francisco, CA 94104
Tel: (415) 362-2580
Contact: Duane C. Musfelt, Esq.

550 West C Street, Suite 800
San Diego, CA 92101
Tel: (619) 233-1006
Contact: R. Gaylord Smith, Esq.

650 Town Center Drive, Suite 1400
Costa Mesa, CA 92626
Tel: (714) 545-9200
Contact: Mercedes Cruz, Esq.

Suite 600, 650 East Hospitality Ln
Tel: (909) 387-1130
Contact: Joseph Arias, Esq.

2500 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Tel: (916) 564-5400
Contact: David L. Cohen, Esq

O'MELVENY & MYERS LLP
610 Newport Center Driver
Newport Beach, CA 92660
Tel: (714) 760-9600
Contact: Stephen P. Page, Esq.
*Class Action Approved-All Locations

Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Tel: (415) 984-8700
Contact: Douglas Dexter, Esq.

400 South Hope Street
15th Floor
Los Angeles, CA 90071-2899
Tel: (213) 430-6000
Contact: Gordon E. Krischer, Esq.

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
1055 West Seventh Street
Los Angeles, CA 90017
Tel: (213) 624-3044
Contact: James A. Stankowski, Esq.

650 California Street
San Francisco, CA 94108
Tel: (415) 433-0990
Contact: Louis H. Castoria, Esq.

### COLORADO

KUTAK ROCK
717 Seventeenth Street
Suite 2800
Denver, CO 80202
Tel: (303) 297-2400
Tel: (828) 432-1630
Contact: Gregory Hurley, Esq.

SHERMAN & HOWARD
633 17th Street
Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Contact: Andrew Bolin, Esq.

PATTON BOGGS
1660 Lincoln Street
Suite 1900
Denver, CO 80264
Tel: (303) 830-1776
Contact: Timothy D. Kraus, Esq.

### CONNECTICUT

EPSTEIN BECKER & GREEN PC
One Landmark Plaza
Suite 1800
Stamford, CT 06901-2601
Tel: (212) 351-4500
Contact: Howard Pianko, Esq
*Class Action Approved

JACKSON LEWIS SCHNITZLER &
KRUPMAN
55 Farmington Avenue
Suite 1200
Hartford, CT 06105
Tel: (860) 522-0404
Tel: (914) 328-0404
Contact: Steven Baderlan, Esq.
*Class Action Approved-All Locations

177 Broad Street
Post Office Box 251
Stamford, CT 06904-0251
Tel: (203) 981-0404
Tel: (914) 328-0404
Contact: Steven D. Baderlan, Esq.

Revised (5/01)

2

02/27/2004 10:25 FAX 2125091292     FRANK CRYSTAL     Ø 037

THE MCLHUGHLIN Co          ID: 2026570555          JAN 5' 05     10:29 NO.004 P.04

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

### DELAWARE

WOLF BLOCK SCHORR & SOLIS-COHEN
One Rodney Square
10th & King Street
Wilmington, DE 19801
Tel: (302) 777-5860
Contact: Barry M. Klayman, Esq.
*Class Action Approved*

GREENBERG TRAURIG
The Brandy Wine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Tel: (302) 661-7000
    (302) 661-1604

### DISTRICT OF COLUMBIA

DRINKER BIDDLE PITNEY HARDEN
1500 K Street, N.W.
Suite 110
Washington, DC 20005
Tel: (202) 842-8857
Contact: Jennifer Smith, Esq.

PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Tel: (202) 457-6000
Contact: Douglas B. Mishkin, Esq. or
         Sally D. Garr, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER &
KRUPMAN
13501 I Street, NW
Suite 510
Washington, DC 20005
Tel: (202) 347-5200
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
1341 G. Street NW
Washington, DC 20005
Tel: (202) 626-7660
Contact: Paul D. Krause, Esq.
         Robert B. Wallace, Esq.
*Class Action Approved*

JORDON COYNE & SAVITS, LLP
1100 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 496-2810
Contact: Deborah Murrell Whelihan, Esq.
*Class Action Approved*

FORD & HARRISON
1300 19th Street NW
Suite 700
Washington, DC 20036
Tel: (202) 719-2012
    (202) 719-2000
Contact: David Rosenberg, Esq.

GREENBERG TRAURIG
800 Connecticut Avenue, NW Ste 500
Washington, DC 20036
Tel: (202) 331-3100
Contacts: C. Allen Foster, Esq., Eric C.
Rowe, Esq., & Joe Reeder, Esq.
*Class Action Approved*

### FLORIDA

AKERMAN SENTERFITT
Suntrust International Center
One Southeast 3rd Ave, 28th FL
Miami, FL 33131-1714
Tel: (305) 982-5543
Contact: Michael Marsh, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER &
KRUPMAN
First Union Financial Center
200 South Biscayne Boulevard
Suite 2600
Miami, FL 33131
Tel: (305) 577-7600
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved-All Locations*

390 North Orange Avenue
Suite 1285
Orlando, FL 32801-1641
Tel: (407) 246-8440
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

Revised (5/01)

HE McLAUGHLIN Co         ID:          JAN    16:28 NO.004 P.33

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**VERNIS & BOWLING**
517 Northlake Blvd
North Palm Beach, FL 33408
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

**CARLTON FIELDS WARD EMMANUAL
SMITH & CUTLER PA**
100 S.E. 2nd Street
Suite 4000
Miami, FL 33131
Tel: (305) 539-7225
Contact: Nancy H. Henry, Esq.

**KUBICKI DRAPER**
25 West Flagler Street Penthouse
Miami, Florida 33130
Tel: (305) 374-1212
Contact: Gene Kubicki
*Class Action Approved

**GREENBERG TRAURIG**
515 East Las Olas Boulevard
L Lauderdale, FL 33301
Tel: (954) 765-0500
Contact: Frank Scruggs, Esq.
*Class Action Approved-All Locations

1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Contact: Ron Rosengarten, Esq.

**KATZ BARRON SQUITERO FAUST**
2699 So. Bayshore Drive
7th Floor
Miami, FL 33133-5408
Tel: (305) 856-2444
Contact: Todd Boyd, Esq.

### GEORGIA

**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: (404) 881-7000
Contact: Peter Q. Bassett, Esq. or
            Robert P. Riordan, Esq.
*Class Action Approved

**FISHER & PHILLIPS LLP**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326
Tel: (404) 240-4235
Contact: D. Albert Brannen, Esq. or
            Ilene W. Barman, Esq.

**JACKSON LEWIS SCHNITZLER &
KRUPMAN**
1900 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303-1226
Tel: (404) 525-8200
Tel: (202) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

**LONG ALDRIDGE & NORMAN**
One Peachtree Center
5300
Atlanta, GA 30308
Tel: (404) 527-8312
Contact: Phillip A. Bradley, Esq.

### HAWAII

**LOVE YAMAMOTO & MOTOOKA**
1000 Bishop Street
Honolulu, HI 96813
Tel: (808) 532-7900
Contact: Chad Love, Esq.
*Class Action Approved

### IDAHO

**QUANE SMITH LLP**
US Bank Plaza, Suite 1600
101 South Capitol Blvd
Boise, ID 83702
Tel: (208) 345-0960
Contact: Jeremiah A. Quane, Esq.
*Class Action Approved

### ILLINOIS

**CLAUSEN MILLER PC**
10 South La Salle Street
Suite 1600
Chicago, IL 60603-1098
Tel: (312) 855-1010
Contact: James S. Barber, Esq. or
            James Nolan, Esq.

Revised (5/01)

4

HE MCLHUGHLIN CO        ID: 7026576555        JAN 37 93   16.26 NO.004 P.56

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**FREEBORN & PETERS**
311 South Wacker Drive
Suite 3000
Chicago, IL 60606-6677
Tel: (312) 360-6000
Contact: David H. Kistenbroker, Esq. or
          Steven M. Hartmann, Esq.

**JACKSON LEWIS SCHNITZLER &**
**KRUPMAN**
320 West Ohio Street
Suite 500
Chicago, IL 60610
Tel: (312) 787-4949
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

**SIDLEY & AUSTIN**
One First National Plaza
Chicago, IL 60603
Tel: (312) 853-7000
Contact: James S. Whitehead, Esq.,
        Julie O. Allen, Esq., Lawrence
        Lawrence I. Kipperman, Esq.,
        Thomas A. Roberts, Esq.
*Class Action Approved*

**SONNENSCHEIN NATH & ROSENTHAL**
800 Sears Towers
Chicago, IL 60601-1682
Tel: (312) 876-3112
Contact: Roger T. Brice, Esq.
*Class Action Approved*

**VEDDER PRICE KAUFMAN &**
**KAMMHOLZ**
222 N. La Salle Street
Chicago, IL 60601-1003
Tel: (312) 609-7745
Contact: Barry Hartstein, Esq.
*Class Action Approved*

### INDIANA

**KIGHTLINGER & GRAY**
Market Square Center, Suite 660
151 North Delaware
Tel: (317) 638-4521
Contact: Donald L. Dawson, Esq.
*Class Action Approved*

### IOWA

**NYEMASTER GOODE VOIGTS WEST**
**HANSELL & O'BRIEN**
700 Walnut Street
Des Moines, IA 50309
Tel: (515) 283-3100
Contact: Hayward Draper, Esq.
*Class Action Approved*

### KENTUCKY

**BOEHL STOPHER & GRAVES**
400 West Market Street
Suite 2300
Louisville, KY 40222
Tel: (502) 589-5980
Contact: Ed Stopher, Esq.
*Class Action Approved*

**HARLIN, PACKER ALCOTT &**
**SHOULDDIN**
519 East Tenth Street
PO Box 390
Bowling Green, KY 42102-0390
Tel: (270) 842-5611
Contact: William J. Parker, Esq.
*Class Action Approved*

### LOUISIANA

**ADAMS & REESE**
4500 One Shell Square
New Orleans, LA 70139
Tel: (604) 581-3234
Contact: Janis VanMeerveld, Esq.
*Class Action Approved*

**DEUTSCH KERRIGAN & STILES LLP**
755 Magazine Street
New Orleans, LA 70130
Tel: (604) 581-5141
Contact: Ellis B. Muory, Esq.

**LOCKE LIDDLE & SAPP LLP**
Pan American Life Center
601 Poydras Street, Suite 2400
New Orleans, LA 70130-6036
Tel: (604) 558-5106
Contact: Amelia W. Koch, Esq.

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**MCGLINCHEY STAFFORD**
643 Magazine Street
New Orleans, LA 70130
Tel: (504) 586-1200
Contact: E. Frederick Preis, Jr., Esq.

**THE JUNEAU FIRM**
The Harding Center
1018 Harding Strret, Suite 202
Lafayette, LA 70503-2412
Tel: (337) 269-0052
Contact: Mike Juneau

## MAINE

**MOON MOSS MCGILL & BACHELDER PA**
10 Free Street
PO Box 7250
Portland, ME 04112-7250
Tel: (207) 228-1526
Contact: Richard O. Moon, Esq.

## MARYLAND

**WHITEFORD TAYLOR & PRESTON LLP**
Seven St. Paul Street
Baltimore, MD 21202
Tel: (410) 347-8700
Contact: William Ryan, Jr., Esq.

**JORDAN COYNE & SAVITS, LLP**
33 Wood Lane
Rockville, MD 20850
Tel: (301) 424-4161
Contact: Deborah Murrell Whelihan

## MASSACHUSETTS

**FOLEY HOAG & ELIOT LLP**
One Post Office Square
Boston, MA 02109
Tel: (617) 832-1000
Contact: Peter M. Rozenblum

**HUTCHINS WHEELER & DITTMAR PC**
101 Federal Street
Boston, MA 02110
Tel: (617) 951-6624
Contact: David S. Rosenthal, Esq.
*Class Action Approved*

**JACKSON LEWIS SCHNITZLER & KRUPMAN**
One Beacon Street
33rd Floor
Boston, MA 02108
Tel: (617) 367-0025
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC**
One Financial Center
Boston, MA 02110
Tel: (617) 542-6000
Contact: Patrick Sharkey, Esq. &
        Robert Gault, Esq.
*Class Action Approved*

**GETMAN, STACEY, TAMPOSI, SCHULTESS & STEERE, PA**
163 South River Road
Bedford, NH 03110
Tel: (603) 634-4300
Contact: Laurence W. Getman, Esq. or
        Dona Feeney, Esq.
*Western Mass. Only*

**NIXON PEABODY LLP**
101 Federal Street
Boston, Ma. 02110
Tel: (516) 832-7584
Contact: Joseph J. Ortego, Esq.
*Class Action Approved*

**MURPHY HESSE TOOMEY & LEHANE**
300 Crown Colony, Suite 410
Quincy, MA 02269
Tel: (617) 478-6467
Contact: James Toomey, Esq.

**PEABODY & ARNOLD**
50 Rowes Wharf
Boston, MA 02110
Tel: (617) 951-2100
Contact: William A. Cotter, Esq.

## MICHIGAN

**DYKEMA GOSSETT, LLP**
1577 N. Woodward Avenue
Bloomfield Hills, MI 48304
Tel: (248) 203-0705
Contact: Robert L. Duty, Esq.

6

02/27/2004 10:26 FAX 2125091292      FRANK CRYSTAL                                                      @041

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**MADDIN HOUSER WARTELL ROTH**
28400 Northwestern Highway
PO Box 215
Southfield, MI 48034
Tel: (248) 354-4080
Contact: Harvey Heller, Esq.

**MILLER CANFIELD PADDOCK AND STONE PLC**
1200 Campau Square Plaza
99 Monroe Avenue, NW
Grand Rapids, MI 49503
Tel: (616) 454-8656
Contact: Charles S. Mishkind, Esq.
*Class Action Approved-All Locations*

150 West Jefferson, Suite 2500
Detroit, MI 48226
Tel: (313) 963-6420
Contact: Charles S. Mishkind, Esq. or
         Carl H. Von Ende, Esq.

**PLUNKETT & COONEY**
505 N. Woodward Avenue
Suite 3000
Bloomfield Hills, MI 48304
Tel: (248) 901-4005
Contact: Teresa Smith Lloyd, Esq.

**BRADY HATHAWAY & BRETZ**
1330 Buhl Building
Detroit, MI 48226-3502
Tel: (313) 965-3700
Contact: Dannel Bertz

## MINNESOTA

**DORSEY & WHITNEY LLP**
Pilsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 340-2600
Contact: Robert R. Reinhart, Esq., or
         Peter S. Hendrickson, Esq.
*Class Action Approved*

**JACKSON LEWIS SCHNITZLER & KRUPMAN**
150 Fifth Street Towers
150 South Fifth Street, Suite 2800
Minneapolis, MN 55402
Tel: (612) 341-8131
Tel: (616) 364-0404
Contact: Steven D. Bederian, Esq.
*Class Action Approved*

**MEAGHER & GEER LLP**
4200 Multifoods Tower
Minneapolis, MN 55402
Tel: (612) 338-0661
Contact: James F. Roegge, Esq.

## MISSOURI

**ARMSTRONG & TEASDALE LLP**
2345 Grand Blvd
Suite 2000
Kansas City, MO 64108
Tel: (816) 221-3420
Contact: Lynn W. Hursh, Esq.
*Class Action Approved*

**BROWN & JAMES, PC**
705 Olive Street
Suite 1100
St. Louis, MO 63101-2270
Tel: (314) 421-3128
Contact: Charles E. Reis, IV, Esq.

**GALLOP JOHNSON & NEUMAN LC**
Interco Corporate Tower
101 South Hanley
St. Louis, MO 63105
Tel: (314) 862-1200
Contact: Ron Hack, Esq.

**LEWIS RICE & FINGERSH, L.C.**
500 N. Broadway, Suite 2000
St. Louis, MO 63102-2147
Tel: (314) 444-7600
Contacts: Robert J. Golterman, Esq.
          Neal F. Perryman, Esq.
*Class Action Approved*

## MISSISSIPPI

**BUTLER SNOW O'MARA STEVENS & CANNADA PLLC**
210 East Capitol Street
Jackson, MS 39201
Tel: (601) 948-5711
Contact: Jeffrey Walker, Esq.
*Class Action Approved*

**WATKINS & EAGER PLLC**
400 East Capitol Street
Jackson, MS 39201
Tel: (601) 948-6470
Contact: Kenneth E. Milan, Esq.

Revised (5/01)

7

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**MONTANA**

MATOVICH AND KELLER PC
225 First Citizens Bank
2812 First Avenue N.
Billings, MT 59101
Tel: (406) 252-5500
Contact: E. Matovich, Esq.

**NEBRASKA**

KUTAK ROCK
1630 Farnam Street
Omaha, NE 68102
Tel: (402) 346-6000
Contact: Gregory Hurley, Esq.

**NEW HAMPSHIRE**

GETMAN STACEY TAMPOSI
SCHULTESS & STEERE, PA
183 South River Road
Bedford, NH 03110
Tel: (603) 634-4300
Contact: Laurence W. Getman, Esq. or
        Dona Feeney, Esq.

**NEW JERSEY**

DRINKER BIDDLE PITNEY HARDEN
105 College Road
Suite 300
Princeton, NJ 08542
Tel: (609) 716-6500
Contact: Jon Epstein, Esq.

EPSTEIN BECKER & GREEN PC
One Riverfront Plaza, 7th Floor
Newark, NJ 07102
Tel: (973) 639-8262
Contact: Howard Planko, Esq.
*Class Action Approved

HARWOOD LLOYD
130 Main Street
Hackensack, NJ 07601
Tel: (201) 487-1080
Contact: Frank Lloyd, Esq.
        Elizabeth Lorell, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
80 Washington Street
Morristown, NJ 07960-6844
Tel: (973) 538-6890
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LINDABURY MCCORMICK &
ESTABROOK
53 Cardinal Drive
PO Box 2369
Westfield, NJ 07091
Tel: (908) 233-6800
Contact: Richard Cino, Esq.

SAIBER, SCHLESINGER, SATZ &
GOLDSTEIN
One Gateway Center, 13th Floor
Newark, NJ 07102-5311
Tel: (973) 622-3333
Contact: Jeffrey Lorell, Esq.

THOMPKINS MCGUIRE WACHENFELD &
BARRY
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4070
Tel: (973) 622-3000
Contact: William B. McGuire, Esq.

**NEVADA**

BARKER BROWN BUSBY CHRISMAN &
THOMAS
300 South Fourth Street
Suite 800
Las Vegas, NV 89101
Tel: (702) 386-1086
Contact: James P. Chrisman, Esq.

**NEW MEXICO**

BUTT THORNTON & BAEHR PC
4101 Indian School Road NE
Suite 3005
Albuquerque, NM 87110
Tel: (505) 884-0777
Contact: Agnes Fuentevilla Padilla, Esq.

8

02/27/2004 10:27 FAX 2125091292        FRANK CRYSTAL

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

### NEW YORK

D'AMATO & LYNCH
70 Pine Street
New York, NY 10270
Tel: (212) 269-0927
Contact: Luke Lynch Jr., Esq.

EPSTEIN BECKER & GREEN PC
250 Park Avenue, 12th Floor
New York, NY 1010019
Tel: (212) 351-4500
Contact: Howard Pianko, Esq.
*Class Action Approved

GARBARINI & SCHER PC
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 764-4000
Contact: James Kachadoorian, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
101 Park Avenue
17th Floor
New York, NY 10178
Local Tel: (212) 697-8200, (212) 545-4000
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved-All Locations

1000 Woodbury Road
Suite 402
Woodbury, NY 11797
Tel: (516) 364-0404
Tel: (814) 328-0404
Contact: Steven D. Baderian, Esq.

One North Broadway
White Plains, NY 10601-2305
Contact: Steve Baderian, Esq.
Tel: (914) 328-0404

JONES HIRSCH CONNORS BULL
101 East 52nd Street
New York, NY 10022
Tel: (212) 507-1000
Contact: Richard Steer

KAUFMAN BORGEEST & RYAN
747 Third Avenue
New York, NY 10017
Tel: (212) 880-9600
Contact: Julianne Ryan

KRAMER LEVIN NAFTALIS & FRANKEL
919 Third Avenue
New York, NY 10022
Tel: (212) 715-9100
Contact: Kevin LeBlang, Esq.

OHRENSTEIN & BROWN LLP
One World Trade Center
85th Floor
New York, NY 10048
Tel: (212) 682-4500
Contact: Michael D. Brown, Esq.

WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, NY 10019-6099
Tel: (212) 728-8000
Contact: Stephen Greiner, Esq.
*Class Action Approved

HODGSOM, RUSS, ANDREWS, WOODS
& GOODYEAR, LLP
One M&T Plaza, Suite 2000
Buffalo, NY 14203-2391
Tel: (716) 848-1496
Contact: Patrick J. Tomovic, Esq

NIXON PEABODY LLP
990 Stewart Avenue
Garden City, NY 11530
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq
*Class Action Approved-All Locations

Omni Plaza
300 South Pearl St.
Albany NY 12207
Tel: (518) 427-2650
Contact: Joseph J. Ortego, Esq

437 Madison Avenue
New York NY 10022
Tel: (212) 940-3000
Contact: Joseph J. Ortego, Esq

Revised (5/01)

02/27/2004 10:27 FAX 2125091292    FRANK CRYSTAL

THE MCLAUGHLIN CO    ID 202031009    JAN 00 10:29 NO.004 P.41

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

Clinton Square, PO Box 31051
Rochester, NY 14603
Tel: (716) 263-1000
Contact: Joseph J. Ortego, Esq.

### NORTH CAROLINA

COZEN & O'CONNOR
2100 One First Union Center
301 South College St. Suite 2100
Charlotte, NC 28202
Tel: (704) 376-3400
Contact: Jay Goldstein, Esq.

PARKER POE ADAMS & BERNSTEIN
401 S. Tyon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 372-9000
Contact: Jonathan M. Crotty

### OHIO

DINSMORE SHOAL
175 South 3rd Street
10th Floor
Columbus, OH 43215
Tel: (614) 628-6220

GALLAGHER SHARP FULTON &
NORMAN
Seventh Floor Bulkley Building
1501 Euclid Avenue
Cleveland, OH 44115
Tel: (216) 241-5310
Contact: Alton Stephens, Esq.
*Class Action Approved*

JANIK & DORMAN
Building Two
8223 Brecksville Road
Cleveland, OH 44141
Tel: (440) 836-7600
Contact: Steven G. Janik, Esq.
*Class Action Approved*

### OKLAHOMA

RHODES HIERONYMUS JONES TUCKER
& GABLE PLLC
P.O. Box 21100
Tel: (918) 582-1173
Contact: Chris L. Rhodes, III, Esq.

### OREGON

BULLIVANT HOUSER BAILEY
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2089
Tel: (503) 228-6351
Contact: Chrys A. Martin, Esq.

LANE POWELL SPEARS LUBERSKY LLP
601 SW Second Avenue
Suite 2100
Portland, OR 97204
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved*

LINDSAY HART NEIL & WEIGLER LLP
1300 West Fifth Avenue
Suite 3400
Portland, OR 97201-5696
Tel: (503) 226-7677
Contact: Lisa F. Rackner, Esq.
          Jarard S. Weigler, Esq.

### PENNSYLVANIA

COZEN AND O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2000
Contact: Jeffrey Pasek, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
One PPG Place
29th Floor
Pittsburgh, PA 15222-5414
Tel: (412) 232-0404
Tel: (814) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

MARSHALL DENNEHY
1845 Walnut Street
Philadelphia, PA 19103
Tel: (215) 575-2600
Contact: Phil Torin, Esq.
          Jay Rothman, Esq.

Revised (5/01)

02/27/2004 10:27 FAX 2125091292    FRANK CRYSTAL    @045

ME MCLAUGHLIN CO          ID: 2020310333          JAN 30 03   10:29 NO.004 P.42

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Contact: Anthony B. Haller, Esq.
*Class Action Approved

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
The Curtis Center
Suite 1130 East
Philadelphia, PA 19106
Tel: (215) 627-6900
Contact: Lou Isaacsohn, Esq.
*Class Action Approved

WOLF BLOCK SCHORR & SOLIS – COHEN
LLP
1650 Arch Street
Philadelphia, PA 19103 – 2097
Tel: (215) 977-2588
Contact: Alan Kessler, Esq.
*Class Action Approved

HAMBURG & GOLDEN
1601 Market Street, Suite 565
Philadelphia, PA 19103-1443
Tel: (215) 255-8590
Contact: Nell Hamburg, Esq.

### RHODE ISLAND

ROPES & GRAY
30 Kennedy Plaza
Providence, RI 02903-2328
Tel: (401) 455-4400
Contact: William S. Eggeling, Esq.
*Class Action Approved

NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq
*Class Action Approved

### SOUTH CAROLINA

JACKSON LEWIS SCHNITZLER &
KRUPMAN
2100 Daniel Building
301 S. Main Street
Greenville, SC 28601
Tel: (914) 328-0404
Contact: Steve Baderian, Esq.
*Class Action Approved

YOUNG CLEMENT RIVERS & TISDALE
LLP
P.O. Box 993
28 Boad Street
Charleston, SC 29402
Tel: (864) 577-4000
Contact: Shawn D. Wallace, Esq.

### SOUTH DAKOTA

COSTELLO PORTER HILL HEISTERKAMP
BUSHNELL & CARPENTER LLP
200 Security Building
P.O. Box 290
Rapid City, SD 57709
Tel: (605) 343-2410
Contact: Robert L. Lewis, Esq.

DAVENPORT EVANS HURWITZ & SMITH
LLP
P.O. Box 1030
513 South Main Avenue
Sioux Falls, SD 57101-1030
Tel: (605) 336-2880
Contact: Susan Brunick Simons, Esq.
           Jean H. Bender, Esq.

### TENNESSEE

LEITNER WILLIAMS DOOLEY &
NAPOLITAN PLLC
Pioneer Building
3rd Floor
Chattanooga, TN 37402
Tel: (423) 265-0214
Contact: Paul R. Leitner, Esq.

Revised (5/01)

FRANK CRYSTAL

02/27/2004 10:27 FAX 2125091292

THE MCLAUGHLIN CO

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

WEINTRAUB, STOCK BENNETT
GRISHAM & UNDERWOOD
One Commerce Square
Suite 2560
Memphis, TN 38103
Tel: (901) 526-0431
Contact: James H. Stock, Esq.

## TEXAS

CLARK WEST KELLER BUTLER & ELLIS
LLP
4800 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2146
Tel: (214) 741-1001
Contact: Mark Shenk, Esq.

FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Tel: (214) 855-8188
Contact: Bob Harrell, Esq.
           A.J. Harper, Esq.
*Class Action Approved-All Locations*

1301 McKinney
Suite 5100
Houston, TX 77101-3095
Tel: (713) 651-5442
Contact: Frank Jones, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
3811 Turtle Creek Boulevard
Suite 500
Dallas, TX 75219
Tel: (214) 520-2400
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*EPLI Class*

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
Tel: (214) 740-8000
Contact: John McElheney, Esq.

MILLS SHIRLEY ECKEL & BASSETT, LLP
400 Washington Building
2228 Mechanic, P.O. Box 1943
Galveston, TX 77553
Tel: (409) 763-2341
Contact: Carla Cotropia, Esq.

PATTON BOGGS LLP
2626 Cole Avenue
Suite 700
Dallas, TX 75204
Tel: (214) 871-2141
Contact: D. Patrick Long, Esq.
*Class Action Approved*

THOMPSON & KNIGHT LLP
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201-4693
Tel: (214) 969-1700
Contact: Timothy R. McCormick, Esq.

## UTAH

CHRISTENSON & JENSEN PC
50 South Main Street
Suite 1500
Salt Lake City, UT 84101
Tel: (801) 355-3431
Contact: Phillip S. Ferguson, Esq.

## VERMONT

CLEARY SHAHI ASSOCIATES
110 Merchants Row
P.O. Box 6740
Rutland, VT 05702
Tel: (802) 775-8800
Contact: David L. Cleary, Esq.

## VIRGINIA

GENTRY LOCKE RAKES & MOORE
P.O. Box 40013
Roanoke, VA 24022-0013
Tel: (540) 983-9300
Contact: W. David Paxton, Esq.
*Class Action Approved-All Locations*

305 Harrison Street, SE
LeeBurg, VA 20175
Tel: (202) 496-2810
Debra M. Whelihan, Esq

12

Revised (5/01)

02/27/2004 10:28 FAX 2125091292          FRANK CRYSTAL

HE McLAUGHLIN Co          ID:2028578355          JAN 31 05    18:30 NO.004 P.44

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

MCGUIRE WOODS BATTLE & BOOTHE
LLP
901 East Cary Street
Richmond, VA 23219
Tel: (804) 775-4378
Contact: Stephen D. Busch, Esq.

### WASHINGTON

COZEN AND O'CONNOR
1201 Third Avenue
Suite 5200
Seattle, WA 98101
Tel: (206) 340-1000
Contact: Thomas M. Jones, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
1420 Fifth Avenue, Suite 2000
Seattle, WA 98101
Tel: (205) 405-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue
Suite 4100
Seattle, WA 98101-2338
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved*

### WEST VIRGINIA

STEPTOE & JOHNSON LLP
Bank One Center
P.O. Box 2190
Clarksburg, WV 26302-2190
Tel: (304) 624-8000
Contact: C. David Morrison, Esq.
*Class Action Approved*

### WISCONSIN

MELLI WALKER PEASE & RUHLY SC
18 Martin Luther King Blvd
Madison, WI 53701
Tel: (608) 257-4812
Contact: Jack D. Walker, Esq.

### WYOMING

HIRST & APPLEGATE
1720 Carey Avenue
Suite 200
Cheyenne, WY 82001
Tel: (307) 632-0541
Contact: Thomas A. Nicholas, Esq.

13

Revised (5/01)

## ENDORSEMENT# 1

This endorsement, effective *12:01 a.m.*  *October 30, 2002*      forms a part of
policy number  *495-36-84*
issued to *ULLICO INC.*

### National Union Fire Insurance Company of Pittsburgh, Pa.

by

Wherever used in this endorsement: 1) "we", "us", "our", and "insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named insured", "First Named Insured", and "insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or insured stated in the declarations page; and 3) "Other insured(s)" means all other persons or entities afforded coverage under the policy.

### WASHINGTON, D.C.
### CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    **Cancellation**

If this policy has been in effect for thirty (30) days or more, the insurer may cancel this policy only if one or more of the following reasons apply:

1)    Insured has refused or failed to pay a premium due under the terms of the policy;

2)    Insured or Other Insured(s) have made a material and willful misstatement or omission of fact to the insurer or its employees, agents or brokers in connection with any application to, or claim against the insurer; or

3)    Property or other interest of the insured shall have been transferred to a person other than the insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

The insurer will mail or deliver to the named insured notice of cancellation at least thirty (30) days prior to the date of cancellation. For cancellation as described under 2) and 3) above, the insurer will mail or deliver a copy of the notice to the Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    **Nonrenewal**

If the insurer decides not to renew this policy the insurer will mail or deliver to the named insured the insurer's notice of nonrenewal at least thirty (30) days before the end of the policy period.

The insurer will mail or deliver notice of cancellation or nonrenewal to the agent or broker at least five (5) days prior to the insurer's mailing of notice to the named insured.

**END 001**                              – 1 –

52138 (8/95)   *COPY*

02/27/2004 10:28 FAX 2125091292    FRANK CRYSTAL

## ENDORSEMENT# 1    (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

AUTHORIZED REPRESENTATIVE

**END 001**

52135 (8/95)    *COPY*

– 2 –

02/27/2004 10:28 FAX 2125091292          FRANK CRYSTAL

HE MCLAUGHLIN CO          ID:20285785555          JAN 31 03   10:31 NO.004 P.41

ENDORSEMENT# 2

This endorsement, effective 12:01 a.m.   October 30, 2002          forms a part of
policy number   495-36-84
issued to   ULLICO INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (BROAD FORM)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s):

A.  alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

   (1)  nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

   (2)  nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

   (3)  the furnishing by an Insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

   (4)  claims for damages to the company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B.  (1)  which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or.

   (2)  with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

   "hazardous properties" include radioactive, toxic or explosive properties;

**END 2**

**COPY**

(2/90)

**ENDORSEMENT# 2**    (Con__ued)

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number    *495-36-84*
Issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

"nuclear material" means source material, special nuclear material or byproduct
material;

"source material", "special nuclear material", and "byproduct material" have the
meanings given them in the Atomic Energy Act of 1954 or in law amendatory
thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has
been used or exposed to radiation in a nuclear reactor;

"waste" means any   waste material (1) containing byproduct material and (2)
resulting from the operation by any person or organization of any nuclear facility
included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of
uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling,
processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of
special nuclear material if at any time the total amount of such material in the
custody of the insured at the premises where such equipment or device is
located consists of or contains more than 25 grams of plutonium or uranium
233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin,  excavation, premises or place prepared  or used for the
storage or disposal of waste, and includes the site on which any of the
foregoing is located, all operations conducted on such  site and  all premises
used for such operations;

"nuclear reactor" means any apparatus designed or used to  sustain nuclear fission in a self-
supporting chain reaction or to contain a critical mass of fissionable material.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*
*COPY*

AUTHORIZED REPRESENTATIVE

(2/90)

FRANK CRYSTAL

02/27/2004 10:29 FAX 2125091292

## ENDORSEMENT# 3

This endorsement, effective *12:01 a.m.*    *October 30, 2002*    forms a pa
policy number *495-36-84*
issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PROFESSIONAL ERRORS & OMISSIONS EXCLUSION
## (WITH SHAREHOLDER CARVE-OUT)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to any Insured(s)' performance of or failure to perform professional services for others for a fee, or any act(s), error(s) or omission(s) relating thereto.

Notwithstanding the foregoing, it is further understood and agreed that this endorsement shall not apply to any Claim(s) brought by a shareholder of the Company in the form of a shareholder class, direct or derivative action alleging failure to supervise those who performed or failed to perform such professional services, provided that such shareholder action is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the Company or any Insured(s).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 3

AUTHORIZED REPRESENTATIVE

(2/90)    COPY

02/27/2004 10:29 FAX 2125091292

FRANK CRYSTAL

THE MCLAUGHLIN CO

ID: 20203100000

**ENDORSEMENT# 4**

This endorsement, effective **12:01 a.m.    October 30, 2002**    forms a part of
policy number **495-36-84**
issued to **ULLICO INC.**

by    **National Union Fire Insurance Company of Pittsburgh, Pa.**

## PRIOR ACTS EXCLUSION FOR LISTED SUBSIDIARIES

### (STANDARD)

In consideration of the premium charged, it is hereby understood and agreed that this policy provides coverage for Loss arising from claims made against the Directors and Officers of any Subsidiary listed below for any alleged Wrongful Act occurring only on or after its Retroactive Date stated below and prior to the end of the Policy Period and otherwise covered by this policy. Losses arising from the same or related Wrongful Act shall be deemed to arise from the first such same or related Wrongful Act.

| NAME OF NEW SUBSIDIARY | RETROACTIVE DATE |
|---|---|
| Richard Reese Associates | September 1, 1986 |
| K.D.S. Corporation | September 1, 1986 |

Nothing in this endorsement shall serve to limit the applicability of exclusion (n) to any Subsidiary not listed above.

ALL OTHER TERMS. CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 4**
**COPY**

(2/80)

_____
**AUTHORIZED REPRESENTATIVE**

**ENDORSEMENT# 5**

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number    *495-36-84*
Issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CAPTIVE INSURANCE COMPANY EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payments for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon, attributable to the ownership, management, maintenance, operation and/or control by the Company of any captive insurance company or entity including but not limited to any Claim(s) alleging the insolvency or bankruptcy of the Named Entity as a result of such ownership, operation, management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 5**
**COPY**

AUTHORIZED REPRESENTATIVE

(2/90)

02/27/2004 10:30 FAX 2125091292          FRANK CRYSTAL

ENDORSEMENT# 6

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number  *495-36-84*
issued to   *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## MEDICAL MALPRACTICE EXCLUSION

### (WITH SHAREHOLDER CARVE-OUT)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to medical or professional malpractice including, but not limited to, the rendering or failure to render of medical or professional service or treatment.

Notwithstanding the foregoing, this exclusion shall not apply to any Claim brought by a shareholder of the Company in the form of a shareholder class, direct or derivative action(s) made against any Insured(s) for failure to supervise or manage those who rendered or failed to render medical or professional service or treatment, provided that such Claim is not instigated and continued by, solicited by, assisted by, and/or participated in by any Insured or the Company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 6*                              AUTHORIZED REPRESENTATIVE
*COPY*

(2/90)

FRANK CRYSTAL

02/27/2004 10:30 FAX 2125091292

THE McLAUGHLIN Co          ID:2028578355          JAN 3 '03   16:34 No.004 P.00

## ENDORSEMENT# 7

This endorsement, effective **12:01 a.m.   October 30, 2002**          forms a part of
policy number   **495-36-84**
issued to   **ULLICO INC.**

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable to make any payment for Loss in connection with any Claim(s)
made against any Insured(s) alleging, arising out of, based upon, or attributable to:

    (i)   Payments, commissions, gratuities, benefits or any other favors to or for the
         benefit of any full or part-time domestic or foreign government or armed
         services officials, agents, representatives, employees or any members of
         their family or any entity with which they are affiliated; or

    (ii)  Payments, commissions, gratuities, benefits or any other favors to or for the
         benefit of any full or part-time officials, directors, agents, partners,
         representatives, principal shareholders, or owners or employees, or
         "affiliates" (as that term is defined in The Securities Exchange Act of 1934,
         including any officers, directors, agents, owners, partners, representatives,
         principal shareholders or employees of such affiliates) of any customers of
         the company or any members of their family or any entity with which they
         are affiliated; or

    (iii)  Political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 7*

*COPY*

(2/90)

02/27/2004 10:30 FAX 2125091292          FRANK CRYSTAL

THE MCLAUGHLIN CO          ID:2020513033          JAN 31 03  10:34 NO.004 P.34

## ENDORSEMENT# 8

This endorsement, effective *12:01 a.m.   October 30, 2002*          forms a part of
policy number   *496-36-84*
issued to *ULLICO INC.*

`by    National Union Fire Insurance Company of Pittsburgh, Pa.*

### OUTSIDE ENTITY ENDORSEMENT

In consideration of the premium  charged, it is hereby understood and agreed that the
following entities shall be deemed an "Outside Entity" with respect to its corresponding
Continuity Date below:

CONTINUITY DATE

OUTSIDE ENTITY

*October 8, 1998*

1)  a not-for-profit organization under
section 501 (c)(3) of the Internal Revenue
Code of 1986 (as amended).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 008*
    *COPY*

FRANK CRYSTAL

02/27/2004 10:30 FAX 2125091292

THE MCLAUGHLIN CO        ID:2028578355                JAN '03  10:33 NO.004 P.33

## ENDORSEMENT# 9

This endorsement, effective *12:01 a.m.  October 30, 2002*        forms a part of
policy number  *495-36-84*
issued to   *ULLICO INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## AMEND DEFINITION OF EMPLOYMENT PRACTICES VIOLATIONS

In consideration of the premium  charged, it is hereby  understood and agreed that  the last
paragraph of Definition (h) of the policy, "Employment  Practices Violation(s)", and the first
full paragraph of section 4 of endorsement #11 is amended to read as follows:

> .With respect to any  customer(s), client(s), supplier(s), distributor(s), or  any other
> individual or group  of individuals, Employment  Practices Violation(s)  shall  mean any
> actual or  alleged  sexual harassment  or  violation of an individual's civil rights
> relating to such  sexual harassment,  whether direct, indirect,  intentional or
> unintentional.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

*END 9*

*COPY*

(2/90)

AUTHORIZED REPRESENTATIVE

02/27/2004 10:30 FAX 2125091292         FRANK CRYSTAL

THE MCLAUGHLIN CO            ID:2020310333            JAN ?? 05    1043

## ENDORSEMENT# 10

This endorsement, effective *12:01 a.m.   October 30, 2002*         forms a pa
policy number   *495-36-84*
issued to   *ULLICO INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ARC PRIVATE EDGE℠ AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that unless modified by another endorsement to this policy, coverage as is afforded by this policy is amended as follows:

1.    **Automatic new acquisitions coverage**

Definition of "Subsidiary", paragraph (2) is amended to read as follows:

    (2)    automatically any for-profit organization, whose securities are not publicly traded and which becomes a Subsidiary during the Policy Period but only if:

        (i)    its assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy; or

        (ii)    its Employees total less than the lesser of: (A) 20% of the total Employees of the Company as of the inception date of this policy; or (B) two thousand (2000); or

        (iii)    such for-profit organization, whose securities are not publicly traded, becomes a Subsidiary during the last ninety (90) days of the Policy Period;

The Definition of "Subsidiary," is further amended by adding the following new paragraph at the end thereof:

    Notwithstanding the above, solely with respect to coverage afforded under this policy for Employment Practices Claims, this policy shall apply to Employment Practices Violations committed or allegedly committed prior to the time it was a Subsidiary as defined in paragraph (2)(ii) with respect to a Claim made against any such Subsidiary or made against any Individual Insured of such Subsidiary for which such Subsidiary has indemnified with respects to the Claim; provided, however, that the foregoing shall not apply if such Subsidiary or any Director or executive Officer of the Company or such Subsidiary knew of the Employment Practices Violation.

2.    **Definitions of Insured and Employee amended; Director and Officer added**

Definition of "Employee" is hereby deleted in its entirety and replaced with the following:

    "Employee(s)" mean any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise,

**END 10**

**COPY**

(2/90)

02/27/2004 10:31 FAX 2125091292        FRANK CRYSTAL

THE McLAUGHLIN Co            ID: 2028578555        JAN 3 03    10:30 NO.004 P.01

### ENDORSEMENT# 10   (Continued)

This endorsement, effective **12:01 a.m.   October 30, 2002**     forms a part of
policy number  **495-36-84**
issued to   **ULLICO INC.**

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

including any part-time, seasonal and temporary Employee in his or her
capacity as such. An individual who is leased to the Company   or is a
volunteer for the Company shall also be an Employee. Any other individual
who is contracted to perform work for the Company, or who is an
independent contractor for the Company shall also be an Employee.

Subparagraph (4) of the Definition of "Individual Insured(s)" is hereby deleted in its
entirety and replaced with the following:

   (4)    any Insured Employee of the Company.

The following Definition of "Insured Employee" is hereby added to the policy:

"Insured Employee" means any past, present or future employee, whether
such employee is in a supervisory, co-worker or subordinate position or
otherwise, including any part-time, seasonal and temporary Employee in his
or her capacity as such. An individual who is leased to the Company or is a
volunteer for the Company shall also be an Employee, but only if the
Company provides indemnification to such leased individual in the same
manner as is provided to the Company's Employees. Any other individual
who is contracted to perform work for the Company, or who is an
independent contractor for the Company shall also be an Employee, but only
if the Company provides indemnification to such individual in the same
manner as that provided to the Company's Employees.

Solely for the purposes of the coverage afforded hereunder, the term "Director or
Officer" means an individual Insured as defined in Definition (i)(1), (2) and (3).

3.    Punitive, Exemplary and Multiple Damages Coverage

The Definition of "Loss" is amended as follows:

   (1)    Subparagraph (6) is hereby deleted in its entirety and replaced with the
          following:

      (6)    matters which may be deemed uninsurable under the law pursuant to
             which this policy shall be construed. It is further understood and
             agreed that a determination as to whether or not matters are
             "deemed uninsurable" for the purposes of this subparagraph (6) shall
             be governed by such applicable law which most favors the Insured.

**END 10**

(2/90)      **COPY**

ENDORSEMENT# 10    (Continued)

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number *495-36-84*
issued to *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

(2)    The final paragraph thereof is deleted in its entirety and replaced with the
following:

Notwithstanding the foregoing, Loss shall specifically include (subject to the
policy's other terms, conditions and exclusions) punitive, exemplary and
multiple damages (including the multiple or liquidated damages' awards
under the Age Discrimination in Employment Act and the Equal Pay Act). It
is further understood and agreed that the enforceability of the foregoing
coverage shall be governed by such applicable law which most favors
coverage for punitive, exemplary and multiple damages.

4.    **Third Party Sexual Harassment and Discrimination Coverage**

The Definition of "Employment Practices Violation", is amended by deleting the last
paragraph thereof in its entirety and replacing it with the following:

With respect to any customer(s), client(s), supplier(s), distributor(s), or any
other individual or group of individuals, Employment Practices Violation shall
mean any actual or alleged discrimination, sexual harassment or violation of
an individual's civil rights relating to such discrimination or sexual
harassment, whether direct, indirect, intentional or unintentional.

5.    **Definition of Employment Practices Violation**

Definition of "Employment Practices Violation" is amended to read as follows:

(2)    harassment (including sexual harassment, whether "quid pro quo", hostile
work environment or otherwise, including "same sex" sexual harassment);

6.    **Limitations to Exclusions**

Conduct Exclusions

1.    Exclusion (a) is deleted in its entirety and replaced with the following:

(a)    arising out of, based upon or attributable to the gaining of any profit
or advantage to which a final adjudication adverse to the Insured(s)
or an alternative dispute resolution proceeding establishes the
Insured(s) were not legally entitled; provided however that the
foregoing exclusion shall not apply to Employment Practices Claims;

**END 10**

(2/80)    **COPY**

02/27/2004 10:31 FAX 2125091292    FRANK CRYSTAL

THE MCLAUGHLIN CO.          ID-2520910055          JAN 41 00    10:01 NO.004 P.99

## ENDORSEMENT# 10    (Continued)

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number  *495-36-84*
issued to  *ULLICO INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

2.  Exclusion (c) is hereby deleted in its entirety and replaced with the following:

    (c)  arising out of, based upon or attributable to the committing of any deliberate criminal, deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if a final adjudication adverse to the Insured(s) or an alternative dispute resolution proceeding establishes that such deliberate criminal, deliberate fraudulent or dishonest act or any willful violation of any statute, rule or law occurred;

### Bodily Injury

Exclusion (l) is deleted in its entirety and replaced with the following:

    (l)  with respect to Coverages A and B(ii) only: for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; and with respect to Coverage B(ii): alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof.

    Provided, however, that this Exclusion (l) shall not apply to Securities Claims; and with respect to coverage afforded to Employment Practices Claims, shall only apply to Employment Practices Claims alleging, arising out of, or in any way involving directly or indirectly, sexual abuse, sexual assault or battery;

### Insured v. Insured

Exclusion (i)(2) is deleted in its entirety and replaced with the following:

    (2)  an Employment Practices Claim;

### Retaliation

Notwithstanding Exclusions (o) and (p), this policy shall provide coverage (subject to the policy's other terms, conditions and exclusions) for Loss arising from a Claim for Retaliation against an Employee in response to such

*END 10*

(2/90)    COPY

02/27/2004 10:31 FAX 2125091292    FRANK CRYSTAL

THE MCLAUGHLIN CO         ID:2020510555        JAN . ' 05    10:51 No.004 P.00

## ENDORSEMENT# 10   (Continued)

This endorsement, effective *12:01 a.m.   October 30, 2002*      forms a part of
policy number *495-36-84*
issued to   *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

Employee's attempt to exercise his or her rights  under law including any of the
following laws or benefit rights:

    (i)   Employee Retirement Income Security Act of 1974 (ERISA),
          specifically including Claims against an Insured brought under
          Section 510 of ERISA,

    (ii)  Fair Labor Standards Act (except the Equal Pay Act),

    (iii)  National Labor Relations Act (NLRA),

    (iv)  Worker Adjustment and Retraining Notification Act (WARN),

    (v)   Consolidated Omnibus Budget Reconciliation Act (COBRA),

    (vi)  Occupational Safety and Health Act (OSHA),

    (vii)  worker's compensation,

    (viii)  disability benefits,

    (ix)  unemployment compensation,

    (x)   unemployment insurance,

    (xi)  retirement benefits or social security benefits, or

    (xii)  any rules or regulations of the foregoing promulgated thereunder.

### Breach of Contract

Exclusion (h) is deleted in its entirety and replaced with the following:

    (h)  alleging, arising out of, based upon or attributable to any actual or
         alleged contractual liability of the Company or any other Insured
         under any express contract or agreement; provided, however, that
         this exclusion shall not apply to:

        (1)  the extent any liability does not arise under such express
            contract or agreement; or

        (2)  a Director or Officer, provided that this exception for Directors
            or Officers shall not apply to a Claim alleging, arising out of,
            based upon or attributable to any actual or alleged contractual
            liability of the Company or any other Insured under any express
            employment contract or agreement.

**END 10**

(2/80)      COPY

02/27/2004 10:32 FAX 2125091292          FRANK CRYSTAL

HE McLAUGHLIN LO          ID: 7028578555          JAN 31 05    10:38 No.004 P.01

**ENDORSEMENT# 10    (Continued)**

This endorsement, effective *12:01 a.m.   October 30, 2002*    forms a part of
policy number    *495-36-84*
issued to    *ULLICO INC.*

by        *National Union Fire Insurance Company of Pittsburgh, Pa.*

Provided further however, that solely with respect to coverage
afforded by this policy for Employment Practices Claims, this
exclusion shall not apply to:

(i)    Loss constituting Defense Costs;

(ii)   Loss arises out of mental anguish or emotional distress; or

(iii)  the extent any liability does not arise under such express
       contract or agreement; or

(iv)   liability of the Insured which has been assumed under an
       indemnification provision with a leasing company or temporary
       help employment agency, but only if such liability arises from an
       Employment Practices Violation by an Employee leased or hired
       by such company or agency, and does not arise from any act,
       error or omission solely by the leasing company or temporary
       help agency;

It is further understood and agreed that with respect to (A) Defense Costs jointly
incurred by, (B) any joint settlement made by and/or (C) any judgment of joint and
several liability against the Company and any Individual Insured in connection with
a Claim, the Company and the Individual Insured and the Insurer agree to use their
best efforts to determine a fair and proper allocation of the amounts as between
the Company and the Individual Insureds and the Insurer, taking into account the
relative legal and financial exposures, and the relative benefits obtained by the
Individual Insureds and the Company.

7.    **Notice Provisions**

Clause 7(a) is deleted in its entirety and replaced by the following:

(a)    The Company or the Insureds shall, as a condition precedent to the
       obligations of the Insurer under this policy, give written notice to the Insurer
       of a Claim as soon as practicable after the Claim is reported to or first
       becomes known by the human resources department or office of general
       counsel (or if no such office or department exists, then the equivalent office
       or department) and upon the earliest occurrence of the following:

       (1)    The Claim is or is sought to be certified as a class action; or

*END 10*

(2/90)    *COPY*

02/27/2004 10:32 FAX 2125091292     FRANK CRYSTAL

THE MILLAUGHLIN CO

**ENDORSEMENT# 10**   (Con___ied)

This endorsement, effective   12:01 a.m.   October 30, 2002      forms a part of
policy number  495-36-84
issued to   ULLICO INC.

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

    (2)   The Claim is brought by more than one claimant or is sought to be consolidated with another claim brought by another claimant; or

    (3)   The Claim alleges sexual harassment by a duly elected or appointed corporate Director or Officer of the Company; or

    (4)   Total Loss (including Defense Costs) of the Claim is reasonably estimated by the human resources department or office of general counsel (or if no such office or department exists, than the equivalent office or department) to exceed 50% of the applicable Retention amount stated in Item 5. of the Declarations;

but in all events no later than:

    (i)   anytime during the Policy Period or during the Discovery Period (if applicable); or

    (ii)   within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than thirty (30) days after the date such Claim was first made against an Insured.

It is further understood and agreed that at the Named Entity's option, the Insureds may submit to the Insurer a quarterly bordereau of Claims to which coverage under this policy may apply, including any documentation and all relevant pleadings, letters and other information descriptive of such Claims, such Claims shall be subject to all of the terms and conditions of this policy including but not limited to Clause 7(c).

8.   **Defense Provisions**

Clause 8 of the policy is amended as follows:

Settlements within Retention Amount (inclusive of Defense Costs): Insurer waives consent

Notwithstanding the above, if all Insured defendants are able to dispose of all Claims, which are subject to one Retention amount for an amount (inclusive of Defense Costs) not exceeding such Retention amount, then the Insurer's consent shall not be required for such Claims.

*END 10*

**COPY**

(2/90)

02/27/2004 10:32 FAX 2125091292    FRANK CRYSTAL

THE MCLAUGHLIN CO    ID:2026318333    JAN 3 '03    10:33 No.004 P.03

## ENDORSEMENT# 10   (Continued)

This endorsement effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number *495-36-84*
Issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Choice of Counsel/ Duty to Defend: Mutual Consent Provisions

Subject to the provisions of Clause 8, the Named Entity may choose on behalf of all
Insureds whether to defend a Claim themselves or tender the Claim over to the
Insurer to defend.

### Settlement Clause

The last paragraph of Clause 8 is deleted in its entirety and replaced with the
following:

Furthermore, in the event the Insureds do not consent to the first Settlement
Opportunity within the time prescribed, then, subject to the applicable limit of
liability, the Insurer's liability for all Loss on account of such Claim shall not exceed:
(1) the amount for which the Insurer could have settled such Claim plus Defense
Costs incurred as of the date such settlement was proposed in writing by the
Insurer, ("Settlement Opportunity Amount") plus (2) 80% of covered Loss in excess
of such Settlement Opportunity Amount, it being a condition of this insurance that
the remaining 20% of such Loss excess of the Settlement Opportunity Amount
shall be carried by the Company and the Insureds at their own risk and be
uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the
Settlement Opportunity Amount exceeds the Retention amount stated in Item 5. of
the Declarations.

9.    **Clause 9 Panel Counsel Amendment applicable to certain Employment Practices
Claims**

Clause 9 is hereby amended by adding the following at the end thereof:

Notwithstanding the foregoing, solely with respect to an Employment Practices
Claim, other than a Claim described in paragraph (4) below, Clause 9 shall not
apply to a single plaintiff action Employment Practices Claim alleging discrimination
or sexual harassment against an Insured if the total Loss (including Defense Costs)
of such Claim does not exceed, or is not reasonably estimated by the human
resources department or office of general counsel (or if no such office or
department exists, then the equivalent office or department) to exceed, 300% of
the applicable Retention amount stated in Item 5. of the Declarations (hereinafter
"Non-Designated Claim"), subject to the following conditions:

(1)    The Insured or the Company shall select either a Panel Counsel Firm,
pursuant to the terms and conditions of Clause 9, or a law firm listed

**END 10**

(2/90)    **COPY**

02/27/2004 10:33 FAX 2125091292    FRANK CRYSTAL    @007

THE MCLAUGHLIN Co        ID-2020510555        JAN 0-05    10-55 RO-504 P-04

## ENDORSEMENT# 10    (Continued)

This endorsement, effective *12:01 a.m.*    *October 30, 2002*        forms a part of
policy number    *495-38-84*
issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

below ("Non-Panel Counsel Firm") to conduct the defense of such Non-Designated Claims. A Non-Panel Counsel Firm may only be selected for a Non-Designated Claim brought in the jurisdiction indicated below. In the event a Non-Designated Claim is brought in a jurisdiction not indicated below, then the insured shall select a Panel Counsel Firm, pursuant to the terms and conditions of Clause 9, to conduct the defense of such Claim.

(2)    If at any time either: (i) the total Loss (including Defense Costs) of such Non-Designated Claim exceeds, or becomes reasonably estimated by the Human Resources Department or Office of General Counsel to exceed, 300% of the applicable Retention amount stated in Item 5 of the Declarations, or (ii) the Defense Costs incurred in the defense of such Non-Designated Claim exceeds $100,000, then a Panel Counsel Firm shall be selected by the Insurer, pursuant to the terms and conditions of Clause 9, to conduct the defense of such Non-Designated Claim as lead counsel. In such an event, however, the Insurer may, at its sole discretion, maintain the Non-Panel Counsel Firm in the jurisdiction in which the Non-Designated Claim is brought to function as "local counsel" on the Non-Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in such Claim.

(3)    In all events, Defense Costs may not be incurred by or at the direction of any Non-Panel Counsel Firm for any Non-Designated Claim without the prior written consent of the Insurer, such consent not to be unreasonably withheld, subject to all the terms and conditions of Clause 8.

(4)    This exception to Clause 9 herein does not, in any way, apply to a Claim: (i) for which the Insurer has assumed the defense pursuant to Clause 8 of this policy; (ii) alleging Retaliation; (iii) brought in the form of a class action or multiple plaintiff action; or (iv) alleging discrimination or sexual harassment conduct by a duly elected or appointed Director or Officer of the Company.

### ADDITIONAL FIRM                    ### JURISDICTION

**END 10**

(2/90)    **COPY**

THE MCLAUGHLIN CO          ID:202031U033          JAN 3 '03   10:43 No.004 P.03

## ENDORSEMENT# 10   (Continued)

This endorsement, effective **12:01 a.m.   October 30, 2002**   forms a part of
policy number   **496-36-84**
Issued to   **ULLICO INC.**

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

10.   **Extended Reporting Provision**

Subject to Clause 10. DISCOVERY CLAUSE, the Named Entity may elect a
Discovery Period of one, two or three years. The Additional Premium Amount for:

(1)   one year shall be 75% of the "full annual premium";

(2)   two years shall be 150% of the "full annual premium"; and

(3)   three years shall be 200% of the "full annual premium".

As used herein, "full annual premium" means the premium level in effect
immediately prior to the end of the Policy Period.

11.   **Alternative Dispute Resolution ("ADR")**

Clause 17. DISPUTE RESOLUTION PROCESS, is amended by adding the following
at the end thereof:

Either choice of ADR may be commenced in any of the following locations
which relate to the Named Entity;

(1)   the state of incorporation of the Named Entity; or

(2)   the state indicated in Item 1. of the Declarations page as the
mailing address for the Named Entity;

OR any of the following locations (regardless of whether they relate to the
Named Entity):

(3)   New York, New York;

(4)   Boston, Massachusetts;

(5)   Atlanta, Georgia;

(6)   Chicago, Illinois;

(7)   Denver, Colorado.

The Named Entity shall act on behalf of all Insureds in deciding to proceed
with ADR under this clause.

**END 10**

(2/90)   **COPY**

**ENDORSEMENT# 10** (Continued)

This endorsement, effective *12:01 a.m.    October 30, 2002*        forms a part of
policy number    *495-36-84*
Issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*


**12.    Named Parent Coverage**

The term Company shall include the  Named Parent of the Named Entity,  subject to
the following terms and conditions.

Coverage as is afforded under this policy solely with respect to Employment
Practices Claims made against  the Named Parent  or any individual  Insured thereof
shall only apply  if: (1)  such  Claim relates to  an Employment Practices Violation
committed by  an Insured  (other  than the  Named Parent or  an individual  Insured
thereof); and (2) an  insured (other  than  the Named Parent  or an individual  insured
thereof) is and remains a defendant  in the action along with  such Named Parent or
any Individual Insured thereof.

In all events coverage  as is afforded  under this policy  with respect  to an
Employment Practices Claim made  against  the Named  Parent or  any individual
Insured thereof shall  only apply  to Employment  Practices Violations  committed or
allegedly committed after  the time that such Named Parent became a Named Parent
and prior to the time such Named Parent ceases to be a Named Parent.

The term Named Parent means any  organization incorporated outside  the United
States, its territories or possessions that owns more than a 50% ownership interest
in the Named Entity, either directly, or indirectly through one or more of its
subsidiaries.

A foreign organization becomes the  Named Parent when it owns more  than a 50%
ownership interest in the Named  Entity, either directly, or indirectly  through one or
more of its  subsidiaries. Such  organization ceases  to be  the Named Parent when
the organization ceases to  own more than  a 50% ownership in  the Named Entity,
either directly, or indirectly through one or more of its subsidiaries.

**13.    Liberalization Clause**

.In the event that  the Insurer shall  announce either: (1) a new Private Company
Directors and Officers  and Employment  Practices Insurance policy  form; or  (2) an
enhancement of coverage  endorsement to  this policy form,  which is  to be  made
available to all Insureds and for which  no additional  premium is required,  then the
Named Entity shall have  the right to  such new policy or  such new  coverage
enhancement endorsement subject to  all underwriting information  or particulars as
the Insurer may require for such new policy or enhanced coverage.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 10**

**COPY**

(2/90)

_____
**AUTHORIZED REPRESENTATIVE**

## ENDORSEMENT# 11

This endorsement, effective *12:01 a.m.   October 30, 2002*        forms a part of
policy number   *495-36-84*
issued to *ULLICO INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### "NO LIABILITY" PROVISION DELETED

In consideration of the premium charged, it is hereby understood and agreed that the
policy is hereby amended as follows:

(1)   The Definition of "No Liability" is hereby deleted in its entirety; and

(2)   The last paragraph of Clause 6. RETENTION CLAUSE is hereby deleted in its
entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 011*
   *COPY*

**ENDORSEMENT# 12**

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number *495-36-84*
issued to    *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FAILURE TO EFFECT AND/OR MAINTAIN INSURANCE EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. EXCLUSIONS, is hereby amended by adding the following exclusion to the end thereof:

(r)    alleging, arising out of, based upon, attributable to, or in any way directly or indirectly relating to any failure or omission on the part of the Insureds or an Organization to effect and/or maintain insurance;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 12*

*COPY*

(2/90)

AUTHORIZED REPRESENTATIVE

This endorsement, effective *12:01 a.m.    October 30, 2002*    forms a part of
policy number   *495-36-84*
issued to   *ULLICO INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the
policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby
amended to the extent necessary for the policy to provide the following:

1.  Clause 10. DISCOVERY CLAUSE is deleted in its entirety and replaced with the
    following:

    **10. DISCOVERY CLAUSE**

    Except as indicated below, if the Named Entity shall cancel or the Named Entity or
    the Insurer shall refuse to renew this policy, the Named Entity shall have the right
    to a period of  one year following the effective date of such cancellation or
    nonrenewal upon payment of the respective "Additional Premium Amount"
    described below (herein referred to as the "Discovery Period") in which to give to
    the Insurer written notice of Claims first made against the Insureds during said
    Discovery Period for any Wrongful Act occurring prior to the end of the Policy
    Period and otherwise covered by this policy. The rights contained in this
    paragraph shall terminate, however, unless written notice of such election
    together with the additional premium due is received by the Insurer within 30
    days of the effective date of cancellation or nonrenewal. The Additional Premium
    for the Discovery Period shall be fully earned at the inception of the Discovery
    Period.   The Discovery Period is not cancelable. This clause and the rights
    contained herein shall not apply to any cancellation resulting from non-payment of
    premium.

    The Additional Premium Amount for  one year shall be no  more than 200% of the
    "full annual premium". As used herein, "full annual premium" means the premium
    level in effect immediately prior to the end of the Policy Period.

    In the  event of  a Transaction, as defined in Clause 12, the  Named Entity shall
    have the right, within 30 days before the  end of the Policy Period, to request an
    offer from the Insurer of a Discovery Period (with respect to Wrongful Acts
    occurring prior to the  effective time of the  Transaction) for  a period  of no  less
    than three  years or  for such  longer or  shorter period as the  Named Entity may
    request.   The Insurer shall offer such Discovery Period pursuant to such terms,
    conditions and premium as  the Insurer may reasonably  decide. In the  event of a
    Transaction, the right to a Discovery Period  shall not  otherwise exist  except as
    indicated in this paragraph.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 13**
**COPY**

(2/80)

AUTHORIZED REPRESENTATIVE

# American International Companies

### Employee Benefit Plan Fiduciary Liability Insurance

POLICY NUMBER:
*548-03-72*
REPLACEMENT OF
POLICY NUMBER:
*495-38-35*

**FILE COPY**

☐ AIU Insurance Company
☐ American Home Assurance Company
☐ American International Pacific Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Pennsylvania

☐ Granite State Insurance Company
☐ Illinois National Insurance Company
☐ National Union Fire Insurance Company of Louisiana
☒ National Union Fire Insurance Co. of Pittsburgh, Pa.
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: EXCEPT AS SET FORTH IN ITEM 3(b) OF THE DECLARATIONS, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

**NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 3 OF THE POLICY.**

### DECLARATIONS

| ITEMS | |
|---|---|
| 1 | (herein **Named Sponsor**")<br>**NAMED SPONSOR:** *ULLICO INC. AND ITS SUBSIDIARIES* |
| 1(a) | MAILING ADDRESS: *111 MASSACHUSETTS AVE NW*<br>*WASHINGTON, DC 20001* |
| 1(b) | **SUBSIDIARY** COVERAGE:     Any past, present or future **Subsidiary** of the **Named Sponsor** |
| 1(c) | **PLAN** COVERAGE:     Any past, present or future **Plan** |
| 2 | **POLICY PERIOD:**  From: *October 30, 2003*  To: *October 30, 2004*<br>12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. |
| 3(a) | **POLICY AGGREGATE LIMIT OF LIABILITY** (herein "**Limit of Liability**")<br>For all **Loss**, in the aggregate, under this policy including **Defense Costs** (other than **Defense Costs** (if any) set forth in Item 3(b) of the Declarations):<br>*$5,000,000* |

*138200*

77893 (3/01)   **COPY**                                    1

ITEMS (Continued)

| | |
|---|---|
| 3(b) | ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS: *$0* |
| 3(c) | SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS |

For all **Voluntary Compliance Loss**, in the aggregate, ☐ See endorsement # under this policy including **Defense Expenses**    ☒ None

This Sublimit of Liability shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 3(a) of the Declarations.

| | |
|---|---|
| 4 | RETENTION:    Not applicable to: (i) non-**Indemnifiable Loss** of a **Natural Person Insured** (ii) judgments and settlements (all Coverages); and (iii) **Voluntary Compliance Loss** |
| 4(a) | **Defense Costs:** *$250,000* |

☐ None

| | |
|---|---|
| 5 | CONTINUITY DATE: *October 30, 1998* |
| 6 | PREMIUM:                    *$156,550* |

  *Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002: $1,550 included in policy premium. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows:  90% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.*
  *A copy of the TRIA disclosure sent with the original quote is attached hereto.*

| | |
|---|---|
| 7 | NAME AND ADDRESS OF INSURER (herein "Insurer"): *National Union Fire Insurance Company of Pittsburgh, Pa.* *175 Water Street* *New York, NY 10038* |

This policy is issued only by the insurance company indicated in this Item 7.

*138200*

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage.  The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review.  There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act.  Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

Unless you sign this form and return it to us rejecting Terrorism Coverage under the Federal Act, you will be covered for Terrorism as defined in the Act and your premium for that coverage is _$1,550_____ .

_____ I hereby reject coverage in accordance with the Act.

_____
Signature of Insured

_____
Print Name/Title

_____
Date

**COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE**

Insured Name: *ULLICO INC. AND ITS SUBSIDIARIES*

Policy Number: *548-03-72*
Policy Period Effective Date From: *October 30, 2003*    To: *October 30, 2004*

81285 (1/03)

**IN WITNESS WHEREOF,** the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_
_____
SECRETARY

_[signature]_
_____
PRESIDENT

_[signature]_
_____
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE DATE

_____
COUNTERSIGNED AT

ARC EXCESS & SURPLUS INC
1122 FRANKLIN AVENUE, 3RD FL
GARDEN CITY, NY 11530

138200

77893 (3/01)    **COPY**

American International Companies

## Employee Benefit Plan Fiduciary Liability Insurance

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including any attachments and any materials incorporated therein which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

   (a) Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

   (b) Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** during the **Policy Period** or the **Discovery Period** (if applicable) or within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

   (i) pay the **CAP Penalties** and **Delinquent Filer Penalties**; and

   (ii) reimburse the **Voluntary Fiduciary Correction Loss**,

   of each and every **Insured**, collectively not to exceed the amount of the **Sublimit of Liability** set forth in Item 3(c) of the Declarations; provided that the **Insured** shall select a **Panel Counsel Firm** as provided in Clause 9 of the policy.

The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

   (a) **INSURER'S DUTY TO DEFEND**

   Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

   The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after either: (1) the **Limit of Liability** and any additional **Defense Costs** (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

   (b) **INSURED'S OPTION TO ASSUME DEFENSE**

   Notwithstanding the above, the **Insureds** shall have the right to assume the defense of any **Claim** made against them. This right shall be exercised in writing by the **Named Sponsor** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 8 of the policy. Upon receipt of such

written request, the **Insurer** shall tender the defense of the **Claim** to the **Insureds**. Once the defense has been so tendered, the **Insurer** cannot re-assume the defense of the **Claim**. The **Insurer** shall have the right to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement. Provided that the **Insurer** shall be permitted to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement of any **Claim**, the **Insurer's** consent to settlements, stipulated judgments and **Defense Costs** shall not be unreasonably withheld.

(c)   **GENERAL PROVISIONS (applicable to both (a) and (b) above)**

The Insurer shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this policy. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insured(s)** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to in writing by the **Insurer** shall be recoverable as **Loss** under the terms of this policy.

The **Insured(s)** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require. The **Insurer** may make any settlement of any **Claim** it deems expedient with respect to any **Insured**, subject to such **Insured's** written consent. If any **Insured** withholds consent to such settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the **Insurer** could have settled such **Claim**, plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer**. Further, in the event the **Insurer** is defending the **Claim** pursuant to Clause 2(a) above, then the **Insurer** shall tender the **Claim** to the **Insureds** who shall thereafter at their own expense and on their own behalf negotiate and defend such **Claim** independently of the **Insurer**.

Selection of counsel to defend the **Claim** made against the **Insureds** shall be governed by Clause 9 of the policy (if applicable).

3.   **DEFINITIONS**

"**Administrator**" means an **Insured** with respect to any **Wrongful Act** described in subparagraph (2) of the Definition of **Wrongful Act.**

"**Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"**Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by ERISA.

"**Cafeteria Plan**" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"**CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to

correct such **Plan** defect was entered into in writing by the **Insured** with the IRS during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Claim**" means:

    (1)  a written demand for monetary, non-monetary or injunctive relief; or

    (2)  a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

        (i)  service of a complaint or similar pleading; or

        (ii)  return of an indictment, information or similar document (in the case of a criminal proceeding); or

        (iii)  receipt or filing of a notice of charges; or

    (3)  a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or

    (4)  any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

"**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

"**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to in writing by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Dependent Care Assistance Program**" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Sponsor** or any **Subsidiary**.

"**Employee Benefit Law**" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Except to the extent set forth in subparagraph (2) of the Definition of **Wrongful Act**, **Employee Benefit Law** shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"**ESOP**" means any employee stock ownership plan as defined in **ERISA**, or any other **Plan** under which investments are made primarily in securities of the **Sponsor Organization** or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the **Sponsor Organization**.

"**Fiduciary**" means a fiduciary as defined in an **Employee Benefit Law** (if applicable), with respect to a **Plan**, or a person or entity who exercises discretionary control as respects the management of a **Plan** or the disposition of its assets.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

"**Foreign Policy**" means the **Insured's** or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction**, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then **Foreign Policy** means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term **Foreign Policy** shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

"**Fringe Benefit**" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"**Indemnifiable Loss**" means **Loss** for which the **Sponsor Organization** has indemnified or is permitted or required to indemnify any natural person **Insured**.

"**Insured(s)**" means:

   (1)  any **Natural Person Insured**;
   (2)  any **Plan(s)**;
   (3)  the **Sponsor Organization**; and
   (4)  any other person or entity in his, her or its capacity as a **Fiduciary, Administrator** or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this policy.

"**Loss**" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and **Defense Costs**; however, **Loss** shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for **Voluntary Compliance Loss**, (ii) **UK Fines and Penalties**, (iii) the five percent or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**, and (iv) the 20 percent or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (5) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of a **Natural Person Insured**; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, **Loss** shall include punitive or exemplary damages imposed upon any **Insured** (subject to the policy s other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to **Employee Benefit Law**).

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1)–(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall include **Voluntary Compliance Loss**.

"**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Sponsor**, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"**Natural Person Insured**" means any:

   (1)  past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a **Sponsor Organization** or if applicable, of a **Plan**, and as to all of the above in his or her capacity as a **Fiduciary, Administrator** or trustee of a **Plan**; or

   (2)  past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the **Sponsor Organization** is operating in a **Foreign Jurisdiction**.

"**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.
"**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

"**Plan**" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any **Pension Plan, Welfare Plan, Cafeteria Plan, Dependent Care Assistance Program, Fringe Benefit**, and VEBA) or **Non-qualified Plan**, established anywhere in the world, which was, is or shall be sponsored solely by the **Sponsor Organization**, or sponsored jointly by the **Sponsor Organization** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Sponsor Organization**, subject to the following provisions:

   (1)  if such **Plan** is a **Pension Plan(s),** other than an **ESOP**, stock option plan or **Pension Plan** described in subparagraphs (5)(a) and 5(b) below, then the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this policy, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal;

   (2)  if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

(3) if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4) if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

(5) if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

    (a) is acquired during the **Policy Period** as a result of the **Sponsor Organization**'s acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Sponsor Organization** as of the inception date of this policy; or

    (b) is acquired during the **Policy Period** and such **Plan**'s assets total more than 25% of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

then, this policy shall apply to such **Plan** (but solely with respect to a **Wrongful Act**(s) occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the **Named Sponsor** shall have provided the **Insurer** with a completed application for such new **Plan** and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**. The 90 day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Sponsor Organization** and the failure to report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: (i) the following government-mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this policy; (ii) any **Pension Plan** (other than an **ESOP** or stock option plan) considered or created by the **Sponsor Organization** during the **Policy Period**; or (iii) any other plan, fund or program, which is included in the Definition of **Plan** by specific written endorsement attached to this policy.

In no event, however, shall the Definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

"**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"**Pollutants**" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"**Sponsor Organization**" means the **Named Sponsor** designated in Item 1 of the Declarations and any **Subsidiary** thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the **Named Sponsor** or any **Subsidiary** thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"**Subsidiary**" means any past, present or future: (1) for-profit entity of which the **Named Sponsor** has **Management Control** either directly or indirectly through one or more other **Subsidiaries**; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Named Sponsor**. The term **Subsidiary** shall automatically apply to any new **Subsidiary** acquired or created during the **Policy Period**.

A for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer maintains **Management Control** of such **Subsidiary**. A not-for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer exclusively sponsors such **Subsidiary**.

"UK Fines and Penalties" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"VEBA" means a voluntary employees beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the **Sponsor Organization**, and provides benefits for voluntary members who are employees or former employees of the **Sponsor Organization** and/or their beneficiaries.

"Voluntary Compliance Loss" means **CAP Penalties, Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

"Voluntary Fiduciary Correction Loss" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the DOL; however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this policy or the first policy issued by the **Insurer** to the **Named Sponsor** of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"Welfare Plan" means a welfare plan as defined in **Employee Benefit Law**.

"Wrongful Act" means:

(1) as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**; and

(2) as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:

    (i) counseling employees, participants and beneficiaries; or

    (ii) providing interpretations; or

    (iii) handling of records; or

    (iv) activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,

or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**;

(3) as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any

multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured.**

## 4.    WORLDWIDE EXTENSION

Where legally permissible, this policy shall apply to a **Claim** made against any **Insured** anywhere in the world.

With regard to a **Claim(s)** brought and maintained solely in a **Foreign Jurisdiction** against an **Insured** formed and operating in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3-5, 9-13, and 16-19 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Sponsor**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

## 5.    EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured(s)**:

(a)    arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an **Insured** was not legally entitled;

(b)    arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**;

[The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).]

(c)    for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d)    alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)    alleging, arising out of, based upon or attributable to, as of the **Continuity Date,** any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

77892 (3/01)    *COPY*                                    8

(f)  for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; except that this exclusion shall not apply to **Defense Costs**;

(g)  alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program;

(h)  for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for **Breach of Fiduciary Duty**;

(i)  alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Sponsor Organization** did not sponsor such **Plan** or when the **Natural Person Insured** was not a **Fiduciary**, **Administrator**, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Sponsor Organization** or if applicable, a **Plan**;

(j)  alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, that this exclusion shall not apply to non–**Indemnifiable Loss** arising from a **Claim** alleging damage to a **Plan**, other than non–**Indemnifiable Loss** constituting **Cleanup Costs**;

## 6.  LIMIT OF LIABILITY  (FOR ALL LOSS – INCLUDING DEFENSE COSTS)

The **Limit of Liability** stated in Item 3(a) of the Declarations is the limit of the **Insurer's** liability for all **Loss**, including **Defense Costs**, under this policy arising out of all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** stated in Item 3(b) of the Declarations, if any, shall be an additional **Limit of Liability** for that part of **Loss** constituting **Defense Costs** incurred in connection with all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** for **Defense Costs** stated in Item 3(b) shall be in addition to and not part of the **Limit of Liability** stated in Item 3(a) of the Declarations.  **Loss** constituting **Defense Costs** shall first reduce the additional **Limit of Liability** stated in Item 3(b). Should the **Limit of Liability** stated in Item 3(b) of the Declarations become exhausted, or should the **Limit of Liability** stated in Item 3(b) of the Declarations be stated as "none", then subsequent **Defense Costs** will reduce the **Limit of Liability** stated in Item 3(a).

The **Sublimit of Liability** set forth in Item 3(c) of the Declarations shall be part of and not in addition to the **Limit of Liability** set forth in Item 3(a).

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**.  Further, any **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the aggregate **Limit(s) of Liability** stated in Item 3 of the Declarations.

**Defense Costs**, whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the Insurer in addition to the **Limit of Liability**; except that the separate limit, if any, listed in Item 3(b) of the Declarations shall be in addition to the aggregate Limit of Liability stated in Item 3(a) of the Declarations.  Defense Costs are part of **Loss** and as such are subject to the Limit of Liability for Loss.

7.  **RETENTION CLAUSE**

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the **Insured** and shall remain uninsured, with regard to all **Defense Costs** other than: (1) non-**Indemnifiable Loss** of a **Natural Person Insured**; and (2) **Voluntary Compliance Loss**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

8.  **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the Insurer named in Item 7 of the Declarations at the address indicated in Item 7 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a)  The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of a **Claim** made against an **Insured** as soon as practicable after the **Named Sponsor's** risk manager or general counsel (or if no such position exists, then such equivalent position) first becomes aware of the **Claim**, but in all events no later than either:

(1)  the end of the **Policy Period** or during the **Discovery Period** (if applicable); or

(2)  within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an Insured within the final thirty (30) days of the **Policy Period** or the **Discovery Period** (if applicable).

(b)  If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 8(a) above, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered related to the first **Claim** and made at the time such notice was given.

(c)  If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Sponsor Organization** or an **Insured(s)** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9.  **PRE–AUTHORIZED DEFENSE ATTORNEYS**

This Clause 9 applies only to: (1) a **Claim** brought by any government entity; (2) a request for coverage for a **Voluntary Compliance Loss**; or (3) a **Claim** brought in the form of a class or representative action.

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("**Panel Counsel Firm(s)**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** to which this Clause 9 applies and pursuant to the terms set forth below:

In the event the **Insurer** is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. Upon the written request of the **Named Sponsor**, the **Insurer** may consent to a different **Panel Counsel Firm** selected by the **Named Sponsor** to defend the **Insureds**, which consent shall not be unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to Clause 2(b) of the policy, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insured**. In addition, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, the **Insured** may select a **Panel Counsel Firm** different from that selected by other **Insureds** if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the **Claim** against the **Insureds** shall not be restricted to the jurisdiction in which the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made to the specific list attached to this policy during the **Policy Period** without the consent of the **Named Sponsor**. At the request of the **Named Sponsor**, the **Insurer** may in its discretion add one or more law firms to the attached list of **Panel Counsel Firms** for the purposes of defending the **Claim** made against the **Insureds**. The list of **Panel Counsel Firms** may also be amended to add, at the sole discretion of the **Insurer**, a non-**Panel Counsel Firm** for the purpose of acting as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel Counsel Firm** will act as "lead counsel" in conducting the defense of the **Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel Firm** does not maintain an office.

## 10. DISCOVERY CLAUSE

Except as indicated below, if the **Named Sponsor** shall cancel or the **Named Sponsor** or the **Insurer** shall refuse to renew this policy, the **Named Sponsor** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal ("**Discovery Period**"), upon payment of the respective "**Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clauses 8(a) and 8(c) of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which the **Natural Person Insured** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 75% of the **Full Annual Premium**; (2) two years shall be no more than 150% of the **Full Annual Premium**; and (3) three years shall be no more than 225% of the **Full Annual Premium**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

Notwithstanding the first paragraph of Clause 6, if the **Named Sponsor** shall cancel or the **Insurer** or the **Named Sponsor** shall refuse to renew this policy, then the **Named Sponsor** shall also have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the end of the **Policy Period**) with an aggregate limit of liability applicable to **Claims** made against the **Insured** during such **Discovery Period** which is in addition to, and not part of, the applicable **Limit of Liability** set forth in Item 3 of the Declarations. The **Insurer** shall quote such a **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such Discovery Period pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period**, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the **Named Sponsor** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Sponsor**. In the event of non-payment of premium by the **Named Sponsor**, the **Insurer** may cancel this policy by delivering to the **Named Sponsor** or by mailing to the **Named Sponsor**, by registered, certified, or other first class mail, at the **Named Sponsor's** address as shown in Item 1 of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Sponsor**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

## 12. ORGANIZATIONAL CHANGES

(a) If during the **Policy Period**:

    (1) the **Named Sponsor** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    (2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Sponsor**;

(any of such events being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Sponsor** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 10 of this policy.

(b) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

## 13. SUBROGATION AND WAIVER OF RECOURSE

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery thereof, and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insureds**. In no event shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to **Employee Benefit Law**), or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

In the event this policy has been purchased by an **Insured** other than a **Plan**, the **Insurer** shall have no right of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

It is further provided that in the event of any recovery under this Clause 13, the **Limit of Liability** of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

## 14. OTHER INSURANCE

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

## 15. NOTICE AND AUTHORITY

It is agreed that the **Named Sponsor** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right under Clause 2(b) or Clause 10 of this policy.

## 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

## 17. ACTION AGAINST INSURER

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured** or his or her spouse or **Domestic Partner** or his, her or its legal representatives. Bankruptcy or insolvency of any **Insured** or of his, her or its estate shall not relieve the **Insurer** of any of its obligations hereunder.

## 18. SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION

If a **Claim** against a **Natural Person Insured** includes a **Claim** against: (i) the lawful spouse **or Domestic Partner** of such **Natural Person Insured**; or (ii) a property interest of such spouse or **Domestic Partner**, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Natural Person Insured**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or **Domestic Partner** or the property of that spouse or **Domestic Partner** to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or **Domestic Partner**. This policy shall cover **Loss** arising from a **Claim** made against the estate, heirs, or legal representatives of any deceased **Natural Person Insured**, and the legal representatives of any **Natural Person Insured**, in the event of incompetency, insolvency or bankruptcy, who was a **Natural Person Insured** at the time the **Wrongful Act(s)** upon which the **Claim** is based was committed.

## 19. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

# APPENDIX A
## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

– 1 –

### ARIZONA

Snell & Wilmer
One Arizona Center
Phoenix, AZ 85004–0001
Primary Contact:
Katherine M. Harmeyer (602) 382–6357

### CALIFORNIA

Lillick & Charles, L.L.P.
Two Embarcadero Center, Suite 2700
San Francisco, CA 94111
Primary Contact:
D. Ward Kallstrom (415) 984–8282

Pillsbury Madison & Sutro, L.L.P.
235 Montgomery Street
P.O. Box 7880
San Francisco, CA 94120
Primary Contact:
Robert A. Gordon (415) 983–1782

Sedgwick, Detert, Moran & Arnold
One Embarcadero Center, 16th Floor
San Francisco, CA 94111–3765
Primary Contact:
Julia A. Molander (415) 627–1424

### DISTRICT OF COLUMBIA

Arent, Fox, Kintner, Plotkin & Kahn
1050 Connecticut Avenue, NW
Washington, DC 20036–5339
Primary Contact:
Carol Connor Flowe (202) 857–6054

Arnold & Porter
555 12th Street, NW
Washington, DC 20004–1206
Primary Contact:
Scott B. Schreiber (202) 942–5000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036–5306
Primary Contact:
William J. Kilberg, P.C. (202) 955–8573

Groom and Nordberg
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20006
Primary Contact:
Robert Gallagher (202) 857–0620

Kilpatrick Stockton L.L.P.
700 13th Street, NW, Suite 800
Washington, DC 20005–5923
Primary Contact:
Steven J. Sacher (202) 508–5840

O'Melveny & Myers LLP
555 13th Street, NW, Suite 500 West
Washington, DC 20004–1109
Primary Contact:
Robert N. Eccles (202) 383–5300

Patton Boggs, L.L.P.
2550 M Street, N.W.
Washington, DC 20037
Primary Contact:
Michael A. Curto (202) 457–5611

Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Primary Contact:
Paul J. Ondrasik, Jr. (202) 429–8088

Verner, Liipfert, Bernhard, McPherson & Hand
901 15th Street, NW, Suite 700
Washington, DC 20005
Primary Contact:
Ronald B. Natalie (202) 371–6028

### GEORGIA

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309–3424
Primary Contact:
Gregory C. Braden (404) 881–7497

King & Spalding
191 Peachtree Street
Atlanta, GA 30303–1763
Primary Contact:
Lara B. Robinson (404) 572–3567

*COPY*

# APPENDIX A
## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

– 2 –

**ILLINOIS**

Baker & McKenzie
130 East Randolph Drive
Chicago, IL 60601
Primary Contact:
Michael A. Pollard, Esq. (312) 861–2786

Mayer, Brown & Platt
190 South La Salle Street
Chicago, IL 60603–3441
Primary Contact:
William A. Gordon (312) 701–7164

McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606–5096
Primary Contact:
Bill Boies, P.C. (312) 984–7686

Seyfarth, Shaw, Fairweather & Geraldson
55 East Monroe, Suite 4200
Chicago, IL 60603
Primary Contact:
Thomas J Piskorski (312) 269–8925

Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street
Chicago, IL 60601
Primary Contact:
Charles B. Wolf (312) 609–7888

**MASSACHUSETTS**

Hale & Dorr LLP
60 State Street
Boston, MA 02109–1803
Primary Contact:
Neil Jacobs (617) 526–6970

Murphy, Hesse, Toomey & Lehane
44 Farnsworth Street
Boston, MA 02210
Primary Contact:
Katherine A. Hesse, CEBS (617) 479–5000

Peabody & Arnold
50 Rowes Wharf
Boston, MA 02110
Primary Contact:
Robert T. Gill, P.C. (617) 951–4706

**LOUISIANA**

McCalla, Thompson, Pyburn, Hymowitz &
Shapiro
650 Poydras Street, Suite 2800
New Orleans, LA 70130
Primary Contact:
Howard Shapiro (504) 524–2499

**MAINE**

MMMB Group
22 Free Street, Suite 201
P.O. Box 17594
Portland, ME 04112–8594
Primary Contact:
Stephan G. Bachelder (207) 761–8100

Pierce Atwood
One Monument Square
Portland, ME 04101
Primary Contact:
William J. Kayatta, Jr (207) 791–1238

**MICHIGAN**

Miller, Canfield, Paddock & Stone, PLC
1200 Campau Square Plaza
99 Monroe Avenue, NW
Grand Rapids, MI 49503
Primary Contact:
Charles S. Mishkind (616) 454–8656

**MINNESOTA**

Dorsey & Whitney L.L.P.
Pillsbury Center South
220 South 6th Street, Suite 1300
Minneapolis, MN 55402–1498
Primary Contact:
Stephen P. Lucke (612) 343–7947

Faegre & Benson, LLP
2200 Norwest Center
90 South Seventh Street
Minneapolis, MN 55402
Primary Contact:
Hubert V. Forcier (612) 336–3000

*COPY*

# APPENDIX A

## PANEL COUNSEL

## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

– 3 –

**NORTH CAROLINA**

Poyner & Spruill, LLP
3600 Glenwood Avenue
Raleigh, NC 27612
Primary Contact:
Susanna G. Gibbons (919) 783-6400

**NEW YORK**

Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-0077
Primary Contact:
Howard Pianko (212) 351-4591

Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY 10022
Primary Contact:
Michael J. Dell (212) 715-9100

Winthrop, Stimson, Putnam & Roberts
One Battery Park Plaza
New York, NY 10004
Primary Contact:
Susan P. Serota (212) 858-1125

**PENNSYLVANIA**

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Primary Contact:
Mary McLaughlin (215) 994-2958

Pepper, Hamilton & Scheetz LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799
Primary Contact:
Susan Katz Hoffman (215) 981-4000

**TEXAS**

Baker & Botts, L.L.P.
910 Louisiana
Houston, TX 77002-4995
Primary Contact:
James R. Raborn (713) 229-1234

Fulbright & Jaworski L.L.P.
1301 McKinney Street, Suite 5100
Houston, TX 77010
Primary Contact:
A.J. Harper II (713) 651-5442

**WASHINGTON**

Perkins Coie
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
Primary Contact:
Bruce D. Corker (206) 583-8538

**WISCONSIN**

Reinhart, Boerner, Van Deuren, Norris
& Rieselbach, SC
1000 North Water Street, Suite 2100
P.O. Box 92900
Milwaukee, WI 53202-0900
Primary Contact:
Richard P. Carr (414) 298-8139

*COPY*

**ENDORSEMENT#** *1*

This endorsement, effective *12:01 am        October 30, 2003*        forms a part of
policy number    *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance
company which issued this policy; and 2) "you", "your", "named Insured", "First Named
Insured", and "Insured" mean the Named Corporation, Named Organization, Named
Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other
Insured(s)" means all other persons or entities afforded coverage under the policy.

## WASHINGTON, D.C.
## CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the
cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    Cancellation

If this policy has been in effect for thirty (30) days or more, the Insurer may cancel
this policy only if one or more of the following reasons apply:

1)    Insured has refused or failed to pay a premium due under the terms of the
policy;

2)    Insured or Other Insured(s) have made a material and willful misstatement or
omission of fact to the Insurer or its employees, agents or brokers in
connection with any application to, or claim against the Insurer; or

3)    Property or other interest of the Insured shall have been transferred to a
person other than the Insured or beneficiary, unless the transfer is
permissible under the terms of the policy, or unless the property, interest or
use thereof shall have materially changed with respect to its insurability.

The Insurer will mail or deliver to the named Insured notice of cancellation at least
thirty (30) days prior to the date of cancellation. For cancellation as described
under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the
Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    Nonrenewal

If the Insurer decides not to renew this policy the Insurer will mail or deliver to the
named Insured the Insurer's notice of nonrenewal at least thirty (30) days before
the end of the policy period.

The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or
broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

## END 001

**ENDORSEMENT# 1** (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

_____
AUTHORIZED REPRESENTATIVE

*END 001*

**ENDORSEMENT#** *2*

This endorsement, effective *12:01 am      October 30, 2003*      forms a part of
policy number  *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FAILURE TO EFFECT AND/OR MAINTAIN INSURANCE EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** made against any **Insured** alleging, arising out of, based upon, attributable to any failure or omission on the part of the **Insureds** or the **Sponsor Organization** to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 002*

*COPY*

ENDORSEMENT# *3*

This endorsement, effective *12:01 am    October 30, 2003*    forms a part of
policy number *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY AMENDED
### BILATERAL – ONE YEAR PRESET

In consideration of the premium charged, it is hereby understood and agreed that the
policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby
amended to the extent necessary for the policy to provide the following:

1.    Clause 10. DISCOVERY CLAUSE, is deleted in its entirety and replaced with the
following:

   **10.    DISCOVERY CLAUSE**

   Except as indicated below, if the **Named Sponsor** shall cancel or the **Named
   Sponsor** or the **Insurer** shall refuse to renew this policy, the **Named Sponsor**
   shall have the right to a period of one year following the effective date of
   such nonrenewal ("**Discovery Period**"), upon payment of the respective
   "**Additional Premium Amount**" described below, in which to give to the
   **Insurer** written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i)
   **Claims** first made against an **Insured**; and (ii)  circumstances of which the
   **Natural Person Insured** or an **Insured** shall become aware, in either case
   during said **Discovery Period** and solely with respect to a **Wrongful Act**
   occurring prior to the end of the **Policy Period** and otherwise covered by this
   policy.

   The **Additional Premium Amount** for one year shall be  *150* % of the **Full
   Annual Premium**. As used herein, "**Full Annual Premium**" means the premium
   level in effect immediately prior to the end of the policy period.

   In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor**
   shall have the right to request an offer from the **Insurer** of a **Discovery Period**
   (with respect to **Wrongful Acts** occurring prior to the effective time of the
   **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such
   terms, conditions, exclusions and additional premium as the **Insurer**  may
   reasonably decide. In the event of a **Transaction**, the right to a **Discovery
   Period** shall not otherwise exist except as indicated in this paragraph.

   The **Discovery Period** is not cancelable and the additional premium charged
   shall be fully earned at inception.  The rights contained in this Clause 10 shall
   terminate unless written notice of election of a **Discovery Period**, together
   with any additional premium due, is received by the **Insurer** no later than
   thirty (30) days subsequent to the effective date of the nonrenewal or
   **Transaction**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

### END 003

*COPY*    1 of 1

This endorsement, effective *12:01 am      October 30, 2003*      forms a part of
policy number   *548-03-72*
issued to    *ULLICO INC. AND ITS SUBSIDIARIES*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## COORDINATION OF AIG LIMITS

In consideration of the premium charged, it is hereby understood and agreed that with respect to any **Claim** under this policy for which coverage is provided by one or more other policies issued by the **Insurer** or any other member of the American International Companies ( **AIG**), (or would be provided but for the exhaustion of the limit of liability, the applicability of the retention/deductible amount or coinsurance amount, or the failure of the **Insured** to submit a notice of a **Claim**), the **Limit of Liability** provided by virtue of this policy shall be reduced by the limit of liability provided by said other **AIG** policy.

Notwithstanding the above, in the event such other **AIG** policy contains a provision which is similar in intent to the foregoing paragraph, then the foregoing paragraph will not apply, but instead:

1)    the **Insurer** shall not be liable under this policy for a greater proportion of the **Loss** than the applicable **Limit of Liability** under this policy bears to the total limit of liability of all such policies, and

2)    the maximum amount payable under all such policies shall not exceed the limit of liability of the policy which has the highest available limit of liability.

Nothing contained in this endorsement shall be construed to increase the limit of liability of this policy.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


AUTHORIZED REPRESENTATIVE

*COPY*          *END 4*

**ENDORSEMENT# 5**

This endorsement, effective *12:01 am    October 30, 2003*    forms a part of
policy number *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SPONSOR ORGANIZATION SECURITIES
### SEPARATE RETENTION

In consideration of the premium charged herein, it is understood and agreed that the
policy is amended as follows:

1.  Item 4. of the Declarations is amended by addition of the following at the end
    thereof:

    > 4(b) **RETENTION: Sponsor Organization, Plan, or**
    > **Natural Person Insured for Indemnifiable Loss: *$500,000***
    > For all **Loss** in connection with any **Claim(s)** made against any
    > **Insured**, including but not limited to any derivative or
    > representative class action, arising out of, based upon,
    > attributable to or in any way related to any securities of the
    > **Sponsor Organization** or any affiliate thereof.

2.  Clause 7. RETENTION CLAUSE is deleted in its entirety and replaced with the
    following:

    **7.    RETENTION CLAUSE**

    The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim**
    which is in excess of the Retention amount stated in Item 4(a) and 4(b) of the
    Declarations, such Retention amount to be borne by the **Insured** and shall
    remain uninsured, with regard to all **Defense Costs** under Item 4(a) and with
    regard to all **Loss** under Item 4(b), other than: (1) non-**Indemnifiable Loss** of a
    **Natural Person Insured**; and (2) **Voluntary Compliance Loss**. A single
    Retention amount shall apply to **Loss** arising from all **Claims** alleging the
    same **Wrongful Act** or related **Wrongful Acts**.

3.  It is hereby understood and agreed that this endorsement shall only apply as a
    limitation on coverage otherwise provided by this policy and shall not in any way be
    construed as an intent to expand coverage under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 005*

*COPY*                    1 of 1

**ENDORSEMENT# *6***

This endorsement, effective *12:01 am     October 30, 2003*     forms a part of policy number⁻ *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### 3/01 EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY AMENDATORY

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending the policy) is hereby amended as follows:

Clause 3. DEFINITIONS

1. The definition of "**Employee Benefit Law**" is deleted in its entirety and replaced with the following:

   "**Employee Benefit Law**" means:

   (1) **ERISA** or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject.

   (2) Solely with respect to paragraph (2) of the definition of **Wrongful Act**, **Employee Benefit Law** shall also include Part 164 of the regulations under the Health Insurance Portability and Accountability Act of 1996 (hereinafter "**HIPAA Privacy Regulations**"), unemployment insurance, Social Security, government-mandated disability benefits or similar law.

   (3) In no event shall **Employee Benefit Law**, other than as set forth in paragraph (2) of this definition of **Employee Benefit Law**, include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

2. The definition of "**ERISA**" is deleted in its entirety and replaced with the following:

   "**ERISA**" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, Health Insurance Portability and Accountability Act of 1996 as it relates to Sections 102(b) and 104(b)(1) of **ERISA**, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

3. The definition of "**ESOP**" is deleted in its entirety and replaced with the following:

   "**ESOP**" means any employee stock ownership plan as defined in **ERISA**, or any other **Plan** under which investments are made primarily in securities of or issued by (i) the **Sponsor Organization**, (ii) the parent of the **Sponsor Organization**, (iii) any acquired **Subsidiary**, or (iv) any parent of any acquired **Subsidiary**, or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 10% or more of securities of the **Sponsor Organization**, the parent of the **Sponsor Organization**, any acquired **Subsidiary**, or any parent of any acquired **Subsidiary**.

*END 006*

*COPY*                     Page 1 of 3

ENDORSEMENT# 6    (continued)

4.  The definition of "**Plan**" is amended by deleting paragraphs (2) and (4) in their entirety and replacing *them* with the following:

    (2)  if such **Plan** was sold, spun–off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin–off or termination to the **Insurer** prior to the inception date of this policy and pay any required premium relating to such Plan, unless such sale, spin–off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

    (4)  if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

5.  The definition of "**Wrongful Act**" is deleted in its entirety and replaced with the following:

    (1)  as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**; and

    (2)  as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:
         (i)    counseling employees, participants and beneficiaries; or
         (ii)   providing interpretations; or
         (iii)  handling of records; or
         (iv)   activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,
         or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, but only with respect to a **Plan**;

    (3)  as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

Clause 12. ORGANIZATIONAL CHANGES is amended by deleting paragraph (b) in its entirety and replacing it with the following:

(b)  *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and

**END 006**

**COPY**                                    Page 2 of 3

**ENDORSEMENT#** *6* (continued)

prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period,** this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that in the event of a sale, spin-off or termination prior to the inception of this **Policy Period**, notice of such sale, spin-off or termination is provided to the Insurer *prior to the inception of this* **Policy Period** and any required premium is paid, or, in the event of a sale, spin-off termination during the Policy Period, notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

The following clause shall be added to the policy:

**20.  ORDER OF PAYMENTS**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this policy, then the **Insurer** shall in all events:

(a)  first, pay **Loss** for which coverage is provided under this policy for any **Natural Person Insured** and any covered **Plan** under this policy; and

(b)  then, only after payment of **Loss** has been made pursuant to Clause 20(a) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, shall payment for the **Sponsor Organization** be made for such other **Loss** for which coverage is provided under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 006*

*COPY*                                        Page 3 of 3

**ENDORSEMENT# 7**

This endorsement, effective *12:01 am*      *October 30, 2003*      forms a part of
policy number⁻ *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ADDITIONAL LISTED PLANS

In consideration of the premium charged, it is hereby understood and agreed that the
Definition of **"Plan"** shall also include the following listed **Plan(s)**, subject to the
corresponding Continuity Date:

| **PLAN(S)** | **CONTINUITY DATE** |
|---|---|
| *Zenith Administrators Inc. Central Pension Plan and Trust* | *October 30, 1998* |
| *Ullico Inc. Pension Plan and Trust* | *October 30, 1998* |
| *Ullico Inc. 401(k) Plan* | *October 30, 1998* |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 007*

78643 (8/01)    *COPY*

This endorsement, effective *12:01 am    October 30, 2003*    forms a part of
policy number *548-03-72*
issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT
## OR ACT EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of items (1) below; (hereinafter " **Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Breach of Fiduciary Duty**, **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to any **Event(s)**:

> (1)    Department of Labor issued subpoena to the Ullico Pension Plan and Trust, to Playa Pacific Partners and to Ullico, Inc. as part of its fact finding investigation surrounding a real estate transaction between Ullico and Playa Pacific Partners and regarding Ullico stock.
>
> (hereinafter the " **Events**")

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to a related **Breach of Fiduciary Duty** or related **Wrongful Act** alleged in any of the items (1) above, regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action, or the same or different claimants, or is brought in the same or different venue, or resolved in the same or different forum.


ALL OTHER TERMS, CONDITIONS AND EXCLUSION REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*COPY*        *END 8*

**ENDORSEMENT#** *9*

This endorsement, effective *12:01 am    October 30, 2003*    forms a part of
policy number  *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**RETENTION AMENDED**
**ALL LOSS OTHER THAN NON-INDEMNIFIABLE AND VOLUNTARY COMPLIANCE**

In consideration of the premium charged, it is hereby understood and agreed that the
policy is amended as follows:

1.    Item 4 of the Declarations is deleted in its entirety and replaced with the following:

| 4 | **RETENTION:** | (i) **non-Indemnifiable Loss** of a **Natural Person Insured:** | None |
| | | (ii) **Voluntary Compliance Loss:** | None |
| | | (iii) Judgments, Settlements and **Defense Costs** for **Sponsor Organization, Plan** or **Natural Person Insured** for **Indemnifiable Loss:** | *$250,000* (for **Loss** arising from **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**) |

2.    The Clause of the policy entitled RETENTION CLAUSE is deleted in its entirety and
replaced with the following:

**RETENTION CLAUSE**

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which
is in excess of the Retention amount stated in Item 4 of the Declarations, such
Retention amount to be borne by the **Insured** and shall remain uninsured, with
regard to all **Loss** other than: (1) non-**Indemnifiable Loss** of a **Natural Person
Insured**; and (2) **Voluntary Compliance Loss**.  A single Retention amount shall
apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related
**Wrongful Acts**.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 009*

*COPY*                        1 of 1

<u>ENDORSEMENT# *10*</u>

This endorsement, effective *12:01 am*    *October 30, 2003*    forms a part of
policy number *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AUTO PLAN THRESHOLD AMENDED

In consideration of the premium charged, it is hereby understood and agreed that subparagraphs (5)(a) and (b) of the Definition of "**Plan**" are deleted in their entirety and replaced with the following:

(5)    if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

   (a)    is acquired during the **Policy Period** as a result of the **Sponsor Organization**'s acquisition of a **Subsidiary** whose assets total more than *10* % of the total consolidated assets of the **Sponsor Organization** as of the inception date of this policy; or

   (b)    is acquired during the **Policy Period** and such **Plan**'s assets total more than *10* % of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

   then, this policy shall apply to such **Plan** (but solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the **Named Sponsor** shall have provided the **Insurer** with a completed application for such new **Plan** and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**. The 90 day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Sponsor Organization** and the failure to report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 010*

*COPY*    1 of 1

ENDORSEMENT# 11

This endorsement, effective *12:01 am    October 30, 2003*    forms a part of
policy number  *548-03-72*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### BENEFITS WORDING – AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the first
paragraph of Clause 3, DEFINITIONS "Loss," is deleted in its entirety and replaced by the
following:

"**Loss**" means damages, judgments (including pre/post-judgment interest on a
covered judgment), settlements and **Defense Costs**; however, **Loss** shall not
include: (1) civil or criminal fines or penalties imposed by law, except (i) to the
extent set forth in Item 3(c) of the Declarations page for **Voluntary Compliance
Loss**, (ii) **UK Fines and Penalties**, (iii) the five percent or less civil penalty imposed
upon an Insured under Section 502(i) of **ERISA**, and (iv) the 20 percent or less
penalty imposed upon an Insured under Section 502(l) of **ERISA**, with respect to
covered settlements or judgments; (2) the multiplied portion of multiplied damages;
(3) taxes or tax penalties; (4) any amount for which an Insured is not financially
liable or which is without legal recourse to the Insured; (5) **Benefits**, or that portion
of any settlement or award in an amount equal to such **Benefits**; or (6) matters
which may be deemed uninsurable under the law pursuant to which this policy shall
be construed.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 011*

COPY    1 of 1

This endorsement, effective *12:01 am   October 30, 2003*   forms a part of
policy number   *548-03-72*
issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT
## OR ACT EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that
Endorsement # 8 of this policy is deleted in its entirety and replaced with the following:

It is understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection
with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of items
(1) Through (3) below; (hereinafter " **Events**"); (ii) the prosecution, adjudication, settlement,
disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any
**Event(s)**; or (iii) any **Breach of Fiduciary Duty, Wrongful Act,** underlying facts,
circumstances, acts or omissions in any way related, directly or indirectly, to any **Event(s)**:

(1) United States Department of Labor issued a subpoena relating to the
DOL's investigation of investments in the Playa Vista land development
(more specifically in the matter of an investigation of the Plumber &
Pipefitters National Pension Fund, Bricklayers & Towel Trades
International Pension Fund, National Electrical Benefit Fund, and
Carpenters Pension Fund for Southern California as per subpoena dated
April 25, 2002)

(2) United States Department of Labor issued a subpoena directed to the
ULLICO, Inc. relating to the investigation of ERISA covered plans that are
eligible to purchase ULLICO, Inc. stock. (as per DOL subpoena dated
April 11, 2002)

(3) United States Department of Labor issued a subpoena to the ULLICO,
Inc. Pension Plan and Trust relating to investigation being conducted by
DOL to determine whether any person has violated or is about to violate
any provision of Title I of the Employee Retirement Income Security Act
of 1974 (ERISA), 29 U.S.C. Section 1134 (a) (1). (as per DOL subpoena
dated June 11, 2002)

(hereinafter the " **Events**")

*COPY     END 12*

## Quality Analyst : AIG Quality Review Checklist - National Union

| Sbmn No. | Sbmn Eff Dt. | Contract _ No | Account Name | Insured Name | Policy Type | LOB | Credited Division | Region | Se C |
|---|---|---|---|---|---|---|---|---|---|
| 409165 | 10/30/2003 | 0 | ULLICO INC | ULLICO INC. AND ITS SUBSIDIARI | Pension Trust Liability | Pension Trust Liability (PTL) | 069 MIDDLE MARKET FINANCIAL INSTITUTION (69) | NEW YORK (1) | N U |

| Policy No. : 5480372 | | Policy Eff. Dt. : 10/30/2003 | | ASCO : Nat'l Union Fire I |
|---|---|---|---|---|

| Branch : 1 - NEW YORK | Service Center : 01N - National Union |
|---|---|

| Review Date | Rush Due Dt | Underwriter | Reviewer | Specialist | System |
|---|---|---|---|---|---|
| 11/26/2003 | 11/28/2003 | LAVRENTKO , ANTON | Kugielska,David | Rosado , Miguel | AI QUIC |

| # | Criteria | Answer | Cor |
|---|---|---|---|
| | **Critical Errors** | | |
| | **COVER LETTER VS. BINDER** | | |
| 1 | Does the **Insured Name** on the Cover Letter match the Binder? | ⦿ Yes ◯ No | ☐ |
| 2 | Does the **Broker Contact** on the Cover Letter match the Binder? | ⦿ Yes ◯ No | ☐ |
| 3 | Does the **Broker** on the Cover Letter match the Binder? | ⦿ Yes ◯ No | ☐ |
| 4 | Does the **Broker Address** on the Cover Letter match the Binder? | ⦿ Yes ◯ No | ☐ |
| | **DEC PAGE VS. BINDER** | | |
| 5 | Does the **Insured Name** on the Dec Page match the Binder? | ⦿ Yes ◯ No | ☐ |
| 6 | Does the **Insured Address** on the Dec Page match the Binder? | ⦿ Yes ◯ No ◯ N/A | ☐ |
| 7 | Does the **Broker** on the Dec Page match the Binder? | ⦿ Yes ◯ No ◯ N/A | ☐ |
| 8 | Does the **Broker Address** on the Dec Page match the Binder? | ⦿ Yes ◯ No ◯ N/A | ☐ |
| 9 | Does the **Policy Number** on the Dec Page match the Binder? | ⦿ Yes ◯ No | ☐ |
| 10 | Does the **Company Paper** on the Dec Page match the Binder? | ⦿ Yes ◯ No | ☐ |
| 11 | Do the **Limit(s) of Liability** on the Dec Page match the Binder? | ⦿ Yes ◯ No | ☐ |
| 12 | Does the **Policy Period** on the Dec Page match the Binder? | ⦿ Yes ◯ No | ☐ |
| | Q# 13 APPLIES TO PRIMARY POLICIES ONLY. ALL OTHERS MARK N/A. | | |
| 13 | Do the Policy Retention(s)/Deductible(s) on the Dec Page match the Binder? | ⦿ Yes ◯ No ◯ N/A | ☐ |
| | Q# 14 APPLIES TO EXCESS POLICIES ONLY | | |
| 14 | Does the Attachment Point(i.e. Total Underlying Limits) on the Dec Page match the Binder? | ◯ Yes ◯ No ⦿ N/A | ☐ |
| | Q# 15 APPLIES TO PRIVATE EDGE AND NOT FOR PROFIT PROTECTOR POLICIES ONLY. | | |
| 15 | If punitive damages are granted in the Binder, does the Dec Page reflect this? | ◯ Yes ◯ No ⦿ N/A | ☐ |
| | Q# 16 DOES NOT APPLY TO COMMERCIAL CRIME POLICIES AND FINANCIAL INSTITUTIONS FIDELITY BONDS. | | |
| 16 | Does the Total Policy Premium on the Dec Page match the Binder? | ⦿ Yes ◯ No ◯ N/A | ☐ |
| | **ENDORSEMENTS VS. BINDER** | | |
| 17 | Does the Insured Name on the Endorsements match the Binder? | ⦿ Yes ◯ No ◯ N/A | ☐ |
| 18 | Does the legal number and edition date of the GUTS of the Policy | ⦿ Yes ◯ No ◯ N/A | ☐ |

# **AIG** American International Companies®

### Employee Benefit Plan Fiduciary Liability Insurance

POLICY NUMBER: *495-38-35*
RENEWAL OF: *874-44-03*

- [ ] AIU Insurance Company
- [ ] American Home Assurance Company
- [ ] American International Pacific Insurance Company
- [ ] American International South Insurance Company
- [ ] Birmingham Fire Insurance Company of Pennsylvania

- [ ] Granite State Insurance Company
- [ ] Illinois National Insurance Company
- [ ] National Union Fire Insurance Company of Louisiana
- [x] National Union Fire Insurance Co. of Pittsburgh, Pa.
- [ ] New Hampshire Insurance Company

(each of the above being a capital stock company)

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: EXCEPT AS SET FORTH IN ITEM 3(b) OF THE DECLARATIONS, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND.  IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 3 OF THE POLICY.

### DECLARATIONS

| ITEMS | | |
|---|---|---|
| | | (herein "Named Sponsor") |
| 1 | NAMED SPONSOR: *ULLICO INC. AND ITS SUBSIDIARIES* | |
| 1(a) | MAILING ADDRESS: *111 MASSACHUSETTS AVE NW WASHINGTON, DC 20001* | |
| 1(b) | SUBSIDIARY COVERAGE: | Any past, present or future Subsidiary of the Named Sponsor |
| 1(c) | PLAN COVERAGE: | Any past, present or future Plan |
| 2 | POLICY PERIOD:  From: *October 30, 2002*   To: *October 30, 2003* 12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. | |
| 3(a) | POLICY AGGREGATE LIMIT OF LIABILITY (herein "Limit of Liability") For all Loss, in the aggregate, under this policy including Defense Costs (other than Defense Costs (if any) set forth in Item 3(b) of the Declarations): *$5,000,000* | |

*138200*

| ITEMS (Continued) | |
|---|---|
| 3(b) | ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS: *$0* |
| 3(c) | SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS<br>For all Voluntary Compliance Loss, in the aggregate, ☐ See endorsement #<br>under this policy including Defense Expenses    ☒ None<br><br>This Sublimit of Liability shall be part of and not in<br>addition to the **Policy Aggregate Limit of Liability**<br>set forth in Item 3(a) of the Declarations. |
| 4 | RETENTION:   Not applicable to: (i) non-Indemnifiable Loss of a Natural<br>Person Insured (ii) judgments and settlements (all Coverages);<br>and (iii) **Voluntary Compliance Loss** |
| 4(a) | Defense Costs: *$50,000*<br>☐ None |
| 5 | CONTINUITY DATE: *October 30, 1998* |
| 6 | PREMIUM:           *$40,000* |
| 7 | NAME AND ADDRESS OF INSURER (herein "Insurer"):<br>*National Union Fire Insurance Company of Pittsburgh, Pa.*<br>*175 Water Street*<br>*New York, NY 10038*<br><br>This policy is issued only by the insurance company indicated in this Item **7.** |

*138200*

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_
SECRETARY

PRESIDENT

AUTHORIZED REPRESENTATIVE

COUNTERSIGNATURE DATE

COUNTERSIGNED AT

ARC EXCESS & SURPLUS INC
1122 FRANKLIN AVENUE. 3RD FL
GARDEN CITY. NY 11530

138200

77893 (3/01)    INSUArchive Copy



**AIG** American International Companies®

Employee Benefit Plan Fiduciary Liability Insurance

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application, including any attachments and any materials incorporated therein which form a part of this policy, the Insurer agrees as follows:

1.  **INSURING AGREEMENTS**

    (a)  Solely with respect to Claims first made against an Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the Loss of each and every Insured arising from a Claim against an Insured for any actual or alleged Wrongful Act by any such Insured (or by any employee for whom such Insured is legally responsible).

    (b)  Solely with respect to CAP Penalties and Delinquent Filer Penalties assessed against an Insured, and Voluntary Fiduciary Correction Loss incurred by an Insured, during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) or within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

        (i)   pay the CAP Penalties and Delinquent Filer Penalties; and
        (ii)  reimburse the Voluntary Fiduciary Correction Loss.

    of each and every Insured, collectively not to exceed the amount of the Sublimit of Liability set forth in Item 3(c) of the Declarations; provided that the Insured shall select a Panel Counsel Firm as provided in Clause 9 of the policy.

    The payment of any Voluntary Compliance Loss under this policy shall not waive any of the Insurer's rights under this policy or at law, including in the event that a Voluntary Compliance Loss results in a Claim.

2.  **DEFENSE AGREEMENT**

    (a)  **INSURER'S DUTY TO DEFEND**

        Except as hereinafter stated, the Insurer shall have both the right and duty to defend any Claim against an Insured alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent.

        The Insured shall have the right to effectively associate with the Insurer in the defense of any Claim, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The Insurer shall not, however, be obligated to defend any Claim after either: (1) the Limit of Liability and any additional Defense Costs (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

    (b)  **INSURED'S OPTION TO ASSUME DEFENSE**

        Notwithstanding the above, the Insureds shall have the right to assume the defense of any Claim made against them. This right shall be exercised in writing by the Named Sponsor on the behalf of all Insureds within sixty (60) days of the reporting of the Claim to the Insurer pursuant to Clause 8 of the policy. Upon receipt of such

written request, the Insurer shall tender the defense of the Claim to the Insureds. Once the defense has been so tendered, the Insurer cannot re-assume the defense of the Claim. The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement. Provided that the Insurer shall be permitted to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement of any Claim, the Insurer's consent to settlements, stipulated judgments and Defense Costs shall not be unreasonably withheld.

(c)   GENERAL PROVISIONS (applicable to both (a) and (b) above)

The Insurer shall advance Defense Costs prior to the final disposition of a Claim, subject to the other provisions of this policy.  Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insured(s) shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to in writing by the Insurer shall be recoverable as Loss under the terms of this policy.

The Insured(s) shall give the Insurer full cooperation and such information as the Insurer may reasonably require. The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured, subject to such Insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim, plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer. Further, in the event the Insurer is defending the Claim pursuant to Clause 2(a) above, then the Insurer shall tender the Claim to the Insureds who shall thereafter at their own expense and on their own behalf negotiate and defend such Claim independently of the Insurer.

Selection of counsel to defend the Claim made against the Insureds shall be governed by Clause 9 of the policy (if applicable).

3.   DEFINITIONS

"Administrator" means an Insured with respect to any Wrongful Act described in subparagraph (2) of the Definition of Wrongful Act.

"Benefits" means any obligation under a Plan to a participant or beneficiary under a Plan which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"Breach of Fiduciary Duty" means a violation of the responsibilities, obligations or duties imposed upon Insureds by ERISA.

"Cafeteria Plan" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"CAP Penalties" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an Insured by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent Plan defect under an Employee Plans Compliance Resolution System, provided that such agreement to

correct such Plan defect was entered into in writing by the Insured with the IRS during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal).

"Claim" means:

    (1)  a written demand for monetary, non-monetary or injunctive relief; or

    (2)  a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

        (i)  service of a complaint or similar pleading; or

        (ii)  return of an indictment, information or similar document (in the case of a criminal proceeding); or

        (iii)  receipt or filing of a notice of charges; or

    (3)  a formal agency or regulatory adjudicative proceeding to which an Insured is subject; or

    (4)  any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"Cleanup Costs" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of Pollutants.

"Consulting Fees" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential Breach of Fiduciary Duty, but excluding any fees, costs or expenses associated with: (i) a Plan audit; or (ii) identifying, finding or assessing such Breach of Fiduciary Duty.

"Defense Costs" means reasonable and necessary fees, costs and expenses consented to in writing by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against an Insured, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of Natural Person Insureds or employees of an Insured.

"Defense Expenses" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the Insurer resulting solely from the correction of an actual or potential Breach of Fiduciary Duty, but excluding any fees, costs and expenses associated with finding or assessing such Breach of Fiduciary Duty and any compensation of Natural Person Insureds or employees of an Insured.

"Delinquent Filer Penalties" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal).

"Dependent Care Assistance Program" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"Domestic Partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the Named Sponsor or any Subsidiary.

"Employee Benefit Law" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a Plan is subject. Except to the extent set forth in subparagraph (2) of the Definition of Wrongful Act, Employee Benefit Law shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

"ERISA" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"ESOP" means any employee stock ownership plan as defined in ERISA, or any other Plan under which investments are made primarily in securities of the Sponsor Organization or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the Sponsor Organization.

"Fiduciary" means a fiduciary as defined in an Employee Benefit Law (if applicable), with respect to a Plan, or a person or entity who exercises discretionary control as respects the management of a Plan or the disposition of its assets.

"Foreign Jurisdiction" means any jurisdiction, other than the United States or any of its territories or possessions.

"Foreign Policy" means the Insured's or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a Foreign Jurisdiction, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then Foreign Policy means the standard policy most recently registered in the local language of the Foreign Jurisdiction, or if no such policy has been registered, then the policy most recently registered in that Foreign Jurisdiction. The term Foreign Policy shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

"Fringe Benefit" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"Indemnifiable Loss" means Loss for which the Sponsor Organization has indemnified or is permitted or required to indemnify any natural person Insured.

"Insured(s)" means:

    (1)  any Natural Person Insured;
    (2)  any Plan(s);
    (3)  the Sponsor Organization; and
    (4)  any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan and included in the Definition of Insured by specific written endorsement attached to this policy.

"Loss" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for Voluntary Compliance Loss, (ii) UK Fines and Penalties, (iii) the five percent or less civil penalty imposed upon an Insured under Section 502(i) of ERISA, and (iv) the 20 percent or less penalty imposed upon an Insured under Section 502(l) of ERISA, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (5) Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Where permitted by law, Loss shall include punitive or exemplary damages imposed upon any Insured (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to Employee Benefit Law).

Defense Costs shall be provided for items specifically excluded from Loss pursuant to subparagraphs (1)-(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

Loss shall include Voluntary Compliance Loss.

"Management Control" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the Named Sponsor, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"Natural Person Insured" means any:

(1) past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a Sponsor Organization or if applicable, of a Plan, and as to all of the above in his or her capacity as a Fiduciary, Administrator or trustee of a Plan; or

(2) past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the Sponsor Organization is operating in a Foreign Jurisdiction.

"Non-qualified Plan" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.

"Pension Plan" means a pension plan as defined in any Employee Benefit Law.

"Plan" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any Pension Plan, Welfare Plan, Cafeteria Plan, Dependent Care Assistance Program, Fringe Benefit, and VEBA) or Non-qualified Plan, established anywhere in the world, which was, is or shall be sponsored solely by the Sponsor Organization, or sponsored jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the Sponsor Organization, subject to the following provisions:

(1) if such Plan is a Pension Plan(s), other than an ESOP, stock option plan or Pension Plan described in subparagraphs (5)(a) and 5(b) below, then the Named Sponsor shall provide written notice of such Plan to the Insurer prior to the inception date of this policy, unless such Plan was already covered under a policy issued by the Insurer of which this policy is a continuous renewal;

(2) if such Plan was sold, spun-off or terminated prior to the inception date of this policy the Named Sponsor shall provide written notice of such sale, spin-off or termination to the Insurer prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the Insurer under a policy issued by the Insurer of which this policy is a continuous renewal;

(3) if such Plan is sold, spun-off or terminated during the Policy Period, the Named Sponsor shall provide written notice of such sale, spin-off or termination to the Insurer prior to the end of the Policy Period;

(4) if such Plan is an ESOP or stock option plan, the Named Sponsor shall provide written notice of such Plan to the Insurer unless such Plan was already covered under a policy issued by the Insurer of which this policy is a continuous renewal and such Plan is added to the Definition of Plan by specific written endorsement attached to this policy; or

(5) if such Plan is a Pension Plan (other than an ESOP, or stock option plan) and:

    (a) is acquired during the Policy Period as a result of the Sponsor Organization's acquisition of a Subsidiary whose assets total more than 25% of the total consolidated assets of the Sponsor Organization as of the inception date of this policy; or

    (b) is acquired during the Policy Period and such Plan's assets total more than 25% of the total consolidated assets of all covered Pension Plans as of the inception date of this policy,

then, this policy shall apply to such Plan (but solely with respect to a Wrongful Act(s) occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the Named Sponsor shall have provided the Insurer with a completed application for such new Plan and agreed to any additional premium or amendment of the provisions of the policy required by the Insurer relating to such new Plan. The 90 day reporting condition shall not apply if such new Plan does not constitute one of the five largest Pension Plans of the Sponsor Organization and the failure to report such Plan within the 90 day reporting period was due to inadvertent omission by the Named Sponsor and upon discovery of such Plan, the Named Sponsor shall notify the Insurer as soon as practicable, provide any information required by the Insurer relating to such Plan and pay any premium required by the Insurer relating to such Plan.

The Definition of Plan shall also include: (i) the following government-mandated programs: unemployment insurance. Social Security, or disability benefits, but solely with respect to a Wrongful Act defined in subparagraph (2) of the Definition of Wrongful Act in this policy; (ii) any Pension Plan (other than an ESOP or stock option plan) considered or created by the Sponsor Organization during the Policy Period; or (iii) any other plan, fund or program, which is included in the Definition of Plan by specific written endorsement attached to this policy.

In no event, however, shall the Definition of Plan include any multiemployer plan as defined in Employee Benefit Law.

"Policy Period" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"Pollutants" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"Sponsor Organization" means the Named Sponsor designated in Item 1 of the Declarations and any Subsidiary thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the Named Sponsor or any Subsidiary thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"Subsidiary" means any past, present or future: (1) for-profit entity of which the Named Sponsor has Management Control either directly or indirectly through one or more other Subsidiaries; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the Named Sponsor. The term Subsidiary shall automatically apply to any new Subsidiary acquired or created during the Policy Period.

A for-profit entity ceases to be a Subsidiary when the Named Sponsor no longer maintains Management Control of such Subsidiary. A not-for-profit entity ceases to be a Subsidiary when the Named Sponsor no longer exclusively sponsors such Subsidiary.

"UK Fines and Penalties" means civil fines and penalties assessed against an Insured by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"VEBA" means a voluntary employees' beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the Sponsor Organization, and provides benefits for voluntary members who are employees or former employees of the Sponsor Organization and/or their beneficiaries.

"Voluntary Compliance Loss" means CAP Penalties, Delinquent Filer Penalties and Voluntary Fiduciary Correction Loss.

"Voluntary Fiduciary Correction Loss" means damages, Defense Expenses and Consulting Fees incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent Breach of Fiduciary Duty occurring during the Policy Period (or during the policy period of a policy issued by the Insurer of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the Insured obtaining a "No Action" letter from the DOL; however, Voluntary Fiduciary Correction Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (6) Benefits, or that portion of damages equal to such Benefits; (7) matters of which the Insured had knowledge prior to the inception date of this policy or the first policy issued by the Insurer to the Named Sponsor of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"Welfare Plan" means a welfare plan as defined in Employee Benefit Law.

"Wrongful Act" means:

    (1)  as respects an Insured: a violation of any of the responsibilities, obligations or duties imposed upon Fiduciaries by Employee Benefit Law with respect to a Plan; or any matter claimed against an Insured solely by reason of his, her or its status as a Fiduciary, the Plan or the Sponsor Organization, but only with respect to a Plan; and

    (2)  as respects an Administrator, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a Plan:
        (i)  counseling employees, participants and beneficiaries; or
        (ii)  providing interpretations; or
        (iii)  handling of records; or
        (iv)  activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the Plan,
      or any matter claimed against an Insured solely by reason of his, her or its status as an Administrator, the Plan or the Sponsor Organization, but only with respect to a Plan;

    (3)  as respects a Natural Person Insured, any matter claimed against him or her arising out of his or her service as a Fiduciary or Administrator of any

multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

4.  **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to a **Claim** made against any **Insured** anywhere in the world.

With regard to a **Claim(s)** brought and maintained solely in a **Foreign Jurisdiction** against an **Insured** formed and operating in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3-5, 9-13, and 16-19 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Sponsor**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

5.  **EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured(s)**:

(a)  arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an **Insured** was not legally entitled;

(b)  arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**;

[The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).]

(c)  for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d)  alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)  alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) for failure to fund a Plan in accordance with Employee Benefit Law or the Plan instrument, or the failure to collect contributions owed to the Plan; except that this exclusion shall not apply to Defense Costs;

(g) alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program, other than a Plan as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program;

(h) for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to Defense Costs incurred in the defense of a Claim for Breach of Fiduciary Duty;

(i) alleging, arising out of, based upon or attributable to any Wrongful Act as respects the Plan taking place at any time when the Sponsor Organization did not sponsor such Plan or when the Natural Person Insured was not a Fiduciary, Administrator, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the Sponsor Organization or if applicable, a Plan;

(j) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants; provided, however, that this exclusion shall not apply to non-Indemnifiable Loss arising from a Claim alleging damage to a Plan, other than non-Indemnifiable Loss constituting Cleanup Costs;

6. LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING DEFENSE COSTS)

The Limit of Liability stated in Item 3(a) of the Declarations is the limit of the Insurer's liability for all Loss, including Defense Costs, under this policy arising out of all Claims first made against the Insured during the Policy Period or the Discovery Period (if applicable). The Limit of Liability stated in Item 3(b) of the Declarations, if any, shall be an additional Limit of Liability for that part of Loss constituting Defense Costs incurred in connection with all Claims first made against the Insured during the Policy Period or the Discovery Period (if applicable). The Limit of Liability for Defense Costs stated in Item 3(b) shall be in addition to and not part of the Limit of Liability stated in Item 3(a) of the Declarations. Loss constituting Defense Costs shall first reduce the additional Limit of Liability stated in Item 3(b). Should the Limit of Liability stated in Item 3(b) of the Declarations become exhausted, or should the Limit of Liability stated in Item 3(b) of the Declarations be stated as "none", then subsequent Defense Costs will reduce the Limit of Liability stated in Item 3(a).

The Sublimit of Liability set forth in Item 3(c) of the Declarations shall be part of and not in addition to the Limit of Liability set forth in Item 3(a).

The Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period. Further, any Claim which is made subsequent to the Policy Period or Discovery Period (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the Policy Period or Discovery Period, shall also be subject to the aggregate Limit(s) of Liability stated in Item 3 of the Declarations.

Defense Costs, whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the Insurer in addition to the Limit of Liability; except that the separate limit, if any, listed in Item 3(b) of the Declarations shall be in addition to the aggregate Limit of Liability stated in Item 3(a) of the Declarations. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.

7.   RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the Insured and shall remain uninsured, with regard to all Defense Costs other than: (1) non-Indemnifiable Loss of a Natural Person Insured; and (2) Voluntary Compliance Loss. A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

8.   NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 7 of the Declarations at the address indicated in Item 7 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a)   The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable after the Named Sponsor's risk manager or general counsel (or if no such position exists, then such equivalent position) first becomes aware of the Claim, but in all events no later than either:

(1)   the end of the Policy Period or during the Discovery Period (if applicable); or

(2)   within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim was first made against an Insured within the final thirty (30) days of the Policy Period or the Discovery Period (if applicable).

(b)   If written notice of a Claim has been given to the Insurer pursuant to Clause 8(a) above, then a Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered related to the first Claim and made at the time such notice was given.

(c)   If during the Policy Period or during the Discovery Period (if applicable) the Sponsor Organization or an Insured(s) shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9.   PRE-AUTHORIZED DEFENSE ATTORNEYS

This Clause 9 applies only to: (1) a Claim brought by any government entity; (2) a request for coverage for a Voluntary Compliance Loss; or (3) a Claim brought in the form of a class or representative action.

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firm(s)") from which a selection of legal counsel shall be made to conduct the defense of any Claim against an Insured to which this Clause 9 applies and pursuant to the terms set forth below:

In the event the Insurer is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. Upon the written request of the Named Sponsor, the Insurer may consent to a different Panel Counsel Firm selected by the Named Sponsor to defend the Insureds, which consent shall not be unreasonably withheld.

In the event the Insureds have assumed the defense of the Claim pursuant to Clause 2(b) of the policy, then the Insureds shall select a Panel Counsel Firm to defend the Insured. In addition, with the express prior written consent of the Insurer, which consent shall not be unreasonably withheld, the Insured may select a Panel Counsel Firm different from that selected by other Insureds if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a Panel Counsel Firm from the attached list to defend the Claim against the Insureds shall not be restricted to the jurisdiction in which the Claim is brought.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Sponsor. At the request of the Named Sponsor, the Insurer may in its discretion add one or more law firms to the attached list of Panel Counsel Firms for the purposes of defending the Claim made against the Insureds. The list of Panel Counsel Firms may also be amended to add, at the sole discretion of the Insurer, a non-Panel Counsel Firm for the purpose of acting as "local counsel" to assist an existing Panel Counsel Firm, which Panel Counsel Firm will act as "lead counsel" in conducting the defense of the Claim, for Claims brought in a jurisdiction in which the chosen Panel Counsel Firm does not maintain an office.

## 10. DISCOVERY CLAUSE

Except as indicated below, if the Named Sponsor shall cancel or the Named Sponsor or the Insurer shall refuse to renew this policy, the Named Sponsor shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal ("Discovery Period"), upon payment of the respective "Additional Premium Amount" described below, in which to give to the Insurer written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i) Claims first made against an Insured; and (ii) circumstances of which the Natural Person Insured or an Insured shall become aware, in either case during said Discovery Period and solely with respect to a Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy.

The Additional Premium Amount for: (1) one year shall be no more than 75% of the Full Annual Premium; (2) two years shall be no more than 150% of the Full Annual Premium; and (3) three years shall be no more than 225% of the Full Annual Premium. As used herein, "Full Annual Premium" means the premium level in effect immediately prior to the end of the Policy Period.

Notwithstanding the first paragraph of Clause 6, if the Named Sponsor shall cancel or the Insurer or the Named Sponsor shall refuse to renew this policy, then the Named Sponsor shall also have the right to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the end of the Policy Period) with an aggregate limit of liability applicable to Claims made against the Insured during such Discovery Period which is in addition to, and not part of, the applicable Limit of Liability set forth in Item 3 of the Declarations. The Insurer shall quote such a Discovery Period pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

In the event of a Transaction, as defined in Clause 12(a), the **Named Sponsor** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period**, together with any additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the **Named Sponsor** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Sponsor**. In the event of non-payment of premium by the **Named Sponsor**, the **Insurer** may cancel this policy by delivering to the **Named Sponsor** or by mailing to the **Named Sponsor**, by registered, certified, or other first class mail, at the **Named Sponsor's** address as shown in Item 1 of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Sponsor**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

## 12. ORGANIZATIONAL CHANGES

(a) If during the **Policy Period**:

(1) the **Named Sponsor** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

(2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Sponsor**;

(any of such events being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Sponsor** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 10 of this policy.

(b) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a Claim made against any Sponsor Organization and/or any Insured thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time such Sponsor Organization became a Sponsor Organization and such Insured became an Insured, and prior to the effective time that such Sponsor Organization ceases to be a Sponsor Organization or such Insured ceases to be an Insured.

With regard to any Plan that was sold, spun-off or terminated either prior to the inception date of this policy or during the Policy Period, this policy shall apply but solely with respect to a Wrongful Act(s) that occurred prior to the date of such sale or spin-off, or prior to the date that the Sponsor Organization or Natural Person Insured ceases to be a Fiduciary or Administrator of, a sold or spun-off Plan, or in the case of a terminated Plan, prior to the final date of asset distribution of such Plan, provided that notice of such sale, spin-off or termination is provided to the Insurer before the end of the Policy Period.

## 13. SUBROGATION AND WAIVER OF RECOURSE

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Insureds' rights of recovery thereof, and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Insureds. In no event shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to Employee Benefit Law), or been determined to have in fact obtained any profit or advantage to which such Insured was not legally entitled.

In the event this policy has been purchased by an Insured other than a Plan, the Insurer shall have no right of recourse against an Insured. Notwithstanding the foregoing, the Insurer shall have a right of recourse against an Insured arising out of a Claim by an Insured against another Insured unless such Claim is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the Insured claimed against.

It is further provided that in the event of any recovery under this Clause 13, the Limit of Liability of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the Insurer in connection therewith.

## 14. OTHER INSURANCE

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a Claim for which this policy may be obligated to pay Loss.

## 15. NOTICE AND AUTHORITY

It is agreed that the Named Sponsor shall act on behalf of its Subsidiaries and each and every Insured with respect to the giving of notice of Claim, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right under Clause 2(b) or Clause 10 of this policy.

16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17. ACTION AGAINST INSURER

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against any Insured to determine the Insured's liability, nor shall the Insurer be impleaded by any Insured or his or her spouse or Domestic Partner or his, her or its legal representatives. Bankruptcy or insolvency of any Insured or of his, her or its estate shall not relieve the Insurer of any of its obligations hereunder.

18. SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION

If a Claim against a Natural Person Insured includes a Claim against: (i) the lawful spouse or Domestic Partner of such Natural Person Insured; or (ii) a property interest of such spouse or Domestic Partner, and such Claim arises from any actual or alleged Wrongful Act of such Natural Person Insured, this policy shall cover Loss arising from the Claim made against that spouse or Domestic Partner or the property of that spouse or Domestic Partner to the extent that such Loss does not arise from a Claim for any actual or alleged act, error or omission of such spouse or Domestic Partner. This policy shall cover Loss arising from a Claim made against the estate, heirs, or legal representatives of any deceased Natural Person Insured, and the legal representatives of any Natural Person Insured, in the event of incompetency, insolvency or bankruptcy, who was a Natural Person Insured at the time the Wrongful Act(s) upon which the Claim is based was committed.

19. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

## ENDORSEMENT# 1

This endorsement, effective *12:01 am , October 30, 2002*    forms a part of
policy number *495-38-35*
issued to *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance
company which issued this policy; and 2) "you", "your", "named Insured", "First Named
Insured", and "Insured" mean the Named Corporation, Named Organization, Named
Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other
Insured(s)" means all other persons or entities afforded coverage under the policy.

### WASHINGTON, D.C.
### CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the
cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    Cancellation

If this policy has been in effect for thirty (30) days or more, the Insurer may cancel
this policy only if one or more of the following reasons apply:

1)    Insured has refused or failed to pay a premium due under the terms of the
policy;

2)    Insured or Other Insured(s) have made a material and willful misstatement or
omission of fact to the Insurer or its employees, agents or brokers in
connection with any application to, or claim against the Insurer; or

3)    Property or other interest of the Insured shall have been transferred to a
person other than the Insured or beneficiary, unless the transfer is
permissible under the terms of the policy, or unless the property, interest or
use thereof shall have materially changed with respect to its insurability.

The Insurer will mail or deliver to the named Insured notice of cancellation at least
thirty (30) days prior to the date of cancellation. For cancellation as described
under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the
Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    Nonrenewal

If the Insurer decides not to renew this policy the Insurer will mail or deliver to the
named Insured the Insurer's notice of nonrenewal at least thirty (30) days before
the end of the policy period.

The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or
broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

*END 001*

52136 (8/95)    *INSUArchive Copy*        - 1 -

ENDORSEMENT# *1*    (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

_____

AUTHORIZED REPRESENTATIVE

*END 001*

52136 (8/95)    *INSUArchive Copy*        - 2 -

## ENDORSEMENT# 2

This endorsement, effective  *12:01 am*        *October 30. 2002*        forms a part of
policy number  *495·38·35*
issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Failure to Effect/Or Maintain Insurance Exclusion

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable for any Loss in connection with any Claim(s) made against any
Insured alleging, arising out of, based upon, attributable to any failure or omission on the
part of the Insureds or the Sponsor Organization to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 2*
*INSUArchive Copy*

AUTHORIZED REPRESENTATIVE

## ENDORSEMENT# 3

This endorsement, effective  *12:01 am*    *October 30, 2002*    forms a part of
policy number  *495-38-35*
issued to    *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### Discovery Amended

In consideration of the premium charged, it is hereby understood and agreed that the
policy (and any endorsement amending Clause **10. DISCOVERY CLAUSE**) is hereby
amended to the extent necessary for the policy to provide the following:

1. **Clause 10. DISCOVERY CLAUSE** is deleted in its entirety and replaced with the
   following:

   Except as indicated below, if the **Insurer** shall refuse to renew this policy, the **Named
   Sponsor** shall have the right to a period of one year following the effective date of
   such nonrenewal (" Discovery Period"), upon payment of the respective " **Additional
   Premium Amount**" described below, in which to give to the **Insurer** written notice
   pursuant to Clauses 8(a) and 8(c) of the policy of: (i) **Claims** first made against an
   **Insured**; and (ii) circumstances of which the **Natural Person Insured** or an **Insured** shall
   become aware, in either case during said **Discovery Period** and solely with respect to a
   **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by
   this policy.

   The **Additional Premium Amount** for one year shall be no more than 200% of the **Full
   Annual Premium**. As used herein, " **Full Annual Premium**" means the premium level in
   effect immediately prior to the end of the **Policy Period**.

   In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor** shall
   have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect
   to Wrongful Acts occurring prior to the effective time of the **Transaction**). The **Insurer**
   shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and
   additional premium as the **Insurer** may reasonably decide. In the event of a
   **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as
   indicated in this paragraph.

   The **Discovery Period** is not cancelable and the additional premium charged shall be
   fully earned at inception. This Clause 10 shall not apply to any cancellation resulting
   from non-payment of premium. The rights contained in this Clause 10 shall terminate
   unless written notice of election of a **Discovery Period**, together with any additional
   premium due, is received by the **Insurer** no later than thirty (30) days subsequent to
   the effective date of the cancellation, nonrenewal or **Transaction**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 3*
*INSU Archive Copy*

AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 4

This endorsement, effective *12:01 am     October 30, 2002*      forms a part of
policy number  *495-38-35*
issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## TIE-IN OF LIMITS ENDORSEMENT
## (COMMON CLAIM)

In consideration of the premium charged, it is hereby understood and agreed that with respect to any **Claim(s)** alleging the same **Wrongful Act** or related **Wrongful Act(s)**, in which at least one person/entity claimed against is an **Insured** under this policy, and at least one person/entity claimed against is an **Insured** under the <u>Directors, Officer and Private Company Liability Insurance Policy, 4953684</u> (or any successor or replacement thereof), issued by the **Insurer** to <u>ULLICO INC.</u>, the combined limit of liability under both policies for such **Claim(s)** shall be <u>$10,000,000.</u> This limitation shall apply even if both policies have been triggered due to a **Claim** against the same person/entity but alleging **Wrongful Act(s)** both in his/her/its capacity as an **Insured** of <u>ULLICO INC.</u> and as an **Insured** of the **Sponsor Organization.**

Nothing in this endorsement shall be construed to increase the **Insurer's Limit of Liability** under this policy as stated in Item 3. of the Declarations page, which shall remain <u>$5,000,000.</u>


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 4*
*INSUArchive Copy*                              _____
                                                        AUTHORIZED REPRESENTATIVE

ENDORSEMENT# *5*

This endorsement, effective  *12:01 am*      *October 30, 2002*      forms a part of
policy number   *495-38-35*
issued to    *ULLICO INC. AND ITS SUBSIDIARIES*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

SPONSOR ORGANIZATION SECURITIES

SEPARATE RETENTION

In consideration of the premium charged herein, it is understood and agreed that the policy
is amended as follows:

1. Item 4. of the Declarations is amended by addition of the following at the end thereof:

| 4(b) | RETENTION: | Sponsor Organization, Plan, or Natural Person Insured for Indemnifiable Loss: $250,000 |
| | | For all Loss in connection with any Claim(s) made against any Insured, including but not limited to any derivative or representative class action, arising out of, based upon, attributable to or in any way related to any securities issued by the Sponsor Organization |

2. Clause 7. RETENTION CLAUSE is deleted in its entirety and replaced with the following:

    **7.    RETENTION CLAUSE**

    The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 4(a) and 4(b) of the Declarations, such Retention amount to be borne by the **Insured** and shall remain uninsured, with regard to all **Defense Costs** under Item 4(a) and with regard to all **Loss** under Item 4(b), other than: (1) non-**Indemnifiable Loss** of a **Natural Person Insured**; and (2) **Voluntary Compliance Loss**.  A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END 5*
*INSUArchive Copy*                                    _____
                                                       AUTHORIZED REPRESENTATIVE

POLICY NUMBER:
*874-44-03*

 *American International Companies*® RENEWAL OF:
*473-68-49*

### Employee Benefit Plan Fiduciary Liability Insurance

☐ AIU Insurance Company     ☐ Illinois National Insurance Company
☐ American International South Insurance Company   ☒ National Union Fire Insurance Company of Pitts., Pa®
☐ Birmingham Fire Insurance Company of Penns.    ☐ National Union Fire Insurance Company of Louisiana
☐ Granite State Insurance Company     ☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

### DECLARATIONS

ITEM 1. (a) NAMED SPONSOR:    *ULLICO INC. AND ITS SUBSIDIARIES*

        MAILING ADDRESS:    *111 MASSACHUSETTS AVE NW*
                         *WASHINGTON, DC 20001*

        STATE OF INCORPORATION OF THE NAMED SPONSOR:
                *District of Columbia*

    (b) SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Sponsor

    (c) PLAN COVERAGE: any past, present or future Plan defined in Clause 3(k)

ITEM 2.    POLICY PERIOD:    From: *October 30, 2001*     To: *October 30, 2002*
          (12:01 A.M. standard time at the address stated in Item 1.)

ITEM 3.    LIMIT OF LIABILITY:    *$5,000,000*
          aggregate for all Loss combined (including Defense Costs)

   *138200*

63854 (12/95) *COPY*

ITEM 4.    **RETENTION:**

Natural Person Insured for non-Indemnifiable Loss       None

Sponsor Organization, Plan, or Natural Person Insured for
Indemnifiable Loss       *$15,000*

for Loss arising from
Claims alleging the same
Wrongful Act or related
Wrongful Acts

ITEM 5.    **CONTINUITY DATE:**       *October 30, 1998*

ITEM 6.    **PREMIUM:**       *$20,300*

ITEM 7.    **NAME AND ADDRESS OF INSURER ("Insurer"):**
(This policy is issued only by the insurance company indicated below.)

*National Union Fire Insurance Company of Pittsburgh, Pa.*

*175 Water Street*

*New York, NY 10038*

*138200*

63854 (12/95)   **COPY**

**IN WITNESS WHEREOF,** the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_

**SECRETARY**

_John King_

**PRESIDENT**

_____

**AUTHORIZED REPRESENTATIVE**

_____

**COUNTERSIGNATURE DATE**

_____

**COUNTERSIGNED AT**

_ARC EXCESS & SURPLUS INC_
_300 OLD COUNTRY ROAD_
_MINEOLA, NY 11501_

138200

63854 (12/95)    *COPY*

# **A[O]** *American International Companies®*

### **Employee Benefit Plan Fiduciary Liability Insurance**

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 7 of the Declarations, herein called the "Insurer," agrees as follows:

1. **INSURING AGREEMENT**

   This policy shall pay the Loss of each and every Insured arising from a Claim first made against an Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act by any such Insured (or by any employee for whom such Insured is legally responsible).

2. **DEFENSE AGREEMENT**

   (a) **INSURER'S DUTY TO DEFEND**

   Except as hereinafter stated, the Insurer shall have both the right and duty to defend any Claim against an Insured alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent.

   The Insured shall have the right to effectively associate with the Insurer in the defense of any Claim, including but not limited to negotiating a settlement, subject to the provisions of this clause. However, the Insurer shall not be obligated to defend any Claim after the Limit of Liability has been exhausted, or, pursuant to subparagraph (c) below, after the rejection of a settlement offer.

   (b) **INSURED'S OPTION TO ASSUME DEFENSE**

   Notwithstanding the above, the Insureds shall have the right to assume the defense of any Claim made against them. This right shall be exercised in writing by the Named Sponsor on the behalf of all Insureds within thirty (30) days of the reporting of the Claim to the Insurer pursuant to Clause 8 of the policy. Upon receipt of such written request, the Insurer shall tender the defense of the Claim to the Insureds. Once the defense has been so tendered, the Insurer cannot re-assume the defense of the Claim. The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement. Provided that the Insurer shall be permitted to effectively associate with the Insureds in the defense of any Claim, including but not limited to negotiating a settlement of any Claim, the Insurer's consent to settlements, stipulated judgments and Defense Costs shall not be unreasonably withheld.

   (c) **GENERAL PROVISIONS (applicable to both (a) and (b) above)**

   The Insurer shall advance Defense Costs prior to the final disposition of a Claim, subject to the other provisions of this policy. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insured shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy.

The Insureds shall give the Insurer full cooperation and such information as the Insurer may reasonably require. The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured subject to such insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer. Further, in the event the Insurer is defending the Claim pursuant to Clause 2(a) above, then the Insurer shall tender the Claim to the Insureds who shall thereafter at their own expense and on their own behalf negotiate and defend such Claim independently of the Insurer.

Selection of counsel to defend the Claim made against the Insureds shall be governed by Clause 9 of the policy (if applicable).

3. **DEFINITIONS**

    (a)   "Administrator" means an Insured with respect to any Wrongful Act described in paragraph (o)(2) of the definition of "Wrongful Act" in this policy.

    (b)   "Benefits" means any obligation under a Plan to a participant or beneficiary under a Plan which is a payment of money or property, or the grant of a privilege or perquisite.

    (c)   "Claim" means:

        (1)   a written demand for monetary relief; or

        (2)   a written demand for injunctive relief; or

        (3)   a civil or criminal proceeding for monetary or injunctive relief which is commenced by:

            (i)   service of a complaint or similar pleading; or

            (ii)   return of an indictment (in the case of a criminal proceeding); or

            (iii)   receipt or filing of a notice of charges; or

        (4)   a formal agency adjudicative proceeding anywhere in the world to which an Insured is subject; or

        (5)   any fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

    (d)   "Defense Costs" means reasonable and necessary fees, costs and expenses consented to in writing by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against an Insured, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding salaries of Natural Person Insureds or employees of an Insured.

(e) "ERISA" means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985), and including any amendment or revision thereto, or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a Plan is subject. Except to the extent set forth in sub-paragraph (6)(ii) of the definition of "Plan" in this policy, "ERISA" shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

(f) "ESOP" or "ESOP Feature" means any employee stock ownership plan so defined in ERISA, or any other Plan (or portion of a Plan) that is designed to invest primarily in securities of the Sponsor Organization.

(g) "Fiduciary" means a fiduciary as defined in ERISA with respect to a Plan, or a person or entity who exercises discretionary control respecting the management of a Plan or the disposition of its assets.

(h) "Insured(s)" means:

(1) any Natural Person Insured;

(2) any Plan(s);

(3) the Sponsor Organization;

(4) any other person or entity in his, her or its capacity as a Fiduciary, Administrator or trustee of a Plan who is included in the definition of "Insured" by specific written endorsement attached to this policy.

(i) "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include (1) civil or criminal fines or penalties imposed by law, except for the five percent or less civil penalty imposed upon an Insured under Section 502(i) of the Employee Retirement Income Security Act of 1974, as amended, and the 20 percent or less penalty imposed upon an Insured under Section 502(l) of the Employee Retirement Income Security Act of 1974, as amended, with respect to covered settlements or judgments; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes; (5) any amount for which an Insured is not financially liable or which is without legal recourse to the Insured; (6) Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured; or (7) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(j) "Natural Person Insured" means any past, present or future natural person director, officer, partner or employee of the Sponsor Organization or a Plan in his or her capacity as a Fiduciary, Administrator or trustee of a Plan.

(k) "Plan" means any plan, fund or program established anywhere in the world, regardless of whether it is subject to regulation under Title I of the Employee Retirement Income Security Act of 1974, as amended, or any Part thereof, or meets the requirements for qualification under section 401 of the Internal Revenue Code of 1986, as amended, and which is:

PAST, PRESENT OR FUTURE WELFARE PLAN

(1)    A welfare plan, as defined in ERISA which was, is now, or hereinafter becomes sponsored solely by the Sponsor Organization, or sponsored jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees of the Sponsor Organization;

PAST OR PRESENT PENSION PLAN

(2)    A pension plan as defined in ERISA (other than an ESOP) which was, on or prior to the inception date of the policy, sponsored solely by the Sponsor Organization, or sponsored jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees of the Sponsor Organization, provided that at any time prior to the inception date of this policy such plan has been reported in writing to the Insurer by the Named Sponsor pursuant to the terms of the application for this policy, or any prior policy or its application issued by the Insurer (or any other member company of American International Group, Inc.) and the Named Sponsor shall have paid any required premium relating to such plan. With respect to any plan not reported to the Insurer pursuant to this paragraph, coverage shall be provided in the event that: (i) the failure to report such Plan was due to inadvertent omission by the Named Sponsor, (ii) upon discovery of such Plan, the Named Sponsor shall notify the Insurer as soon as practicable, provide any information required by the Insurer relating to such Plan and pay any premium required by the Insurer relating to such Plan, (iii) such Plan does not constitute one of the largest (by asset size) five pension plans of the Sponsor Organization and (iv) such Plan was not sold, spun-off or terminated prior to the date the Claim was made;

SOLD OR TERMINATED PLAN

(3)    Subject to the requirements of sub-paragraphs (1) and (2) above, coverage under this policy shall apply to any pension or welfare plan that was sold, spun-off or terminated during or prior to the inception date of this policy solely with respect to Wrongful Acts that occurred prior to the date of such sale or spin-off, or in the case of a terminated plan, prior to the final date of asset distribution of such plan, provided that notice of such sale, spin-off or termination is provided to the Insurer before the end of the Policy Period;

CREATED OR ACQUIRED PENSION PLAN

(4)    A pension plan as defined in ERISA (other than an ESOP) which, during the Policy Period, becomes sponsored solely by the Sponsor Organization, or sponsored jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees of the Sponsor Organization, but only upon the condition that within 90 days of it becoming so sponsored, the Named Sponsor shall have provided the Insurer with a completed application for such new plan and agreed to any additional premium or amendment of the provisions of the policy required by the Insurer relating to such new plan. With respect to such new plan, the 90 day reporting condition shall not apply if: (i) such new plan is created or acquired as a result of the Sponsor Organization's acquisition of a corporation whose assets total less than 10% of the total consolidated assets of the Sponsor Organization as of the inception date of this policy, and for whose pension  plan the Sponsor Organization provides the Insurer with full particulars before  the end of

the Policy Period, or (ii) such new plan does not constitute one of the largest five pension plans of the Sponsor Organization and the failure to report such Plan within the 90 day reporting period was due to inadvertent omission by the Named Sponsor and upon discovery of such Plan, the Named Sponsor shall notify the Insurer as soon as practicable, provide any information required by the Insurer relating to such Plan and pay any premium required by the Insurer relating to such Plan;

MERGED PLAN

(5)  A pension plan which, during or prior to the Policy Period of this policy, has been merged into or consolidated with a pension plan for which coverage is afforded under this policy; and

OTHER PLANS

(6)  (i)  A plan which is both a welfare plan and a pension plan as defined in ERISA, other than an ESOP, subject to the requirements of Definition (k);

(ii)  The following government-mandated programs: unemployment insurance, Social Security or disability benefits, solely with respect to a Wrongful Act defined in paragraph (o)(2) of the definition of "Wrongful Act" in this policy;

(iii)  Any other plan, fund or program, including an ESOP, which is included in the definition of "Plan" by specific written endorsement attached to this policy.

Notwithstanding the foregoing, the term "Plan" shall not include any multiemployer plan as defined in ERISA.

(l)  "Policy Period" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at any time other than 12:01 A.M. on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

(m)  "Sponsor Organization" means the Named Sponsor designated in Item 1 of the Declarations and any Subsidiary thereof.

(n)  "Subsidiary" means any past, present or future corporation of which the Named Sponsor owns more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries but only for a Wrongful Act taking place at a time when the Subsidiary was so owned by the Named Sponsor. The term "Subsidiary" shall automatically apply to any new Subsidiary acquired or created during the Policy Period.

(o)  "Wrongful Act" means:

(1)  as respects a Fiduciary, the Plan or the Sponsor Organization: a violation of any of the responsibilities, obligations or duties imposed upon fiduciaries by ERISA; or any matter claimed against an Insured solely by reason of his, her or its status as a Fiduciary, the Plan or the Sponsor Organization, but only with respect to a Plan; and

(2)   as respects an Administrator, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a Plan:

   (i)    counseling employees with respect to a Plan; or

   (ii)   providing interpretations with respect to a Plan; or

   (iii)  handling of records in connection with a Plan; or

   (iv)   activities affecting enrollment, termination or cancellation of employees under the Plan,

   or any matter claimed against an Insured solely by reason of his, her or its status as an Administrator, the Plan or the Sponsor Organization, but only with respect to a covered Plan;

(3)   as respects a Natural Person Insured, any matter claimed against him or her arising out of his or her service as a Fiduciary or Administrator of any multiemployer plan as defined by ERISA, but only if such service is at the specific written request or direction of the Sponsor Organization and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a Claim against the Plan itself, its sponsor organization(s) or any other fiduciaries or administrators of such Plan other than a Natural Person Insured.

## 4.   EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of a Natural Person Insured in the event of such Natural Person Insured's death or incompetence for alleged Wrongful Acts by such Natural Person Insured prior to such event.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of a Natural Person Insured for all Claims arising solely out of his or her status as the spouse of a Natural Person Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by the Natural Person Insured and the spouse, or property transferred from the Natural Person Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of a Natural Person Insured, subject to the policy's terms, conditions and exclusions.

## 5.   EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)   arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)   arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute (including but not limited to ERISA);

The Wrongful Act of any Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b)

(c)   for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of the Employee Retirement Income Security Act of 1974, as amended;

(d)   alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Act alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)   alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(f)   for failure to fund a Plan in accordance with ERISA or the Plan Instrument or the failure to collect contributions owed to the Plan; except that this exclusion shall not apply to Defense Costs;

(g)   alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program other than a Plan as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program;

(h)   for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for libel or slander;

(i)   alleging, arising out of, based upon or attributable to any Wrongful Act as respects the Plan taking place at any time when the Sponsor Organization did not sponsor such Plan or when the Natural Person Insured was not a director, officer, partner or employee of the Sponsor Organization or a Plan;

(j)   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

(1)   the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

(2)   any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

6.   **LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

The Limit of Liability stated in Item 3 of the Declarations is the limit of the Insurer's liability for all Loss under this policy arising out of all Claims first made against the Insured during the Policy Period or the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period. Further, any Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 8(b) or 8(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate Limit of Liability stated in Item 3 of the Declarations.

Defense Costs, whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the Insurer in addition to the Limit of Liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.

7.  **RETENTION CLAUSE**

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the Insured and shall remain uninsured, with regard to all Loss arising out of a Claim made against: (a) the Sponsor Organization, a Plan or any other entity-Insured, or (b) any other Insured whom the Sponsor Organization or the Plan has Indemnified or is permitted or required to indemnify ("Indemnifiable Loss"). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

8.  **NOTICE/CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing and sent to the address of the Insurer named in Item 7 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

(a) The Insured(s) shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

(1) any time during the Policy Period or during the Discovery Period (if applicable); or

(2) within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b) If written notice of a Claim has been given to the Insurer pursuant to Clause 8(a) above, then any Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the Policy Period or during the Discovery Period (if applicable) the Insured(s) shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9.  **PRE-AUTHORIZED DEFENSE ATTORNEYS**

This clause only applies with respect to: (1) an agency proceeding or investigation as defined in either paragraphs (c)(4) or (5) of Clause 3, Definitions, or (2) a class or representative action.

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel First(s)") from which a selection of legal counsel shall be made to conduct the defense of any Claim to which this clause applies against an Insured pursuant to the terms set forth below:

In the event the Insurer is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. Upon the written request of the Named Sponsor, the Insurer may consent to a law firm selected by the Named Sponsor, whether or not a Panel Counsel Firm, to defend the Insureds, which consent shall not be unreasonably withheld. If at any time thereafter a dispute arises between the Insurer and the Insureds involving the defense of a Claim, the Insurer and the Insured shall select a mutually agreeable replacement defense counsel.

In the event the Insureds have assumed the defense of the Claim pursuant to Clause 2(b) of the policy, then the Insureds shall select a Panel Counsel Firm to defend the Insured. The Insured may select a law firm other than a Panel Counsel Firm at the sole discretion of the Insurer. In addition, with the express prior written consent of the Insurer, which consent shall not be unreasonably withheld, the Insured may select a Panel Counsel Firm different from that selected by other Insureds if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a Panel Counsel Firm from the attached list to defend the Claim against the Insureds shall be made without regard to the jurisdiction in which the Claim is brought.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Sponsor. At the request of the Named Sponsor, the Insurer may in its discretion add one or more law firms to the attached list of Panel Counsel Firms for the purposes of defending the Claim made against the Insureds. The list of Panel Counsel Firms may also be amended to add, with the consent of the Insurer, which consent shall not be unreasonably withheld, a non-Panel Counsel Firm for the purpose of acting as "local counsel" to assist an existing Panel Counsel Firm, which Panel Counsel Firm will act as "lead counsel" in conducting the defense of the Claim, for Claims brought in a jurisdiction in which the chosen Panel Counsel Firm does not maintain an office.

10.  **DISCOVERY CLAUSE**

Except as indicated below, if the Insurer or the Named Sponsor shall cancel or refuse to renew this policy, the Named Sponsor shall have the right, upon payment of an additional premium of 75% of the "full annual premium", to a period of one year following the effective date of such cancellation or nonrenewal (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal.

In the event of a Transaction, as defined in Clause 12, the Named Sponsor shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Sponsor may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Sponsor at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent. This policy may also be canceled by or on behalf of the Insurer by delivering to the Named Sponsor or by mailing to the Named Sponsor, by registered, certified, or other first class mail, at the Named Sponsor's address as shown in Item 1 of the Declarations, written notice stating when, not less than 60 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Sponsor, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12. CHANGE IN CONTROL OF NAMED SPONSOR

If during the Policy Period:

a.  the Named Sponsor shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

b.  any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the Named Sponsor, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "Transaction")

63853 (12/95)  *COPY*            − 10 −

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Sponsor shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Sponsor shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

13.  **SUBROGATION AND WAIVER OF RECOURSE**

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Insureds' rights of recovery thereof, and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Insureds. In no event shall subrogation be had against any Insured unless the Wrongful Act which gave rise to such subrogation claim against such Insured is excluded from coverage by reason of the terms, conditions and exclusions of this policy.

In the event this policy has been purchased by an Insured other than a Plan, the Insurer shall have no right of recourse against an Insured. Notwithstanding the foregoing, the Insurer shall have a right of recourse against an Insured arising out of a Claim by an Insured against another Insured unless such Claim is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the Insured claimed against.

It is further provided that in the event of any recovery under this clause, the Limit of Liability of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the Insurer in connection therewith.

14.  **OTHER INSURANCE**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

15.  **NOTICE AND AUTHORITY**

It is agreed that the Named Sponsor shall act on behalf of all Insureds with respect to the giving of notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right under Clause 2(b) or Clause 10 of this policy.

16.  **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17. **ACTION AGAINST INSURER**

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against an Insured to determine the Insured's liability, nor shall the Insurer be impleaded by an Insured or his, her or its legal representatives. Bankruptcy or insolvency of an Insured or of his, her or its estate shall not relieve the Insurer of any of its obligations hereunder.

18. **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

# APPENDIX A

## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

– 1 –

**ARIZONA**

Snell & Wilmer
One Arizona Center
Phoenix, AZ 85004-0001
Primary Contact:
Katherine M. Harmeyer (602) 382-6357

**CALIFORNIA**

Lillick & Charles, L.L.P.
Two Embarcadero Center, Suite 2700
San Francisco, CA 94111
Primary Contact:
D. Ward Kallstrom (415) 984-8282

Littler, Mendelson, Fastiff, Tichy & Mathiason
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107
Primary Contact:
Ronald J. Cooke (310) 772-7217

Pillsbury Madison & Sutro, L.L.P.
235 Montgomery Street
P.O. Box 7880
San Francisco, CA 94120
Primary Contact:
Robert A. Gordon (415) 983-1782

Sedgwick, Detert, Moran & Arnold
One Embarcadero Center, 16th Floor
San Francisco, CA 94111-3765
Primary Contact:
Julia A. Molander (415) 627-1424

**DISTRICT OF COLUMBIA**

Arent, Fox, Kintner, Plotkin & Kahn
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
Primary Contact:
Carol Connor Flowe (202) 857-6054

Arnold & Porter
555 12th Street, NW
Washington, DC 20004-1206
Primary Contact:
Scott B. Schreiber (202) 942-5000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Primary Contact:
William J. Kilberg, P.C. (202) 955-8573

Groom and Nordberg
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20006
Primary Contact:
Robert Gallagher (202) 857-0620

Kilpatrick Stockton L.L.P.
700 13th Street, NW, Suite 800
Washington, DC 20005-5923
Primary Contact:
Steven J. Sacher (202) 508-5840

O'Melveny & Myers LLP
555 13th Street, NW, Suite 500 West
Washington, DC 20004-1109
Primary Contact:
Robert N. Eccles (202) 383-5300

Patton Boggs, L.L.P.
2550 M Street, N.W.
Washington, DC 20037
Primary Contact:
Michael A. Curto (202) 457-5611

Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Primary Contact:
Paul J. Ondrasik, Jr. (202) 429-8088

Verner, Liipfert, Bernhard, McPherson & Hand
901 15th Street, NW, Suite 700
Washington, DC 20005
Primary Contact:
Ronald B. Natalie (202) 371-6028

**GEORGIA**

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Primary Contact:
Gregory C. Braden (404) 881-7497

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Primary Contact:
Lara B. Robinson (404) 572-3567

*COPY*

# APPENDIX A

## PANEL COUNSEL

## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

- 2 -

**ILLINOIS**

Baker & McKenzie
130 East Randolph Drive
Chicago, IL 60601
Primary Contact:
Michael A. Pollard, Esq. (312) 861-2786

Mayer, Brown & Platt
190 South La Salle Street
Chicago, IL 60603-3441
Primary Contact:
William A. Gordon (312) 701-7164

McDermott, Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Primary Contact:
Bill Boles, P.C. (312) 984-7686

Seyfarth, Shaw, Fairweather & Geraldson
55 East Monroe, Suite 4200
Chicago, IL 60603
Primary Contact:
Thomas J Piskorski (312) 269-8925

Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street
Chicago, IL 60601
Primary Contact:
Charles B. Wolf (312) 609-7888

**MASSACHUSETTS**

Hale & Dorr LLP
60 State Street
Boston, MA 02109-1803
Primary Contact:
Neil Jacobs (617) 526-6970

Murphy, Hesse, Toomey & Lehane
44 Farnsworth Street
Boston, MA 02210
Primary Contact:
Katherine A. Hesse, CEBS (617) 479-5000

Peabody & Arnold
50 Rowes Wharf
Boston, MA 02110
Primary Contact:
Robert T. Gill, P.C. (617) 951-4706

**LOUISIANA**

McCalla, Thompson, Pyburn, Hymowitz & Shapiro
650 Poydras Street, Suite 2800
New Orleans, LA 70130
Primary Contact:
Howard Shapiro (504) 524-2499

**MAINE**

MMMB Group
22 Free Street, Suite 201
P.O. Box 17594
Portland, ME 04112-8594
Primary Contact:
Stephan G. Bachelder (207) 761-8100

Pierce Atwood
One Monument Square
Portland, ME 04101
Primary Contact:
William J. Kayatta, Jr (207) 791-1238

**MICHIGAN**

Miller, Canfield, Paddock & Stone, PLC
1200 Campau Square Plaza
99 Monroe Avenue, NW
Grand Rapids, MI 49503
Primary Contact:
Charles S. Mishkind (616) 454-8656

**MINNESOTA**

Dorsey & Whitney L.L.P.
Pillsbury Center South
220 South 6th Street, Suite 1300
Minneapolis, MN 55402-1498
Primary Contact:
Stephen P. Lucke (612) 343-7947

Faegre & Benson, LLP
2200 Norwest Center
90 South Seventh Street
Minneapolis, MN 55402
Primary Contact:
Hubert V. Forcier (612) 336-3000

*COPY*

# APPENDIX A
## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

- 3 -

**NORTH CAROLINA**

Poyner & Spruill, LLP
3600 Glenwood Avenue
Raleigh, NC 27612
Primary Contact:
Susanna G. Gibbons (919) 783-6400

**NEW YORK**

Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177-0077
Primary Contact:
Howard Pianko (212) 351-4591

Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY 10022
Primary Contact:
Michael J. Dell (212) 715-9100

Winthrop, Stimson, Putnam & Roberts
One Battery Park Plaza
New York, NY 10004
Primary Contact:
Susan P. Serota (212) 858-1125

**PENNSYLVANIA**

Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Primary Contact:
Mary McLaughlin (215) 994-2958

Pepper, Hamilton & Scheetz LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799
Primary Contact:
Susan Katz Hoffman (215) 981-4000

**TEXAS**

Baker & Botts, L.L.P.
910 Louisiana
Houston, TX 77002-4995
Primary Contact:
James R. Raborn (713) 229-1234

Fulbright & Jaworski L.L.P.
1301 McKinney Street, Suite 5100
Houston, TX 77010
Primary Contact:
A.J. Harper II (713) 651-5442

**WASHINGTON**

Perkins Coie
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
Primary Contact:
Bruce D. Corker (206) 583-8538

**WISCONSIN**

Reinhart, Boerner, Van Deuren, Norris
& Rieselbach, SC
1000 North Water Street, Suite 2100
P.O. Box 92900
Milwaukee, WI 53202-0900
Primary Contact:
Richard P. Carr (414) 298-8139

*COPY*

**ENDORSEMENT# 1**

This endorsement, effective *12:01 am      October 30, 2001*      forms a part of
policy number  *874-44-03*
issued to   *ULLICO INC. AND ITS SUBSIDIARIES*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## AUTOMATIC PLAN COVERAGE

In consideration of the premium charged, it is hereby understood and agreed that Clause 2, DEFINITIONS, paragraph (i) (4) is deleted in its entirety and replaced by the following:

(4) (A)   Any pension plan(s) which, during the Policy Period, becomes sponsored solely by the Sponsor Organization, or jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees of the Sponsor Organization, with assets less than $25,000,000 as of the date the plan becomes so sponsored; and

   (B)   Any pension plan(s) which, during the Policy Period, becomes sponsored solely by the Sponsor Organization, or jointly by the Sponsor Organization and a labor organization, solely for the benefit of the employees of the Sponsor Organization, with assets in excess of $25,000,000, but only upon the condition that within 90 days of it becoming so sponsored, the Sponsor Organization shall have provided the Insurer with a completed application for such plan(s), agreed to any additional premium and/or amendment of the provisions of the policy required by the Insurer relating to such new plan(s) and the Insurer shall have added such new plan(s) to Item 1(c) of the Declarations. Further, coverage as shall be afforded respecting such new plan(s) is conditioned upon the Sponsor Organization paying when due any additional premium required by the Insurer relating to such new plan(s).

All other terms and conditions remain unchanged.

*END 1*

(2/90)   *COPY*

AUTHORIZED REPRESENTATIVE

# KRUPIN O'BRIEN LLC

ATTORNEYS AT LAW

WILLIAM H. IHRKE
(202) 467-2495
WHI@KRUPINOBRIEN.COM

1156 FIFTEENTH STREET, N.W.
SUITE 200
WASHINGTON, D.C. 20005

T: (202) 530-0700
F: (202) 530-0703
WWW.KRUPINOBRIEN.COM

April 13, 2004

**VIA FIRST CLASS MAIL**

Joe Vaccaro
ARC Excess and Surplus LLC
1122 Franklin Avenue, 3rd Floor
PO Box 9240
Garden City, NY 11530-9240

National Union Fire Insurance
  Company of Pittsburgh, PA
National Services Claim Department
175 Water Street, 9th Floor
New York, NY 10038

Allison Eisenberg
Frank Crystal & Company
40 Broad Street
New York, NY 10004

Zurich Claims Department
2355 Briargate Parkway
Colorado Springs, CO 80920

Re:     Tender of Claim on Behalf of John K. Grelle
        *Carabillo v. ULLICO, Inc.*, and related counterclaims, No. 03-1556 (RJL)
        United Stated District Court for the District of Columbia

To Whom It May Concern:

This firm is counsel to John K. Grelle in the above-referenced matter. Enclosed please find a copy of the Answer and Counterclaim by ULLICO Inc. et al., and the Amended Answer and Counterclaim by ULLICO Inc. et al., against Counterclaim Defendants Robert A. Georgine, et al. By this letter, we hereby tender on behalf of Counterclaim Defendant John K. Grelle the Counterclaim and Amended Counterclaim under all applicable insurance policies for defense and indemnity.

If you have any questions concerning this letter, please do not hesitate to contact Alison Davis or myself.

Very truly yours,

William H. Ihrke

WASHINGTON                 CHICAGO                 PHOENIX

# AIG  AIG Technical Services, Inc.

**Gene Domanico**
Director, Financial Institutions Complex Claims
Direct Dial:  (212) 458-3498
E-mail:      Gene.Domanico@aig.com

175 Water Street, 4th Floor
New York, New York 10038
General Number (212) 770-7000

April 30, 2004

**Via Certified Mail, Return Receipt Requested**

William H. Ihrke, Esq.
Krupin O'Brien, LLC
1156 Fifteenth Street, N.W., Suite 200
Washington, D.C.  20005

**Re: *Directors, Officers and Private Company Liability Insurance Policy***
    *Policyholder:*    ***Ullico, Inc.***
    *Matter:*        ***John K. Grelle***
    *Policy No.:*     ***299-96-17***
    *Claim No.:*     ***654-001401***

    ***Directors, Officers and Private Company Liability Insurance Policy***
    *Policy No.:*     ***495-36-84 (RUN-OFF)***
    *Claim No.:*     ***654-001400***

Dear Mr. Ihrke:

AIG Technical Services, Inc. has been retained by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") in connection with this matter.  National Union issued Directors, Officers and Private Company Liability Insurance Policy No. 299-96-17 and Policy 495-36-84 (together the "Policies"[1]) to Ullico, Inc. ("Ullico" or the "Company").

The purpose of this letter is to advise you of certain policy provisions that may limit or preclude coverage under each Policy.

We are in receipt of the complaint in an action captioned *Carabillo v. Ullico, Inc.* (the "Complaint") which is venued in the U.S. District Court for the District of Columbia.  The Complaint names Ullico as the sole defendant.  The Plaintiff has alleged causes of action for ERISA violations, breach of contract and wrongful termination.  Ullico filed an Amended Answer and Counterclaim naming John Grelle, the former Senior Vice President and CFO, and others as Counterclaim Defendants (the "Counterclaim").  Mr. Grelle seeks coverage in connection with Ullico's Counterclaim under the above-referenced Policies.

---

[1] Capitalized terms used in this letter and not otherwise defined shall have the meanings given them in the Policies.

*A Member Company of American International Group, Inc.*

For the reasons stated below, there is no coverage for Mr. Grelle for this matter as the Counter-claim is being asserted by another Insured.

National Union reserves all rights and acknowledges a full and mutual reservation of rights, in-cluding the right to disclaim or otherwise amend or supplement our coverage analysis as forth-coming information dictates. We also stress that our analysis does not imply any validity to the allegations made in the lawsuit comprising this matter.

## Evaluation

The Complaint was brought by Joseph A. Carabillo ( "Carabillo"), Ullico's former Chief Legal Officer, in which he asserted that defendant's "unlawful" termination of him violates ERISA, breaches his contract rights concerning payment of pension benefits, and constitutes a wrongful termination under District of Columbia common law. Ullico counterclaimed against Grelle and others and alleged that Grelle breached his fiduciary duty to Ullico and was unjustly enriched by his self-dealing in Ullico stock. All of these acts occurred during Grelle's employment with Ul-lico, which employment ended on February 25, 2003 with Grelle's resignation.

The Complaint and Counterclaim were reported under National Union's Directors, Officers and Private Company Liability Insurance Policy No. 299-96-17 and No. 495-36-84 (the "Run-Off Policy"). Coverage shall be evaluated separately under each Policy.

## Policy 299-96-17

The insuring agreement states the Policy provides coverage on a "claims made" and reported ba-sis for only covered claims that are first made against an Insured Person or the Company and re-ported to the Insurer during the Policy Period of July 19, 2003 to July 19, 2004. Subject to the Policy's terms, conditions, definitions, exclusions and endorsements, the Policy has a Limit of Liability of $10 million in the aggregate, for all coverages combined (inclusive of Defense Costs). The Policy is subject to a retention of $750,000, which is applicable to indemnifiable Judgments, Settlements and Defense Costs for Employment Practices, Securities and all other Claims.

Subject to its terms, conditions, limitations and exclusions, the Policy, in general, pays the Loss of an Insured arising from a Claim made against an Officer, Director or Employee for Wrongful Acts to the extent they are not indemnified by the Company. Coverage is extended to the Com-pany to the extent the Company indemnifies an Individual Insured for such Loss and for Loss of the Company arising from a Claim.

The Policy, at Clause 4(i), excludes coverage for Claims made against an Insured by any Insured. Section 2(j) of the Policy defines "Insured" as "(1) an Individual Insured; and (2) the Company." Section 2(i) of the Policy defines "Individual Insured" as any past, present or future duly elected

April 30, 2004
Page 3

or appointed directors or officers. Since both the Company and Mr. Grelle are Insureds, there would be no coverage for Mr. Grelle for the Counterclaim brought against him by the Company.

In addition, the Policy, at Endorsement 16, contains a Prior Acts Exclusion which excludes coverage for Wrongful Acts which occur prior to the inception date of the Policy Period (July 19, 2003). Since the alleged Wrongful Acts occurred during Grelle's employment at Ullico, which employment ended on February 25, 2003, there is no coverage for this claim under Policy 299-96-17.

## Policy 495-36-84 (Run-Off)

The Run-Off Endorsement provides coverage on a "claims made" and reported basis for only covered claims that are first made against any Insured during said Discovery Period (July 19, 2003 through July19, 2009) for any Wrongful Act occurring on or prior to the Effective Time (July 19, 2003). Subject to the Policy's terms, conditions, definitions, exclusions and endorsements, the Policy has a Limit of Liability of $10 million in the aggregate, for all coverages combined (inclusive of Defense Costs). The Policy is subject to a retention of $750,000, which is applicable to indemnifiable Judgments, Settlements and Defense Costs for Employment Practices, Securities and all other claims.

The Policy, at Clause 4(i), excludes coverage for Claims made against an Insured by any Insured. Section 2(j) of the Policy defines "Insured" as "(1) an Individual Insured; and (2) the Company." Section 2(i) of the Policy defines "Individual Insured" as any past, present or future duly elected or appointed directors or officers. Since both the Company and Mr. Grelle are Insureds, there would be no coverage for Mr. Grelle for the Counterclaim brought against him by the Company.

Given this position, we have not addressed certain other provisions of the Policy, which may also limit or exclude coverage for the claims that have been asserted.

If you are in possession of any information that you believe may change the position of National Union as expressed herein, please forward all relevant information and documents to my attention, and I will give it prompt consideration.

As is customary, National Union considers all rights at law or equity mutually reserved.

Sincerely,

GENE DOMANICO
Director of Complex Claims

April 30, 2004
Page 4


cc: Allison Eisenberg
    Frank Crystal & Company
    40 Broad Street
    New York, NY  10004

# KRUPIN O'BRIEN LLC

ATTORNEYS AT LAW

KARA K. MATHER
(202) 467-2486
KKM@KRUPINOBRIEN.COM

1156 FIFTEENTH STREET, NW
SUITE 200
WASHINGTON, D.C. 20005

T: (202) 530-0700
F: (202) 530-0703
WWW.KRUPINOBRIEN.COM

August 18, 2004

**VIA FIRST CLASS MAIL**

National Union Fire Insurance
Company of Pittsburgh, PA
National Services Claim Department
175 Water Street, 9th Floor
New York, NY 10038

Re:    Tender of Claim on Behalf of John K. Grelle
*Carabillo v. ULLICO, Inc.*, and related counterclaims, No. 04-776 (RJL)
<u>United Stated District Court for the District of Columbia</u>

To Whom It May Concern:

This firm is counsel to John K. Grelle in the above-referenced matter. Enclosed please find a copy of the Answer and Counterclaim by ULLICO Inc. et al., against Counterclaim Defendants Joseph A. Carabillo, et al. By this letter, we hereby tender on behalf of Counterclaim Defendant John K. Grelle the Counterclaim under all applicable insurance policies, including policy number 548-03-72, for defense and indemnity.

If you have any questions concerning this letter, please do not hesitate to contact Alison Davis or myself.

Very truly yours,

Kara K. Mather

Kara K. Mather

Enclosure

WASHINGTON        NEW YORK        BOSTON        CHICAGO        PHOENIX

# D'AMATO & LYNCH

LAWYERS

70 PINE STREET

NEW YORK, N.Y. 10270-0110

TELEPHONE 212/269-0927

CABLE ADDRESS

DAMCOSH

TELEX 960085 DCOS UI NYK

TELECOPIER: 269-3559

LONDON OFFICE

LLOYD'S

ONE LIME STREET

LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5877

TELECOPIER 0207 816 7257

GEORGE G. D'AMATO
LUKE D. LYNCH (1999)
KENNETH A. SAGAT
LUKE D. LYNCH, JR.
ROBERT E. KUSHNER
RICHARD F. RUSSELL
RONALD H. ALENSTEIN
HARRY J. ARNOLD, JR.
PHILIP J. BERGAN
ROBERT W. LANG
NEAL M. GLAZER
ANDREW R. SIMMONDS
JOHN P. HIGGINS
THOMAS F. BREEN
ALFRED A. D'AGOSTINO, JR.
WILLIAM P. LARSEN, III
ROBERT D. LANG
DAVID A. BOYAR
MARY JO BARRY
BARBARA R. SEYMOUR
HARVEY BARRISON

WILLIAM C. BURTON
CHARLES BRAMHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. MANIRE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
STEPHEN F. WILLIG
DEBORAH M. COLLINS
NEIL R. MORRISON
PETER A. STROILI
FRANCES BUCKLEY
DAVID J. KUFFLER

LLOYD J. HERMAN
KEVIN P. CARROLL
LAURIE P. BEATUS
LIZA A. CHAFIIAN

RICHARD S. TROSTLE
JAN H. DUFFALO
JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD M. ROTH
CHRISTINE TIERNEY
MARIA T. EHRLICH
THOMAS G. DARMODY
RICHARD F. FERRIGNO
HUMPHREY O. UDDOH
DEEANNA M. GALLA
JUDY Y. CHUNG
JOHN J. MAALOUF
R. DAVID ADES
ARTHUR STEINBERG
JONATHAN L. KRANZ
INGRID A. SMITH

ARTURO M. BOUTIN
THOMAS ZACHARIA
WENDY L. KALNICK
WILLIAM A. CURRAN, III
TAE S. UM
JOHN C. MUCCIFORI
ANNA E. BOMSTEIN
MOLLY Z. BROWN
MAXINE K. NAKAMURA
JAMES L. FUCHS
GERARDO LAPETINA
LAURA S. WEINER
DAVID BERGENFELD
EDWARD R. WILSON
JONATHAN ARKINS
JASON B. GRANT
JARED S. KAPLAN
GAVIN J. CURLEY
BRIAN M. MARGOLIES
BRYAN HA
ASSAF RONEN
ALEXANDER M. RAZI

COUNSEL

ROBERT M. MAKLA
ALBERT B. LEWIS
CHARLES H. WITHERWAX

VICTOR F. MUSTELIER
ROBERT GILROY
RICHARD G. McGAHREN
PETER J. THUMSER

October 29, 2004

**Via Facsimile & U.S. Mail**
Ms. Allison Eisenberg
Frank Crystal & Company
40 Broad Street
New York, NY 10004

Fax No. (212) 504-5855

Re:   Employee Benefit Plan Fiduciary Liability Insurance
      Insured:      Ullico Inc. and its Subsidiaries ("Ullico")
      Matter :      Carabillo
      A.I. File No.:  434-003952
      Our File No.:  101-69615

Dear Ms. Eisenberg:

AIG Technical Services, Inc. ("AIGTS") on behalf of National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") has established a file to handle the above-referenced matter. Based upon the limited information National Union has received to date, the following will serve to set forth National Union's preliminary coverage position under the Policy after review of: (i) the amended answer and counterclaim styled as Ullico, Inc., et al. v. Joseph A. Carabillo, et al. filed on November 3, 2003 in response to the complaint filed by Joseph A. Carabillo on July 18, 2003 in the United States District Court, District of Columbia, case no. 03CV01556 ("Carabillo I Counterclaim").

National Union issued Employee Benefit Plan Fiduciary Liability Insurance under Policy No. 548-03-72 ("Policy") to Ullico. The Policy has a Policy Period of October 30, 2003 to October 30, 2004. The limit of liability is $5,000,000 in the aggregate for all Loss combined (including defense costs) and there is a $250,000 retention for each covered Claim under the Policy.[1]

---

[1] All capitalized terms shall have the meanings ascribed them by the Policy unless otherwise defined herein.

#188365v1

Ms. Allison Eisenberg
October 29, 2004
Page 2

### Carabillo I Counterclaim

Ullico filed the Carabillo I Counterclaim against Joseph A. Carabillo ("Carabillo"); Robert A. Georgine ("Georgine"); John K. Grelle ("Grelle"); James W. Luce ("Luce"); Ann J. O'Brien ("O'Brien"), Trustee, Robert A. and Mary Rita Georgine Trust; and Pacific Life Insurance Co. (Carabillo, Georgine, Grelle, Luce, O'Brien and Pacific Life Insurance Co. are sometimes hereinafter collectively referred to as the Carabillo I Counterclaim Defendants). Ullico alleges that Carabillo, along with Georgine and other senior executives at Ullico, breached their fiduciary duties to Ullico by entering into self-interested stock transactions and personally profiting at the expense of Ullico shareholders. Ullico alleges that the company was heavily invested in Global Crossing stock which had grown from a $7.6 million initial investment to become an investment worth approximately $486 million. Ullico further alleges that before the price of Global Crossing stock started plummeting (eventually becoming worthless), these senior executives created programs, which inured to their benefit by allowing them to be bought out of Ullico stock at an inflated price (to the exclusion of other shareholders) and allowing them also to receive special Global Crossing "incentive payments" along with expanded retirement benefits. It is alleged that when the United States Department of Labor ("DOL") discovered what these senior executives had done, the Board of Ullico hired former Illinois Governor James Thompson as Special Counsel to investigate certain stock repurchase programs at Ullico. The Thompson Report concluded, among other things, that a good argument existed for finding that senior officers of the company (especially Carabillo and Georgine) violated duties of loyalty and care to the company by entering into self-interested transactions. As a result of the Thompson Report, Ullico became the subject of a number of additional regulatory actions or investigations including, among others, those conducted by the DOL, the Securities and Exchange Commission ("SEC") and the United States Senate.

Ullico asserts the following theories of liability in the Carabillo I Counterclaim: (1) Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment (against Georgine and Carabillo) (2) Professional Negligence (against Carabillo); (3) Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment (against Grelle); (4) Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty and Unjust Enrichment (against Luce); (5) Breach of Employment Agreement (against Georgine, O'Brien and Pacific Life Insurance Co.); (6) Declaratory Judgment: Auxillary Retirement Benefits Plan (against Georgine, Carabillo, Grelle and Luce); (7) Declaratory Judgment: (against Georgine and Luce); (8) Breach of Fiduciary Duty and Return of Profits: Deferred Compensation Plan (against Georgine and Carabillo); (9) Breach of Fiduciary Duty and Return of Profit; Deferred Compensation Plan (against Georgine, Carabillo and Grelle); (10) Declaratory Judgment: SERP (against Georgine); (11) Declaratory Judgment: Split Dollar Life Insurance Agreement (against Georgine, O'Brien and Pacific Life Insurance Co.); (12) Declaratory Judgment: Stock Purchase and Credit Agreement (against Georgine); and (13) Breach of Fiduciary Duty: P&I Loans (against Georgine and Luce).

Ms. Allison Eisenberg
October 29, 2004
Page 3

## Coverage Evaluation for the Carabillo I Counterclaim

As an initial matter, it is our understanding that the Carabillo I Counterclaim was served upon the Carabillo I Counterclaim Defendants on November 11, 2003. On that basis, it would appear that the Carabillo I Counterclaim was first made during the policy period of the Policy. However, with respect to the Carabillo I Counterclaim, Endorsement #12 of the Policy provides the following:

> It is understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of items (1) through (3) below; (hereinafter "**Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Breach of Fiduciary Duty**, **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to any **Event(s)**:

> (1)    United States Department of Labor issued a subpoena relating to the DOL's investigation of investments in the Playa Vista land development (more specifically in the matter of an investigation of the Plumber & Pipefitters National Pension Fund, Bricklayers & Towel Trades International Pension Fund, National Electrical Benefit Fund, and Carpenters Pension Fund for Southern California as per subpoena dated April 25, 2002)

> (2)    United States Department of Labor issued a subpoena directed to the ULLICO, Inc. relating to the investigation of ERISA covered plans that are eligible to purchase ULLICO, Inc. stock. (as per DOL subpoena dated April 11, 2002)

> (3)    United States Department of Labor issued a subpoena to the ULLICO, Inc. Pension Plan and Trust relating to investigation being conducted by DOL to determine whether any person has violated or is about to violate any provision of Title I of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S. C. Section 1134 (a) (1). (as per DOL subpoena dated June 11, 2002)

> (hereinafter the "**Events**")

> It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with any **Claim(s)** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to a related **Breach of Fiduciary Duty** or related **Wrongful Act** alleged in any of the items (1-3) above, regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action, or the same or

#188365v1

Ms. Allison Eisenberg
October 29, 2004
Page 4

different claimants, or is brought in the same or different venue, or resolved in the same or different forum.

In that regard, please be advised that there is no coverage under the Policy for the Carabillo I Counterclaim because the Carabillo I Counterclaim arises out of the Events (as that term is defined in Endorsement #12 of the Policy). In particular, the Carabillo I Counterclaim involves the defense of a Claim which arises out of or is related to the DOL subpoenas identified as Events (2) and/or (3) of Endorsement #12. Therefore, there is no coverage for the Carabillo I Counterclaim under the Policy on the basis of Endorsement # 12 of the Policy.

Notwithstanding the fact that the Carabillo I Counterclaim is not covered under the Policy, the Notice/Claim Reporting Provisions of Section 8(b) of National Union Policy No. 874-44-03 ("01-02 Policy") serve to bring the Carabillo I Counterclaim within the period of the 01-02 Policy. In that regard, Section 8(b) of the 01-02 Policy provides the following:

> (b)    If written notice of a Claim has been given to the Insurer pursuant to Clause 8(a) above, then any Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

Since the Carabillo I Counterclaim constitutes a Claim alleging Wrongful Acts which are the same as or related to the Wrongful Acts alleged or contained in the DOL investigation, the Carabillo I Counterclaim will be considered to have been made when the DOL investigation matter was reported. Therefore, the Carabillo I Counterclaim will be handled as part of the DOL investigation matter reported to the 01-02 Policy on October 30, 2002 and for which reservation of rights letters were issued on January 15, 2003, August 6, 2003 and January 19, 2004, respectively (the "ROR letters"). The ROR letters are incorporated herein by reference and made a part hereof, and additional coverage issues are discussed later in this letter. Since the Carabillo I Counterclaim falls within the coverage provided by the 01-02 Policy, it is the provisions of that policy that will apply to the Carabillo I Counterclaim.

Please note that the 01-02 Policy defines Wrongful Act, in pertinent part, to mean: "(1) as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**." In that regard, there is no coverage for Counts 1, 2, 3, 4, 5, 10, 11, 12 and 13 of the Carabillo I Counterclaim because these Counts do not fall within the 01-02 Policy's definition of Wrongful Act and are not within the scope of coverage afforded. Therefore (subject to satisfaction of the retention and based upon the uncovered Counts and allegations asserted): (i) National Union shall allocate 40% of any Loss associated with Georgine's defense of the Carabillo I Counterclaim under the 01-02 Policy, with Georgine to assume the other 60%; (ii) National Union shall allocate 60% of any Loss associated with Carabillo's defense of the Carabillo I

#188365v1

Ms. Allison Eisenberg
October 29, 2004
Page 5

Counterclaim under the 01-02 Policy, with Carabillo to assume the other 40%; (iii) National
Union shall allocate 75% of any Loss associated with Luce's defense of the Carabillo I
Counterclaim under the 01-02 Policy, with Luce to assume the other 25%;[1] (iv) there is no
coverage for Grelle under the 01-02 Policy for this Claim; (v) there is no coverage for O'Brien
under the 01-02 Policy for this Claim; and (vi) there is no coverage for Pacific Life Ins. Co.
under the 01-02 Policy for this Claim.

Please also note the potential application of the following exclusions from the 01-02
Policy: Exclusion (a) of the Policy precludes coverage for "the gaining in fact of any profit or
advantage to which an Insured was not legally entitled." To the extent that the Carabillo I
Counterclaim matter uncovers activities that have resulted in the gaining of any profit or
advantage or for restitution or disgorgement of amounts wrongfully withheld, Exclusion (a)
would serve to preclude coverage for all payments made on account of such wrongdoing.

Exclusion (b) of the 01-02 Policy states that there will be no coverage for any Claim
"arising out of, based upon or attributable to the committing in fact of any criminal or deliberate
fraudulent act, or any knowing or willful violation of any statute (including, but not limited to
ERISA)." In that regard, paragraph 95 of the Carabillo I Counterclaim alleges, in pertinent part,
that Georgine and Carabillo are jointly and severally liable to Ullico for "all compensation and
benefits including bonuses and Global Crossing Incentive bonuses received between 1998 and
2001, the period during which they engaged in willful breaches of fiduciary and other duties
owed to Ullico, in the approximate amount of $6.1 million." Also, a report was prepared on June
2, 2004 by the United States Senate entitled *Self-Dealing and Breach of Duty at Ullico, Inc.*
("Senate Report") indicating that the exclusive stock offers and repurchase programs that the
Carabillo I Counterclaim Defendants allegedly engaged in were arguably schemes designed to
defraud investors and were in violation of Rule 10b-5 and Section 14 (e) of the federal securities
laws. Prior to the Senate Report being issued, a report was issued by Jon O. Shimabukuro,
Congressional Research Service to James R. McKay, U.S. Senate Governmental Affairs
Committee on May 12, 2003 regarding the same Ullico stock offers and repurchase programs
and the issue concerning the failure to disclose material information. Prior to that, the Thompson
Report was prepared and submitted to Ullico's Board of Directors on November 26, 2002
strongly recommending that certain officers and directors who purchased Ullico stock in 1998 or
1999 and who sold that stock back to Ullico in 2000 and 2001 return the profits made on those
transactions. Governor Thompson recommended that 18 directors and officers return
approximately $5.6 million in pre-tax profits. As a result of the Thompson Report, demand
letters were sent to the 18 individuals cited in the Thompson Report and all had either returned or
pledged to return their profits from the stock transactions with the exception of Georgine,
Carabillo, Grelle and Luce. To that extent, should it turn out that the Carabillo I Counterclaim
Defendants are found to have committed fraud, self-dealing or knowing violations of any law,
there will be no coverage for this matter in its entirety.

---

[1] National Union reserves the right to decrease these allocation percentages as new or additional information
becomes available.

#188365v1

Ms. Allison Eisenberg
October 29, 2004
Page 6

Exclusion (e) of the 01-02 Policy precludes coverage for any Claim "alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation." In that regard, a lawsuit was filed by a participant and/or DOL in the Ironworkers Pension Plan against an individual named Jacob West, a trustee of that plan and a former Ullico director, as well as against other former Ullico directors. This Ironworkers lawsuit apparently led to the DOL investigations into Ullico and, ultimately, culminated in the Thompson Report. National Union reserves its rights to the extent that the Ironworkers lawsuit constitutes a pending or prior litigation under the terms of Exclusion (e) of the 01-02 Policy.

Exclusion (g) of the 01-02 Policy precludes coverage for any Claim "alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program other than a Plan as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program."

Exclusion (i) of the 01-02 Policy precludes coverage for any Claim "alleging, arising out of, based upon or attributable to any Wrongful Act as respects the Plan taking place at any time when the Sponsor Organization did not sponsor such Plan or when the Natural Person Insured was not a director, officer, partner or employee or the Sponsor Organization or a Plan."

Please be advised that the failure to disclose material information about the November 2000 formal repurchase program and the discretionary repurchase program may be a non-ERISA corporate act. The 01-02 Policy defines Wrongful Act, in pertinent part, to mean "as respects a Fiduciary, the Plan or the Sponsor Organization: a violation of any of the responsibilities, obligations or duties imposed upon fiduciaries by ERISA; or any matter claimed against an Insured solely by reason of his, her or its status as a Fiduciary, the Plan or the Sponsor Organization, but only with respect to a Plan." In the instant matter, if the alleged Carabillo I Counterclaim Defendants' decision to withhold material information from the plan participants was a corporate act, "settlor" act or act undertaken for the purpose of personally benefiting one or more Carabillo I Counterclaim Defendants, as opposed to a fiduciary act undertaken solely in such person's ERISA fiduciary capacity with respect to a covered plan, then there would be no coverage under the 01-02 Policy for the Carabillo I Counterclaim Defendants' non-ERISA fiduciary activities.

The Senate Report indicates that legal and accounting professionals at Ullico structured the repurchase transactions that are the subject of the Carabillo I Counterclaim. In that regard, the Carabillo I Counterclaim Defendants may be able to bring a subrogation claim against these legal and accounting professionals. Please advise which legal and accounting firms Ullico consulted with in connection with the repurchase transactions and advise if a tolling agreement has been entered into with these firms. Further, Clause 13 of the 01-02 Policy provides, in relevant part, that in the event of any payment under the 01-02 Policy, National Union shall be subrogated to the extent of such payment to all of the Insureds' rights of recovery thereof, and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights. National Union asks that the Carabillo I Counterclaim Defendants please

Ms. Allison Eisenberg
October 29, 2004
Page 7

take whatever steps are necessary to protect the Insureds' rights against any legal and accounting professionals to the extent any liability, if any, was caused by such entities' services to Ullico or the Carabillo I Counterclaim Defendants. If there has been no tolling agreement entered into with these firms, National Union asks that the Carabillo I Counterclaim Defendants please undertake steps to obtain such tolling agreements and provide a copy of same to National Union for approval prior to execution.

Furthermore, the Senate Report indicates that after the Thompson Report was issued, Ullico sent demand letters to the Carabillo I Counterclaim Defendants for the return of all profits made from the stock transactions. In that regard, it is possible that the demand letters constitute a Claim (as that term is defined by the 01-02 Policy). Please, at your earliest convenience, provide us with a complete copy of all such demand letters issued by Ullico or its legal counsel, including any enclosures or attachments thereto.

Also, the 01-02 Policy's definition of Loss does not include, among other things, "Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured."

Please be advised that pursuant to Section 2 of the 01-02 Policy entitled Defense Agreement, "the Insurer shall have both the right and duty to defend any Claim against an Insured alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent." The 01-02 Policy also provides, pursuant to its NOTICE provisions, that the Insured may elect to assume the defense of the Claim, which we note has been in this instance. In such a case, the provisions of Section 2(b) of the 01-02 Policy shall apply, including National Union's right to effectively associate with the Carabillo I Counterclaim Defendants in the defense of the Claim.

National Union has been advised that the Carabillo I Counterclaim Defendants have retained the following law firms to serve as defense counsel in this matter. These law firms are: (1) Baker Botts LLP for Georgine; (2) Jackson Kelly PLLC for Carabillo; and (3) Rees, Broome & Diaz, P.C. for Luce. However, with respect to Georgine, Carabillo and Luce, it is unclear at this time why three separate law firms have been retained and what the necessity is for three separate law firms to be defending in light of the matter being at a preliminary stage.

Also, because the Carabillo I Counterclaim arises from or is related to the DOL investigation, Panel Counsel is required for the defense of this claim pursuant to Section 9 of the 01-02 Policy. In that regard, the only law firm retained by the Carabillo I Counterclaim Defendants that is on the Panel Counsel list is Baker Botts. Please arrange for Carabillo I Counterclaim Defendants Georgine, Carabillo and Luce to be represented by Baker Botts or indicate what actual conflict exists that prevents them from being represented collectively by one law firm. **In any event, please inform us as soon as possible which Panel Counsel law firm has been retained to collectively represent the Carabillo I Counterclaim Defendants. National Union does not consent to the retention of any non-panel law firm by the Carabillo I Counterclaim Defendants or the retention of more than one defense firm without the prior written consent of National Union.**

#188365v1

Ms. Allison Eisenberg
October 29, 2004
Page 8

Further, pursuant to Section 2(c) of the 01-02 Policy, "The Insured shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy." On that basis, please provide us with: i) a summary of defense counsel's billing rates, ii) the name of the lead attorney at the law firm assigned to this matter and a summary of that person's expertise and experience in handling ERISA lawsuits and iii) a list of the law firm's staff assigned to this matter and their respective titles. In the event there is any settlement offer or demand in this matter, please immediately provide full particulars to the undersigned and a copy of any document setting forth the proposal. National Union is entitled to a reasonable period of time to review, consider or participate in any settlement discussions prior to any settlement agreement being reached. Please also arrange for the Panel Counsel law firm that is ultimately retained by the Carabillo I Counterclaim Defendants to execute and return a copy of the Defense Counsel Guidelines that is enclosed herewith.

Also, please note that the coverage provided by the 01-02 Policy shall be excess of any other valid and collectible insurance. Please forward to us copies of any other insurance policies under which the Carabillo I Counterclaim Defendants have reported this Claim, along with any corresponding coverage letters received from such insurer(s).

AIGTS on behalf of National Union reserves all of National Union's rights, privileges and defenses under the Policy, the 01-02 Policy, at law and in equity. To the extent that discovery, new information or other developments may later indicate that other terms, conditions, provisions, exclusions or endorsements of the Policy and of the 01-02 Policy are applicable in addition to those mentioned above, National Union reserves the right to supplement this letter or its coverage defenses if circumstances so warrant. National Union reserves the right to allocate for any uncovered Carabillo I Counterclaim Defendants or for any uncovered causes of action asserted in the Carabillo I Counterclaim. National Union also reserves the right to deny coverage for this matter or to recover any payments made under the 01-02 Policy (including Defense Costs) if it is determined that all or part of this matter is not covered under the 01-02 Policy. In this regard, enclosed is a Reimbursement Agreement (the "Agreement") confirming that the Carabillo I Counterclaim Defendants' acknowledge and agree to return any sums paid under the 01-02 Policy to the extent it is determined by a neutral party that there is no coverage for the Carabillo I Counterclaim under the 01-02 Policy. Please arrange for the Carabillo I Counterclaim Defendants to execute the Agreement and return an executed original to the undersigned as soon as possible.

If you have any questions or comments concerning the above, please do not hesitate to contact us immediately. We await prompt receipt of the above requested information and thank

#188365v1

Ms. Allison Eisenberg
October 29, 2004
Page 9


you in advance for your assistance.

Very truly yours,

Samuel F. Paniccia

Enc. (Reimbursement Agreement; Defense Counsel Guidelines)

cc:     Mr. John K. Grelle     (without encs.)
        2556 Bridge Hill Lane
        Oakton, VA  22124-1140

        Mr. James W. Luce     (with encs.)
        10712 Milweed Drive
        Great Falls, VA  22066

        Mr. Joseph A. Carabillo     (with encs.)
        1543 Beehm Town Road
        Culpepper, VA  22701

        Mr. Robert A. Georgine     (with encs.)
        c/o Randall J. Turk, Esq.
        The Warner
        1299 Pennsylvania Ave., NW
        Washington, D.C.  20004-2400

# D'AMATO & LYNCH

### LAWYERS

:ORGE G. D'AMATO
KE O. LYNCH (1999)
NNETH A. SAGAT
KE D. LYNCH, JR.
·BERT E. KUSHNER
:HARD F. RUSSELL
·NALD H. ALENSTEIN
.RRY J. ARNOLD, JR.
.ILIP J. BERGAN
·BERT W. LANG
AL M. GLAZER
IDREW R. SIMMONDS
IHN P. HIGGINS
OMAS F. BREEN
.FRED A. D'AGOSTINO, JR.
.LLIAM P. LARSEN, III
·BERT D. LANG
.VID A. BOYAR
.RY JO BARRY
.RBARA R. SEYMOUR
.RVEY BARRISON

WILLIAM C. BURTON
CHARLES BRAMHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. MANIRE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
STEPHEN F. WILLIG
DEBORAH M. COLLINS
NEIL R. MORRISON
PETER A. STROILI
FRANCES BUCKLEY
DAVID J KUFFLER

LLOYD J. HERMAN
KEVIN P. CARROLL
LAURIE P. BEATUS
LIZA A. CHAFIIAN

70 PINE STREET

NEW YORK, N.Y. 10270-0110

TELEPHONE 212/269-0927
CABLE ADDRESS
DAMCOSH
TELEX 960085 DCOS UI NYK
TELECOPIER: 269-3559

LONDON OFFICE

LLOYD'S

ONE LIME STREET

LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7257

RICHARD S. TROSTLE
JAN H. DUFFALO
JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD M. ROTH
CHRISTINE TIERNEY
MARIA T. EHRLICH
THOMAS G. DARMODY
RICHARD F. FERRIGNO
HUMPHREY O. UDDOH
DEEANNA M. GALLA
JUDY Y. CHUNG
JOHN J. MAALOUF
R. DAVID ADES
ARTHUR STEINBERG
JONATHAN L. KRANZ
INGRID A. SMITH

ARTURO M. BOUTIN
THOMAS ZACHARIA
WENDY L. KALNICK
WILLIAM A. CURRAN, III
TAE S. UM
JOHN C. MUCCIFORI
ANNA E. BOMSTEIN
MOLLY Z. BROWN
MAXINE K. NAKAMURA
JAMES L. FUCHS
GERARDO LAPETINA
LAURA S. WEINER
DAVID BERGENFELD
EDWARD R. WILSON
JONATHAN ARKINS
JASON B. GRANT
JARED S. KAPLAN
GAVIN J. CURLEY
BRIAN M. MARGOLIES
BRYAN HA
ASSAF RONEN
ALEXANDER M. RAZI

COUNSEL

ROBERT M. MAKLA
ALBERT B. LEWIS
CHARLES H. WITHERWAX

VICTOR F. MUSTELIER
ROBERT GILROY
RICHARD G. McGAHREN
PETER J. THUMSER

November 29, 2004

<u>Via Facsimile (212) 504-5855</u>
<u>& U.S. Mail</u>
Ms. Allison Eisenberg
Frank Crystal & Company
40 Broad Street
New York, NY 10004

Re:   Employee Benefit Plan Fiduciary Liability Insurance
Insured:   Ullico Inc. and its Subsidiaries ("Ullico")
Matter :   Carabillo
A.I. File No.:  434-003952
Our File No.:  101-69615

Dear Ms. Eisenberg:

AIG Technical Services, Inc. ("AIGTS") on behalf of National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") has established a file to handle the above-referenced matter. Based upon the limited information National Union has received to date, the following will serve to set forth National Union's preliminary coverage position under the Policy after review of: (i) the answer and counterclaim styled as <u>Ullico, Inc., et al. v. Joseph A. Carabillo, et al.</u> filed on July 6, 2004 in response to the complaint filed by Joseph A. Carabillo ("Carabillo") on May 13, 2004 in the United States District Court, District of Columbia, case no. 04CV00776 ("Carabillo II Counterclaim").

National Union issued Employee Benefit Plan Fiduciary Liability Insurance under Policy No. 548-03-72 ("Policy") to Ullico. The Policy has a Policy Period of October 30, 2003 to October 30, 2004. The limit of liability is $5,000,000 in the aggregate for all Loss combined (including defense costs) and there is a $250,000 retention for each covered Claim under the Policy.[1]

---

[1] All capitalized terms shall have the meanings ascribed them by the Policy unless otherwise defined herein.

#188566v1

Ms. Allison Eisenberg
November 29, 2004
Page 2

### Carabillo II Counterclaim

Ullico filed the Carabillo II Counterclaim against Carabillo, Robert A. Georgine ("Georgine"), John K. Grelle ("Grelle") and James W. Luce ("Luce") (Carabillo, Georgine, Grelle and Luce are sometimes hereinafter collectively referred to as the Carabillo II Counterclaim Defendants). Ullico alleges that the Carabillo II Counterclaim Defendants breached their fiduciary duties to Ullico by amending the terms of the Ullico Inc. Pension Plan and Trust ("Qualified Plan") in order to increase the percentage of a participant's salary used to determine his normal retirement benefit. As members of Ullico's Benefits Committee which served as the plan administrator for all of Ullico's employee benefits plans, the Carabillo II Counterclaim Defendants allegedly breached their fiduciary duties to the Qualified Plan by engaging in a "settlor" function without proper authority from the company's board of directors. Ullico alleges that the Carabillo II Counterclaim Defendants dealt with the Qualified Plan and the Qualified Plan assets for their own benefit in violation of the terms of the Qualified Plan and in violation of ERISA.

Ullico asserts the following theories of liability in the Carabillo II Counterclaim: (1) Breach of Fiduciary Duty to the Qualified Plan; (2) Breach of Fiduciary Duty to the Welfare Plan; and (3) Breach of Fiduciary Duty with respect to the Auxillary Plan. Ullico seeks the following relief: (1) As to Count I, judgment against the Carabillo II Counterclaim Defendants in an amount to be determined at trial and a declaration that the amendments purportedly adopted by the Benefits Committee are invalid and unenforceable and a declaration that the Carabillo II Counterclaim Defendants breached their fiduciary duties to the Qualified Plan; (2) As to Count II, a declaration that the Carabillo II Counterclaim Defendants are not entitled to benefits under the Welfare Plan; (3) As to Count III, a declaration that the Carabillo II Counterclaim Defendants are not entitled to benefits under the Auxillary Plan; and (4) such other equitable relief as the court deems appropriate including set-offs, recoupments and constructive trusts in addition to attorneys fees and costs of suit.

### Coverage Evaluation for the Carabillo II Counterclaim

As an initial matter, it is our understanding that the Carabillo II Counterclaim was served upon the Carabillo II Counterclaim Defendants on July 28, 2004. On that basis, it would appear that the Carabillo II Counterclaim was made during the policy period of the Policy. However, with respect to the Carabillo II Counterclaim, Endorsement #12 of the Policy provides the following:

> It is understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with: (i) any **Claim(s)**, notices, events, investigations or actions referred to in any of items (1) through (3) below; (hereinafter "**Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Breach of Fiduciary Duty**, **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to any **Event(s)**:

Ms. Allison Eisenberg
November 29, 2004
Page 3

(1)     United States Department of Labor issued a subpoena relating to the
        DOL's investigation of investments in the Playa Vista land development
        (more specifically in the matter of an investigation of the Plumber &
        Pipefitters National Pension Fund, Bricklayers & Towel Trades
        International Pension Fund, National Electrical Benefit Fund, and
        Carpenters Pension Fund for Southern California as per subpoena dated
        April 25, 2002)

(2)     United States Department of Labor issued a subpoena directed to the
        ULLICO, Inc. relating to the investigation of ERISA covered plans that
        are eligible to purchase ULLICO, Inc. stock. (as per DOL subpoena dated
        April 11, 2002)

(3)     United States Department of Labor issued a subpoena to the ULLICO, Inc.
        Pension Plan and Trust relating to investigation being conducted by DOL
        to determine whether any person has violated or is about to violate any
        provision of Title I of the Employee Retirement Income Security Act of
        1974 (ERISA), 29 U.S. C. Section 1134 (a) (1). (as per DOL subpoena
        dated June 11, 2002)

(hereinafter the "**Events**")

It is further understood and agreed that the **Insurer** shall not be liable for any
**Loss** in connection with any **Claim(s)** alleging, arising out of, based upon,
attributable to or in any way related directly or indirectly, in part or in whole, to a
related **Breach of Fiduciary Duty** or related **Wrongful Act** alleged in any of the
items (1-3) above, regardless of whether or not such **Claim** involved the same or
different **Insureds**, the same or different legal causes of action, or the same or
different claimants, or is brought in the same or different venue, or resolved in the
same or different forum.

In that regard, please be advised that there is no coverage under the Policy for the Carabillo II
Counterclaim because the Carabillo II Counterclaim arises out of the Events (as that term is
defined in Endorsement #12 of the Policy). In particular, the Carabillo II Counterclaim involves
the defense of a Claim which arises out of or is related to the DOL subpoenas identified as
Events (2) and/or (3) of Endorsement #12. Therefore, there is no coverage for the Carabillo II
Counterclaim under the Policy on the basis of Endorsement # 12 of the Policy.

Notwithstanding the fact that the Carabillo II Counterclaim is not covered under the
Policy, the Notice/Claim Reporting Provisions of Section 8(b) of National Union Policy # 874-
44-03 ("01-02 Policy") serve to bring the Carabillo II Counterclaim within the period of the 01-
02 Policy. In that regard, Section 8(b) of the 01-02 Policy provides the following:

(b)     If written notice of a Claim has been given to the Insurer pursuant to Clause 8(a)
        above, then any Claim which is subsequently made against an Insured and

Ms. Allison Eisenberg
November 29, 2004
Page 4

reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

Since the Carabillo II Counterclaim constitutes a Claim alleging Wrongful Acts which are the same as or related to the Wrongful Acts alleged or contained in the DOL investigation, the Carabillo II Counterclaim will be considered to have been made when the DOL investigation matter was reported. Therefore, the Carabillo II Counterclaim will be handled as part of the DOL investigation matter reported to National Union under the 01-02 Policy on October 30, 2002 and for which reservation of rights letters were issued on January 15, 2003, August 6, 2003 and January 19, 2004, respectively (the "ROR letters"). The ROR letters are incorporated herein by reference and made a part hereof, and additional coverage issues are discussed later in this letter. Since the Carabillo II Counterclaim falls within the coverage provided by the 01-02 Policy, it is the provisions of that policy that will apply to the Carabillo II Counterclaim.

Please note that the 01-02 Policy defines Wrongful Act, in pertinent part, to mean: "(1) as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**." National Union reserves its rights to the extent that the Carabillo II Counterclaim Defendants engaged in a corporate or "settlor" act when they allegedly amended the terms of the Qualified Plan without proper authority from the company's board of directors.

Please also note the potential application of the following exclusions from the 01-02 Policy: Exclusion (a) of the Policy precludes coverage for "the gaining in fact of any profit or advantage to which an Insured was not legally entitled." To the extent that the Carabillo II Counterclaim matter uncovers activities that have resulted in the gaining of any profit or advantage or for restitution or disgorgement of amounts wrongfully withheld, Exclusion (a) would serve to preclude coverage for all payments made on account of such wrongdoing.

Exclusion (b) of the 01-02 Policy states that there will be no coverage for any Claim "arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute (including, but not limited to ERISA)."

Exclusion (e) of the 01-02 Policy precludes coverage for any Claim "alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation." In that regard, a lawsuit was filed by a participant and/or DOL in the Ironworkers Pension Plan against an individual named Jacob West, a trustee of that plan and a former Ullico director, as well as against other former Ullico directors. This <u>Ironworkers</u> lawsuit apparently led to the DOL investigations into Ullico. National Union reserves its rights to the

Ms. Allison Eisenberg
November 29, 2004
Page 5

extent that the Ironworkers lawsuit constitutes a pending or prior litigation under the terms of Exclusion (e) of the 01-02 Policy.

Exclusion (g) of the 01-02 Policy precludes coverage for any Claim "alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program other than a Plan as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program."

Exclusion (i) of the 01-02 Policy precludes coverage for any Claim "alleging, arising out of, based upon or attributable to any Wrongful Act as respects the Plan taking place at any time when the Sponsor Organization did not sponsor such Plan or when the Natural Person Insured was not a director, officer, partner or employee or the Sponsor Organization or a Plan."

Please be advised that the decision to amend the terms of the Qualified Plan may be a non-ERISA corporate act. The 01-02 Policy defines Wrongful Act, in pertinent part, to mean "as respects a Fiduciary, the Plan or the Sponsor Organization:  a violation of any of the responsibilities, obligations or duties imposed upon fiduciaries by ERISA; or any matter claimed against an Insured solely by reason of his, her or its status as a Fiduciary, the Plan or the Sponsor Organization, but only with respect to a Plan." In the instant matter, if the alleged Carabillo II Counterclaim Defendants' decision to amend the terms of the Qualified Plan was a corporate act, "settlor" act or act undertaken for the purpose of personally benefiting one or more Carabillo II Counterclaim Defendants, as opposed to a fiduciary act undertaken solely in such person's ERISA fiduciary capacity with respect to a covered plan, then there would be no coverage under the 01-02 Policy for the Carabillo II Counterclaim Defendants' non-ERISA fiduciary activities.

The Carabillo II Counterclaim Defendants may have been advised by legal and/or accounting professionals with respect to the alleged amendments made to the Qualified Plan. In that regard, the Carabillo II Counterclaim Defendants may be able to bring a subrogation claim against these legal and accounting professionals. Please advise whether any legal and/or accounting firms advised the Carabillo II Counterclaim Defendants in connection with the alleged amendments made to the Qualified Plan and, if so, advise if a tolling agreement has been entered into with these firms. Further, Clause 13 of the 01-02 Policy provides, in relevant part, that in the event of any payment under the 01-02 Policy, National Union shall be subrogated to the extent of such payment to all of the Insureds' rights of recovery thereof, and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights. National Union asks that the Carabillo II Counterclaim Defendants please take whatever steps are necessary to protect the Insureds' rights against any legal and accounting professionals to the extent any liability, if any, was caused by such entities' services to the Carabillo II Counterclaim Defendants. If there has been no tolling agreement entered into with these firms, National Union asks that the Carabillo II Counterclaim Defendants please undertake steps to obtain such tolling agreements and provide a copy of same to National Union for approval prior to execution.

Ms. Allison Eisenberg
November 29, 2004
Page 6

Also, the 01-02 Policy's definition of Loss does not include, among other things, "Benefits, or that portion of any settlement or award in an amount equal to such Benefits, unless and to the extent that recovery of such Benefits is based upon a covered Wrongful Act and is payable as a personal obligation of a Natural Person Insured."

Please be advised that pursuant to Section 2 of the 01-02 Policy entitled Defense Agreement, "the Insurer shall have both the right and duty to defend any Claim against an Insured alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent." The 01-02 Policy also provides, pursuant to its NOTICE provisions that the Insured may elect to assume the defense of the Claim, which we note has been in this instance. In such a case, the provisions of Section 2(b) of the 01-02 Policy shall apply, including National Union's right to effectively associate with the Carabillo II Counterclaim Defendants in the defense of the Claim.

National Union has been advised that the Carabillo II Counterclaim Defendants have retained the following law firms to serve as defense counsel in this matter. These law firms are: (1) Baker Botts LLP for Georgine; and (2) O'Melveny & Myers for Carabillo, Luce and Grelle. It is unclear at this time why two separate law firms have been retained and what the necessity is for two separate law firms to be defending in light of the matter being at a preliminary stage. Please arrange for Georgine to be represented by O'Melveny & Myers along with the other Carabillo II Counterclaim Defendants or indicate what actual conflict exists that prevents Georgine from being represented by O'Melveny & Myers.

Further, pursuant to Section 2(c) of the 01-02 Policy, "The Insured shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy." On that basis, please provide us with: i) a summary of defense counsel's billing rates, ii) the name of the lead attorney at the law firm assigned to this matter and a summary of that person's expertise and experience in handling ERISA lawsuits and iii) a list of the law firm's staff assigned to this matter and their respective titles. In the event there is any settlement offer or demand in this matter, please immediately provide full particulars to the undersigned and a copy of any document setting forth the proposal. National Union is entitled to a reasonable period of time to review, consider or participate in any settlement discussions prior to any settlement agreement being reached. Please also arrange for defense counsel to execute and return a copy of the Defense Counsel Guidelines that is enclosed herewith.

Also, please note that the coverage provided by the 01-02 Policy shall be excess of any other valid and collectible insurance. Please forward to us copies of any other insurance policies under which the Carabillo II Counterclaim Defendants have reported this Claim, along with any corresponding coverage letters received from such insurer(s).

AIGTS on behalf of National Union reserves all of National Union's rights, privileges and defenses under the Policy, the 01-02 Policy, at law and in equity. To the extent that discovery, new information or other developments may later indicate that other terms,

Ms. Allison Eisenberg
November 29, 2004
Page 7

conditions, provisions, exclusions or endorsements of the Policy and of the 01-02 Policy are applicable in addition to those mentioned above, National Union reserves the right to supplement this letter or its coverage defenses if circumstances so warrant. National Union reserves the right to allocate for any uncovered Carabillo II Counterclaim Defendants or for any uncovered causes of action asserted in the Carabillo II Counterclaim. National Union also reserves the right to deny coverage for this matter or to recover any payments made under the 01-02 Policy (including Defense Costs) if it is determined that all or part of this matter is not covered under the 01-02 Policy. In this regard, enclosed is a Reimbursement Agreement (the "Agreement") confirming that the Carabillo II Counterclaim Defendants' acknowledge and agree to return any sums paid under the 01-02 Policy to the extent it is determined by a neutral party that there is no coverage for the Carabillo II Counterclaim under the 01-02 Policy. Please arrange for the Carabillo II Counterclaim Defendants to execute the Agreement and return an executed original to the undersigned as soon as possible.

If you have any questions or comments concerning the above, please do not hesitate to contact us immediately. We await prompt receipt of the above requested information and thank you in advance for your assistance.

Very truly yours,

Samuel F. Paniccia

Samuel F. Paniccia

Enc. (Reimbursement Agreement; Defense Counsel Guidelines)

cc:    Mr. John K. Grelle    (with encs.)
       2556 Bridge Hill Lane
       Oakton, VA  22124-1140

       Mr. James W. Luce    (with encs.)
       10712 Milweed Drive
       Great Falls, VA  22066

       Mr. Joseph A. Carabillo        (with encs.)
       1543 Beahm Town Road
       P.O. Box 43
       Oak Park, VA  22730

       Mr. Robert A. Georgine        (with encs.)
       c/o Randall J. Turk
       Baker Botts
       The Warner
       1299 Pennsylvania Ave., NW
       Washington, D.C.  20004-2400

# D'AMATO & LYNCH

### LAWYERS

| | | | |
|---|---|---|---|
| GEORGE G. D'AMATO | WILLIAM C. BURTON | RICHARD S. TROSTLE | ARTURO H. BOUTIN |
| LUKE D. LYNCH [1999] | CHARLES BRAXHAM | JAN H. DUFFALO | THOMAS ZACHARIA |
| KENNETH A. SAGAT | BILL V. KAKOULLIS | JAMES E. TOLAN, II | WENDY L. KALNICK |
| LUKE D. LYNCH JR. | THOMAS W. HANLON | CATHERINE L. CASAVANT | WILLIAM A. CURRAN, II |
| ROBERT E. KUSHNER | JOHN H. FITZSIMONS | ROY CAPLINGER | TAE S. UN |
| RICHARD F. RUSSELL | MICHAEL L. MANIRE | ANNEMARIE J. MAZZONE | JOHN C. MUCCIFORI |
| RONALD H. ALENSTEIN | KEVIN J. WINDELS | EDWARD H. ROTH | ANNA E. BORNSTEIN |
| HARRY J. ARNOLD, JR. | SAMUEL F. PANICCIA | CHRISTINE TIERNEY | HOLLY Z. BROWN |
| PHILIP J. BERGAN | ROBERT S. FRASER | MARIA T. EHRLICH | MAXINE H. NAKAMURA |
| ROBERT W. LANG | STEPHEN F. WILLIG | THOMAS G. DARHOOY | JAMES L. FUCHS |
| NEAL M. GLAZER | DEBORAH M. COLLINS | RICHARD F. FERRIGNO | GERARDO LAPETINA |
| ANDREW R. SIMMONDS | NEIL R. MORRISON | HUMPHREY O. UDDOH | LAURA E. WENER |
| JOHN P. HIGGINS | PETER A. STROILI | DEEANNA M. GALLA | DAVID BERGENFELD |
| THOMAS F. BREEN | FRANCES BUCKLEY | JUDY Y. CHUNG | EDWARD R. WILSON |
| ALFRED A. D'AGOSTINO, JR. | DAVID J. KUFFLER | JOHN J. HAALOUF | JONATHAN ARKINS |
| WILLIAM P. LARSEN, III | | R. DAVID ADES | JASON B. GRANT |
| ROBERT D. LANG | | ARTHUR STEINBERG | JARED S. KAPLAN |
| DAVID A. BOYAR | LLOYD J. HERMAN | JONATHAN L. KRANZ | GAVIN J. CURLEY |
| MARY JO BARRY | KEVIN P. CARROLL | INGRID A. SMITH | BRIAN H. MARGOLIES |
| BARBARA R. SEYMOUR | LAURIE P. BEATUS | | BRYAN HA |
| HARVEY BARRISON | LIZA A. CHAFIIAN | | ASSAF RONEN |
| | | | ALEXANDER H. RAZI |

70 PINE STREET

NEW YORK, N.Y. 10270-0110

TELEPHONE 212/269-0927
CABLE ADDRESS
DAMCOSH
TELEX 960085 DCOS UI NYK
TELECOPIER: 269-3559

LONDON OFFICE

LLOYD'S

ONE LIME STREET

LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7257

COUNSEL

| | |
|---|---|
| ROBERT H. MAKLA | VICTOR F. MUSTELIER |
| ALBERT B. LEWIS | ROBERT ELROY |
| CHARLES H. WITHERWAX | RICHARD G. McGAHREN |
| PETER J. THUNSER | |

December 14, 2004

**Via Facsimile & U.S. Mail**          Fax No. (212) 504-5855

Ms. Allison Eisenberg
Frank Crystal & Company
40 Broad Street
New York, NY 10004

> Re:  Employee Benefit Plan Fiduciary Liability Insurance
>  Policy No.:   874-44-03 (the "01-02 Policy")
>  Insured:     Ullico Inc. and its Subsidiaries ("Ullico")
>  Matter :     Carabillo
>  A.I. File No.: 434-003376
>  Our File No.: 101-69615

Dear Ms. Eisenberg:

As you know, we have been retained by AIG Technical Services, Inc. ("AIGTS") on behalf of National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") in connection with the above-referenced matter. On October 29, 2004, we issued a letter setting forth National Union's preliminary coverage position under the 01-02 Policy for the amended answer and counterclaim styled as Ullico, Inc., et al. v. Joseph A. Carabillo, et al. filed on November 3, 2003 in response to the complaint filed by Joseph A. Carabillo on July 18, 2003 in the United States District Court, District of Columbia, case no. 03CV01556 ("Carabillo I Counterclaim"). In that regard, please allow this letter to supplement the October 29th letter, which is incorporated herein by reference and made a part hereof.

In the October 29th letter, National Union indicated, among other things, that (subject to satisfaction of the 01-02 Policy's retention and based upon the uncovered Counts and allegations asserted in the Carabillo I Counterclaim): (i) National Union would allocate 75% of any Loss associated with the defense by James W. Luce ("Luce") of the Carabillo I Counterclaim under

#191292v1

Ms. Allison Eisenberg
December 14, 2004
Page 2

the 01-02 Policy, with Luce to assume the other 25%; and (iv) there would be no coverage for
John K. Grelle ("Grelle") under the 01-02 Policy for the Carabillo I Counterclaim.

Please be advised that, upon further review of the Carabillo I Counterclaim, it appears
that the October 29th letter should have indicated that National Union would allocate: (i) two-
thirds of any Loss associated with Luce's defense of the Carabillo I Counterclaim under the 01-
02 Policy, with Luce to assume the other one-third; and (ii) 50% of any Loss associated with
Grelle's defense of the Carabillo I Counterclaim under the 01-02 Policy, with Grelle to assume
the other 50%. These revised calculations are based upon the existence of: (i) coverage for two
out of the three Counts alleged against Luce (Count 4 is not covered; Counts 6 and 7 are
covered); and (ii) coverage for two out of the four Counts alleged against Grelle (Counts 3 and
13 are not covered; Counts 6 and 9 are covered). Also, it has come to our attention that Count 4
of the Carabillo I Counterclaim (which was alleged against Luce only) was dismissed by the
District Court. Therefore (subject to the terms and conditions of the 01-02 Policy), Luce will be
entitled to full coverage from National Union under the 01-02 Policy for defense fees and
expenses associated with the Carabillo I Counterclaim because the remaining two Counts that are
alleged against him (Counts 6 and 7) are both covered.

National Union has been advised that Grelle has retained the law firm of Krupin O'Brien
to serve as defense counsel in this matter. In that regard, because the Carabillo I Counterclaim
arises from or is related to the DOL investigation matter that was reported under the 01-02 Policy
on October 30, 2002, Panel Counsel is required for the defense of this claim pursuant to Section
9 of the 01-02 Policy. Please arrange for Grelle to be represented by one of the Panel Counsel
law firms that is representing the other Carabillo I Counterclaim defendants or indicate what
actual conflict exists that prevents him from being represented by one of those law firms.
**National Union does not consent to the retention of any non-panel law firm by Grelle or the
retention of more than one defense firm without the prior written consent of National
Union.**

Further, pursuant to Section 2(c) of the 01-02 Policy, "The Insured shall not admit or
assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any
Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated
judgments and Defense Costs which have been consented to by the Insurer shall be recoverable
as Loss under the terms of this policy." On that basis, please provide us with: i) a summary of
defense counsel's billing rates, ii) the name of the lead attorney at the law firm assigned to this
matter and a summary of that person's expertise and experience in handling ERISA lawsuits and
iii) a list of the law firm's staff assigned to this matter and their respective titles. In the event
there is any settlement offer or demand in this matter, please immediately provide full particulars
to the undersigned and a copy of any document setting forth the proposal. National Union is
entitled to a reasonable period of time to review, consider or participate in any settlement
discussions prior to any settlement agreement being reached. Please also arrange for the Panel
Counsel law firm that is ultimately retained by Grelle to execute and return a copy of the
Defense Counsel Guidelines that is enclosed herewith.

#191292v1

Ms. Allison Eisenberg
December 14, 2004
Page 3

Also, please note that the coverage provided by the 01-02 Policy shall be excess of any other valid and collectible insurance. Please forward to us copies of any other insurance policies under which Grelle has reported this Claim, along with any corresponding coverage letters received from such insurer(s).

AIGTS on behalf of National Union reserves all of National Union's rights, privileges and defenses under the Policy, the 01-02 Policy, at law and in equity. To the extent that discovery, new information or other developments may later indicate that other terms, conditions, provisions, exclusions or endorsements of the Policy and of the 01-02 Policy are applicable in addition to those mentioned above, National Union reserves the right to supplement this letter or its coverage defenses if circumstances so warrant. National Union reserves the right to allocate for any uncovered causes of action asserted in the Carabillo I Counterclaim. National Union also reserves the right to deny coverage for this matter or to recover any payments made under the 01-02 Policy (including Defense Costs) if it is determined that all or part of this matter is not covered under the 01-02 Policy. In this regard, enclosed is a Reimbursement Agreement (the "Agreement") confirming that Grelle (along with the other Carabillo I Counterclaim defendants) acknowledge and agree to return any sums paid under the 01-02 Policy to the extent it is determined by a neutral party that there is no coverage for the Carabillo I Counterclaim under the 01-02 Policy. Please arrange for Grelle (along with the other Carabillo I Counterclaim defendants) to execute the Agreement and return an executed original to the undersigned as soon as possible.

If you have any questions or comments concerning the above, please do not hesitate to contact us immediately. We await prompt receipt of the above requested information and thank you in advance for your assistance.

Very truly yours,

Samuel F. Paniccia

Enc. (Reimbursement Agreement; Defense Counsel Guidelines)

cc:     Mr. John K. Grelle     (with encs.)
        2556 Bridge Hill Lane
        Oakton, VA  22124-1140

        Mr. James W. Luce     (with encs.)
        10712 Milweed Drive
        Great Falls, VA  22066

        Mr. Joseph A. Carabillo     (with encs.)
        1543 Beahm Town Road
        P.O. Box 43
        Oak Park, VA  22730

#191292v1

Ms. Allison Eisenberg
December 14, 2004
Page 4

        Mr. Robert A. Georgine        (with encs.)
        c/o Randall J. Turk, Esq.
        Baker Botts
        The Warner
        1299 Pennsylvania Ave., NW
        Washington, D.C.  20004-2400

#191292v1

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| John K. Grelle | National Union Fire Insurance Company of Pittsburgh, P.A. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF         88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)         88888
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Timothy C. Lynch
Eric J. Pelletier
Offit Kurman, P.A.
8171 Maple Lawn Blvd.
Suite 200
Maple Lawn, Maryland 20759
443-738-1500

ATTORNEYS (IF KNOWN)

---

| II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY) |
|---|

○ 1 U.S. Government Plaintiff

⦿ 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**          **OR**          ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊙ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☒ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. 2201 and 2202; This action seeks a declaratory judgment determining liability of Defendant.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS<br>ACTION UNDER F.R.C.P. 23 | **DEMAND $** 750,000<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE 4/26/07    SIGNATURE OF ATTORNEY OF RECORD _[signature]_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.